No. 25-1791

# United States Court of Appeals
# for the Federal Circuit

---

SAMSUNG DISPLAY CO., LTD.

*Appellant*

v.

INTERNATIONAL TRADE COMMISSION

*Appellee*

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD.

*Intervenor*

---

Appeal from the United States International Trade Commission,
Investigation No. 337-TA-1351

---

## PRINCIPAL BRIEF OF APPELLANT SAMSUNG DISPLAY CO., LTD. (NON-CONFIDENTIAL)

---

Robert A. Long
Richard L. Rainey
Jeffrey H. Lerner
Tarek J. Austin
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Brian G. Bieluch
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800

*Counsel for Appellant Samsung Display Co., Ltd.*

August 15, 2025

## EXEMPLARY PATENT CLAIMS AT ISSUE

**U.S. Patent No. 7,414,599 (Appx273-274) (Excerpted)**

15. A pixel circuit in an organic light emitting device, comprising:

a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied; […]

a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, […]

a fifth transistor including a gate to which the current light-emitting signal is applied, […]

a capacitor in which one terminal of the capacitor is coupled to the gate of the second transistor and a power supply voltage is applied to the other terminal of the capacitor.

**U.S. Patent No. 9,818,803 (Appx286-287) (Excerpted)**

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:

a plurality of pixels for displaying an image on the OLED display and comprising […]

wherein the first pixel is configured to emit green light.

**U.S. Patent No. 11,594,578 (Appx302) (Excerpted)**

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising […]

wherein the […] pixels are configured to emit different color lights […].

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1791

**Short Case Caption** Samsung Display Co., Ltd. v. ITC

**Filing Party/Entity** Samsung Display Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/15/2025

Signature: /s/ Tarek J. Austin

Name: Tarek J. Austin

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Samsung Display Co., Ltd. | | Samsung SDI Co., Ltd. |
| | | Samsung Electronics Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable              ☑    Additional pages attached

| See additional page attached | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)      ☐    No      ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

| | | |
|---|---|---|
| | | |

**Attachment**

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in the court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Covington & Burling LLP: Jessica C. Hill, Paul J. Wilson, Derek J. Andros, Natalie M. Ritchie (no longer with Covington), Kee Young Lee, Scott C. Burger, Yong Joon Kwon, Allyson C. Corigliano, Amy Bond, Michael K. Plimack, Scott A. Schrader, Philip A. Irwin, Jesse Chang, Shara L. Aranoff, Matthew A. Kudzin, Lucas Moench, William Meyer, Jia Hui Jiang (no longer with Covington).

Quinn Emanuel Urquhart & Sullivan, LLP: S. Alex Lasher, K. Kevin Chu, Mike Doman, Marc L. Kaplan, D. James Pak, Landon Smith, Jacqueline Wu.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES ........................................................................ iii

TABLE OF ABBREVIATIONS .......................................................... viii

STATEMENT OF RELATED CASES ..................................................... ix

STATEMENT OF JURISDICTION ......................................................... x

INTRODUCTION ....................................................................................... 1

STATEMENT OF THE ISSUES ............................................................... 4

STATEMENT OF THE CASE ................................................................... 4

I.     SAMSUNG DISPLAY'S INNOVATIONS IN AMOLED DISPLAY TECHNOLOGY ................................................................................ 4

II.    EXPLOITATION OF SAMSUNG DISPLAY'S PATENTED TECHNOLOGY IN THE UNITED STATES ................................. 7

     A.    Development of the Displays and Integration into the Smartphones ........................................................................... 8

     B.    Connection Between the Displays and the Smartphones ................. 10

     C.    U.S. Investments in the Displays and Smartphones .......................... 11

III.   COPYING OF SAMSUNG DISPLAY'S INVENTIONS .......................... 12

IV.   SECTION 337'S DOMESTIC INDUSTRY REQUIREMENT ................. 14

V.     PROCEDURAL HISTORY ........................................................ 15

     A.    Samsung Display's Domestic Industry Case ..................................... 17

     B.    The ALJ's Initial Determination ........................................................ 19

     C.    The Commission's Opinion .............................................................. 22

SUMMARY OF THE ARGUMENT .................................................... 26

i

ARGUMENT ................................................................................ 28

STANDARD OF REVIEW ........................................................ 28

I.   THE GALAXY DI PRODUCTS ARE "ARTICLES PROTECTED BY THE PATENT" UNDER SECTION 337(A)(3).................................. 29

     A.   The Galaxy DI Products Are "Articles Protected by the Patent" Under This Court's Precedent. ............................................. 30

     B.   The Plain Meaning of "Articles Protected by the Patent" Is Material Things Covered or Shielded by the Patent. ......................... 32

     C.   The Statutory Context Confirms that Products Containing Authorized Patented Components Are "Articles Protected by the Patent." ......................................................................... 37

     D.   The Legislative History Supports a Broad Interpretation of the Statutory Language.............................................................. 41

     E.   The Commission Lacks a Basis to Rewrite the Statute. .................... 44

II.  ALTERNATIVELY, SEA'S INVESTMENTS IN THE GALAXY DI PRODUCTS ARE "WITH RESPECT TO" THE ARTICLES PROTECTED BY THE PATENT UNDER SECTION 337(A)(3). ............ 46

     A.   Investments Are "with Respect to" Protected Articles if They Have a Connection with Such Articles. ............................................. 47

     B.   Investments in the Galaxy DI Products Are "with Respect to" the Display Panels in the AMOLED DI Products............................ 49

     C.   The *Magnetic Tapes* Test Is Untethered to the Statute. .................... 54

     D.   The *Magnetic Tapes* Test Is Yielding Inconsistent Outcomes. ......... 59

CONCLUSION ......................................................................... 62

ADDENDUM

CERTIFICATE OF CONFIDENTIAL MATERIAL

CERTIFICATE OF COMPLIANCE

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 1, 3, 11, and 18 indicates the dollar amounts of third parties' investments in the United States. The material omitted on pages 8 and 58 indicates the time period of Samsung Display's development process for certain products. The material omitted on pages 19 and 23 identifies Samsung Display product models that are representative of other product models with respect to certain technical features.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003) ............................................................31

*Bayer AG v. Housey Pharms., Inc.,*
  340 F.3d 1367 (Fed. Cir. 2003) ......................................................33, 34

*Broadcom Corp. v. Int'l Trade Comm'n,*
  28 F.4th 240 (Fed. Cir. 2022) ..................................................26, 30, 31

*Certain Elec. Computing Devices,*
  Inv. No. 337-TA-1387, Initial Determ., 2024 WL 4692094 (Oct. 2,
  2024), *aff'd on review*, Comm'n Notice, 2024 WL 4922006 (Nov.
  1, 2024) ...............................................................................................18

*Certain Integrated Circuits & Prods. Containing the Same,*
  Inv. No. 337-TA-1148 (Int'l Trade Comm'n) ......................................38

*Certain Magnetic Tape Cartridges & Components Thereof,*
  Inv. No. 337-TA-1058, Comm'n Op., 2019 WL 2635509 (Apr. 9,
  2019) ............................................................................................*passim*

*Certain Microfluidic Sys. & Components Thereof & Prods.*
  *Containing Same,*
  Inv. No. 337-TA-1100, Comm'n Det., 2020 WL 1504738 (Mar.
  24, 2020) .............................................................................................39

*Certain Mobile Phones and Tablet Computs.,*
  Inv. No. 337-TA-1301, Initial Determ., 2022 WL 3573803 (Aug.
  8, 2022), *not reviewed in relevant part*, Comm'n Notice, 2022 WL
  4236601 (Sept. 9, 2022)......................................................................19

*Certain Mobile Tels., Tablet Computs. with Cellular Connectivity, &*
  *Smart Watches with Cellular Connectivity, Components Thereof,*
  *& Prods. Containing Same,*
  Inv. No. 337-TA-1299 (Int'l Trade Comm'n) ......................................38

*Certain Organic Light-Emitting Diode Display Modules*,
  Inv. No. 337-TA-1378, Initial Determ. (Public Version), EDIS
  Doc. ID 859309 (July 11, 2025) ......................................................... 13, 19

*Certain Video Capable Elec. Devices*,
  Inv. No. 337-TA-1379, Comm'n Notice, 2025 WL 1250782 (Apr.
  22, 2025) .................................................................................................. 61

*Certain Video Capable Elec. Devices*,
  Inv. No. 337-TA-1380, Comm'n Notice, 2025 WL 857710 (Feb.
  27, 2025) .................................................................................................. 60

*Certain Video Capable Elec. Devices*,
  Inv. No. 337-TA-1380, Comm'n Notice, 2025 WL 1250809 (Apr.
  23, 2025) .................................................................................................. 61

*Certain Video Capable Elec. Devices*,
  Inv. No. 337-TA-1380, Initial Determ., 2024 WL 5378885 (Dec.
  20, 2024) .................................................................................................. 61

*Certain Video Capable Elect. Devices*,
  Inv. No. 337-TA-1379, Initial Determ., 2025 WL 689508 (Jan. 29,
  2025), *not reviewed*, Comm'n Notice, 2025 WL 1250782 (Apr. 22,
  2025) ................................................................................................... 18, 61

*ClearCorrect Operating, LLC v. Int'l Trade Comm'n*,
  810 F.3d 1283 (Fed. Cir. 2015) ........................................... 34, 37, 41

*Coventry Health Care of Mo., Inc. v. Nevils*,
  581 U.S. 87 (2017) ................................................................................ 48

*Crocs, Inc. v. Int'l Trade Comm'n*,
  598 F.3d 1294 (Fed. Cir. 2010) ................................................... 31, 34

*Dolly, Inc. v. Spalding & Evenflo Cos.*,
  16 F.3d 394 (Fed. Cir. 1994) ............................................................. 39

*Eli Lilly & Co. v. Hospira, Inc.*,
  933 F.3d 1320 (Fed. Cir. 2019) ......................................................... 39

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ......................................................... 36

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n,*
   707 F.3d 1295 (Fed. Cir. 2013) ..................................................*passim*

*Lamar, Archer & Cofrin, Llp v. Appling,*
   584 U.S. 709 (2018).............................................................47, 48, 53

*Lamie v. United States,*
   540 U.S. 526 (2004)...................................................................46

*Lashify, Inc. v. Int'l Trade Comm'n,*
   130 F.4th 948 (Fed. Cir. 2025) ..................................................*passim*

*Loper Bright Enter. v. Raimondo,*
   603 U.S. 369 (2024)..............................................................29, 32

*Mianyang BOE Optoelectronics Tech. Co. et al. v. Samsung Display Co.,*
   No. IPR2023-00941, Paper No. 68 (P.T.A.B. Dec. 6, 2024) ...........................16

*Mianyang BOE Optoelectronics Tech. Co. et al. v. Samsung Display Co.,*
   No. IPR2023-00987, Paper No. 46 (P.T.A.B. Jan. 6, 2025) ............................16

*Mianyang BOE Optoelectronics Tech. Co. et al. v. Samsung Display Co.,*
   No. IPR2023-01075, Paper No. 46 (P.T.A.B. Jan. 6, 2025) ............................16

*Microsoft Corp. v. Int'l Trade Comm'n,*
   731 F.3d 1354 (Fed. Cir. 2013) ...........................................24, 31, 34

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992)..............................................................47, 48

*Motorola Mobility, LLC v. Int'l Trade Comm'n,*
   737 F.3d 1345 (Fed. Cir. 2013) ...........................................48, 51, 52

*Philip Morris Prods. S.A. v. Int'l Trade Comm'n,*
   63 F.4th 1328 (Fed. Cir. 2023) ...........................................29, 36, 37

*Ratzlaf v. United States,*
   510 U.S. 135 (1994).................................................................41

*Roku, Inc. v. Int'l Trade Comm'n*,
    90 F.4th 1367 (Fed. Cir. 2024) ...........................................................28

*Samsung Elecs. Co. v. Apple Inc.*,
    580 U.S. 53 (2016)...............................................................................33

*Stiftung v. Renishaw PLC*,
    945 F.2d 1173 (Fed. Cir. 1991) ..........................................................40

*Sullivan v. Stroop*,
    496 U.S. 478 (1990)..............................................................................34

*SunTiger, Inc. v. Sci. Rsch. Funding Grp.*,
    189 F.3d 1327 (Fed. Cir. 1999) ..........................................................39

*Suprema, Inc. v. Int'l Trade Comm'n*,
    796 F.3d 1338 (Fed. Cir. 2015) .......................................38, 41, 42, 43

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..........................................................36

*Todd Constr., L.P. v. United States*,
    656 F.3d 1306 (Fed. Cir. 2011) ..........................................................47

*United States v. Tohono*,
    563 U.S. 307 (2011)........................................................................48, 49

*US Synthetic Corp. v. Int'l Trade Comm'n*,
    128 F.4th 1272 (Fed. Cir. 2025) .........................................................28

*Williams v. Taylor*,
    529 U.S. 420 (2000)..............................................................................33

*Zircon Corp. v. Int'l Trade Comm'n*,
    101 F.4th 817 (Fed. Cir. 2024) ...............................................3, 26, 31

**Statutes**

5 U.S.C. § 706(2)(A)......................................................................................28

19 U.S.C. § 1337(a)(1)...............................................................................1, 37

19 U.S.C. § 1337(a)(2)...........................................................................*passim*

19 U.S.C. § 1337(a)(3)..................................................................*passim*

19 U.S.C. § 1337(c) ...........................................................................28

19 U.S.C. § 1337(d) ............................................................................1

35 U.S.C. § 271(g) ............................................................................34

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-
    418, § 1342, 102 Stat. 1107 (1988) .................................33, 34, 44, 49

**Other Authorities**

Black's Law Dictionary (5th ed. 1979) .....................................33, 35, 47

H.R. Rep. No. 99-581 (1985)...................................................................42

H.R. Rep. No. 100-40 (1987)...........................................................*passim*

H.R. Rep. No. 100-576 (1988)...............................................................41

S. Rep. No. 100-71 (1987) .............................................................*passim*

J. Stormonth, A Dictionary of the English Language (1885) .................................33

Webster's New Twentieth Century Dictionary of the English
    Language (2d ed. 1977) ........................................................35, 47, 48

Webster's Third New International Dictionary of the English
    Language (1976) ...........................................................................35

Webster's Third New International Dictionary of the English
    Language (1986) ...........................................................................33

U.S. ITC, *Section 337 Investigations – Answers to Frequently Asked
    Questions*, Pub. No. 4105 (Int'l Trade Comm'n Mar. 2009) ...........................23

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '578 Patent | U.S. Patent No. 11,594,578 |
| '599 Patent | U.S. Patent No. 7,414,599 |
| '803 Patent | U.S. Patent No. 9,818,803 |
| AMOLED | Active Matrix Organic Light-Emitting Diode |
| AMOLED DI Products | The Samsung Display display modules identified at Appx65507-65509, QA19 |
| Asserted Claims | Claims 5, 10, 17, 40, 41, and 47 of the '578 Patent; Claims 2, 3, 13, 15, and 16 of the '599 Patent; Claims 5 and 21 of the '803 Patent |
| Asserted Patents | '578, '599, and '803 Patents |
| BOE | Mianyang BOE Optoelectronics Technology Co., Ltd. |
| DI Products | AMOLED DI Products and Galaxy DI Products |
| Galaxy DI Products | The following Samsung smartphones: Galaxy S20, Galaxy S20+, Galaxy S20 Ultra, Galaxy S20 FE, Galaxy S21, Galaxy S21+, Galaxy S21 Ultra, Galaxy S21 FE, Galaxy S22, Galaxy S22+, Galaxy S22 Ultra, Galaxy S23, Galaxy S23+, Galaxy S23 Ultra, Galaxy Z Fold 2, Galaxy Z Fold 3, Galaxy Z Fold 4, Galaxy Z Flip 3, Galaxy Z Flip 4 (*see* Appx65507-65509, QA19) |
| LCD | Liquid Crystal Display |
| Pixel Circuit Patent | '599 Patent |
| "Samsung Display" or "SDC" | Samsung Display Co., Ltd. |
| SEA | Samsung Electronics America |
| SEC | Samsung Electronics Co., Ltd. |
| Diamond Pixel Patents | '578 and '803 Patents |
| SDAL | Samsung Display America Lab |
| UDC | Universal Display Corporation |

**STATEMENT OF RELATED CASES**

No other appeal from Investigation No. 337-TA-1351 (the "Investigation") was previously before this or any other appellate court.

U.S. Patent Nos. 7,414,599 (the "'599 Patent"), 9,818,803 (the "'803 Patent"), and 11,594,578 (the "'578 Patent") at issue in this appeal are also asserted in *Samsung Display Co. v. BOE Tech. Grp. Co. et al.*, Case No. 1:25-cv-00908-RDA-LRV (E.D. Va.). That case is stayed pending resolution of this appeal and any further proceedings before the Commission. *See id.*, Dkt. 7 (June 25, 2025).

The patentability of the claims of the '599, '803, and '578 Patents at issue in this appeal is at issue in consolidated cases nos. 25-1426, 25-1517, 25-1519, and 25-1520 (Fed. Cir.), which are pending before this Court and have been designated as companion cases to this appeal. *See* Dkt. 14.

ix

## STATEMENT OF JURISDICTION

The Commission has statutory authority to conduct Investigation No. 337-TA-1351 pursuant to 19 U.S.C. § 1337(a)(1)(B). Appx12; Appx66. On March 19, 2025, the Commission issued its Opinion and Final Determination, finding no violation of § 337 and terminating the investigation. Appx1-32. Samsung Display timely petitioned for review on May 14, 2025. Dkt. 1-2. This Court has jurisdiction pursuant to 19 U.S.C. § 1337(c) and 28 U.S.C. § 1295(a)(6).

**CONFIDENTIAL MATERIAL OMITTED**

## INTRODUCTION

The Commission found Samsung Display's patents valid and infringed but granted no relief based on its conclusion that there is no industry in the United States "relating to the articles protected by the patent." The Commission's finding of no domestic industry rests on legal error and should be reversed or at least vacated.

Samsung Display pioneered active-matrix organic light-emitting diode ("AMOLED") display technology, which millions of Americans now use every day. Samsung Display collaborates with its corporate affiliates to bring to the U.S. market Samsung Galaxy smartphones that rely on its displays as critical components, resulting in ▮amount▮ of ▮amount▮ of dollars' worth of domestic investments and employment each year. Because its inventions are subject to rampant copying and even trade secret misappropriation by Chinese manufacturers who produce knock-off displays in China and supply them as replacement parts to U.S. distributors, Samsung Display sought relief from the Commission to preserve the value of its U.S. intellectual property and protect the U.S. industry that its innovations support.

The Commission is empowered to exclude from entry into the United States "articles that … infringe a valid and enforceable United States patent" if there exists "an industry in the United States, relating to the articles protected by the patent." 19 U.S.C. § 1337(a)(1)-(2), (d). Here, the Commission found widespread infringement and rejected respondents' invalidity challenges, but it granted no

remedy because it determined that the domestic industry requirement was not satisfied. The Commission refused to credit the investments of Samsung Electronics America—Samsung Display's U.S. affiliate—in patent-practicing smartphones, based on its conclusion that the investments were not "with respect to the articles protected by the patent" under Section 337(a)(3).

The Commission committed two fundamental legal errors. *First*, it construed the statutory phrase "articles protected by the patent" as limited to the smallest class of products that practice the patent (display panels), exclusive of downstream products (smartphones containing such panels), even though the asserted patents were expressly found to read on the smartphones. *Second*, it applied a legally incorrect understanding of the statutory phrase "[investment/employment] … *with respect to the articles protected by the patent*," interpreting that provision as requiring an evaluation of the investment/employment's connection to the *patented technology* (the invention) rather than the *articles protected by the patent* (the products that practice the invention). In both instances, the Commission ignored the statutory text's plain meaning and impermissibly narrowed its scope.

The Commission committed the same type of legal error—reading limitations into the domestic industry requirement that find no support in the statutory language—earlier this year, when it incorrectly interpreted Section 337(a)(3) as excluding reliance on certain types of employment. *See Lashify, Inc. v. Int'l Trade*

*Comm'n*, 130 F.4th 948 (Fed. Cir. 2025), *reh'g denied*, No. 23-1245, Dkt. 128 (June 25, 2025). Exercising its "independent judgment" in assessing "the correctness of that interpretation," *id.* at 957, this Court concluded that the Commission's narrow reading was "contrary to the [statutory] provision's language," which covers any "employment of labor or capital" "without any limitation" and with "no carveout," *id.* at 958.

The same is true here: the Commission's restrictive understanding of the phrase "articles protected by the patent"—cabining it to the smallest class of patent-practicing articles—contravenes Section 337's plain text. The Commission's position is even more untenable than in *Lashify* because this Court has already construed the clause at issue and held that it encompasses any articles "covered by" the asserted patent or patents. *E.g.*, *Zircon Corp. v. Int'l Trade Comm'n*, 101 F.4th 817, 824 (Fed. Cir. 2024) (quoting *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1297-98 (Fed. Cir. 2013)). Thus, the Commission's interpretation contravenes not only the statutory language but also this Court's settled precedent.

Because the Commission erred in declining to credit ▮amount▮ of ▮amount▮ of dollars of domestic investments, this Court should reverse. At a minimum, it should vacate and remand for a reevaluation of whether the economic prong of the domestic industry requirement has been satisfied.

## STATEMENT OF THE ISSUES

1.    Whether smartphones that practice a patent through their displays are "articles protected by the patent" under 19 U.S.C. § 1337(a)(2)-(3).

2.    Alternatively, whether investments in smartphones containing customized displays without which the smartphones would be inoperable are investments "with respect to" those displays under 19 U.S.C. § 1337(a)(3).

## STATEMENT OF THE CASE

## I.    SAMSUNG DISPLAY'S INNOVATIONS IN AMOLED DISPLAY TECHNOLOGY

Samsung Display pioneered AMOLED display technology, which millions of Americans now use on a daily basis. Appx65504, QA10; Appx65557-65558, QA132; Appx66216, QA12-16. Manufacturers originally dismissed the prospects of AMOLED displays, viewed as too technologically challenging and not competitive with prevailing liquid crystal display ("LCD") technology. Appx65807-65813, QA701-708;  Appx65814-65815,  QA713;  Appx65955-65957,  QA441-445; Appx65966-65968,  QA458-460;  Appx65970-65971,  QA463.  As a result of Samsung Display's award-winning inventions, AMOLED displays have attained widespread commercial adoption and become the displays of choice for high-end mobile devices. Appx65808-65811, QA702-704; Appx65813-65814, QA709-712; Appx65842, QA18; Appx65855-65856, QA58-61; Appx65969-65970, QA461-462; Appx66216-66219, QA15-37; Appx77023-77037. The patents at issue in this case

are directed to novel AMOLED display features that enabled Samsung Display and its affiliates to bring to U.S. consumers flagship smartphones containing state-of-the-art display technology. Appx65507, QA18; Appx65557-65559, QA132.

The '578 Patent and the '803 Patent (the "Diamond Pixel Patents") claim novel pixel arrangement structures in AMOLED displays. Appx283, 1:16-18; Appx286-287; Appx298, 1:21-23; Appx302-307. The patents contemplate incorporation of the claimed displays into devices such as mobile phones, specifying that the claimed structures are configured to display images on the display by emitting light. Appx286-287, cl. 1 ("A pixel arrangement structure of an … OLED[] display, comprising: a plurality of pixels for displaying an image on the OLED display … wherein the first pixel is configured to emit green light[.]"); Appx302, cl. 1 ("A pixel arrangement structure of an … OLED[] display … wherein the … pixels are configured to emit different color lights[.]"). As Samsung Display's expert explained, "to emit light and produce … images," the displays "need to be integrated into a device such as a mobile device that supplies inputs such as power, data …, and other signals." Appx65595, QA27-28; Appx284, 3:58-61 (specification describing use of power lines to drive pixels); Appx60364-60366, 330:11-332:13.

The claimed pixel arrangements' benefits—smaller display thickness and weight, lower power consumption, higher luminance and resolution, and improved image quality and manufacturing—are critical advantages for smartphones and other

portable devices that present significant size constraints. Appx283, 1:21-28; Appx298, 1:29-35; Appx300, 5:26-36, 6:41-52; Appx301, 7:22-34, 8:4-16, 8:47-59; Appx65591-65592, QA17; Appx65594-65595, QA26, QA29; Appx67279-67288, 28:15-37:13; Appx67325-67326, 74:25-75:13; Appx67370-67371, 119:7-120:1.

The '599 Patent (the "Pixel Circuit Patent") claims novel AMOLED display pixel circuits. Appx269, 1:16-21; Appx272-274. Like the Diamond Pixel Patents, the Pixel Circuit Patent contemplates incorporation of the claimed displays into devices such as mobile phones, specifying that the claimed circuits receive inputs (image data and voltage signals) necessary for the pixels to emit light. Appx273, cl. 15 ("A pixel circuit in an organic light emitting device, comprising: a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied … a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied[.]"); Appx271, 6:11-16 (specification referencing use of "power lines"). As Samsung Display's expert explained, "the pixel circuits of the '599 Patent require input signals from a device such as a mobile phone," and those signals "originate from, or are created in response to, signals from the mobile device." Appx65855, QA58; Appx65859, QA70; Appx67464-67465, 88:24-89:2.

As with the Diamond Pixel Patents, the claimed pixel circuits' benefits— smaller circuitry footprint, reduced number of scan lines, reduced cost and

complexity, improved aperture ratio, and self-compensation built into the circuit—are particularly important for relatively small mobile devices such as smartphones. Appx270, 3:44-48; Appx65855-65856, QA60-61; Appx65858-65859, QA69; Appx67450-67453, 74:10-77:4; Appx67480-67481, 104:3-105:17.

## II.    EXPLOITATION OF SAMSUNG DISPLAY'S PATENTED TECHNOLOGY IN THE UNITED STATES

Samsung Display collaborates with its parent company Samsung Electronics ("SEC") and SEC's U.S. subsidiary Samsung Electronics America ("SEA") to develop and bring to the U.S. market cutting-edge Samsung Galaxy Series smartphones containing Samsung Display's displays. Appx65513-65514, QA33-34; Appx66216, QA10-11; Appx66221, QA55, 58-60. The domestic industry products at issue in this case are specific Samsung Galaxy smartphone models (the "Galaxy DI Products"), each of which contains an AMOLED display module specifically developed and manufactured by Samsung Display for that particular smartphone (the "AMOLED DI Products"). Appx66250-66251, QA9-10 (providing chart mapping each Galaxy DI Product to its corresponding AMOLED DI Product(s)); Appx65507-65509, QA19-20. Each display module consists of a display panel (the screen) that contains the patented pixel arrangements and circuits, combined with other components including "a flex circuit, bonding ICs, software, a polarizer, optical clear adhesive, radiator film, and a back film." Appx21; Appx7593.

CONFIDENTIAL MATERIAL OMITTED

## A.    Development of the Displays and Integration into the Smartphones

The Galaxy DI Products and their associated AMOLED DI Products are the fruit of close and sustained collaboration between Samsung Display and its affiliates.

Samsung Display designs the AMOLED DI Products at its research centers in the United States, Japan, and Korea. Appx66252, QA14. Each display undergoes a lengthy "custom-design and custom-manufacture" process. Appx66249, QA8; *see* Appx66252-66257, QA15-40 (describing ███ time period ███ development process after receipt of technical specifications from SEC); Appx60646-60648, 611:20-613:3; Appx75696; Appx75703 (describing how Samsung Display and SEC worked as "One Team" to develop world's first foldable AMOLED display); Appx66179-66181, QA7-10; Appx60502-60503, 468:24-469:14; Appx60650-60651, 615:7-616:19. Both the display panel and other components of the display module are customized. *See, e.g.*, Appx66252-66253, QA16-17 (describing custom-design of "display panel" to "meet[] the criteria included in the RFQ," including "technical requirements … such as size, performance, power consumption, resolution (pixels per inch), refresh rate, and form factor"); Appx66256, QA34 (explaining that specification details "the form factor of the … display module" and "how the frames and inputs/cables for the OLED display modules are customized to fit the specific smartphone model"); Appx75271-75273 (illustrating customization of panel's pixel arrangement); Appx75333 (illustrating customization of panel

8

features including dimensions, resolution, and spacing); Appx75695; Appx75699-75700 (illustrating customization of panel features including organic materials, pixel driving technology, and bent curvature and angle); Appx73594; Appx73616-73620 (exemplary specification detailing panel feature and performance requirements including thickness, size, and luminance).

Samsung Display manufactures the display panels in South Korea, assembles them into display modules in Vietnam and China, and sells the modules to SEC for integration into the Galaxy DI Products in Vietnam. Appx11; Appx66252, QA13; Appx66179, QA4-5; Appx66181, QA12. SEC then sells to SEA, for importation into and commercialization in the United States, (i) Galaxy DI Products containing the AMOLED DI Products, and (ii) standalone AMOLED DI Products as replacement parts for the Galaxy DI Products. Appx11; Appx65514, QA34; Appx60600-60601, 565:25-566:4. SEA also relays consumer feedback on the smartphones' displays. Appx60585-60586, 550:21-551:5; Appx60601, 566:5-8.

To support this collaboration in development and commercialization of the Galaxy DI Products containing its displays, Samsung Display has authorized and impliedly licensed SEC and SEA to practice its patents with respect to those products. Appx65514, QA35; Appx66221-66222, QA55-64; Appx60604, 569:6-19.

### B.    Connection Between the Displays and the Smartphones

The AMOLED DI Products are essential components of the Galaxy DI Products in two ways. Appx211; Appx66249, QA7; Appx65510, QA24. *First*, the displays are fundamental components that provide central and critical functionality, in contrast to peripheral components that are not vital for the smartphones to serve their core functions. Appx65510, QA24; Appx65849, QA39. The display "is the interface through which the user interacts with the smartphone" and utilizes the device's functionality through graphical display and touch interaction. Appx65849, QA39; Appx60506-60507, 472:20-473:7; Appx60515, 481:5-10. Simply put, a smartphone without its display is "not operable." Appx65849, QA39; Appx66249, QA7; Appx60365-60366, 331:20-332:3; Appx60586-60587, 551:9-552:10.

*Second*, unlike off-the-shelf components, each display model has an exclusive operational relationship with its corresponding Galaxy DI Product model. Appx66249, QA8. The displays and the smartphones are "completely customized" for one another, from the panel level to the module level. Appx60586, 551:15-17; *supra* Section II.A. Each display cannot function without being incorporated into— and can only be used in—the specific smartphone model for which it was designed. Appx65849, QA38-39; Appx66249-66252, QA8-12; Appx65509, QA21. Accordingly, the displays are sold on an exclusive basis by Samsung Display to SEC for integration into their corresponding smartphones, whether as original parts or as

replacement parts. Appx66249, QA6; Appx66252, QA12; Appx66179, QA6; Appx65510, QA23. Even when sold as a replacement part, a given display is only capable of being used in its corresponding smartphone. Appx65510, QA23. Thus, exploitation of the AMOLED DI Products requires commercialization of the Galaxy DI Products. Appx65849, QA38-39; Appx65858-65859, QA69-70; Appx65594-65595, QA26-28; Appx65510-65511, QA24-26; Appx65512, QA31; Appx60484-60485, 450:23-451:1; Appx60513-60514, 479:10-480:9. Similarly, each Galaxy DI Product is sold and designed to work exclusively with, and is unable to function without, its corresponding AMOLED DI Product. Appx211; Appx65849, QA39; Appx66251-66252, QA10-12; Appx60586-60587, 551:9-552:10 (non-customized displays, including LCD and other non-AMOLED displays, cannot be used with the Galaxy DI Products).

### C.    U.S. Investments in the Displays and Smartphones

SEA invests ▮amount▮ of ▮amount▮ of dollars annually in activities in the United States devoted to developing, commercializing, and servicing the Galaxy DI Products containing Samsung Display's displays. Appx65532, QA76 (summarizing investments of approximately ▮dollar amount▮ from 2020 to 2022[1]); Appx65515, QA38

---

[1] This figure significantly understates SEA's investments because it does not account for sales and marketing activities, which this Court recently held are cognizable categories of investment for establishing a domestic industry. *See infra* Section V.A.

(identifying SEA's activities); Appx65513-65532, QA33-76 (detailing the activities and amounts invested); Appx75890-75892; Appx60585-60586, 550:21-551:5; Appx60601, 566:5-8. SEA's investments are critical to the successful commercialization of the Galaxy DI Products in the U.S. market. *See* Appx61558, 49:17-21; Appx61561, 52:12-15; Appx61594, 85:14-18; Appx61598-61599, 89:22-90:3; Appx61602, 93:7-13; Appx61605-61606, 96:22-97:3; Appx61609, 100:18-21; Appx65517, QA44; Appx65519, QA49; Appx65520, QA53; Appx65522, QA59; Appx65524, QA63; Appx65525, QA67; Appx60508, 474:10-22.

Two additional entities perform important activities in the United States related to the Galaxy DI Products. Samsung Display America Lab ("SDAL"), Samsung Display's U.S. research arm located in San Jose, California, conducts R&D projects that inform the development and manufacture of the AMOLED DI Products. Appx65533-65535, QA77-81; Appx65544, QA99; Appx66157-66166, QA33-66. Universal Display Corporation ("UDC"), headquartered in Ewing, New Jersey, develops and manufactures the light-emitting materials used in the displays. Appx65544-65546, QA100-102; Appx65548-65554, QA113-124.

## III.    COPYING OF SAMSUNG DISPLAY'S INVENTIONS

Samsung Display's patented innovations in AMOLED display technology are subject to rampant copying by Chinese display manufacturers, including state-

sponsored entity Mianyang BOE Optoelectronics Technology Co., Ltd. ("BOE")—a respondent in the proceedings before the Commission and intervenor in this appeal.

BOE began systematically tearing down and reverse-engineering Samsung Display's AMOLED displays in 2011 and has been marketing copies implementing the patented structures ever since it released its first AMOLED display in 2015. *See* Appx65815-65820, QA714-721; Appx65958-65965, QA446-456; Appx71901-71902; Appx71432-71437. BOE was recently found to have misappropriated six separate categories of Samsung Display trade secrets in connection with the manufacturing of its displays. *See Certain Organic Light-Emitting Diode Display Modules*, Inv. No. 337-TA-1378, Initial Determ. (Public Version), EDIS Doc. ID 859309, at 8-9, 33-319 (July 11, 2025).

BOE and other manufacturers produce their knock-off displays in China and supply them as replacement parts to the U.S. market through opaque supply chains. *See* Appx11724, 18:6-23; Appx11726, 20:14-19; Appx11734, 28:9-14; Appx64272, 27:16-20; Appx64286-64287, 41:3-42:11; Appx65965-65966, QA457. Distributors employ various stratagems to conceal the provenance of the displays, including using intermediaries, generic packaging, non-functional QR codes, and operating under fictitious business names. *See, e.g.*, Appx75919-75920; Appx76020; Appx76089; Appx76845; Appx62071-62073, 134:15-136:15; Appx64305, 60:8-20.

Samsung Display sought relief from the Commission to preserve the value of its intellectual property and protect the large U.S. industry its inventions support.

## IV.   SECTION 337'S DOMESTIC INDUSTRY REQUIREMENT

In patent-based Section 337 investigations, the complainant must establish that "an industry in the United States, relating to the articles protected by the patent … exists or is in the process of being established." 19 U.S.C. § 1337(a)(2).

"[T]he domestic industry requirement … ha[s] two 'prongs': the 'economic prong,' which requires that there be an industry in the United States, and the 'technical prong,' which requires that the industry relate to articles protected by the patent." *InterDigital*, 707 F.3d at 1298. For the economic prong, Section 337(a)(3) identifies three independently sufficient bases for considering the required industry to exist in the United States:

> [A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent ... concerned –
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). "For the technical prong, the question is essentially the same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Lashify*, 130 F.4th at 954 (internal quotation marks omitted).

14

In applying Section 337(a)'s domestic industry requirement, the Commission follows a "principle that the domestic industry is defined by the patented article" or "the article covered by the patent claims," except that it sometimes also credits investments in "unpatented" articles found to be "'central to enabling' exploitation of the article covered by the patent claims." *See Certain Magnetic Tape Cartridges & Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op., 2019 WL 2635509, at *31, *32 (Apr. 9, 2019). The Commission applies a three-factor test (known as the *Magnetic Tapes* test) to determine whether investments in unpatented articles have a sufficient connection to "the patented technology" to be credited. *Id.* at *31. The factors are: "[1] whether the patented technology is sold as a separate entity or article of commerce; [2] whether it is an essential component of the downstream product; and [3] whether the domestic industry activities have a direct relationship to exploitation of the patented technology." *Id.* The Commission applies this test as part of its economic-prong analysis. *Id.* at *26, *30-36.

To date, this Court has not assessed the *Magnetic Tapes* test's congruence with the terms of Section 337(a)(2)-(3).

## V.    PROCEDURAL HISTORY

The Commission instituted its investigation in January 2023 based on a complaint Samsung Display filed in December 2022. Appx377-536; Appx7536-7552; Appx7592-7596. The Complaint alleged violations of Section 337 in the

importation, sale for importation, or sale after importation into the United States of AMOLED display panels and modules that are used as replacement displays and infringe U.S. patents owned by Samsung Display. Appx408-409; Appx424-425; Appx435-497.[2] It named as respondents more than a dozen companies that sell replacement parts for mobile devices in the United States—the "distributor" respondents. Appx408; Appx411-424. Shortly after institution, the ALJ granted BOE's motion to intervene as a respondent. Appx3. Ten respondents defaulted and two were removed after settlement, leaving BOE and three distributors as active respondents. Appx4. The evidentiary hearing was held in July 2024. Appx6.

The ALJ issued its Final Initial Determination in November 2024. Appx40-260. The ALJ found widespread infringement of the Asserted Patents and rejected the respondents' invalidity challenges. Appx230-231.[3] However, the ALJ concluded

---

[2] Samsung Display originally asserted the '803, '683, '599, and '593 Patents, Appx3, later amended the Complaint to assert the '578 Patent, Appx4, and subsequently withdrew the '683 Patent, Appx4. Samsung Display is not appealing the Commission's finding of no violation for the '593 Patent. Appx7. Accordingly, three patents are at issue on appeal: the '599, '578, and '803 Patents, collectively referenced herein as the "Asserted Patents." Appx9.

[3] In parallel *inter partes* review proceedings initiated by BOE, the PTAB upheld the validity of all asserted claims of the '599 and '578 Patents and one of the two asserted claims of the '803 Patent. *See Mianyang BOE Optoelectronics Tech. Co. et al. v. Samsung Display Co.*, No. IPR2023-00987, Paper No. 46 at 2 (P.T.A.B. Jan. 6, 2025); *Mianyang BOE Optoelectronics Tech. Co. et al. v. Samsung Display Co.*, No. IPR2023-01075, Paper No. 46 at 2 (P.T.A.B. Jan. 6, 2025); *Mianyang BOE Optoelectronics Tech. Co. et al. v. Samsung Display Co.*, No. IPR2023-00941, Paper No. 68 at 2 (P.T.A.B. Dec. 6, 2024). Those determinations are on appeal. *See supra* Statement of Related Cases.

that Samsung Display had failed to establish the existence of a domestic industry relating to the Asserted Patents and on that basis found no violation of Section 337. Appx231; Appx257. The Commission affirmed the ID's finding of no domestic industry and terminated the investigation. Appx12-31; Appx38.

The pertinent background for the issues presented on appeal follows.

### A.    Samsung Display's Domestic Industry Case

Samsung Display identified two sets of "articles protected by the patent[s]": the Galaxy DI Products and the AMOLED DI Products, which it defined collectively as the "Domestic Industry Products" or "DI Products." Appx45880-45881; Appx65507-65509, QA19-20; Appx68571-68572; Appx68900-68901.

For the technical prong of the domestic industry requirement, Samsung Display established that all DI Products are protected by the Asserted Patents by showing that they all practice the Asserted Claims. Appx45895; Appx45898; Appx45900; Appx45907; Appx45988-46009; Appx46116-46151; Appx68632-68642; Appx68922; Appx68940-68942.

For the economic prong, Samsung Display argued that a domestic industry exists under prongs A and B of Section 337(a)(3) based on investments[4] by SEA,

---

[4] In the proceedings below (and herein), Samsung Display used the shorthand "investments" to reference both "investment in plant and equipment" under prong A and "employment of labor or capital" under prong B of Section 337(a)(3).

CONFIDENTIAL MATERIAL OMITTED

SDAL, and UDC, "when considered individually by entity and when considered together." Appx46331; Appx46306-46331; Appx65505-65506, QA13; Appx68732-68750; Appx68961-68966. Samsung Display presented evidence of over ▮dollar amount▮ invested by SEA in the Galaxy DI Products, over ▮dollar amount▮ invested by SDAL in the AMOLED DI Products, and over ▮dollar amount▮ invested by UDC in the AMOLED DI Products. Appx46306-46331; Appx68732-68750; Appx68961-68966. Samsung Display conservatively excluded investments relating to sales and marketing based on Commission precedent that this Court subsequently overturned in *Lashify* earlier this year. *See* Appx46307; Appx68741; Appx68963; Appx61593-61594, 84:14-85:13; Appx61656-61658, 147:2-149:4; *Lashify*, 130 F.4th at 963 (holding that employment of labor or capital "in sales, marketing, warehousing, quality control, [and] distribution" constitutes "qualifying expenses").

The Commission has repeatedly found in other investigations that SEA's domestic investments in Galaxy smartphones are sufficiently "significant" to satisfy the economic prong of the domestic industry requirement. *See Certain Video Capable Elect. Devices*, Inv. No. 337-TA-1379, Initial Determ., 2025 WL 689508, at *10, *53, *63-66 (Jan. 29, 2025), *not reviewed*, Comm'n Notice, 2025 WL 1250782, at *3 (Apr. 22, 2025) (economic prong satisfied by SEA's investments in Galaxy smartphones under Prongs A and B); *Certain Elec. Computing Devices*, Inv. No. 337-TA-1387, Initial Determ., 2024 WL 4692094, at *3-8 (Oct. 2, 2024), *aff'd*

CONFIDENTIAL MATERIAL OMITTED

*on review*, Comm'n Notice, 2024 WL 4922006, at *1 (Nov. 1, 2024) (same); *Certain Mobile Phones and Tablet Computs.*, Inv. No. 337-TA-1301, Initial Determ., 2022 WL 3573803, at *5, *12-17 (Aug. 8, 2022) (same under Prong A), *not reviewed in relevant part*, Comm'n Notice, 2022 WL 4236601, at *4 (Sept. 9, 2022). In addition, although SDAL's investments are not at issue in this appeal, its investments in OLED display research and development were recently found to satisfy prong A of the domestic industry requirement's economic prong. *See Certain Organic Light-Emitting Diode Display Modules*, Inv. No. 337-TA-1378, Initial Determ. (Public Version), EDIS Doc. ID 859309, at 323, 326-27, 338-42 (July 11, 2025).

## B.    The ALJ's Initial Determination

The ALJ recognized that Section 337's domestic industry requirement comprises "an economic prong and a technical prong." Appx73-75.

As to the technical prong, the ALJ found that all (Galaxy and AMOLED) DI Products practice the Asserted Patents because they meet all limitations of at least one claim of each patent. Appx109 ("[T]he evidence shows that the Galaxy ▇▇▇▇, ▇▇▇▇, and Galaxy ▇▇▇▇ practice claim 21 [of the '803 Patent]."); Appx148 ("[T]he evidence shows that the Galaxy ▇▇▇ and ▇▇▇ practice claims 5, 10, and 17 of the '578 patent and that the Galaxy ▇▇▇ practices claims 10 and 17."); Appx180 ("[T]he evidence shows that the ▇▇▇, …, and ▇▇▇ practice claim 15 and that the ▇▇▇, and … practice claim 16 [of the '599 Patent]."); Appx204

19

n.48 ("I found that each of the representative DI Products practiced at least one claim of the '803, '578, and '599 patents."). On that basis, the ALJ concluded that "the technical prong is met" for each patent. Appx107-109; Appx146-148; Appx177-180; Appx230-231.

As to the economic prong, rather than proceed to evaluate the significance of domestic investments in the DI Products found to practice the Asserted Patents, the ALJ found it necessary to first "defin[e] the relevant domestic industry." Appx205. Because no party "argue[d] … that it is inappropriate to establish a domestic industry based on the AMOLED DI Products," the ALJ treated investments in those articles as cognizable domestic industry investments, without further analysis. Appx205 & n.49. Turning to the Galaxy DI Products, the ALJ applied the *Magnetic Tapes* test to determine whether investments in those articles were cognizable investments "with respect to the articles protected by the patent." Appx207-221.

As to the first *Magnetic Tapes* factor ("whether the patented technology is sold as a separate entity or article of commerce") (Appx207-208), the ALJ found that "the AMOLED DI Products" embodying the patented technology "are sold as separate articles of commerce" because Samsung Display sells them to SEC and SEC incorporates some of them into the Galaxy DI Products while supplying others to SEA for sale as replacement screens. Appx208-209. The ALJ considered this factor neutral insofar as Commission jurisprudence suggested that "essential[ity]" of

20

a "downstream product" to a "patented product" is the "determinative" consideration. Appx209-210.

As to the second factor ("whether it [the patented technology] is an essential component of the downstream product") (Appx208), the ALJ found that "the AMOLED DI Products are essential components of the Galaxy DI Products" because "the AMOLED DI Products are customized to work in the Galaxy DI Products and … the Galaxy DI Products are unable to function without the displays." Appx210-211. The ALJ rejected "Respondents' argument that other displays can be used in place of AMOLED displays," explaining that no record evidence "shows that either LCD or OLED displays are actually used in place of the AMOLED DI Products in the Galaxy DI Products" and reasoning that the mere "theoretical[] possib[ility]" that "the Galaxy DI Products could be modified to operate with different displays" does not negate the essentiality of the existing customized components. Appx211.

As to the third factor ("whether the domestic industry activities have a direct relationship to exploitation of the patented technology") (Appx208), the ALJ acknowledged (i) the fact that the AMOLED DI Products cannot function without being incorporated into the Galaxy DI Products, and (ii) Commission guidance that "[i]f a patented article … cannot function on its own without a non-patented product, … then the non-patented product necessarily has a direct relationship to the

21

exploitation of the patented technology." Appx211-212 (quoting *Magnetic Tapes*, 2019 WL 2635509, at *35). However, the ALJ found that "some" of SEA's investments in the Galaxy DI Products "appear to be far removed from the patented technology" and concluded that Samsung Display had failed to demonstrate how each investment "relate[s] to the exploitation of the patented technologies." Appx212-216.

The ALJ treated the third factor as "the most important" and concluded that "the realities of the marketplace" did not "warrant extending the domestic industry analysis to the downstream product." Appx217-218. The ALJ proceeded to only evaluate domestic investments in the AMOLED DI Products and determined that they were not sufficiently significant. Appx220-230.

## C.    The Commission's Opinion

As relevant for this appeal, Samsung Display argued in its petition for review (i) that, based on a correct application of the *Magnetic Tapes* framework, SEA's investments in the Galaxy DI Products are properly considered investments "with respect to the articles protected by the patent," Appx70072-70111, and (ii) that, setting aside the *Magnetic Tapes* framework, because the Galaxy DI Products "contain the patented technology and practice the Asserted Patents," they are themselves "articles protected by the patent" "[u]nder the plain text of Section 337," Appx70111-70112. Samsung Display further argued that, although the ID did

CONFIDENTIAL MATERIAL OMITTED

not evaluate the significance of SEA's investments (based on its erroneous finding that the Galaxy DI Products are not "articles protected by the patent"), the developed record warrants finding those investments significant—as the Commission has done in other investigations. Appx70112-70125; *see supra* at 18-19.[5]

The Commission reviewed the ID's technical-prong findings as to the '803 Patent (but not the '578 and '599 Patents) and the ID's economic-prong findings. Appx37-38; Appx70784. Other than confirming whether the ALJ had been appraised that the '803 Patent was the subject of an *inter partes* review, the Commission did not request additional briefing on these issues. Appx16; Appx70784-70785.

As to the technical prong, the Commission "affirm[ed] the ID's finding that representative AMOLED display panels, which are incorporated into display modules, that are used in the Galaxy ▮name▮, Galaxy ▮name▮ and Galaxy ▮name▮ products practice claim 21 of the '803 patent." Appx13-14. The ID's unreviewed findings that the Galaxy DI Products practice the '578 and '599 Patents became Commission determinations. *See* U.S. ITC, *Section 337 Investigations – Answers to*

_____

[5] Samsung Display did not seek review of the ID's findings that SDAL's and UDC's investments in the AMOLED DI Products were not significant on their own but argued that those investments, taken together with SEA's independently significant investments in the Galaxy DI Products, supported finding the economic prong satisfied. Appx70124-70125.

*Frequently Asked Questions*, Pub. No. 4105, at 23 (Int'l Trade Comm'n Mar. 2009) ("Those portions of the ID that are not reviewed by the Commission become the Commission's determination."), *accessible at* https://www.usitc.gov/intellectual_property/documents/337_faqs.pdf (last accessed on Aug. 15, 2025); *see also Microsoft Corp. v. Int'l Trade Comm'n*, 731 F.3d 1354, 1358 (Fed. Cir. 2013) ("The Commission reviewed the ALJ's decision in part, allowing the unreviewed parts … to become Commission determinations.").

Turning to the economic prong, the Commission "affirm[ed] the ID's finding that SEA's investments in the Galaxy DI Products are not investments with respect to articles protected by the patents." Appx17; Appx17-31. The Commission did not explicitly address Samsung Display's argument that the Galaxy DI Products are "articles protected by the patent" because they practice the Asserted Patents. Instead, the Commission treated the generic concept of a display panel containing the claimed pixel structures as "the patented technology or patented article," Appx18, since "the technology of the Asserted Patents concerns particular structural features of an OLED display panel," Appx20, and then applied its *Magnetic Tapes* test to assess whether SEA's investments in the Galaxy DI Products have a sufficient connection to "the patented technology or patented article" to be said to "'relat[e] to' or [be] 'with respect to' the articles protected by the asserted patents," Appx18. *See id.* (describing inquiry as "whether the realities of the marketplace support

finding that investments other than in the patented technology or patented article may be considered investments 'with respect to articles protected by the patent'").

As to the first factor, the Commission affirmed the ID's finding that the AMOLED DI Products are separate articles of commerce but found that this "weighs against considering investments in the Galaxy DI Products as investments with respect to articles protected by the patents." Appx22-25. The Commission accepted that the AMOLED DI Products—including their display panels and even those panels' pixel arrangements—are customized for the Galaxy DI Products, Appx23 (noting that the "diamond pixel arrangement … would be customized for each Smartphone"), but rejected Samsung Display's argument that "the Galaxy DI Products provide the *only* avenue for the AMOLED DI Products to … exploit the benefits of the Asserted Patents," Appx22. The purported basis for its conclusion was that Samsung Display separately sells to other U.S. customers *other* display panels that, while separately customized for those other customers, contain similar pixel arrangements and pixel circuits that also practice the Asserted Patents. Appx23 (emphasizing that "[the] customization work is not unique between SDC and SEC" and that "the patented technology … is sold separately to other customers").

As to the second factor, the Commission found that "*a display* is essential to the Galaxy DI Products" but reasoned that "the patented technology in particular is not essential to the Galaxy DI Products" given the ALJ's finding that, "in theory,"

25

one could "modif[y]" "unpatented displays, *e.g.*, LCD or OLED displays, [to] be used in place of SDC's patented displays." Appx25-28.

As to the third factor, the Commission "affirm[ed] the ID's finding that the domestic activities performed by SEA for the Galaxy DI Products are far removed from the patented technologies." Appx28. The Commission emphasized that "the majority of SEA's activities relate to ensuring the imported phones can operate" rather than "customization of SDC's display panel or the AMOLED DI Products to ensure compatibility with the Galaxy DI Products." *Id.*

Weighing the factors, the Commission concluded that "none of SEA's domestic activities related to the Galaxy DI Products are with respect to articles protected by the Asserted Patents," and affirmed the ID's finding of no domestic industry without evaluating the significance of SEA's investments. Appx31.

## SUMMARY OF THE ARGUMENT

Section 337 requires complainants to demonstrate the existence of "an industry in the United States, relating to the articles protected by the patent," which it defines as significant levels of domestic investment or employment "with respect to the articles protected by the patent." 19 U.S.C. § 1337(a)(2)-(3).

This Court consistently has construed "articles protected by the patent" to encompass any products "covered by"—*i.e.*, products that "practice"—the patent or patents asserted in an investigation. *Zircon*, 101 F.4th at 824; *Broadcom Corp. v.*

*Int'l Trade Comm'n*, 28 F.4th 240, 250 (Fed. Cir. 2022); *infra* at 31. The Samsung Galaxy smartphones are covered by or practice the Asserted Patents because their displays meet all limitations of the Asserted Claims. Therefore, SEA's investments in those smartphones are cognizable domestic industry investments under Section 337(a)(3). In holding otherwise, the Commission effectively limited the statutory phrase "articles protected by the patent" to *the smallest class of* patent-practicing products: the smartphones' display panels. The Commission's unduly narrow interpretation contravenes this Court's precedent, the plain meaning of the statutory text, black-letter principles of patent law, and Congressional guidance.

Even assuming for the sake of argument that the display panels used in the Galaxy DI Products were the only "articles protected by the patent," SEA's domestic investments in the smartphones would still be cognizable investments under the statute's plain terms. The statute refers broadly to an industry "*relating to* the articles protected by the patent" and to investments "*with respect to* the articles protected by the patent" and thus reaches not only investments *in* the protected articles but also investments *connected to* those articles. SEA's investments in smartphones containing custom display panels are plainly connected to the panels within the meaning of Section 337(a)(3) because the panels are constituent parts of the smartphones, or in the alternative because the panels indisputably are significant and customized components of the smartphones. In applying its *Magnetic Tapes* test to

27

find SEA's investments not creditable, the Commission committed a fundamental legal error: It analyzed the connection between the investments and the *patented technology* rather than the *protected articles*, as the statute expressly requires.

In sum, the Commission legally erred in failing to credit SEA's domestic investments in the Galaxy smartphones. Because the Commission has found those same investments sufficient to establish a domestic industry in other investigations, this Court should reverse. Alternatively, it should vacate and remand for a reevaluation of whether the domestic industry requirement has been satisfied.

## ARGUMENT

## STANDARD OF REVIEW

This Court "review[s] the Commission's final determinations under the standards of the Administrative Procedure Act," 5 U.S.C. § 706(2)(A). *US Synthetic Corp. v. Int'l Trade Comm'n*, 128 F.4th 1272, 1281 (Fed. Cir. 2025); 19 U.S.C. § 1337(c). "Whether a complainant has satisfied the domestic industry requirement generally involves mixed questions of law and fact, reviewed de novo and for substantial evidence, respectively." *Roku, Inc. v. Int'l Trade Comm'n*, 90 F.4th 1367, 1372 (Fed. Cir. 2024).

The questions presented regarding the proper construction of Section 337(a)'s clauses "industry … relating to the articles protected by the patent" and "[investment/employment] with respect to the articles protected by the patent" are

statutory interpretation issues that call for de novo review. *See Philip Morris Prods. S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1341 (Fed. Cir. 2023) ("Statutory interpretation presents a question of law, which we review de novo."). This Court "exercise[s] … 'independent judgment'" in resolving such issues, without deference to the Commission. *Lashify*, 130 F. 4th at 957 (quoting *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 412 (2024)).

## I.    THE GALAXY DI PRODUCTS ARE "ARTICLES PROTECTED BY THE PATENT" UNDER SECTION 337(A)(3).

Because the Galaxy DI Products practice (*i.e.*, are covered by) the Asserted Patents, they are "articles protected by the patent" under the plain terms of Section 337(a)(2)-(3) and SEA's investments in those smartphones are "with respect to the articles protected by the patent" under the plain terms of Section 337(a)(3). The Commission's *Magnetic Tapes* test—designed to evaluate whether investments in *non-patent-practicing* articles (*i.e.*, articles *not* covered by the patent) have a sufficient connection to patent-practicing articles to be considered investments "with respect to" the latter articles, Appx18 & n.15—is inapposite here. By nevertheless applying that test to investments in smartphones that were found to themselves practice the Asserted Patents, the Commission effectively construed the statutory phrase "articles protected by the patent" as limited to *the smallest class of* patent-practicing articles or articles covered by the patent—the display panels used

29

in the smartphones. Such a narrow interpretation is foreclosed by this Court's precedent and contravenes Section 337(a)'s plain text and purpose.

### A. The Galaxy DI Products Are "Articles Protected by the Patent" Under This Court's Precedent.

Statutory interpretation begins with the statutory text. *See Lashify*, 130 F.4th at 958 ("The statutory language is the starting point for analysis and typically controls the outcome."). In this case, this Court has already examined and construed the statutory phrase at issue.

The Court has explained that the issue of what products qualify as "articles protected by the patent" within the meaning of Section 337(a)(2)-(3) is analyzed under the technical prong of the domestic industry requirement: The technical-prong inquiry determines whether a product (relied upon to establish the existence of a domestic industry) is an "article[] protected by the patent," whereas the economic-prong inquiry determines whether domestic investments or employment with respect to that product are sufficiently "significant" or "substantial" to constitute an "industry." *Broadcom Corp. v. Int'l Trade Comm'n*, 28 F.4th 240, 249-50 (Fed. Cir. 2022) ("[T]he technical prong … requires a complainant to identify actual 'articles protected by the patent.' To meet the economic prong, the complainant must demonstrate that its investment in the protected article is 'significant' or 'substantial.'"); *InterDigital*, 707 F.3d at 1298 ("[T]he domestic industry requirement … ha[s] two 'prongs': the 'economic prong,' which requires that there

be an industry in the United States, and the 'technical prong,' which requires that the industry relate to articles protected by the patent."); *Lashify*, 130 F.4th at 954 (same).

In defining the technical-prong inquiry, this Court consistently has construed "articles protected by the patent" to mean products "covered by"—*i.e.*, products that "practice"—the patent. *Zircon*, 101 F.4th at 824 (quoting *InterDigital*, 707 F.3d at 1297-98); *Broadcom*, 28 F.4th 250 ("We have previously found that, in order to meet the technical requirement of Section 337, a complainant must 'show that there is a domestic industry product that actually practices' at least one claim of the asserted patent.") (quoting *Microsoft*, 731 F.3d at 1362); *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1306-07 (Fed. Cir. 2010) ("[T]he technical prong requires proof that the patent claims cover the articles of manufacture that establish the domestic industry."); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1376 (Fed. Cir. 2003).

That settled precedent straightforwardly resolves this appeal. The Galaxy DI Products are covered by—*i.e.*, practice—the Asserted Patents because they meet all limitations of at least one claim of each patent, as the ID found in its technical-prong analysis, *see supra* at 19-20.[6] Therefore, the Galaxy DI Products are "articles protected by the patent" for purposes of the economic prong as well.

---

[6] Before the Commission, Respondents challenged the exclusion of testimony relating to the technical prong for the '599 Patent but did not challenge the ID's (continued…)

31

The Commission's understanding of the clause "articles protected by the patent" as excluding downstream products that practice patents through one of their components is irreconcilable with—and must yield to—this Court's longstanding holding that the clause encompasses any products that are covered by the patent. *See Loper Bright*, 603 U.S. at 400-01 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").

**B.     The Plain Meaning of "Articles Protected by the Patent" Is Material Things Covered or Shielded by the Patent.**

This Court's construction of "articles protected by the patent" as "products covered by the patent" or "products that practice the patent" aligns with the plain meaning of the statutory text.

The text is "straightforward[]." *Lashify*, 130 F.4th at 958. Section 337 states that "an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent … concerned," significant investment or employment of the enumerated types. 19 U.S.C. § 1337(a)(3). On its face, the provision encompasses any identified "articles protected" by the "concerned" patent (*i.e.*, the asserted patent or patents),

---

technical-prong findings as to the '803 and '578 Patents. *See* Appx70184-70211. The Commission affirmed the ID's technical-prong findings as to the '803 Patent and did not review its findings as to the '578 and '599 Patents. *Supra* at 23-24. The ID's unreviewed findings thus became Commission determinations. *Id.*

"without any limitation" on an article's position in the supply chain, *Lashify*, 130 F.4th at 958, nor any "carveout" of articles that contain unpatented features in addition to the patented features, *id.*

"The terms ['articles'] and ['protected'], which are not given a definition in the statute, carry their ordinary meaning in [the statute's] context as of 1988, the time of enactment." *Id.* at 959; *see* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1212-13 (1988) (cited in *Lashify*, 130 F.4th at 957); *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1371 (Fed. Cir. 2003) ("When interpreting statutory language, 'words of a statute are given their ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import." (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000))). "Dictionaries of the English language provide the ordinary meaning of words used in statutes." *Bayer*, 340 F.3d at 1371.

An article is "a material thing." *Article*, Webster's Third New International Dictionary of the English Language 123 (1986) ("a material thing: item, object"); *Article*, Black's Law Dictionary (5th ed. 1979) ("A particular object or substance, a material thing or class of things. Material or tangible object."); *see also Samsung Elecs. Co. v. Apple Inc.*, 580 U.S. 53, 59 (2016) ("An 'article' is just 'a particular thing.'" (quoting J. Stormonth, A Dictionary of the English Language 53 (1885))).

This Court exhaustively analyzed the meaning of "'articles' as described in 19 U.S.C. § 1337(a)" and concluded that "Congress's unambiguously expressed intent was for 'articles' to mean 'material things,' not intangibles." *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1294 (Fed. Cir. 2015); *accord Bayer*, 340 F.3d at 1373-76 (analyzing 35 U.S.C. § 271(g), "intended to address the same 'articles' as were addressed in section 1337," and concluding that "Congress was concerned with tangible products and not mere information").[7] Thus, the Court has construed "articles protected by the patent" to refer to actual physical things: manufactured items or goods, *i.e.*, tangible products. *See, e.g.*, *Crocs*, 598 F.3d at 1306-07 ("[T]he technical prong requires proof that the patent claims cover the articles of manufacture that establish the domestic industry."); *InterDigital*, 707 F.3d at 1298 ("[T]he 'plant or equipment' referred to in subparagraph (A) must exist with respect to articles protected by the patent, such as by producing protected goods[.]"); *Microsoft*, 731 F.3d at 1361-62 ("Section 337,

---

[7] Although the clause at issue in *ClearCorrect* was the phrase "importation of articles" in Section 337(a)(1) rather than "articles protected by the patent" in Section 337(a)(2)-(3), the Court analyzed "how 'articles' is used throughout Section 337" and "the Tariff Act in its entirety," to ensure that the term had a "consistent" meaning. *Id.* at 1295-98; *see Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.") (internal quotation marks and citation omitted). The Court also observed that, "[w]hile the Omnibus Trade and Competitiveness Act made numerous changes to the Tariff Act, it included no language that increased the scope of 'articles.'" *ClearCorrect*, 810 F.3d at 1299.

though not requiring that an article protected by the patent be produced in the United States, unmistakably requires that the … investments relate to actual 'articles protected by the patent' … manufactured domestically or abroad.").

Accordingly, "*articles* protected by the patent" means "products" protected by the patent; it does not mean the "invention," "intellectual property," or "technology" protected by the patent (*i.e.*, the "patented technology"), all of which are intangible.

The plain and ordinary meaning of "protected" is "covered" or "shielded." *See Protect*, Webster's Third New International Dictionary of the English Language 1822 (1976) ("to cover or shield from that which would injure, destroy, or detrimentally affect"); *Protect*, Webster's New Twentieth Century Dictionary of the English Language 1446 (2d ed. 1977) ("to cover or shield from danger or injury"). And a patent is "[a] grant made by the government to an inventor, conveying and securing to him the exclusive right to make, use and sell his invention for a term of years." *Patent*, Black's Law Dictionary (5th ed. 1979); *see also Patent*, Webster's New Twentieth Century Dictionary of the English Language 1313 (2d ed. 1977) ("a document granting the monopoly right to produce, use, sell, or get profit from an invention, process, etc. for a certain number of years").

Accordingly, consistent with this Court's precedent (*see supra* Section I.A), "articles *protected* by the patent" means "products *covered* or *shielded* by the

patent." Because each patent claim defines the scope of the patent's coverage—*i.e.*, the scope of the claimed invention—products are "covered" by a patent if they contain all limitations of at least one of the patent's claims. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is the claims that define the metes and bounds of the patentee's invention."); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001) ("scope of [patent's] coverage defined by the words used in the claims"). So long as they are or contain an authorized embodiment of the patented invention (*i.e.*, practice but do not infringe the patent), such products are "shielded" by the patent because the patentholder has the right to exclude any products that are or contain unauthorized embodiments of the invention (*i.e.*, infringing products) that may compete with them and undermine the patentholder's exclusive right to exploit its invention.

Thus, by its terms, the clause "articles protected by the patent" reaches all products—whether end-user/consumer devices or components thereof—that are or contain authorized embodiments of the patented invention. "Nothing in the plain language of the statute requires that the protected articles" belong to the smallest class of patent-practicing products, *Philip Morris*, 63 F.4th at 1341, and "[t]here is no exclusion" of downstream products that practice the patent because one of their components on its own satisfies all limitations of the patent, *Lashify*, 130 F.4th at 959.

In short, "[t]he Commission's interpretation of section 337(a)(3)[] is contrary to the provision's language" because it "attribute[s] limitations to [the] clause … not found there." *Id.* at 959. This Court has recently and repeatedly rejected efforts to inject restrictions into Section 337(a) that do not appear on the face of the statutory text. *See id.* (rejecting theory that statute precludes reliance on particular types of domestic investment or employment); *Philip Morris*, 63 F.4th at 1340-42 (rejecting theory that statute requires that protected articles "have regulatory approval").

## C. The Statutory Context Confirms that Products Containing Authorized Patented Components Are "Articles Protected by the Patent."

The Commission's understanding that products containing patented components are not covered by the patent for purposes of Section 337(a)(2)-(3) is irreconcilable with the fact that such products *are* covered by the patent for purposes of infringement under Section 337(a)(1). *See ClearCorrect*, 810 F.3d at 129 ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme," and "their ultimate meaning should remain consistent with the remainder of the statute.") (cleaned up).

Section 337 declares unlawful the importation of "articles that … infringe," 19 U.S.C. § 1337(a)(1), and empowers the Commission to bar their importation if there is a domestic industry relating to the "articles protected by the patent,"

19 U.S.C. § 1337(a)(2)-(3).[8] Because infringement under Section 337(a)(1) and protection under Section 337(a)(2)-(3) both hinge on whether the product at issue is covered by the patent, *see supra* Section I.B, this Court has held that the determination of whether products are "articles protected by the patent" is "essentially [the] same as that for infringement, *i.e.*, a comparison of [the] domestic products to the asserted claims." *Lashify*, 130 F.4th at 954 (internal quotation marks omitted).

In the context of Section 337(a)(1), the Commission recognizes that infringing articles include not only the smallest class of patent-practicing products but also downstream products containing them: Complainants routinely seek and the Commission routinely issues exclusion orders applying to both categories of products, as reflected in investigation nomenclature "Certain [Products] and Products Containing the Same" or "Certain [Products], Components Thereof, and Products Containing the Same." *E.g.*, *Certain Integrated Circuits & Prods. Containing the Same*, Inv. No. 337-TA-1148 (Int'l Trade Comm'n); *Certain Mobile Tels., Tablet Computs. with Cellular Connectivity, & Smart Watches with Cellular Connectivity, Components Thereof, & Prods. Containing Same*, Inv. No. 337-TA-

_____

[8] The phrases "articles that infringe" and "articles protected" were inserted at the same time. *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1351 (Fed. Cir. 2015).

1299 (Int'l Trade Comm'n); *see also Certain Microfluidic Sys. & Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-1100, Comm'n Det., 2020 WL 1504738, at *50 (Mar. 24, 2020) ("[T]he Commission's long-standing practice is to direct its remedial orders to *all products covered by the patent claims* as to which a violation has been found[.]" (emphasis added)).[9]

The Commission thus follows the black-letter rule that a product is covered by a patent for purposes of infringement so long as it "contains" or "includes" all of a claim's limitations, irrespective of whether it also comprises unpatented features. *See Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) ("To prove infringement, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim.") (internal quotation marks omitted); *Dolly, Inc. v. Spalding & Enflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994) ("To show infringement, the plaintiff must establish that the accused device includes every limitation of the claim or an equivalent of each limitation."); *see SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) ("[W]e have

---

[9] In this case, Samsung Display did not identify infringing smartphones as "accused products" because it seeks to exclude only display panels and modules "used as replacement displays" for mobile devices. Appx408. By definition, such displays are imported, sold for importation, and/or sold after importation separate from the mobile devices into which they are subsequently incorporated as replacement parts.

never required a claim read on the entirety of an accused device in order to infringe. If a claim reads merely on a part of an accused device, that is enough for infringement."); *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine[.]"). There is no need for each part of a product to correspond or map to each limitation of the patent claim; so long as each limitation corresponds or maps to a part of the product, the product is said to be "covered by" or "fall within the scope of" the patent claim and thereby encroach upon the patentee's right to exclude.

The Commission's narrow understanding of patent coverage in the context of Section 337(a)(2)-(3) is irreconcilable with its understanding of patent coverage in the context of Section 337(a)(1). A smartphone containing unauthorized patented technology "infringes" the patent within the meaning of Section 337(a)(1) for the same underlying reason that a smartphone containing authorized patented technology is "protected by" the patent within the meaning of Section 337(a)(2)-(3): The smartphone is *covered by* the patent because the patented technology is *found in* the smartphone. *See InterDigital*, 707 F.3d at 1299 ("The only question is whether [complainant's] concededly substantial investment … is 'with respect to the articles

40

protected by the patent.' That requirement is satisfied in this case because the patents in suit protect the technology that is … found in the products that [complainant] has licensed and that it is attempting to exclude.").

### D. The Legislative History Supports a Broad Interpretation of the Statutory Language.

The clarity of the statutory text at issue "obviates the need to turn to the legislative history." *ClearCorrect*, 810 F.3d at 1298; *see also Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) (Courts should "not resort to legislative history to cloud a statutory text that is clear."); *Lashify*, 130 F.4th at 960. Regardless, the history and circumstances of the text's enactment undermine the Commission's narrow statutory construction.

*First*, as this Court has repeatedly stressed in upholding Section 337(a)'s broad terms, "[t]he 'fundamental purpose' of the 1988 amendment was to 'strengthen the effectiveness of section 337' against the 'importation of articles which infringe U.S. intellectual property rights.'" *Suprema*, 796 F.3d at 1351 (quoting H.R. Rep. No. 100-40, pt. 1, at 155 (1987)); *InterDigital*, 707 F.3d at 1302 (same); *see also* H.R. Rep. No. 100-576, at 112 (1988). Congress achieved that objective not only "by eliminating the requirement to show injury to … a domestic industry as a result of the importation in question," *InterDigital*, 707 F.3d at 1302, but also by, for the first time, statutorily defining the domestic industry requirement. Congressional committee reports indicate that, in enacting Section 337(a)(3)

41

"to clarify the industry standard," Congress was animated by a concern that the Commission had been applying the domestic industry requirement overly restrictively. H.R. Rep. No. 100-40, pt. 1, at 157 ("The Committee is concerned … that in some recent decisions the Commission has interpreted the domestic industry requirement *in an inconsistent and unduly narrow manner*. In order to clarify the industry standard, a definition is included…." (emphasis added)); S. Rep. No. 100-71, at 129 (1987) ("The domestic industry requirement should not be interpreted in an unduly narrow manner, however. The definition specifies that …."); H.R. Rep. No. 99-581, at 112 (1985) (same). Thus, Section 337(a)(3) was intended generally to "enhance Commission authority," *Suprema*, 796 F.3d at 1351, and specifically to prevent atextual interpretations of the domestic industry requirement from unduly circumscribing the scope of the agency's powers.

*Second*, in presenting the new domestic industry definition, the Congressional reports used expansive language to describe the "articles protected by the patent" clause, explaining that the investments or employment relied upon to establish the existence of a domestic industry need only relate to articles "involving" the intellectual property right at issue. *See* H.R. Rep. No. 100-40, at 157 ("[A] definition is included which specifies that an industry exists in the United States with respect to *a particular article involving an intellectual property right* if there is, in the United States…." (emphasis added)); S. Rep. No. 100-71, at 129 (1987) (same); H.R. Rep.

42

No. 99-581, at 112 (same). Such flexible terminology is inconsistent with the Commission's narrow cabining of that clause to the smallest class of patent-practicing products.

*Third*, the Congressional reports used the terms "infringe" and "covered by" interchangeably, confirming that the identification of articles "covered by" (*i.e.*, "protected by," *see supra* Sections I.A-B) the patent should mirror the identification of infringing articles. *Compare* S. Rep. No. 100-71, at 128-29 ("Any sale in the United States of a product *covered by* an intellectual property right is a sale that rightfully belongs only to the holder or licensee of that property. The importation of any *infringing* merchandise derogates from the statutory right, diminishes the value of the intellectual property, and thus indirectly harms the public interest." (emphases added)), *with* H.R. Rep. No. 100-40, at 156 ("Any sale in the United States of an *infringing* product is a sale that rightfully belongs only to the holder or licensee of that property." (emphasis added)); *accord Lashify*, 130 F.4th at 954 ("For the technical prong, the question is essentially [the] same as that for infringement[.]") (internal quotation marks omitted); *see supra* Section I.C.

Thus, the Commission's narrow interpretation of "articles protected by the patent" is inconsistent with "Congress' … broadening purpose in 1988," *Suprema*, 796 F.3d at 1351, Congressional intent to curb the Commission's restrictive

43

interpretations of the domestic industry requirement, and Congress's capacious vision for the particular statutory clause at issue.

### E.    The Commission Lacks a Basis to Rewrite the Statute.

In the proceedings before the Commission, Respondents argued that allowing complainants to rely on domestic investments in patent-practicing articles downstream of patented components "would render the DI requirement a nullity." Appx70488; Appx70490-70491. It does no such thing. The economic prong of the domestic industry requirement still requires complainants to establish "significant" levels of domestic investment or employment with respect to the downstream articles. 19 U.S.C. § 1337(a)(3). Those downstream articles use the patented technology and thus deserve Section 337's protection. If the value an innovator can exact for its patented components (and by extension the value of its intellectual property) diminishes due to downstream infringement, the innovator may stop producing the components or stop developing new technology and components, negatively impacting the downstream U.S. industry that relies on those components and potentially causing it to disappear altogether.

Moreover, the domestic industry requirement set forth in the Omnibus Trade and Competitiveness Act of 1988 was not intended to set a high bar. Congress considered "eliminat[ing] the industry requirement altogether," *InterDigital*, 707 F.3d at 1301-02, but ultimately retained it for the modest purpose of "preclud[ing]

44

holders of U.S. intellectual property rights who have *no contact* with the United States other than owning such intellectual property rights from utilizing section 337," H.R. Rep. No. 100-40, at 57 (emphasis added); S. Rep. No. 100-71, at 129 (same). So long as patented components support significant downstream investments or employment in the United States, as is the case here, the owners of U.S. patents protecting those components should be entitled to seek Commission relief from infringement in the United States that negatively impacts the value of their intellectual property, the downstream U.S. industry supported by and benefiting from their innovation, and, by extension, the U.S. public interest. *Accord* H.R. Rep. No. 100-40, at 156 ("Any sale in the United States of an infringing product is a sale that rightfully belongs only to the holder or licensee of that property. The importation of any infringing merchandise derogates from the statutory right, diminishes the value of the intellectual property, and thus indirectly harms the public interest."); S. Rep. No. 100-71, at 128-29 (same).

In any event, should the Commission present policy-based arguments that downstream investments should only be credited if the patented component is an "important" or "significant" part of the end-user product, that clearly is the case here. Samsung Display's customized display panels used in the AMOLED DI Products are "essential" to the Galaxy DI Products, which are "inoperable" without them. *See supra* at 8-11. Hypothetical situations in which the connection between patented

45

component and downstream article is much more attenuated are properly left for Congress or, at a minimum, to any future cases that present those situations. Where, as here, "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States*, 540 U.S. 526, 534 (2004) (internal quotation marks and citation omitted).

## II.    ALTERNATIVELY, SEA'S INVESTMENTS IN THE GALAXY DI PRODUCTS ARE "WITH RESPECT TO" THE ARTICLES PROTECTED BY THE PATENT UNDER SECTION 337(A)(3).

Even assuming for the sake of argument that the only "articles protected by the patent" within the meaning of Section 337(a) are the smallest class of patent-practicing articles, *i.e.*, the display panels in the AMOLED DI Products, SEA's investments in the smartphones containing those panels would still be cognizable domestic industry investments under the statute's plain terms. As the Commission recognizes (Appx17-18), Section 337(a)(3) broadly refers to investments "*with respect to* the articles protected by the patent" and thus reaches not only investments *in* the protected articles but also investments *connected to* those articles. *Infra* at 47-49. SEA's investments in the Galaxy DI Products are "connected to" the display panels in the AMOLED DI Products within the meaning of Section 337(a)(3) because those panels are constituent parts of the Galaxy DI Products, or in the alternative because the panels indisputably are significant and customized

46

components of the Galaxy DI Products. *Infra* at 50-53. In applying its *Magnetic Tapes* test to conclude otherwise, the Commission erroneously analyzed the connection between the investments and the *patented technology* rather than the *protected articles*, as the statute expressly requires. *Infra* at 54-62.

## A. Investments Are "with Respect to" Protected Articles if They Have a Connection with Such Articles.

Section 337(a) requires the existence of a domestic industry "*relating to* the articles protected by the patent," 19 U.S.C. § 1337(a)(2) (emphasis added), and specifies that, "[f]or purposes of paragraph (2)," such an industry exists so long as there is significant domestic investment or employment "*with respect to* the articles protected by the patent," 19 U.S.C. § 1337(a)(3) (emphasis added).

It is well established that the terms "relating to" and "with respect to" are "expansive." *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717 (2018). "The ordinary meaning of these words ['relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1312-13 (Fed. Cir. 2011) (collecting cases since the early 1980s "interpret[ing] the term 'related to' broadly"). "Relating to" is "one of the meanings of 'respecting,'" *i.e.*, "with respect to." *Lamar*, 584 U.S. at 717; *see Respect*, Webster's New Twentieth Century Dictionary (2d ed. 1977)

("relation; regard; reference"); *id.*, *Respecting* ("concerning; about; regarding; in regard to; relating to"); *see also* Appx17 (Commission recognizing that terms "related to" and "with respect to" are "equally broad").

The typical purpose of these broad terms is to expand a statutory provision's coverage beyond its specified subject to reach other, related subjects. *See Lamar*, 584 U.S. at 717 ("Use of the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters *relating to* that subject." (emphasis added)); *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) ("Congress characteristically employs the phrase ['relate to'] to reach any subject that has 'a connection with, or reference to,' the topics the statute enumerates."); *United States v. Tohono*, 563 U.S. 307, 312 (2011) ("in respect to" extends scope to subjects "related although not identical … regardless of whether [the subject] carries a special or limited meaning"); *Morales*, 504 U.S. at 386 ("relate to" encompasses "indirect" relationships).

Thus, by its terms, Section 337(a) credits not only investments *in* the "articles protected by the patent" but also investments that "stand in some relation to" or "have 'a connection with'" the protected articles. *Cf. Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1351 (Fed. Cir. 2013) ("The investments or employment must *only* be 'with respect to the articles protected by the patent.'"

48

(emphasis added) (quoting 19 U.S.C. § 1337(a)(3))). The Commission has reached the same conclusion. *See* Appx17-18 ("Like 'with respect to,' 'relating to' means 'hav[ing] a connection with.'"); *accord* H.R. Rep. No. 100-40, at 57 (describing purpose of Omnibus Trade and Competitiveness Act of 1988's retention of domestic industry requirement as "preclud[ing] holders of U.S. intellectual property rights who have *no contact* with the United States other than owning such intellectual property rights from utilizing section 337" (emphasis added)); S. Rep. No. 100-71, at 129 (same). There is good reason for Section 337(a)(3) to reach domestic investments "other than those made directly in the patented technology or patented article," Appx 18 n.15: When a protected article is designed to be used with another article or vice versa (for example, when one article is an accessory to the other), reduced production of the protected article due to infringement can also put in jeopardy U.S. investments in the related article.

### B.    Investments in the Galaxy DI Products Are "with Respect to" the Display Panels in the AMOLED DI Products.

SEA's investments in the Galaxy DI Products plainly "stand in some relation to" or "have a connection with" the display panels in the AMOLED DI Products within the meaning of Section 337(a)(3). Although the statutory language "do[es] not resolve all doubt" as to the outer limits of the statute's flexible standard, *Tohono*, 563 U.S. at 312, this is nowhere near a potential "edge case."

*First*, the Court can resolve this case by holding that investments in a multi-component product that contains a patented component (and thus itself practices the patent) as one of its constituent parts are directly "related" or "connected" to and thus "with respect to" the component within the meaning of Section 337(a)(3). As the analogy of a river to describe a supply chain illustrates, upstream components and downstream consumer products are intrinsically linked: Investments in the components enable the consumer product to be made, and investments in the consumer product containing the component generate demand for the components. The different supply chain levels are interdependent and symbiotic, with the success of the component manufacturers tied to the success of the finished-product industry that uses the components. This type of case is distinguishable from cases involving investments in a product that is separate-and-distinct from the patent-practicing article (and thus does not itself practice the patent) but is used with or alongside it. Investments in accessories or other ancillary products are only indirectly connected to the protected articles, and whether they can fairly be considered to be "with respect to" those articles may therefore depend on the ancillary product's importance to the exploitation of the protected article and/or the importance of the protected article to the ancillary product's exploitation. There is no need for the Court to address in this case what nature or degree of connection Section 337(a)(3) might require for investments in ancillary products, however, because Samsung

50

Display's display panels indisputably are constituent parts of the Galaxy DI Products.

*Second*, the Court could conclude that the statutory language requires some form of "degree of connection" analysis even for investments in products containing patented components—*i.e.*, that there may exist situations in which the connection between patented component and end-user product is too attenuated for the investment in the end-user product to be considered "with respect to" the component under Section 337(a)(3). In that case, the Court should hold, consistent with its decision in *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345 (Fed. Cir. 2013), that investments in downstream articles are "with respect to" the protected articles within the meaning of Section 337(a)(3) so long as the protected articles are "significant" and "specifically tailored" components of the downstream articles, *id.* at 1351.

*Motorola* presented the converse issue of whether investments in a component (an operating system) were properly considered investments "with respect to the articles protected by the patent" when the patent covered the downstream product (a mobile device) only. *See id.* at 1347-48, 1351. Because the claims recited "[a] mobile device" comprising multiple components including but not limited to an operating system, the only "articles protected by the patent" were the mobile devices. *Id.* at 1347. The ALJ and Commission had found, however, that the operating

51

systems were "significant parts of the mobile devices" and "specifically tailored to meet the specifications and demands of each mobile device." *Id.* at 1351. Highlighting those findings, this Court held:

> [N]othing in § 337 precludes a complainant from relying on investments or employment directed to significant components, specifically tailored for use in an article protected by the patent. The investments or employment must *only* be 'with respect to the articles protected by the patent.' 19 U.S.C. § 1337(a)(3). An investment directed to a specifically tailored, significant aspect of the article is still directed to the article.

*Id.* (emphasis added).

There is no meaningful dispute that the display panels in the AMOLED DI Products are "significant" and "specifically tailored" components. *See supra* at 8-11, 21, 25. Consistent with this Court's approach in *Motorola*, Samsung Display is entitled to rely on investments in downstream products of which its display panels are significant and customized components.

*Third*, even if the Court were to conclude that the statutory language requires a more onerous "degree of connection" test than the one it applied in *Motorola*, SEA's investments in the Galaxy DI Products would readily satisfy such a test. The Commission and ALJ found that (1) displays are "essential" components of

52

smartphones (Appx26; Appx210-211)[10] and (2) "the specific AMOLED DI Products are customized for the Galaxy DI Products" (Appx23; Appx211); and the ALJ found that (3) each AMOLED DI Product cannot function without being incorporated into its corresponding Galaxy DI Product (Appx211) (and the Commission did not find otherwise). *Supra* at 21, 25. It follows that each display has no purpose and value other than as a component for incorporation into its corresponding smartphone; without a market for a given Galaxy DI Product, the corresponding AMOLED DI Product(s)—whether earmarked for incorporation into original phones or as replacement parts—are worthless. *Supra* at 10-11. The connection between component and end-user product could hardly be tighter: Each display is critical to its corresponding smartphone and each smartphone provides the sole use-case for the display. Because SEA's investments are essential to the commercialization of the smartphones in the U.S. market, *supra* at 11-12, they are essential to the exploitation of the customized displays in those smartphones. In these circumstances, SEA's investments satisfy any reasonable degree-of-connection standard. A contrary statutory interpretation "must be rejected" because it would "read ['with respect to' and 'relating to'] out of the statute." *Lamar*, 584 U.S. at 719.

---

[10] Although the ALJ and Commission did not make additional findings specifically as to the "centrality" of the display to the smartphone, the record is clear that a display provides central functionality in that it provides the means for the user to receive information from and interact with the smartphone. *See supra* at 10.

## C.     The *Magnetic Tapes* Test Is Untethered to the Statute.

In applying its *Magnetic Tapes* test to find that SEA's investments are not creditable, the Commission committed a fundamental legal error: It analyzed the degree of connection between the downstream articles (the Galaxy DI Products) and the *patented technology* (the claimed display panel "pixel arrangement structures" and "pixel circuits," Appx20-21 & n.19; Appx26) rather than the *articles protected by the patent* (the display panels in the AMOLED DI Products[11]). *See* Appx20-31. The statute refers to "[investment/employment] … with respect to the *articles protected by the patent*"—not investment/employment with respect to the "patented technology," "patented invention," or "patent." The statutory "articles protected by the patent" are the manufactured products relied upon by the complainant and shown to be covered by the patent—not the "technology," "invention," or "intellectual property" covered by the patent, all of which are mere intangible information. *See supra* at 34-35. Thus, the statute's plain text provides no basis for evaluating the connection between the downstream industry and the *patented technology*; any degree-of-connection analysis must pertain to the relationship between the downstream industry and the *protected articles*. In short, the *Magnetic Tapes'*

_____

[11] For the avoidance of doubt, Samsung Display's position is that the Galaxy DI Products are themselves "articles protected by the patent." *See supra* Section I. Solely for purposes of the alternative argument presented in Section II, Samsung Display assumes that the smallest class of patent-practicing articles (*i.e.*, the display panels used in the AMOLED DI Products) are the only protected articles.

"patented technology"-focused test is—both by its terms and as applied by the Commission here—fundamentally untethered to the statutory language.

The Commission's misplaced focus permeated its entire analysis and was outcome determinative at each step.

As to the first *Magnetic Tapes* factor ("whether the *patented technology* is sold as a separate entity or article of commerce") (Appx18), the Commission viewed as determinative the fact that "the patented technology may be used separate and apart from the downstream article" (Appx24-25), based on its findings (i) that "the patented technology … is sold separately to other customers" (Appx23); (ii) that "the patented technology … can also be used, and there is a market for, the patented technology in consumer products other than smartphones" (Appx24); and (iii) that "the claims … do not limit use of the pixel arrangement [*i.e.*, the patented technology] to any specific application" (Appx23).

The legally appropriate question for a degree-of-connection analysis consistent with the statutory language, however, is whether the *display panels in the AMOLED DI Products* may be used separate and apart from the Galaxy DI Products—*i.e.*, sold for a purpose other than incorporation into a Galaxy DI Product. The undisputed answer to that question is "no." Samsung Display's AMOLED display panels are specifically tailored to meet the Galaxy DI Products' specifications and can only be used in their corresponding Galaxy smartphone

models—they are not sold to any customers other than SEC and cannot be used for smartphone applications other than their dedicated Galaxy smartphones, let alone non-smartphone applications. *See supra* at 8-11, 21, 25.

As to the second *Magnetic Tapes* factor ("whether *it* [the *patented technology*] is an essential component of the downstream product") (Appx18), the Commission stressed that "the focus … must remain on the patented technologies like the first factor" (Appx26) and concluded that "the patented technology in particular is not essential to the Galaxy DI Products" (Appx27-28), based on its findings (i) that although "*a display* is essential to the Galaxy DI Products," one could "in theory" "modif[y]" those smartphones to make them compatible with "unpatented displays" (Appx26) (emphasis in original), and (ii) that "if the Galaxy DI Products were to discontinue, SDC could still exploit its patented technologies" with other smartphone manufacturers (Appx27).

Once again, the legally appropriate question is whether the *display panels in the AMOLED DI Products* are "essential components" of the Galaxy DI Products. The undisputed answer to that question is "yes," for multiple reasons. *First*, as the Commission correctly recognized, "*a display* is essential to the Galaxy DI Products." Appx26. If the display panels in the AMOLED DI Products are removed from the Galaxy DI Products, the Galaxy DI Products become inoperative and useless. *See supra* at 8-11, 21, 25. That should end any essentiality inquiry.

56

*Second*, even if the availability of substitute "non-patent-practicing" displays were part of the analysis (it is not), the record reflects that no such substitutes exist for any Galaxy DI Product. Appx211 (ID emphasizing absence of any "evidence … that either LCD or OLED displays are actually used in place of the AMOLED DI Products in the Galaxy DI Products"). The ALJ also noted that the "theoretical[] possib[ility]" of the Galaxy DI Products using "different displays" would require *modifying the smartphones* "so that [they] could work with other components"— thus, it would require designing new, different smartphones. Appx211 (finding that "th[e] evidence … shows only that, in theory, the Galaxy DI Products could be modified to operate with different displays," and reasoning that "[t]he fact that it is theoretically possible to modify a product so that it could work with other components" does not negate a component's essentiality); *see also* Appx25 n.22. The record further reflects that a hypothetical attempt to develop a non-patent-practicing display satisfying all technical requirements of a Galaxy DI Product would represent an onerous and time-consuming undertaking. *See* Appx60586-60587, 551:23-552:10 ("Q. … [A]n LCD display could be used with a Samsung DI product so long as it was customized to work with it; is that correct? A. No. They would not be able to use them for the Smartphones … for these products, there is a development effort that happened that would go for about a year between Samsung Electronics and Samsung Display. … LCD displays[] … cannot be

57

CONFIDENTIAL MATERIAL OMITTED

accommodated to these high-end and premium products."); *supra* at 8-9 (describing Samsung Display's ███ time period ███ custom-development process for each AMOLED DI Product project).

*Third*, if the Galaxy DI Products "were to discontinue," Appx27, Samsung Display would be unable to sell to other smartphone manufacturers the customized display panels and modules it manufactured for the Galaxy DI Products because those displays are specifically tailored to their corresponding smartphone models. *See supra* at 8-11, 21.

As to the third *Magnetic Tapes* factor ("whether the domestic industry activities have a direct relationship to exploitation of the *patented technology*") (Appx18), the Commission concluded that SEA's investments and employment were "far removed from the patented technologies" (Appx28), based on its findings that (i) SEA's efforts to commercialize the Galaxy DI Products "do[] not affect a consumer's ability to view information or use the display and do[] not relate to SEC's incorporation of the display into the phone" (Appx28) and (ii) "SDC can and does commercially exploit its patents in smartphones and consumer products other than the Galaxy DI Products" (Appx29-30).

Once more, the legally appropriate question is whether SEA's investments in the Galaxy DI Products relate to exploitation of the *display panels in the AMOLED DI Products*. The answer to that question indisputably is "yes." SEA's investments

help ensure that Galaxy DI Products containing Samsung Display's customized display panels receive approval to be—and are—sold to and used by U.S. consumers. *See supra* at 11-12. Therefore, SEA's investments directly support exploitation of the customized display panels, whose sole raison d'être and path to exploitation is incorporation into their associated smartphones. *See supra* at 10-11.

As the preceding analysis shows, once the Commission's misguided focus on the "patented technology" rather than the "articles protected by the patent" is corrected, the *Magnetic Tapes* considerations all clearly support the conclusion that SEA's investments in the Galaxy DI Products are intimately connected to— and "related to" and "with respect to"—the protected display panels.

### D. The *Magnetic Tapes* Test Is Yielding Inconsistent Outcomes.

In addition to being untethered to the statutory language, the Commission's "patented technology"-focused *Magnetic Tapes* test is indeterminate. Basic ambiguities in the test's three factors include (i) how "patented technology" (*i.e.*, a patented invention or intellectual property), an intangible concept, can be "sold" and/or can serve as a "component of the downstream product"; (ii) whether the Commission understands "patented technology" to mean and/or encompass *physical embodiments of* a claimed invention, and if so, what specific embodiments; (iii) the meaning and scope of the phrase "exploitation of the patented technology," including whether it means or encompasses exploitation of *physical embodiments of*

59

the patented technology, and if so, what specific embodiments; and (iv) what the appropriate analytical approach is to evaluate the nature of the "relationship" between "domestic industry activities" and "exploitation of the patented technology."[12]

The vagueness of the Commission's framework leads to inconsistent outcomes, exemplified by diametrically opposed applications of the *Magnetic Tapes* test in Investigations Nos. 337-TA-1379 (the "1379 Investigation") and 337-TA-1380 (the "1380 Investigation"). The investigations involved "the same private parties," "the same domestic industry products-at-issue," and "the same testimony and exhibits … relating to domestic industry," but were assigned to different ALJs. *Petition of the Office of Unfair Import Investigations for Review-in-Part of the Final Initial Determination*, 1379 Investigation, at 1 (Feb. 10, 2025) ("*OUII Petition*").

In each case, the presiding ALJ applied the *Magnetic Tapes* test to determine whether investments in smartphones containing patented components (chipsets and operating systems) should be considered investments "with respect to the articles

---

[12] The Commission tacitly recognizes the indeterminacy of the third *Magnetic Tapes* factor, having recently asked litigants to elucidate its general meaning in briefing. *See* Notice of Commission Determination, *Certain Video Capable Elec. Devices*, Inv. No. 337-TA-1380, 2025 WL 857710, at *6 (Feb. 27, 2025) (posing the generic question: "Under the rationale of *Magnetic Tapes*, at what point would domestic industry activities no longer have a direct relationship to exploitation of the patented technology such that the activities should not be considered 'with respect to the article protected by the patent'?").

protected by the patent." One ALJ found the first and third *Magnetic Tapes* factors to weigh against crediting investments in the smartphones and the second factor to be neutral and concluded that "the realities of the marketplace do not support extending 'articles protected by the patent' beyond the chipsets." *Certain Video Capable Elec. Devices*, Inv. No. 337-TA-1380, Initial Determ., 2024 WL 5378885, at *104-11 (Dec. 20, 2024). The other ALJ, analyzing the same set of facts and law, reached the opposite conclusion, finding that "each of the three factors weighs in favor of the domestic industry extending to the [downstream] products." *Certain Video Capable Elec. Devices*, Inv. No. 337-TA-1379, Initial Determ., 2025 WL 689508, at *53-61 (Jan. 29, 2025). The ALJs' irreconcilable rulings and rationales prompted Commission Staff (which supported the ALJ's findings and holding in the 1379 Investigation, consistent with Samsung Display's position here) to flag the inconsistencies "as a matter affecting Commission policy." *OUII Petition* at 2. The investigations were then terminated due to settlements prior to Commission review. *See Certain Video Capable Elec. Devices*, Inv. No. 337-TA-1379, Comm'n Notice, 2025 WL 1250782 (Apr. 22, 2025); *Certain Video Capable Elec. Devices*, Inv. No. 337-TA-1380, Comm'n Notice, 2025 WL 1250809 (Apr. 23, 2025).

As the 1379 and 1380 Investigations and this case illustrate, the Commission's indeterminate and extratextual framework for determining whether to credit domestic investments in downstream products leads to the types of "inconsistent and

unduly narrow" rulings and pronouncements that prompted enactment of Section 337(a)(3) in the first place. H.R. Rep. No. 100-40, pt. 1, at 157 ("The Committee is concerned … that in some recent decisions the Commission has interpreted the domestic industry requirement in an inconsistent and unduly narrow manner. In order to clarify the industry standard, a definition is included…."); S. Rep. No. 100-71, at 129. The inconsistencies underscore the need to closely adhere to the statutory language when determining whether investments are "with respect to the articles protected by the patent" under Section 337(a)(3). As demonstrated above, SEA's investments in the Galaxy DI Products clearly satisfy the properly-construed statutory requirement. *See supra* Sections II.A-C.

## CONCLUSION

For the foregoing reasons, the Court should reverse the Commission's determination that Samsung Display failed to establish the existence of a domestic industry, reverse the Commission's determination of no violation of Section 337, and remand for further proceedings. Alternatively, the Court should vacate the Commission's determinations and remand "so that the Commission may, using a correct view of the law, reevaluate whether [Samsung Display] satisfies the economic-prong requirement." *Lashify*, 130 F.4th at 951.

Dated: August 15, 2025

Respectfully submitted,

/s/ *Richard L. Rainey*
Robert A. Long (rlong@cov.com)
Sturgis M. Sobin (ssobin@cov.com)
Richard L. Rainey (rrainey@cov.com)
Jeffrey H. Lerner (jlerner@cov.com)
Jared Frisch (jfrisch@cov.com)
Daniel W. Cho (dwcho@cov.com)
Tarek J. Austin (taustin@cov.com)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-6000

Brian G. Bieluch (bbieluch@cov.com)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800

*Counsel for Appellant*
*Samsung Display Co., Ltd.*

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

| | |
|---|---|
| Commission Opinion (March 19, 2025) | Appx1-34 |
| Notice of Commission's Final Determination (March 19, 2025) | Appx35-39 |
| Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond (November 15, 2024) | Appx40-259 |
| Notice of Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond (November 15, 2024) | Appx260 |
| U.S. Patent No. 7,414,599 | Appx261-274 |
| U.S. Patent No. 9,818,803 | Appx275-287 |
| U.S. Patent No. 11,594,578 | Appx288-307 |

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN ACTIVE MATRIX ORGANIC LIGHT-EMITTING DIODE DISPLAY PANELS AND MODULES FOR MOBILE DEVICES, AND COMPONENTS THEREOF** | **Investigation No. 337-TA-1351 (Remand)** |

COMMISSION OPINION

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 2

I.      BACKGROUND ............................................................................................... 2

        A.      Procedural History ............................................................................ 2

        B.      The Asserted Patents......................................................................... 9

        C.      The Accused Products....................................................................... 10

        D.      The Domestic Industry Products..................................................... 10

II.     COMMISSION REVIEW OF THE FINAL ID.............................................. 11

III.    ANALYSIS OF ISSUES REVIEWED ......................................................... 12

        A.      Statutory Authority and Commission Rule 210.12............................. 12

        B.      Domestic Industry ........................................................................... 13

IV.     CONCLUSION................................................................................................. 31

**PUBLIC VERSION**

## I.    INTRODUCTION

On January 16, 2025, the Commission determined to review in part the final initial determination ("ID") issued by the presiding administrative law judge ("ALJ") on November 15, 2024.  90 Fed. Reg. 8,034-036 (Jan. 23, 2024).  On review, the Commission has determined that there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("section 337"), with respect to U.S. Patent Nos. 9,818,803 ("the '803 patent"); 11,594,578 ("the '578 patent"); and 7,414,599 ("the '599 patent") (collectively, "the Asserted Patents").

In summary, the Commission affirms the ALJ's finding that the Commission has statutory authority to investigate Complainant's alleged violations under section 337(a)(1)(B) by Respondents.  The Commission also affirms the ID's finding that representative display panels in the asserted domestic industry ("DI") products practice claim 21 of the '803 patent.  The Commission further affirms with modified reasoning the ID's finding that Complainant failed to satisfy the domestic industry requirement under section 337(a)(3)(A) and (B).  Based on this dispositive finding, the Commission has determined to take no position on whether the asserted DI products also practice claim 5 of the '803 patent and whether Respondents forfeited their argument that Complainant is not the owner of the Asserted Patents under Commission Rule 210.12(a)(7).  This opinion sets forth the Commission's reasoning in support of that determination.

## I.    BACKGROUND

### A.    Procedural History

The Commission instituted this investigation on February 3, 2023, based on a complaint filed by Samsung Display Co., Ltd. ("SDC" or "Complainant") of the Republic of Korea.  88 Fed. Reg. 7,463-64 (Feb. 3, 2023).  The complaint, as supplemented, alleged violations of

**PUBLIC VERSION**

section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof by reason of infringement of claims 1-5 and 19-21 of the '803 patent; claims 1, 2, 4-10, and 13 of U.S. Patent No. 10,854,683 ("the '683 patent"); claims 1-18 of the '599 patent; and claims 1-3, 6-8, and 14-22 of the '593 patent. *Id.* The complaint further alleged that a domestic industry exists. *Id.* The notice of investigation named the following parties as respondents: Injured Gadgets, LLC ("Injured Gadgets") of Norcross, Georgia; Wholesale Gadget Parts, Inc. ("Wholesale Gadget Parts") of Bixby, Oklahoma; Phone LCD Parts LLC and Parts4LCD (collectively, "Phone LCD Parts") of Wayne, New Jersey; Apt-Ability LLC d/b/a MobileSentrix of Chantilly, Virginia; Mobile Defenders, LLC of Caledonia, Michigan; Group Vertical, LLC ("Group Vertical") of Grand Rapids, Michigan; Electronics Universe, Inc. d/b/a Fixez.com and Electronics Universe, Inc. d/b/a Repairs Universe, Inc. ("Electronics Universe") of Las Vegas, Nevada; LCTech International Inc. d/b/a SEGMobile.com ("LCTech") of City of Industry, California; Sourcely Plus, LLC ("Sourcely Plus") of Tempe, Arizona; eTech Parts Plus LLC ("eTech Parts Plus") of Southlake, Texas; Parts4Cells Inc. ("Parts4Cells") of Houston, Texas; Captain Mobile Parts, Inc. ("Captain Mobile Parts") of Dallas, Texas; DFW Imports LLC d/b/a DFW Cellphone and Parts ("DFW Imports") of Dallas, Texas; Mengtor Inc. ("Mengtor") of El Monte, California; and Gadgetfix Corp. ("Gadgetfix") of Irvine, California. *Id.* The notice of investigation also named the Office of Unfair Import Investigations ("OUII") as a party. *Id.*

On March 22, 2023, the Commission granted Mianyang BOE Optoelectronics Technology Co., Ltd.'s ("BOE") unopposed motion to intervene as a respondent in this investigation. Order No. 7 (Mar. 15, 2023), *unreviewed by* Comm'n Notice (Mar. 22, 2023).

**PUBLIC VERSION**

Two respondents, Apt-Ability LLC d/b/a MobileSentrix and Mobile Defenders, LLC, were terminated based on a consent order.  Order No. 43 (Dec. 20, 2023), *unreviewed by* Comm'n Notice (Apr. 18, 2024).  Ten respondents, Captain Mobile Parts, Group Vertical, Sourcely Plus, Mengtor, Electronics Universe, LCTech, Parts4Cells, DFW Imports, Gadgetfix, and eTech Parts Plus (collectively, "the Defaulted Respondents"), were found in default.  Order No. 16 (May 10, 2023), *unreviewed by* Comm'n Notice (June 7, 2023); Order No. 22 (Jun. 27, 2023), *unreviewed by* Comm'n Notice (July 20, 2023); Order No. 25 (Jul. 19, 2023), *unreviewed by* Comm'n Notice (Aug. 18, 2023); Order No. 27 (Aug. 8, 2023), *unreviewed by* Comm'n Notice (Aug. 30, 2023).  Accordingly, respondents Injured Gadgets, Wholesale Gadget Parts, and Phone LCD Parts (collectively, "the BLF Respondents") and BOE remain active in the investigation.

On April 20, 2023, the Commission granted SDC's motion for leave to amend the complaint and notice of investigation to add allegations of infringement related to claims 1-6, 10, 12, 17, 19, 21-23, 40-47, and 51-52 of the '578 patent.  Order No. 8 (Mar. 28, 2023), *unreviewed by* Comm'n Notice (Apr. 20, 2023).  When the final ID issued, only claims 5 and 21 of the '803 patent, claims 5, 10, 17, 40-41, and 47 of the '578 patent, claims 2-3, 13, and 15-16 of the '599 patent, and claim 6 of the '593 patent remained in the investigation as a result of the termination of all asserted claims of the '683 patent and certain other asserted claims.  *See* Order No. 34 (Oct. 26, 2023), *unreviewed by* Comm'n Notice (Nov. 27, 2024), Order No. 39 (Dec. 7, 2023), *unreviewed by* Comm'n Notice (Jan. 8, 2024), Order No. 51 (Jun. 14, 2024), *unreviewed by* Comm'n Notice (Jul. 3, 2024), Order No. 65 (Aug. 27, 2024), *unreviewed by* Comm'n Notice (Sept. 26, 2024).

**PUBLIC VERSION**

On November 15, 2023, the BLF Respondents and BOE (collectively, "Respondents")

moved for summary determination that SDC lacked standing to bring and maintain this

investigation.  Respondents argued that because SDC's parent company, Samsung Electronics

Co., Ltd. ("SEC"),[1] "has an unfettered right to grant licenses, SDC lacks the exclusionary rights

necessary to prove standing."  Mem. In Support of Respondents' Motion for Summary

Determination of Lack of Standing ("Resp. Mem. Lack of Standing"), EDIS Doc. ID 808708 at

18 (Nov. 15, 2023).  Finding that "there is no genuine issue of material fact that SEC has an

unrestricted right to sublicense the Asserted Patents to others" and that SEC's possession of such

a right divested SDC of exclusionary rights, on January 9, 2024, the ALJ granted Respondents'

motion for summary determination of no violation due to lack of standing.  Order No. 44 at 13,

24-25 (Jan. 9, 2024).

On April 24, 2024, the Commission vacated that initial determination and remanded the

investigation for further proceedings consistent with its opinion.  In its opinion, the Commission

found that "(1) constitutional standing, the Article III requirements of the Constitution related to

the authority of federal courts to adjudicate lawsuits, is not required at [the] Commission; and

(2) there are genuine issues of material facts relating to [Complainant's] rights in the asserted

patents."  Comm'n Op. at 2.  The Commission remanded the investigation to the ALJ to

"conduct further proceedings as appropriate and consistent with the Commission's opinion

herewith."  *Id.*

On May 2, 2024, the ALJ held a case management conference to discuss how the case

would proceed on remand.  Respondent BOE indicated that it wished to argue that SDC lacked

"all substantial rights" to the asserted patents when it filed its complaint and that it wished to

---

[1] SEC owns approximately 85% of SDC.  Tr. (Kim) at 567:4-16.

pursue discovery from SEC on this issue.  Order No. 50 at 3 (June 11, 2024).  SDC responded

that a statutory cause of action defense had never previously been raised and thus was waived.

*Id.* at 5.  OUII noted that "Respondents' argument that [SDC] may not have owned the asserted

patents when it filed the complaint because it did not hold all substantial rights is fundamentally

different from the argument advanced in Respondents' motion for summary determination."  *Id.*

The ALJ then ordered "additional briefing" on "the effect of the Commission opinion on th[e]

Investigation." Order No. 47, EDIS Doc. ID 820416, at 1 (May 3, 2024).

Following a teleconference and briefing on remand, the ALJ found that Respondents

waived[2] their argument that SDC lacked "all substantial rights" to the Asserted Patents and thus

failed to satisfy the requirement of Commission Rule 210.12(a)(7) because Respondents did not

address this issue in their prehearing brief,[3] as required by the ALJ's Ground Rules.  ID at 4

(citing Order No. 50 at 4).   Specifically, the ALJ found that Respondents' prehearing brief

affirmatively raised the issue of constitutional standing, but it did not raise any argument that

Complainant SDC lacked a statutory cause of action under the Commission's Rules.  Order No.

50 at 6.  The ALJ further noted that SDC "still must meet its burden to establish that the

requirements of Commission Rule 210.12 have been met" and "this issue will be addressed at the

evidentiary hearing." *Id.* at 8 & n.8.

The evidentiary hearing was held on July 8-9, 2024, and July 15-17, 2024.

---

[2] While the ALJ used the word "waived" in Order No. 50, we understand the ALJ to have been referring to the doctrine of forfeiture.  *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020).

[3] *See* Respondents' Corrected Joint Pre-Trial Brief, EDIS Doc. ID 810248 at Ex. A (Dec. 12, 2023) ("RPreHB").

On November 15, 2024, the ALJ issued his final ID, finding no violation of section 337 because SDC failed to show the existence of a domestic industry, among other reasons.  In particular, the ID found:  (1) the Commission has statutory authority to investigate SDC's complaint (2) SDC met its burden under Rule 210.12(a)(7); (3) SDC failed to satisfy the economic prong of the domestic industry requirement for all asserted patents; (4) SDC satisfied the technical prong of the domestic industry requirement for the '803, the '578, and the '599 patents but not for the '593 patent; (5) at least one representative accused product infringes claims 5 and 21 of the '803 patent, claims 5, 10, 17, 40-41, and 47 of the '578 patent, claims 15-16 of the '599 patent, and claim 6 of the '593 patent but not claims 2-3 and 13 of the '599 patent; and (6) the claims have not been shown to be invalid.

On November 29, 2024, Complainant SDC filed a petition for review of the ID challenging certain findings related to the '803, the '578, and the '599 patents, including the economic prong of the domestic industry requirement.[4]  SDC did not petition for review of the ID's findings related to the '593 patent.  That same day, Respondent BOE and the BLF Respondents filed a joint contingent petition for review, including the ALJ's finding that "Respondents have waived any argument that Complainant lacks the ability to bring this investigation under Commission Rule 210.12."  RPet at 11 (quoting Order No. 50 at 6).[5]  OUII

---

[4] *See* Complainant's Petition for Review of Final Initial Determination, EDIS DOC ID 838286 (Nov. 29, 2024) ("CPet").

[5] *See* Respondents Mianyang BOE Optoelectronics Technology Co., Ltd., Injured Gadgets, LLC, Phone LCD Parts LLC, and Wholesale Gadget Parts, Inc.'s Contingent Petition for Review of the Final Initial Determination on Violation of Section 337, EDIS DOC ID 838292 (Nov. 29, 2024) ("RPet").

**PUBLIC VERSION**

did not file a petition for review.  On December 9, 2024, Complainant, Respondents, and OUII

each filed a response to the petitions.[6]

The Commission solicited submissions from the public on the public interest issues raised

by the recommended determination.  *See* 89 Fed. Reg. 92721 (Nov. 22, 2024).  The Commission

received comments from Representative John Moolenaar, Chairman of the House Select

Committee on China, EDIS Doc ID 839550, and Dr. Robert D. Atkinson of the Information

Technology & Innovation Foundation ("ITIF"), EDIS Doc ID 839549.

On January 8, 2025, SDC filed a notice of supplemental authority to apprise the

Commission of the Patent Trial and Appeal Board's final written decisions in *inter partes* review

proceedings on the '578 patent and the '803 patent.  In the final written decisions, the Board

found claim 21 of the '803 patent unpatentable and all other asserted claims of the '578 and '803

patents at issue in this investigation had not been proven unpatentable.  *See Mianyang BOE*

*Optoelectronics Tech. Co., Ltd. v. Samsung Display Co., Ltd.*, IPR2023-00987, Final Written

Decision (Jan. 6, 2025); *Mianyang BOE Optoelectronics Tech. Co., Ltd. v. Samsung Display Co.,*

*Ltd.*, IPR2023-01075, Final Written Decision (Jan. 6, 2025).

On January 16, 2025, the Commission determined to review the final ID in part.

Specifically, the Commission determined to review:  (1) the ID's findings that the Commission

has statutory authority to investigate Complainant SDC's alleged violation under section 337 and

that Respondents waived their argument that SDC lacked the ability to bring this investigation

---

[6] *See* Office of Unfair Import Investigations' Combined Response, EDIS DOC ID
838848 (Dec. 9, 2024) ("OResp"); Respondents Mianyang BOE Optoelectronics Technology
Co., Ltd., Injured Gadgets, LLC, Phone LCD Parts LLC, and Wholesale Gadget Parts, Inc.'s
Opposition to Complainant's Petition for Review, EDIS DOC ID 838869 (Dec. 9, 2024)
("RResp"); Complainant's Response to Respondents' Contingent Petition for Review of Final
Initial Determination, EDIS DOC ID 838863 (Dec. 9, 2024).

8

under Commission Rule 210.12; (2) the ID's findings related to the technical prong for the '803

patent; and (3) the ID's findings regarding the economic prong of the domestic industry

requirement.  90 Fed. Reg. 8,034-036 (Jan. 23, 2024).  The Commission determined not to

review any other findings presented in the final ID, including the ID's finding of no violation of

section 337 with respect to the '593 patent.  *Id.* at 8,036.  Accordingly, only the '803 patent, the

'578 patent, and the '599 patent remain in the investigation.

The Commission requested written submissions from the parties on the issues under

review and submissions from the parties, interested government agencies, and interested persons

on the issues of remedy, the public interest, and bonding.  *Id.*  The parties filed their initial

submissions on January 30, 2025,[7] and their response submissions on February 6, 2025.[8]

**B.    The Asserted Patents**

The technology at issue in this investigation relates to an organic light emitting diode

("OLED") display.  The '578 patent and the '803 patent are directed to a pixel arrangement

---

[7]  Response of the Office of Unfair Import Investigations to the Commission's Request for Written Submissions on the Issues Under Review and on Remedy, Bonding, and the Public Interest, EDIS Doc ID 842305 (Jan. 30, 2025); Complainant's Opening Submission in Response to the Commission's Questions on Review, EDIS Doc ID 842300 (Jan. 30, 2025); Respondents Mianyang Boe Optoelectronics Co., Ltd., Injured Gadgets, LLC, Phone Lcd Parts LLC, and Wholesale Gadget Parts, Inc.'s Submission in Response to the Notice of a Commission Determination to Review in Part a Final Initial Determination Finding No Violation of Section 337; Request for Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding, EDIS Doc ID 842302 (Jan. 30, 2025).

[8] Office of Unfair Import Investigations' Reply to the Private Parties' Written Submissions on the Issues Under Review and on Remedy, Bonding, and the Public Interest, EDIS Doc ID 842830 (Feb. 6, 2025); Complainant's Reply Submission in Response to the Commission's Questions on Review, EDIS Doc ID 842826 (Feb. 6, 2025); Respondents Mianyang Boe Optoelectronics Co., Ltd., Injured Gadgets, LLC, Phone Lcd Parts LLC, and Wholesale Gadget Parts, Inc.'s Reply Submission in Response to the Notice of a Commission Determination to Review in Part a Final Initial Determination Finding No Violation of Section 337; Request for Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding, EDIS Doc ID 842817 (Feb. 6, 2025).

structure of an OLED display for displaying images by emitting light through a plurality of pixels. JX-3 ('803 patent) at 1:20; JX-5 ('578 patent) at 1:27. The '599 patent is directed to a pixel circuit in an OLED display "capable of detecting and self-compensating threshold voltage deviations." JX-1 ('599 patent) at 3:44-47.

### C.    The Accused Products

Pursuant to Commission Rule 210.10(b)(1), 19 C.F.R. § 210.10(b)(1), the plain language description of the accused products or category of accused products, which defines the scope of the investigation, is "active matrix organic light-emitting diode ('AMOLED') display panels and modules used as replacement displays for mobile devices comprising organic pixel elements for presenting information to a viewer which infringe one or more claims of the Asserted Patents, and components thereof, where AMOLED display modules refers to the assembly of an AMOLED display panel (containing light-emitting materials, pixel circuitry, and encapsulation layers on a substrate) with additional components such as a connector cable, one or more polarizing layers, window glass, and/or housing materials around the AMOLED display panel." 88 Fed. Reg. 7,463.

The accused products for Respondent BOE, the BLF Respondents, and the Defaulted Respondents are identified in the final ID. ID at 8-11. BOE's seven redesigned products were also adjudicated in the investigation. *Id.* at 13.

### D.    The Domestic Industry Products

Complainant SDC alleges two types of products are "articles protected by the patent": (1) certain AMOLED display modules manufactured abroad by SDC ("AMOLED DI Products") that incorporate the patented display panel; and (2) certain Galaxy smartphones manufactured abroad by non-party SEC that incorporate the AMOLED DI Products ("Galaxy DI Products"). *Id.* at 17, 157 & n.49, 168-69.

SDC manufactures AMOLED display panels in South Korea and assembles them into AMOLED display modules in Vietnam and China.  *Id.* at 168-69 (citing CX-1636C-NCTPSC (Pyon)[9] at Q/A 13).  SDC then sells the AMOLED DI Products to SEC, who incorporates them into the Galaxy DI Products in Vietnam.  *Id.* at 161, 169 (citing Tr. (Kim) at 574:23-575:5).  Each AMOLED DI Product is configured for certain Galaxy DI Products.  SEC then sells the Galaxy DI Products to its wholly owned U.S. subsidiary, Samsung Electronics America ("SEA"), for importation into the United States.  *Id.* at 161, 170.[10]  SEC also sells the AMOLED DI Products to SEA for resale to repair shops as replacement displays in the United States.  *Id.* at 161.  SEA engages in domestic activities relating to the Galaxy DI Products, namely activities that fall into ███████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ .  *Id.* at 166-67.

## II.    COMMISSION REVIEW OF THE FINAL ID

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*.  *Certain Electronic Stud Finders, Metal Detectors and Electrical Scanners*, Inv. No. 337-TA-1221, Comm'n Op. at 9 (Feb. 15, 2022) (citations omitted), *aff'd*, *Zircon Corp. v. Int'l Trade Comm'n*, 101 F.4th 817 (Fed. Cir. 2024).  Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule."  *Certain Electronic Devices, Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, and Components Thereof*,

---

[9] Mr. Chang-Soon Pyon is "the Group Leader of the Layout Design Group in the Design Team at SDC's Mobile Display Development Center."  CX-1636C-NCTPSC at Q/A 5.

[10] The ID mistakenly stated that "SEC, in turn, sells the products to SEC."  ID at 170.  This sentence is corrected to state that SEC sells the products to SEA.  *Id.* at 161.

PUBLIC VERSION

Inv. No. 337-TA-1200, Comm'n Op. at 7 (Nov. 10, 2021) (citations omitted), *aff'd, Roku, Inc. v. Int'l Trade Comm'n*, 90 F.4th 1367 (Fed. Cir. 2024).  With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge."  19 C.F.R. § 210.45(c).  The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding."  *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

## III.    ANALYSIS OF ISSUES REVIEWED

The Commission's findings, conclusions, and supporting analysis follow.  The Commission affirms and adopts the ID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion.

### A.    Statutory Authority and Commission Rule 210.12

On review, the Commission has determined to affirm the ALJ's finding that the Commission has statutory authority to investigate Respondents' alleged violations under section 337(a)(1)(B) based on the allegations in the complaint, including that Respondents have imported infringing articles and that a domestic industry exists.  ID at 18-19.

Respondents appear to have argued before the ALJ that the Commission lacks authority to investigate SDC's complaint based on Respondents' assertion that SDC is not the owner of the patents.  *See* Respondents' Submission in Response to Order No. 47 at 5, 7-10 (EDIS Doc ID 821216).  Setting aside whether Respondents timely raised this argument, Respondents misapprehend the Commissions' statutory authority to investigate.  The Commission has statutory authority to investigate based on the appropriately plead complaint filed by SDC, who alleges *inter alia* that it owns the patent.

**PUBLIC VERSION**
**CONFIDENTIAL MATERIAL OMITTED**

As discussed below (*infra*), the Commission's determination that Complainant SDC failed to satisfy the economic prong of the domestic industry requirement is sufficient to find that SDC has failed to prove a violation of section 337.  Based on the dispositive nature of this finding, the Commission has determined to take no position on whether the ALJ abused his discretion in finding that Respondents forfeited their argument that SDC is not the owner of the Asserted Patents under Commission Rule 210.12.  ID at 4, 19-20; *Beloit Corp.*, 742 F.2d at 1423.

### B.    Domestic Industry

When a section 337 investigation is based on allegations of patent infringement, the complainant must show that "an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established."  19 U.S.C. § 1337(a)(2).  "[A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent . . . concerned –

   (A) significant investment in plant and equipment;

   (B) significant employment of labor or capital; or

   (C) substantial investment in its exploitation, including engineering, research and development, or licensing."

19 U.S.C. § 1337(a)(3).  The "domestic industry requirement" of section 337 consists of a so-called "technical prong" and a so-called "economic prong."  *Philip Morris Products S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1341 (Fed. Cir. 2023).  Here, the Commission affirms the ID's finding that representative AMOLED display panels, which are incorporated into display modules, that are used in the ███████████████████████████████ products

practice claim 21 of the '803 patent.  ID at 59-61 (citing CX-1628-NCT-PSC (Kymissis) at Q/A 592-600, 610-611, 661-669-676, 679-681).[11]

Complainant SDC asserted a domestic industry exists under prongs (A) and (B) of section 337(a)(3).  Before the ALJ, SDC relied on investments in two categories of alleged DI Products: (1) the AMOLED DI Products, which are display modules manufactured abroad by SDC that incorporate the patented display panel; and (2) the Galaxy DI Products, which are Galaxy smartphones manufactured abroad by SEC that incorporate the AMOLED DI Products. *Id.* at 157 & n.49, 168-69.  For each of these two categories of DI products, SDC pointed to different investments.  For the AMOLED DI Products, SDC relied on the alleged investments of its U.S.-based research and development laboratory, Samsung Display America Lab ("SDAL"), and those of a third-party contractor, Universal Display Corp. ("UDC").  *Id.* at 172-81.  For the Galaxy DI Products, SDC relied on the alleged investments of SEC's subsidiary, SEA.  *Id.* at 172.

With respect to the AMOLED DI Products, no party contested that it was appropriate to consider investments in the AMOLED DI Products as investments with respect to articles protected by the patent, and the ID did not separately analyze whether investments in the AMOLED DI Products should be included in the domestic industry.  *Id.* at 157 & n.49.  The ID therefore focused its analysis of whether a domestic industry existed based on the nature and extent of the asserted investments in the AMOLED DI Products by SDAL and UDC.  *Id.* at 172-181.

---

[11] As discussed below (*infra*), the Commission's determination that Complainant SDC failed to satisfy the economic prong of the domestic industry requirement is sufficient to find that SDC has failed to prove a violation of section 337.  Based on the dispositive nature of this finding, the Commission has determined to take no position on whether the ▆▆▆▆▆▆ ▆▆▆▆▆▆ products practice claim 5 of the '803 patent.  *See Beloit Corp.*, 742 F.2d at 1423.

CONFIDENTIAL MATERIAL OMITTED

As to the claimed investments in the AMOLED DI Products, the ID determined that SDC failed to show that SDAL's alleged investments were qualitatively or quantitatively significant. *Id.* at 174-76. The ID also determined that UDC's alleged investments included investments related to dopants that were not specifically developed for the AMOLED DI Products, which were not cognizable under *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879 (Fed. Cir. 2015). *Id.* at 178-81. Specifically, the ID found SDC's allocation methodology was flawed and unreliable because SDC's purchases of dopant materials from UDC are not all cognizable under *Lelo* and SDC failed to account for the non-cognizable portion of UDC's investments. *Id.* at 179-81. The ID further found that even if the UDC investments could be considered notwithstanding SDC's failure to properly allocate investments pursuant to *Lelo*, SDC failed to show that UDC's alleged investments were quantitatively significant based merely on the fact that ███████████

███████████ *Id.* at 181. SDC did not seek Commission review of the ID's findings with respect to SDAL and UDC, and accordingly, no longer relies on those investments in the AMOLED DI Products.[12] CPet at 80. SDC, therefore, has abandoned its claim that the economic prong is met based on the AMOLED DI Products. 19 C.F.R. § 21.0.43(b)(2).

As to the Galaxy DI Products, the ID determined that the relevant domestic industry does not include investments in the Galaxy DI Products, applying the *Magnetic Tape* analysis. ID at 157-72. On this basis, the ID found that SEA's alleged investments in the Galaxy DI Products were irrelevant to whether SDC satisfied the domestic industry requirement. *Id.* at 172. SDC

---

[12] To the extent SDC argues for the first time in its petition for review that SEA's investments may be combined with SDAL's and UDC's investments in the U.S to show significance, the Commission finds this new argument untimely. *See* CPet at 79-80; RResp at 74-75; OResp at 25 n.11.

PUBLIC VERSION
**CONFIDENTIAL MATERIAL OMITTED**

petitioned for Commission review of the ID's economic prong findings regarding the Galaxy DI Products.  CPet at 27-80.

The Commission determined to review the ID's findings on domestic industry but did not request briefing from the parties on this issue.

### 1.    AMOLED DI Products

On review, the Commission affirms the ID's finding that SDC failed to show that SDAL's alleged investments with respect to the AMOLED DI Products were qualitatively or quantitatively significant.  ID at 174-76.  With respect to UDC's alleged investments, the Commission adopts the ID's finding that SDC's allocation methodology was flawed and unreliable because SDC's purchases of dopant materials from UDC are not all cognizable under *Lelo* and SDC failed to account for the non-cognizable portion of UDC's investments.  *Id.* at 179-81.  Because this finding is sufficient to conclude that the evidence does not show a domestic industry exists based on UDC's investments in the AMOLED DI Products, the Commission has determined to take no position on the significance of UDC's investments in the AMOLED DI Products even if they were creditable.[13]  *Id.* at 181.

Accordingly, the Commission affirms with modifications the ID's finding that the evidence does not show a domestic industry exists based on SDAL's or UDC's investments in the AMOLED DI Products.  As explained below, the Commission also affirms with modified

---

[13] Commissioner Kearns would affirm the ID's finding that Complainant has not demonstrated that UDC's investments are quantitatively significant based merely on the fact that ███████████████████████████████  ID at 181.  In particular, Commissioner Kearns agrees with the ID's finding that Complainant's significance argument "is different than the scenario where all the investments in a domestic industry product occurred in the United States" and, thus, there are little to no foreign investments, but, here, the evidence demonstrates that "there are numerous other types of investments in the Domestic Industry Products that occur outside of the United States."  *Id.* at 181 n.58.

reasoning the ID's finding that SDC failed to demonstrate the existence of a domestic industry under sections 337(a)(3)(A) or (B) with respect to the Galaxy DI Products.

### 2.    Galaxy DI Products

On review, the Commission affirms the ID's finding that SEA's investments in the Galaxy DI Products are not investments with respect to articles protected by the patents and thus the relevant domestic industry does not include investments in the Galaxy DI Products.   The Commission, however, does so based on modified reasoning as discussed below.

Since the passage of the Omnibus Trade and Competitiveness Act of 1988, Congress has required "significant investment in plant and equipment" under section 337(a)(3)(A) or "significant employment of labor or capital" under section 337(a)(3)(B) "with respect to the articles protected by the patent[.]"[14]  19 U.S.C. § 1337(a)(3); Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1212-13.  As the Supreme Court has observed, phrases like "with respect to" or "respecting" have a "broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 717 (2018); *see United States* v. *Tohono O'odham Nation*, 563 U.S. 307, 312 (2011) ("in respect to" suggests a "broad" meaning); *see also Muldrow* v. *City of St. Louis*, 601 U.S. 346, 354-355 (2024) (treating "with respect to" to mean "pertain[ing] to" and equating it with the phrase "respecting").  That understanding of section 337(a)(3) is consistent with the preceding paragraph's use of the equally broad term "relating to" in describing the domestic industry requirement.  *See* 19 U.S.C. § 1337(a)(2) (requiring the existence or nascent existence of "an industry in the United States, *relating to* the articles protected by the patent" (emphasis added)).

---

[14] SDC did not allege a domestic industry exists under section 337(a)(3)(C) and, thus, prong (C) is not at issue in this investigation.

Like "with respect to," "'relating to'" means "hav[ing] 'a connection with.'"  *Pugin* v. *Garland*, 599 U.S. 600, 607 (2023) (citation omitted); *see Lamar*, 584 U.S. at 717-718.  The Commission thus examines the domestic industry from the standpoint of whether the relevant investments "relat[e] to" or are "with respect to" the articles protected by the asserted patents.[15]

This inquiry is a fact-specific, case-by-case determination and depends upon how the complainant's domestic investments are connected to the articles that are protected by the asserted patents in the context of the realities of the marketplace.  To aid in that inquiry, in *Magnetic Tape*, the Commission laid out three factors to consider in determining whether the realities of the marketplace support finding that investments other than in the patented technology or patented article may be considered investments "with respect to articles protected by the patent":

> [W]hether the patented technology is sold as a separate entity or article of commerce; whether it is an essential component of the downstream product; and whether the domestic industry activities "have a direct relationship to exploitation of the patented technology."

*Certain Magnetic Tape Cartridges*, Inv. No. 337-TA-1058 ("*Magnetic Tape*"), Comm'n Op. at 48 (Apr. 9, 2019) (citing *Certain Video Game Systems & Wireless Controllers and Components Thereof*, Inv. No. 337-TA-770 ("*Video Game*"), Comm'n Op. at 66-67 (Oct. 28, 2013), *aff'd Creative Kingdoms, LLC. V. Int'l Trade Comm'n*, 588 Fed. Appx. 993 (2014)).

---

[15] In this regard, the ID suggested that a domestic industry should normally be "defined in terms of the patented article" and that only in "some exceptional circumstances" should the Commission recognize expenditures in downstream products.  ID at 157-158.  As discussed herein, however, the Commission has in some circumstances applied the realities of the marketplace to support considering investments other than those made directly in the patented technology or patented article.

PUBLIC VERSION

In appropriate circumstances, the Commission has applied the *Magnetic Tape* analysis (or a similar "realities of the marketplace" analysis) to include within the relevant "industry" investments in unpatented components or products which "relat[e] to" or are "with respect to" articles that are protected by the patents. For example, in *Air Mattress Systems,* the Commission considered complainant's investments in assembling the air mattress systems containing the patented air controllers because the air controllers were not articles of commerce unlike the air mattresses. *See Certain Air Mattress Sys., Components Thereof, & Methods of Using the Same*, Inv. No. 337-TA-971 ("*Air Mattress Systems*"), Comm'n Op., 2017 WL 11165550, at *26-27 (June 20, 2017);[16] *see also Certain Subsea Telecomm. Sys. and Components Thereof*, Inv. No. 337-TA-1098, Comm'n Op., 2019 WL 9596565, at *24-25 (Oct. 21, 2019) ("Recognizing the realities of the marketplace, there was no dispute that the alleged articles in commerce here are [complainant's] NuWave Optima systems that include the patented article, the AC400 module" and that "the whole NuWave Optima system is necessary to exploit the patented technology[.]"); *Magnetic Tape*, Comm'n Op. at 56 (determining the complainant may rely on its licensee's investments in patented magnetic tapes and unpatented proprietary magnetic tape drives because the drives were necessary to exploit the patented technology); *Video Game*, Comm'n Op. at 67-68 (determining the complainant could rely on investments in the patented interactive wand and certain unpatented components that were "central" to "exploit[ing] the technology of the claimed toy wands," but could not rely on investments in the attraction that were unrelated to wand interactivity); *Certain Sleep-Disordered Breathing Treatment Systems & Components Thereof*, Inv. No. 337-TA-890 ("*Sleep-Disordered Breathing*"), ID at 149-50 (Sept. 16, 2014)*,*

---

[16] The Commission decision with respect to the '172 patent was later vacated on remand after the patent expired on appeal. *See Air Mattress Systems*, Comm'n Op., 2020 WL 861520, at *1 (Feb. 19, 2020).

*unreviewed in relevant part*, Comm'n Op., 2015 WL 13817117, at *28 n.13 (Jan. 16, 2015)[17]

(determining the patented article, the H5i humidifier, is wholly dependent on an unpatented

component, the S9 flow generator, and the S9 flow generator was thus central to enabling the

complainant to exploit the patented technology of its humidifier).

Turning to the Galaxy DI Products, the Commission examines whether it is appropriate to

include domestic investments in the Galaxy DI Products made by SEA by applying the *Magnetic

Tape* analysis. There is no dispute that the technology of the Asserted Patents concerns

particular structural features of an OLED display panel. *See* ID at 157 n.49; CPHB[18] at 153

(stating "the AMOLED display" is "the patent-practicing article"). In the context of this

investigation, an AMOLED display panel is "a substrate bearing the pixel array itself, a touch

panel if the display is touch-enabled, and the circuits used to drive the pixels. This includes the

scan driver and pixel circuit at issue in this Investigation." RX-1084 (Pattison) at Q/A 42.[19]

---

[17] The Commission adopted the ALJ's domestic industry findings under section 337(a)(3)(A) and (B). 2015 WL 13817117, at *28 n.13. On appeal, the Commission moved for a remand in light of intervening domestic industry precedent in *Lelo*. On remand, the ALJ's remand ID ("RID") reversed his previous determination and found that a domestic industry did not exist because the claimed investments were not quantitatively "significant" under *Lelo*. *Sleep-Disordered Breathing*, ID on Remand (Nov. 10, 2016). The Commission determined to review the RID and declined to adopt certain findings in the RID. *See* Comm'n Notice at 3 (Jan. 12, 2017) (determining not to adopt the RID's statements that "the amount a complainant spends to purchase components manufactured in the United States is immaterial to the economic prong analysis," RID at 20-21, and that evidence of payments to domestic suppliers is "*per se* insufficient to include in the quantitative analysis," RID at 24).

[18] Complainant's Post-Hearing Initial Brief, EDIS Doc ID 828893 (Aug. 7, 2024).

[19] The asserted claim language and the patent specifications support finding the patented technologies are directed to the OLED display panels. *See Video Game*, Comm'n Op. at 60-63, 66-68 (finding the patent specification and claim language make clear that the "articles protected by the patent" is the toy wand). Here, the Asserted Patents describe the field of art as organic light emitting diode (OLED) displays and all disclosed embodiments are directed to particular structures within the OLED display. *See* JX-1 ('599 patent) at 1:15-21, 3:43-6:7; JX-3 ('803 patent) at 1:15-20, 1:54-3:10; JX-5 ('578 patent) at 1:20-24, 1:61-3:20. The asserted claims of

**PUBLIC VERSION**

SDC manufactures these display panels in South Korea. ID at 168 (citing CX-1636C-NCTPSC (Pyon) at Q/A 13). SDC assembles each AMOLED display panel into an AMOLED display module in Vietnam and China. *Id.* at 168-69 (citing CX-1636C-NCTPSC (Pyon) at Q/A 13). Each display module includes "a number of other components that allow the panel to connect to and operate on the product for which it can be configured or for which it was designed, such as a mobile phone," including "a flex circuit, bonding ICs, software, a polarizer, optical clear adhesive, radiator film, and a back film." RX-1084 (Pattison) at Q/A 42. The parties do not dispute that it is appropriate for SDC to allege a domestic industry based on the AMOLED DI Products that incorporate the patented display panel. ID at 157 & n.49.

The Commission has determined to affirm with modified reasoning the ID's determination that the realities of the marketplace do not warrant considering investments made in the Galaxy DI Products (*i.e.,* Galaxy smartphones) to be investments with respect to articles protected by the patents. Inasmuch as the Commission finds that the relevant domestic industry products do not include the Galaxy DI Products, none of SEA's domestic activities related to the Galaxy DI Products are with respect to articles protected by the Asserted Patents. Complainant SDC thus has failed to demonstrate that a domestic industry exists under sections 337(a)(3)(A) or (B) based on SEA's investments in the Galaxy DI Products.[20]

---

the '803 and '578 patents are directed to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels. JX-3 ('803 patent) at 10:54-55; JX-5 ('578 patent) at 9:5-54, 14:38-62; ID at 28-30, 67-70. The asserted claims of the '599 patent are directed to pixel circuits in an AMOLED display "capable of detecting and self-compensating threshold voltage deviations." JX-1 ('599 patent) at 3:44-47; ID at 108-110. Thus, the patented technologies at issue in this investigation relate to OLED display panels.

[20] Because the ID found SEA's domestic activities related to the Galaxy DI Products are not creditable, the ID did not make findings regarding the proper allocation and significance of SEA's investments in the Galaxy DI Products.

PUBLIC VERSION

The ID analyzed and applied each of the *Magnetic Tape* factors to the facts of this case regarding the Galaxy DI Products and found the first factor (whether the patented technology is sold as a separate entity or article of commerce) is neutral, the second factor (whether it is an essential component of the downstream product) weighs in favor, and the third factor (whether the domestic industry activities have a direct relationship to exploitation of the patented technology) weighs against defining the domestic industry to include investments in the Galaxy DI Products. On review, the Commission finds the first and third factors weigh against broadening the domestic industry to include investments in the Galaxy DI Products and the second factor is at best neutral.

The **first factor** looks at "whether *the patented technology* is sold as a separate entity or article of commerce." *Magnetic Tape*, Comm'n Op. at 48 (emphasis added). There is no dispute that the display panel incorporating the pixel structure *is not* itself an article of commerce. Moreover, as noted above, the display panel is physically incorporated into an AMOLED display module, which in turn is incorporated into the Galaxy DI Products. The Commission agrees with the ID's findings that the evidence suggests that the AMOLED DI Products are separate articles of commerce. *See* ID at 160-161 (citing Tr. (Kim) at 565:16-19; Tr. (Cho) at 611:16-19, 613:5-8; CX-1603C (Sheppard Dep.) at 118:8-14, 176:16-22, 197:9-13; Tr. (Vander Veen) at 425:22-426:10; RX-1085C (Herrington) at Q/A 59); *see also* RX-1085C (Herrington) at Q/A 50, 52, 58; CX-1636C-NCT-PSC (Pyon) at Q/A 13, 15; CX-1245C (Bazelon) at Q/A 27; Order No. 43; CX-4035C.

SDC's Petition for Review argues that this factor favors inclusion of investments in the Galaxy DI Products because the "Galaxy DI Products provide the *only* avenue for the AMOLED DI Products to operate properly and exploit the benefits of the Asserted Patents." CPet at 39.

PUBLIC VERSION
**CONFIDENTIAL MATERIAL OMITTED**

The evidence of record shows, however, that the Galaxy DI Products are *not* "the only use for the displays embodying the patented inventions," even though the specific AMOLED DI Products are customized for the Galaxy DI Products. *Id.* at 2, 15. Such customization work is not unique between SDC and SEC.[21] SDC performs similar customization work for other OEM customers, such as ███████████. Tr. (Pyon) at 549:11-16 (████████████ ██████████████████████████████████), 553:18-554:10 (testifying SDC's ███████████████████████████████). In other words, even though a Galaxy DI Product uses a specific AMOLED DI Product, the patented technology of the display panel incorporated into the AMOLED display module is sold separately to other customers, like ██████████. RX-1085C (Herrington) at Q/A 50, 52, 56; CX-1245C (Bazelon) at Q/A 27.

SDC further argues that this factor favors including the Galaxy DI Products because the patented "inventions provide benefits especially valuable for mobile devices[.]" CPet at 16. Even if the patent specifications teach that the disclosed pixel arrangement is useful in smartphone applications, the claims of the '803 and '578 patents do not limit use of the pixel arrangement to any specific application. Tr. (Kymissis) 1056:19-1057:25 (testifying the asserted claims are not limited to any specific application and the specification of the pixel patents does not use the word "mobile"), 1122:23-1123:21. Indeed, the record shows that SDC's patented technologies are also used in consumer products other than smartphones and other industries including commercial, medical, and military markets. *See* ID at 161 (finding the "AMOLED DI

---

[21] Other than SDAL's and UDC's investments, which the Commission has determined to be insufficient to establish a domestic industry, SDC did not rely on any other investments related to the AMOLED DI Products or any specific investments made to customize its AMOLED DI Products for the Galaxy DI Products. And, as noted above, SDC has abandoned its claim to a domestic industry relating to the AMOLED DI Products.

**PUBLIC VERSION**

Products themselves are a product that can be exploited from an economic perspective, even apart from their use in a Galaxy phone"); CPet at 8; RResp at 8 ("SDC manufactures AMOLED displays for a wide variety of consumer electronics products, including TVs, notebooks, laptops, automotive displays, mobile phones, and VR products."); CX-1628C-NCT-PSC (Kymissis) Q/A 712, 722; *see also* RX-1085C (Herrington) Q/A 50; RX-0211C-NCT (Pyon Dep.) 38:6-21; RX-0213C (Song Dep.) at 24. Thus, the evidence shows that while the patented technology is useful for smartphones, the technology can also be used, and there is a market for, the patented technology in consumer products other than smartphones. Recognizing this distinction, Samsung created SDC to operate as a separate business from that of SEC and SEA. ID at 170-71 ("While the three companies all contain the name "Samsung," they are separate companies."); CX-1635C (Kim) Q/A 10-12 (testifying that SDC "was created to make a new company that would operate independently from SEC in the display business").

Despite finding the AMOLED DI Products incorporating the patented display panels are sold as separate articles of commerce, the ALJ found that "it is unclear if this factor weighs against crediting domestic investments in the Galaxy DI Products" because the Commission has credited investments in a downstream article even when a product is sold separately. ID at 161-62 (citing *Sleep-Disordered Breathing*, ID at 149) (finding the relevant domestic industry includes investments in both the patented humidifier and the unpatented flow generator even though the humidifier was sometimes sold separately)). The Commission, however, finds this factor weighs against considering investments in the Galaxy DI Products as investments with respect to articles protected by the patents. The fact that the patented technology is sold as a separate article of commerce suggests that investments in the downstream product may have less of a connection to the patented technology since the patented technology may be used separate

and apart from the downstream article.  Indeed, the fact that the AMOLED DI Products incorporating the patented technology are sold separately from the downstream Galaxy DI Products tends to suggest that the degree of connection between the patented technology and the downstream Galaxy DI products is not as strong.  The ID seems to misunderstand the Commission's prior determinations, where despite finding the patented technology was sold as a separate article of commerce, the Commission nonetheless considered investments in a downstream or related product.   The fact that the Commission determined to consider investments in a downstream or related product despite the patented technology being sold as a separate article of commerce (one of the three factors the Commission considers under the *Magnetic Tape* factors) does not mean it is unclear how the factor weighs but simply reflects that the determination does not turn on this one factor but rather must be considered along with other factors and the relevant evidence.

For these reasons, the Commission finds that the first factor weighs against considering investments in the domestic industry to include SEA's investments in the Galaxy DI Products.

The **second factor** examines whether the evidence indicates that the patented technology is an essential component of the downstream product.  *Magnetic Tape*, Comm'n Op. at 48.  The ID found this factor favored including SEA's investments in the Galaxy DI Products because the AMOLED DI Products are "essential components" of the Galaxy DI Products and because the phones cannot function without the AMOLED DI Products.  *See, e.g.*, ID at 163 ("I find that the AMOLED DI Products are essential components of the Galaxy DI Products.");[22] CPet at 15 (asserting that the "AMOLED DI Products and Galaxy DI Products are '*completely customized*

---

[22] The ID's statement that the "fact that it is theoretically possible to modify a product so that it could work with other components does negate a finding that the existing component is essential," ID at 163, is a typographical error and should state "does not negate," instead.

*for*'—and exclusively sold for use with—each other"), 61 n.19 ("[T]he AMOLED DI Products

need not be exclusively used by the Galaxy phones for them to be essential to those phones.").

We disagree with the ID's assessment of this factor.

While SDC argues that the AMOLED DI Products are "nonfunctional" on their own and

"must be physically connected to" the Galaxy DI Products "to operate properly," the focus of the

second factor must remain on the patented technologies like the first factor.  CPet. at 39.  As

discussed above, the patented technologies are undisputedly the patented pixel circuit and array

structure in SDC's AMOLED display panels, which are incorporated into the AMOLED DI

Products and then sold to SEC for incorporation into the Galaxy DI Products.  Here, the evidence

only shows that *a display* is essential to the Galaxy DI Products but that other kinds of

unpatented displays, *e.g.,* LCD or OLED displays, can be used in place of SDC's patented

displays.  *See* ID at 163 (finding the evidence shows that "in theory, the Galaxy DI Products

could be modified to operate with different displays") (citing Tr. (Bazelon) at 756:7-14; RX-

1085C (Herrington) at Q/A 60; Tr. (Herrington) at 969:18-24; RX-0714C.23).  Some

modification may be needed to make those other displays work with the Galaxy DI Products, but

modifications were also needed to accommodate SDC's AMOLED DI Products.  Tr. (Pyon) at

549:11-16, 553:18-554:10.

In *Sleep-Disordered Breathing*, the complainant advocated for a "system" approach that

considered all of its CPAP treatment products to be within the scope of the domestic industry,

including its CPAP masks, flow generators, and humidifiers.  The humidifiers were protected by

one patent and the masks were protected by other patents, but none of the patents claimed a flow

generator.  However, the ALJ determined that the unpatented flow generator was "central to

enabling [the complainant] to exploit the patented technology of the H5i humidifier because the

H5i humidifier is designed to work only with the S9 flow generator and "***cannot practice the claims*** of the '453 Patent, ***without an S9 flow generator***."  *Sleep-Disordered Breathing*, ID at 147, 149 (emphasis added).  By contrast, for the patents that disclosed mask-related inventions, the ALJ found that the masks were almost always purchased separately, the masks could be used with other companies' flow generators and humidifiers, and the flow generator and humidifier were not central to enabling the complainant to exploit the patented technology of its masks.  *Id.* at 147.  The ALJ therefore credited investments related to the "co-pack" that included both the humidifier and the flow generator for the patent that protected the humidifier but not for the patents that protected the masks.  *Id.* at 150.

Distinctions in the marketplace between the masks and the humidifiers explain why, under the facts of *Sleep-Disordered Breathing*, a domestic industry for patented masks *did not* include investments in the humidifiers and flow generators while the domestic industry for the patented humidifier *did* include investments in the flow generator.  In the former case, consumers could still buy and use (that is, exploit) the masks in conjunction with other products available in the marketplace even if the complainant had never invested in compatible humidifiers and flow generators business.  In the latter case, stopping production of the compatible flow generator meant eliminating any possible use of the humidifier by consumers.  Similarly, as discussed above, the evidence shows that if the Galaxy DI Products were to discontinue, SDC could still exploit its patented technologies by selling its AMOLED display modules to other manufacturers.

In view of the above, the Commission finds the evidence regarding the second factor is neutral at best, though the fact that the patented technology in particular is not essential to the

PUBLIC VERSION
**CONFIDENTIAL MATERIAL OMITTED**

Galaxy DI Products would tend to weigh against considering investments in the Galaxy DI Products as investments with respect to the articles protected by the patent.

The **third factor** looks at whether the domestic industry activities "have a direct relationship to exploitation of the patented technology." *Magnetic Tape,* Comm'n Op. at 48. Here, the Commission affirms the ID's finding that the domestic activities performed by SEA for the Galaxy DI Products are far removed from the patented technologies and, thus, this factor weighs against broadening the investments in the domestic industry to include the Galaxy DI Products.[23]  ID at 166-68 (finding SEA's activities do not have a direct relationship to the exploitation of the patented technology and are not necessary to ensure that the patented articles could be used by consumers).  There is no evidence that SEA significantly invests in the customization of SDC's display panel or the AMOLED DI Products to ensure compatibility with the Galaxy DI Products.  To the contrary, the majority of SEA's activities relate to ensuring the imported phones ██████████████████████.  *See id.* at 166-67; CPet at 46-54; Tr. (Vander Veen)[24] at 462:6-14 (testifying "there is additional work that is done, at least some of the [imported] phones, for example, flashing software, carrier specific software and so forth on those devices").  But whether a phone can ████████████████████ does not affect a consumer's ability to view information or use the display and does not relate to SEC's incorporation of the display into the phone.

---

[23] To the extent SDC's petition relies on arguments and evidence not set forth in its initial post-hearing brief to support its argument that SEA's activities related to the Galaxy DI Products are essential to the exploitation of the patented technologies or necessary to ensure SDC's patented displays could be used by consumers, the Commission finds those arguments and evidence untimely and waived.  *Compare* CPet at 46-56 *with* CPHB at 159-64; *see* OResp at 18-19 (citing Order No. 46 (Apr. 26, 2024) (arguing that SDC waived "any contentions that are not set forth in detail in the post-hearing initial brief" under Ground Rule 14.2)); RResp at 32-34.

[24] Dr. Vander Veen is SDC's economic expert on domestic industry.

SDC asserts that the ID erred in requiring that the specific SEA investments be necessary to exploit the patented technology in order to find that investments in the Galaxy DI Products are part of the domestic industry. *See, e.g.*, CPet at 3, 28 (arguing that that "the ID legally erred by effectively requiring an additional showing that each investment, assessed one-by-one, was necessary either to exploit the patented technology or to otherwise ensure that the patented article could be used by consumers"). Contrary to SDC's assertion, Commission precedent supports looking at the relationship between domestic activities and investments and the articles protected by the patent to determine whether those investments qualify under section 337(a)(3)(A) and (B).

While the Commission has credited investments in articles that do not themselves practice an asserted patent when the realities of the marketplace supported such an approach, the Commission has, in prior investigations, excluded or otherwise limited consideration of investments in unprotected articles where the connection of those investments to the patented technology was too attenuated. For example, in *Video Game*, the patented article was undisputedly "a 'toy wand' and not a toy wand in combination with an interactive play environment." *Video Game*, Comm'n Op. at 63, 66. The Commission allowed the complainant to include investments related to "the claimed wand, [the] electronic receivers within the MagiQuest effect, and the relevant main server software that coordinate these effects," *id*. at 73, "which [were] central to enabling [the complainant] to exploit the technology of the claimed toy wands," *id*. at 70, but not investments related to the entire MagiQuest attraction, such as the "physical space, design themes, physical props, other peripheral items, and sales and training staff," *id*. at 68, "which [were] far removed from the technology protected by the patent," *id*. at 67. Here, the evidence shows that SEA's activities have no connection to the patented display technologies or AMOLED display modules that incorporate the display panels and SDC can and

does commercially exploit its patents in smartphones and consumer products other than the

Galaxy DI Products.[25]

Contrary to SDC's assertion, the facts of *Magnetic Tape* are also distinguishable.  CPet at

30-32.  In *Magnetic Tape*, licensee IBM was not simply purchasing components from

complainant Sony and incorporating them into a downstream product.  Rather, IBM practiced the

asserted patents under authorization from Sony by developing its own proprietary storage format

for its patent-protected 3592 tapes and its unprotected drives.  The Commission found that

IBM's drive investments "ha[d] a direct relationship to exploitation of the patented technology"

because Sony had "established that IBM's domestic 3592 drive development work is devoted to

improving the interoperability of the 3592 tape media with drives."  *Magnetic Tape*, Comm'n

Op. at 54-55.  Unlike IBM in *Magnetic Tape*, neither SEC nor SEA is separately practicing the

Asserted Patents in the United States, and as discussed above, SEA's domestic activities for the

Galaxy DI Products are far removed from the AMOLED display panels and the patented

---

[25] SDC also argues that it "has included only qualifying investments in the Galaxy DI Products—presenting the same categories of investments in Galaxy smartphones accepted by the Commission in previous investigations."  CPet at 45-46, 68-69 (citing *Certain Mobile Phones and Tablet Computers, All With Switchable Connectivity*, Inv. No. 337-TA-1301 ("*Mobile Phones*"); *Certain Electronic Computing Devices, and Components and Modules Thereof*, Inv. No. 337-TA-1387 ("*Electronic Computing Devices*")).  This case is not like these other investigations in which the Commission credited SEA's investments in Galaxy phones to establish a domestic industry.  The Commission terminated *Mobile Phones* based on a settlement agreement before the presiding ALJ issued an initial determination on violation of section 337.  The presiding ALJ in *Electronic Computing Devices* has not issued an initial determination on violation of section 337 and the technical prong of the domestic industry requirement is still at issue.  Moreover, unlike Respondents here, the respondents in *Mobile Phones* and *Electronic Computing Devices* stipulated that the domestic industry should include investments in various versions of the Galaxy mobile phones and did not contest complainant's motion for summary determination that it satisfied the economic prong of the domestic industry requirement based on licensee Samsung's domestic investments and activities.  However, as explained above, the record evidence in this investigation does not support finding the domestic industry should include investments in the Galaxy DI Products by SEA.

technologies in the display's pixel arrangements and circuits.  ID at 166-68; Tr. (Herrington) at 979:12-980:18, 984:7-23; RX-1085C (Herrington) at Q/A 55, 76, 78, 81-82; Tr. (Vander Veen) at 424:12-425:5.  Thus, the Commission finds the third factor weighs against defining the domestic industry to include investments in the Galaxy DI Products.

In sum, applying the *Magnetic Tape* analysis, the Commission modifies the ID's analysis as discussed above and finds that the first and third factors weigh against broadening the domestic industry beyond investments in the AMOLED DI Products and the second factor is at best neutral.  Thus, the Commission affirms the ID's determination that the realities of the marketplace do not warrant extending the domestic industry to investments in the Galaxy DI Products.  Inasmuch as the Commission finds that the relevant domestic industry products do not include the Galaxy DI Products, none of SEA's domestic activities related to the Galaxy DI Products are with respect to articles protected by the Asserted Patents.  Complainant SDC thus has failed to demonstrate that a domestic industry exists under sections 337(a)(3)(A) or (B) based on SEA's investments in the Galaxy DI Products.

IV.    **CONCLUSION**

The Commission has considered all of the other arguments by the parties and does not find them persuasive.  Therefore, for the reasons set forth herein, the Commission determines that Complainant has not established a violation of section 337 by Respondents with respect to the asserted claims of the '803, the '578, and the '599 patents.  Accordingly, the investigation is terminated with a finding of no violation of section 337.

**PUBLIC VERSION**

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: April 9, 2025

Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For
Mobile Devices, And Components Thereof; Inv. No. 337-TA-1351 (Violation)

337-1351 Violation

CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the parties listed have entered an appearance in the above captioned investigation, and a copy of the PUBLIC CERTIFICATE OF SERVICE was served upon the following parties via first class mail and air mail where necessary.

| Document | Security | Document Type | Official Rec'd | Title |
|---|---|---|---|---|
| 848296 | Public | Opinion, Commission | 04/09/2025 03:26 PM | Commission Opinion |

Service Date:        April 09, 2025

/s

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For Mobile Devices, And Components Thereof; Inv. No. 337-TA-1351 (Violation)

337-1351 Violation

## CERTIFICATE OF SERVICE

**On behalf of Complainant Samsung Display Co., Ltd.:**

Jeffrey H.  Lerner, Lead Representative
Covington and Burling LLP
 850 Tenth Street, NW
Washington, District of Columbia 20001, United States

202-662-6000 -- voice
202-662-6291 -- fax
jlerner@cov.com
Electronic Service

**On behalf of Respondent Mianyang BOE Optoelectronics Technology Co., Ltd.:**

Bas de Blank, Lead Representative
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California 94025, United States
650-614-7343 -- voice
202-339-8500 -- fax
bdeblank@orrick.com
Electronic Service

**On behalf of Respondent Captain Mobile Parts, Inc.;DFW Imports LLC d/b/a DFW Cellphone and Parts ;Electronics Universe, Inc.  d/b/a Fixez.com;Electronics Universe, Inc.  d/b/a Repairs Universe, LLC;Gadgetfix Corp. ;Injured Gadgets, LLC;LCTech International Inc.  d/b/a SEGMobile.com;Parts4Cells, Inc.;Parts4LCD;Phone LCD Parts LLC ;Wholesale Gadget Parts, Inc. ;eTech Parts Plus, LLC:**

Merritt R. Blakeslee, Lead Representative
The Blakeslee Law Firm
226 Lakeside Drive
Boothbay Harbor, Maine 04538, United States
2024570180 -- voice
(202) 419-7007 -- fax
mrb@blakeslee-law.com
Electronic Service

**On behalf of Respondents Mengtor Inc. :**

No designated lead counsel, Lead Representative

3612 Arden Dr, #E
El Monte,  91731,
Paper Service
Express Delivery

**On behalf of Respondents Sourcely Plus LLC:**

No designated lead counsel, Lead Representative

549 S 48th Street, Suite 107
Tempe,  85281,
Paper Service
Express Delivery

**On behalf of Respondents Group Vertical, LLC:**

No designated lead counsel, Lead Representative

678 Front Ave NW Suite 135
Grand Rapids,  49504,
Paper Service
Express Delivery

**On behalf of U.S. International Trade Commission :**

Michael W. Maas
OUII Investigative Attorney
500 E Street, S.W.
Washington, D.C. 20436
Internal Service

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

---

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN ACTIVE MATRIX ORGANIC LIGHT-EMITTING DIODE DISPLAY PANELS AND MODULES FOR MOBILE DEVICES, AND COMPONENTS THEREOF** | Investigation No. 337-TA-1351<br>(Remand) |

---

### NOTICE OF THE COMMISSION'S FINAL DETERMINATION FINDING NO VIOLATION OF SECTION 337; TERMINATION OF THE INVESTIGATION

**AGENCY:**    U.S. International Trade Commission.

**ACTION:**    Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has determined to find no violation of section 337 of the Tariff Act of 1930, as amended, in this investigation.  The investigation is terminated in its entirety.

**FOR FURTHER INFORMATION CONTACT:** Cathy Chen, Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, D.C. 20436, telephone (202) 205-2392.  Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket system ("EDIS") at https://edis.usitc.gov.  For help accessing EDIS, please email EDIS3Help@usitc.gov.  General information concerning the Commission may also be obtained by accessing its Internet server at https://www.usitc.gov.  Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION:**  The Commission instituted this investigation on February 3, 2023, based on a complaint filed by Samsung Display Co., Ltd. ("SDC" or "Complainant") of the Republic of Korea.  88 FR 7,463-64 (Feb. 3, 2023).  The complaint, as supplemented, alleged violations of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof by reason of infringement of claims 1-5 and 19-21 of U.S. Patent No. 9,818,803 ("the '803 patent"); claims 1, 2, 4-10, and 13 of U.S. Patent No. 10,854,683 ("the '683 patent"); claims 1-18 of U.S. Patent No. 7,414,599 ("the '599 patent"); and claims 1-3, 6-8, and 14-22 of U.S. Patent No. 9,330,593 ("the '593 patent").  *Id.*  The complaint further alleged that a domestic industry exists.  *Id.*  The notice of investigation named the following parties as respondents: Injured Gadgets, LLC ("Injured Gadgets") of Norcross, Georgia; Wholesale Gadget Parts, Inc. ("Wholesale Gadget Parts") of Bixby, Oklahoma; Phone LCD Parts LLC and Parts4LCD (collectively, "Phone LCD Parts") of Wayne, New Jersey; Apt-Ability LLC d/b/a MobileSentrix

of Chantilly, Virginia; Mobile Defenders, LLC of Caledonia, Michigan; Group Vertical, LLC ("Group Vertical") of Grand Rapids, Michigan; Electronics Universe, Inc. d/b/a Fixez.com and Electronics Universe, Inc. d/b/a Repairs Universe, Inc. ("Electronics Universe") of Las Vegas, Nevada; LCTech International Inc. d/b/a SEGMobile.com ("LCTech") of City of Industry, California; Sourcely Plus, LLC ("Sourcely Plus") of Tempe, Arizona; eTech Parts Plus LLC ("eTech Parts Plus") of Southlake, Texas; Parts4Cells Inc. ("Parts4Cells") of Houston, Texas; Captain Mobile Parts, Inc. ("Captain Mobile Parts") of Dallas, Texas; DFW Imports LLC d/b/a DFW Cellphone and Parts ("DFW Imports") of Dallas, Texas; Mengtor Inc. ("Mengtor") of El Monte, California; and Gadgetfix Corp. ("Gadgetfix") of Irvine, California. *Id.* The notice of investigation also named the Office of Unfair Import Investigations ("OUII") as a party. *Id.*

On March 22, 2023, the Commission granted Mianyang BOE Optoelectronics Technology Co., Ltd.'s ("BOE") unopposed motion to intervene as a respondent in this investigation. Order No. 7 (Mar. 15, 2023), *unreviewed by* Comm'n Notice (Mar. 22, 2023).

Two respondents, Apt-Ability LLC d/b/a MobileSentrix and Mobile Defenders, LLC, were terminated based on a consent order. Order No. 43 (Dec. 20, 2023), *unreviewed by* Comm'n Notice (Apr. 18, 2024). Ten respondents, Captain Mobile Parts, Group Vertical, Sourcely Plus, Mengtor, Electronics Universe, LCTech, Parts4Cells, DFW Imports, Gadgetfix, and eTech Parts Plus were found in default. Order No. 16 (May 10, 2023), *unreviewed by* Comm'n Notice (June 7, 2023); Order No. 22 (Jun. 27, 2023), *unreviewed by* Comm'n Notice (July 20, 2023); Order No. 25 (Jul. 19, 2023), *unreviewed by* Comm'n Notice (Aug. 18, 2023); Order No. 27 (Aug. 8, 2023), *unreviewed by* Comm'n Notice (Aug. 30, 2023). Accordingly, respondents Injured Gadgets, Wholesale Gadget Parts, and Phone LCD Parts (collectively, "the BLF Respondents") and BOE remain active in the investigation.

On April 20, 2023, the Commission granted SDC's motion for leave to amend the complaint and notice of investigation to add allegations of infringement related to claims 1-6, 10, 12, 17, 19, 21-23, 40-47, and 51-52 of the '578 patent. Order No. 8 (Mar. 28, 2023), *unreviewed by* Comm'n Notice (Apr. 20, 2023). When the final ID issued, only claims 5 and 21 of the '803 patent, claims 5, 10, 17, 40-41, and 47 of the '578 patent, claims 2-3, 13, and 15-16 of the '599 patent, and claim 6 of the '593 patent remain asserted in the investigation as a result of termination of all asserted claims of the '683 patent and certain other asserted claims. *See* Order No. 34 (Oct. 26, 2023), *unreviewed by* Comm'n Notice (Nov. 27, 2024), Order No. 39 (Dec. 7, 2023), *unreviewed by* Comm'n Notice (Jan. 8, 2024), Order No. 51 (Jun. 14, 2024), *unreviewed by* Comm'n Notice (Jul. 3, 2024), Order No. 65 (Aug. 27, 2024), *unreviewed by* Comm'n Notice (Sept. 26, 2024).

On November 15, 2023, the BLF Respondents and BOE (collectively, "Respondents") moved for summary determination that SDC lacked standing to bring and maintain this investigation. Respondents argued because SDC's parent company, Samsung Electronics Co., Ltd. ("SEC"), "has an unfettered right to grant licenses, SDC lacks the exclusionary rights necessary to prove standing." Mot. at 18. Finding that "there is no genuine issue of material fact that SEC has an unrestricted right to sublicense the Asserted Patents to others" and that SEC's possession of such a right divested SDC of exclusionary rights, on January 9, 2024, the ALJ granted Respondents' motion for summary determination of no violation due to lack of standing. Order No. 44 at 13, 24-25 (Jan. 9, 2024).

On April 24, 2024, the Commission vacated that initial determination and remanded the investigation for further proceedings consistent with its opinion. In its opinion, the Commission found that "(1) constitutional standing, the Article III requirements of the Constitution related to the authority of federal courts to adjudicate lawsuits, is not required at [the] Commission; and (2) there are genuine issues of material facts relating to [Complainant's] rights in the asserted patents." Comm'n Op. at 2. The Commission remanded the investigation to the ALJ to "conduct further proceedings as appropriate and consistent with the Commission's opinion herewith." *Id*.

On May 2, 2024, the ALJ held a case management conference to discuss how the case would proceed on remand. Respondent BOE indicated that it wished to argue that SDC lacked "all substantial rights" to the asserted patents when it filed its complaint and that it wished to pursue discovery from SEC on this issue. Order No. 50 at 3 (June 11, 2024). SDC responded that a statutory cause of action defense had never previously been raised and thus was waived. *Id*. at 5. OUII noted that "Respondents' argument that [SDC] may not have owned the asserted patents when it filed the complaint because it did not hold all substantial rights is fundamentally different from the argument advanced in Respondents' motion for summary determination." *Id*. The ALJ then ordered "additional briefing" on "the effect of the Commission opinion on th[e] Investigation." Order No. 47, EDIS Doc. ID 820416, at 1 (May 3, 2024). Following a teleconference and briefing on remand, the ALJ found that Respondents waived their argument that SDC lacked "all substantial rights" to the Asserted Patents and thus failed to satisfy the requirement of Commission Rule 210.12(a)(7) because Respondents did not address this issue in their prehearing brief, as required by the ALJ's Ground Rules. ID at 4 (citing Order No. 50 at 4).

The evidentiary hearing was held on July 8-9, 2024, and July 15-17, 2024.

On November 15, 2024, the ALJ issued a final ID, finding no violation of section 337 because SDC failed to show the existence of a domestic industry, among other reasons. In particular, the ID found: (1) SDC met its burden under Rule 210.12(a)(7); (2) SDC failed to satisfy the economic prong of the domestic industry requirement for all asserted patents; (3) SDC satisfied the technical prong of the domestic industry requirement for the '803, the '578, and the '599 patents but not for the '593 patent; (4) at least one representative accused product infringes claims 5 and 21 of the '803 patent, claims 5, 10, 17, 40-41, and 47 of the '578 patent, claims 15-16 of the '599 patent, and claim 6 of the '593 patent but not claims 2-3 and 13 of the '599 patent; and (5) the claims have not been shown to be invalid.

On November 29, 2024, SDC filed a petition for review of the ID challenging certain findings related to the '803, the '578, and the '599 patents, including the economic prong of the domestic industry requirement. SDC did not petition for review of the ID's findings related to the '593 patent. That same day, Respondent BOE and the BLF Respondents filed a joint contingent petition for review. OUII did not file a petition for review. On December 9, 2024, Complainant, Respondents, and OUII each filed a response to the petitions.

The Commission solicited submissions from the public on the public interest issues raised by the recommended determination. 89 FR 92721 (Nov. 22, 2024). The Commission received comments from Representative John Moolenaar, Chairman of the House Select Committee on China, and Dr. Robert D. Atkinson of the Information Technology & Innovation Foundation.

On January 8, 2025, SDC filed a notice of supplemental authority to apprise the Commission of the Patent Trial and Appeal Board's final written decisions in *inter partes* review proceedings on the '578 patent and the '803 patent.  In the final written decisions, the Board found claim 21 of the '803 patent unpatentable and all other asserted claims of the '578 and '803 patents at issue in this investigation had not been proven unpatentable.  *See Mianyang BOE Optoelectronics Tech. Co., Ltd. v. Samsung Display Co., Ltd.*, IPR2023-00987, Final Written Decision (Jan. 6, 2025); *Mianyang BOE Optoelectronics Tech. Co., Ltd. v. Samsung Display Co., Ltd.*, IPR2023-01075, Final Written Decision (Jan. 6, 2025).

On January 16, 2025, the Commission determined to review the ID in part.  Specifically, the Commission determined to review:  (1) the ID's findings that the Commission has statutory authority to investigate Complainant SDC's alleged violation under section 337 and that Respondents waived their argument that SDC lacked the ability to bring this investigation under Commission Rule 210.12; (2) the ID's findings related to the technical prong for the '803 patent; and (3) the ID's findings regarding the economic prong of the domestic industry requirement.  90 FR 8,034-036 (Jan. 23, 2024).  The Commission determined not to review any other findings presented in the final ID, including the ID's finding of no violation of section 337 with respect to the '593 patent.  The Commission requested briefing from the parties on certain issues under review and on remedy, the public interest, and bonding.  The parties filed their opening written submissions on January 30, 2025, and their responsive written submissions on February 6, 2025.

On review, the Commission has found no violation of section 337 with respect to claims 5 and 21 of the '803 patent; claims 5, 10, 17, 40-41, and 47 of the '578 patent; and claims 2-3, 13, and 15-16 of the '599 patent.  Specifically, the Commission has determined to affirm the ALJ's finding that the Commission has statutory authority to investigate Complainant's alleged violation under section 337.  The Commission has also determined to affirm the ID's finding that representative display panels in the asserted domestic industry products practice claim 21 of the '803 patent.  The Commission has further determined to affirm with modified reasoning the ID's finding that Complainant failed to demonstrate the existence of a domestic industry under sections 337(a)(3)(A) and (B).  Based on this dispositive finding, the Commission has determined to take no position on whether the asserted domestic industry products also practice claim 5 of the '803 patent and whether Respondents forfeited their argument that Complainant is not the owner of the Asserted Patents under Commission Rule 210.12(a)(7).

Accordingly, the investigation is terminated with a finding of no violation.  The Commission's reasoning in support of its determinations is set forth more fully in its opinion issued concurrently herewith.

The Commission vote for this determination took place on March 19, 2025.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: March 19, 2025

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

| |
|---|
| **In the Matter of**<br><br>**CERTAIN ACTIVE MATRIX ORGANIC LIGHT-EMITTING DIODE DISPLAY PANELS AND MODULES FOR MOBILE DEVICES, AND COMPONENTS THEREOF** |

**Inv. No. 337-TA-1351**

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Administrative Law Judge Bryan F. Moore

(November 15, 2024)

**Appearances:**

*For Complainant Samsung Display Co., Ltd.*:
Jeffrey H. Lerner; Daniel W. Cho; Jessica C. Hill; Matthew A. Kudzin; Derek J. Andros; Tarek J. Austin; Lucas Moench; Natalie M. Richie; Kee Young Lee; Allyson C. Corigliano of Covington & Burling LLP of Washington, D.C.

Phil A. Irwin and Jesse Chang of Covington & Burling LLP of New York, NY

Scott A. Schrader of Covington & Burling LLP of Republic of Korea

*For Respondents Injured Gadgets, LLC; Phone LCD Parts LLC, and Wholesale Gadget Parts, Inc.*:
Merritt R. Blakeslee of The Blakeslee Law Form of Boothbay Harbor, Maine

*For Respondent Mianyang BOE Optoelectronics Technology Co., Ltd*:
Bas de Blank; Harrison Geron; and Elaine Ke of Orrick, Herrington & Sutcliffe LLP of Menlo Park, CA

Sten Jensen and Steven Routh of Orrick, Herrington & Sutcliffe LLP of Washington, D.C.

Richard F. Martinelli; Wesley White; Tyler Miller; Jordan Fernandes; and Xiang Wang of Orrick, Herrington & Sutcliffe LLP of New York, NY

David R. Medina of Orrick, Herrington & Sutcliffe LLP of Los Angeles, CA

Johannes Hsu of Orrick, Herrington & Sutcliffe LLP of Irvine, CA

*For the Office of Unfair Import Investigations:*

Michael Maas and Jeffrey Hsu of the U.S. International Trade Commission from Washington, D.C.

## Table of Contents

I. Introduction ................................................................................................ 1

    A.    Procedural History ............................................................................ 1

    B.    The Parties ........................................................................................ 5

        1.   Complainant ................................................................................ 5

        2.   Respondents ................................................................................ 5

    C.    The Products At Issue ...................................................................... 8

        1.   The Accused Products ................................................................ 8

        2.   Redesigns ................................................................................. 11

        3.   The Domestic Industry Products .............................................. 17

II. PRELIMINARY ISSUES ........................................................................ 18

    A.    Statutory Authority ......................................................................... 18

    B.    Importation ..................................................................................... 18

    C.    Commission Rule 210.12(a)(7) ...................................................... 19

III. Legal Principles ....................................................................................... 20

    A.    Infringement ................................................................................... 20

        1.   Literal Infringement .................................................................. 20

        2.   Doctrine of Equivalents ............................................................ 21

    B.    Invalidity ........................................................................................ 22

        1.   35 U.S.C. § 102 (Anticipation) ................................................. 22

        2.   35 U.S.C. § 103 (Obviousness) ................................................ 22

        3.   Written Description ................................................................... 24

        4.   Enablement ............................................................................... 24

        5.   Indefiniteness ........................................................................... 25

    i)    Domestic Industry Requirement ..................................................... 25

        1.   Economic Prong ........................................................................ 26

        2.   Technical Prong ......................................................................... 27

IV. U.S. PATENT NO. 9,818,803 .................................................................. 28

    A.    Overview ......................................................................................... 28

        1.   Asserted Claims ........................................................................ 28

        2.   Claim Construction ................................................................... 30

        3.   Level of Ordinary Skill in the Art ............................................ 30

| | B. | Infringement .................................................................. | 31 |
| | | 1. Methodology ......................................................... | 31 |
| | | 2. ███████████████ ..................................... | 40 |
| | | 3. Redesigned Products ............................................ | 57 |
| | | 4. BLF Accused Products .......................................... | 57 |
| | | 5. Defaulting Respondents' Accused Products ............. | 58 |
| | | 6. Conclusion ........................................................... | 58 |
| | C. | Technical Prong ........................................................... | 59 |
| | D. | Invalidity ..................................................................... | 61 |
| | | 1. Phan .................................................................... | 61 |
| | | 2. Phan/Yamada ....................................................... | 64 |
| | | 3. Matthies/Yamada ................................................. | 65 |
| | | 4. Secondary Considerations .................................... | 66 |
| V. | | U.S. PATENT NO. 11,594,578 .......................................... | 66 |
| | A. | Overview ...................................................................... | 66 |
| | | 1. Asserted Claims ................................................... | 67 |
| | | 2. Claim Construction .............................................. | 70 |
| | | 3. Level of Ordinary Skill in the Art ........................ | 71 |
| | B. | Infringement .................................................................. | 71 |
| | | 1. ███████████████ ..................................... | 72 |
| | | 2. Redesigned Products ............................................ | 88 |
| | | 3. BLF Accused Products .......................................... | 97 |
| | | 4. Defaulting Respondents' Accused Products ............. | 98 |
| | | 5. Conclusion ........................................................... | 98 |
| | C. | Technical Prong ........................................................... | 98 |
| | D. | Invalidity ..................................................................... | 100 |
| | | 1. Matthies/Yamada ................................................. | 101 |
| | | 2. Matthies/Yamada/Hong ........................................ | 101 |
| | | 3. Secondary Considerations .................................... | 103 |
| | | 4. Written Description .............................................. | 103 |
| | | 5. Indefiniteness ...................................................... | 105 |
| VI. | | U.S. PATENT NO, 7,414,599 .......................................... | 107 |
| | A. | Overview ...................................................................... | 107 |

|   |   | 1. | Asserted Claims ................................................................ | 108 |
|---|---|----|------------------------------------------------------------------|-----|
|   |   | 2. | Claim Construction ........................................................... | 110 |
|   |   | 3. | Level of Ordinary Skill in the Art.................................... | 111 |
|   | B. |   | Infringement....................................................................... | 112 |
|   |   | 1. | BOE Accused Products...................................................... | 114 |
|   |   | 2. | Redesigned Products.......................................................... | 127 |
|   |   | 3. | BLF Accused Products....................................................... | 127 |
|   |   | 4. | Defaulting Respondents' Accused Products....................... | 128 |
|   |   | 5. | Conclusion......................................................................... | 128 |
|   | C. |   | Technical Prong................................................................. | 129 |
|   | D. |   | Invalidity........................................................................... | 132 |
|   |   | 1. | Kimura............................................................................... | 133 |
|   |   | 2. | Kimura/Akimoto................................................................ | 136 |
|   |   | 3. | Sakamoto............................................................................ | 137 |
|   |   | 4. | Sakamoto/Akimoto............................................................ | 138 |
|   |   | 5. | Secondary Considerations................................................. | 140 |
|   |   | 6. | § 112.................................................................................. | 140 |
| VII. | U.S. PATENT NO. 9,330,593 ........................................................... | | | 141 |
|   | A. |   | Overview............................................................................ | 141 |
|   |   | 1. | Asserted Claims ................................................................ | 141 |
|   |   | 2. | Claim Construction ........................................................... | 142 |
|   |   | 3. | Level of Ordinary Skill in the Art.................................... | 143 |
|   | B. |   | Infringement....................................................................... | 144 |
|   |   | 1. | BOE Accused Products...................................................... | 144 |
|   |   | 2. | Redesigned Products.......................................................... | 147 |
|   |   | 3. | BLF Accused Products....................................................... | 147 |
|   |   | 4. | Defaulting Respondents' Accused Products....................... | 149 |
|   |   | 5. | Conclusion......................................................................... | 149 |
|   | C. |   | Technical Prong................................................................. | 149 |
|   | D. |   | Invalidity........................................................................... | 152 |
|   |   | 1. | Shin/Sasaki........................................................................ | 152 |
|   |   | 2. | Secondary Considerations................................................. | 154 |
|   |   | 3. | Written Description............................................................ | 154 |

|  |  | 4. | Indefiniteness ................................................................. | 155 |
| VIII. | ECONOMIC PRONG ............................................................. | | | 156 |
|  | A. | | Relevant Domestic Industry ................................................. | 157 |
|  |  | 1. | Sold as a Separate Entity or Article of Commerce ...................... | 160 |
|  |  | 2. | Essential Component of Downstream Product ............................. | 162 |
|  |  | 3. | Direct Relationship of Exploitation of the Patented Technology ........ | 163 |
|  |  | 4. | Conclusion ................................................................ | 169 |
|  | B. | | SEA ....................................................................... | 172 |
|  | C. | | SDAL ...................................................................... | 172 |
|  |  | 1. | Qualitative Significance .................................................. | 174 |
|  |  | 2. | Quantitative Significance ................................................. | 175 |
|  | D. | | UDC ....................................................................... | 176 |
|  |  | 1. | Qualifying Investments .................................................... | 178 |
|  |  | 2. | Quantitative Significance ................................................. | 181 |
|  | E. | | Conclusion ................................................................ | 182 |
| IX. | CONCLUSIONS OF LAW ...................................................... | | | 182 |
| X. | RECOMMENDED DETERMINATION ON REMEDY AND BOND ................... | | | 184 |
|  | A. | | General Exclusion Order ................................................... | 184 |
|  |  | 1. | Circumvention of a Limited Exclusion Order ............................. | 185 |
|  |  | 2. | Widespread Pattern of Unauthorized Use ................................. | 187 |
|  |  | 3. | Conclusion ................................................................ | 189 |
|  | B. | | Limited Exclusion Order ................................................... | 189 |
|  |  | 1. | Limiting LEOs to Replacement Displays .................................. | 190 |
|  |  | 2. | License ................................................................... | 191 |
|  | C. | | Cease and Desist Orders ................................................... | 192 |
|  |  | 1. | BLF Respondents .......................................................... | 192 |
|  |  | 2. | Defaulting Respondents ................................................... | 193 |
|  |  | 3. | BOE ...................................................................... | 193 |
|  | D. | | Bond ...................................................................... | 195 |
|  | E. | | Public Interest ........................................................... | 195 |
|  |  | 1. | Public Health and Welfare ................................................ | 196 |
|  |  | 2. | Competitive Conditions in the United States Economy .................... | 197 |
|  |  | 3. | Production of Like or Competitive Articles in the U.S. .................. | 197 |

4.  Effect on U.S. Consumers ........................................................... 197

5.  Scope and Duration of Remedial Orders .................................... 208

XI.    INITIAL DETERMINATION ON VIOLATION ......................................... 209

XII.   Order ......................................................................................................... 210

## Table of Abbreviations

The following abbreviations may be used in this Initial Determination:

| | |
|---|---|
| **CDX** | Complainant's demonstrative exhibit |
| **CPX** | Complainant's physical exhibit |
| **CX** | Complainant's exhibit |
| **CIB** | Complainant's initial post-hearing brief |
| **CRB** | Complainant's reply post-hearing brief |
| **CPHB** | Complainant's pre-hearing brief |
| **JX** | Joint Exhibit |
| **RDX** | Respondents' demonstrative exhibit |
| **RPX** | Respondents' physical exhibit |
| **RX** | Respondents' exhibit |
| **RIB** | Respondents' initial post-hearing brief |
| **RRB** | Respondents' reply post-hearing brief |
| **RPHB** | Respondents' pre-hearing brief |
| **SIB** | Staff's initial post-hearing brief |
| **SRB** | Staff's reply post-hearing brief |
| **SPHB** | Staff's pre-hearing brief |
| **Tr.** | Transcript |

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN ACTIVE MATRIX ORGANIC LIGHT-EMITTING DIODE DISPLAY PANELS AND MODULES FOR MOBILE DEVICES, AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1351** |

**INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Administrative Law Judge Bryan F. Moore

(November 15, 2024)

Pursuant to the Notice of Investigation, this is the final initial determination in the matter of *Certain Active Matrix Organic Light-Emitting Diode Display Panels and Modules for Mobile Devices, and Components Thereof,* Investigation No. 337-TA-1351.

For the reasons stated herein, I have determined that there is no violation of section 337 of the Tariff Act of 1930, as amended, in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof based on infringement of U.S. Patent Nos. 9,818,803, 7,414,599, 9,330,593 and 11,594,578.

## I.    INTRODUCTION

### A.    Procedural History

On December 28, 2022, Samsung Display Co., Ltd. ("Complainant" or "SDC") filed a complaint alleging violations of section 337 based on the importation, sale for importation, or sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components that purportedly infringe U.S. Patent Nos. 9,818,803 ("the '803 patent"), 10,854,683 ("the '683 patent"), 7,414,599 ("the '599 patent"), and 9,330,593 ("the '593 patent").[1] 88 Fed. Reg. 7,463 (Feb. 3, 2023); *see* EDIS Doc. ID 789379. A supplement to the complaint was filed on January 17, 2023. *Id.*

The Notice of Investigation named the following parties as respondents: Apt-Ability, LLC d/b/a MobileSentrix; Mobile Defenders, LLC; Injured Gadgets, LLC ("Injured Gadgets"); Group Vertical, LLC ("Group Vertical"); Electronics Universe, Inc. d/b/a Fixez.com and Repairs Universe, Inc. ("Electronics Universe"); LCTech International Inc. d/b/a SEGMobile.com ("LCTech"); Sourcely Plus, LLC ("Sourcely Plus"); eTech Parts Plus, LLC ("eTech Parts Plus"); Parts4Cells Inc. ("Parts4Cells"); Wholesale Gadget Parts, Inc. ("Wholesale Gadget Parts"); Captain Mobile Parts, Inc. ("Capitan Mobile Parts"); DFW Imports LLC d/b/a DFW Cellphone and Parts ("DFW Imports"); Phone LCD Parts LLC and Parts4LCD (collectively, "Phone LCD Parts"); Mengtor Inc. ("Mengtor"); and Gadgetfix Corp ("Gadgetfix").[2] *Id.* at 7,464. The Office of Unfair Import Investigations ("Staff") is also a party to this investigation. *Id.*

---

[1] The investigation was instituted as to the following claims: claims 1-5 and 19-21 of the '803 patent, claims 1, 2, 4-10, and 13 of the '683 patent, claims 1-18 of the '599 patent, and claims 1-3, 6-8, and 14-22 of the '593 patent.

[2] Injured Gadgets, Wholesale Gadget Parts, and Phone LCD Parts  are collectively referred to as "the BLF Respondents."

On March 13, 2023, I granted Mianyang BOE Optoelectronics Technology Co., Ltd.'s ("BOE") motion to intervene as a respondent. Order No. 7; *not reviewed*, Comm'n Notice (Mar. 22, 2023).

On March 28, 2023, I granted Complainant's motion to amend the complaint and investigation to add allegations of infringement related to U.S. Patent No. 11,594,578 ("the '578 patent) (collectively with the other patents, "the Asserted Patents").[3] Order No. 8, *not reviewed,* Comm'n Notice (Apr. 20, 2023).

I have also issued a series of initial determinations finding certain respondents in default. Specifically, on May 10, 2023, I issued an Initial Determination finding Respondent Captain Mobile Parts in default. Order No. 16, *not reviewed*, Comm'n Notice (June 7, 2023). On June 27, 2023, I issued an Initial Determination finding Respondents Group Vertical, Sourcely Plus, and Mengtor in default. Order No. 22, *not reviewed*, Comm'n Notice (July 20, 2023). On July 19, 2023, I issued an Initial Determination finding Electronics Universe and LCTech in default. Order No. 25, *not reviewed*, Comm'n Notice (Aug. 18, 2023). Finally, on August 8, 2023, I issued an Initial Determination finding Respondents Parts4Cells, DFW Imports, Gadgetfix, and eTech Parts Plus in default. Order No. 27, *not reviewed*, Comm'n Notice (Aug. 30, 2023). These parties are collectively referred to as the "Defaulting Respondents."

On October 26, 2023, I issued an Initial Determination terminating claims 4, 6, 7, 8, 9, 10, 11, 12, and 14 of the '599 patent, claims 1, 2, 3, and 19 of the '803 patent, claims 1, 4, 6, 7, 9, 10, 12, 13, and 14 of the '683 patent, claims 1, 3, 4, 12, 13, 22, 42, 45, 46, and 51 of the '578 patent,

---

[3] Specifically, claims 1-6, 10, 12, 17, 19, 21-23, 40-47, and 51-52 of the '578 patent were added to the Investigation.

and claims 2, 3, 5, 14, 15, 16, 17, 18, and 25 of the '593 patent.[4] Order No. 34, *not reviewed*, Comm'n Notice (Nov. 27, 2023).

On December 7, 2023, I issued an Initial Determination terminating additional claims of the asserted patents. Specifically, I terminated claims 1, 5, 17, and 18 of the '599 patent, claims 1, 7, 8, and 19 of the '593 patent, claims 4 and 20 of the '803 patent, claims 3, 8, and 11 of the '683 patent, and claims 2, 6, 14, 19, 21, 23, 44, and 52 of the '578 patent.[5] Order 39, *not reviewed*, Comm'n Notice (Jan. 8, 2024).

On December 20, 2023, I issued an Initial Determination terminating Respondents Apt-Ability LLC d/b/a MobileSentrix and Mobile Defenders, LLC based on a consent order stipulation, proposed consent order, and a binding settlement term sheet. Order No. 43. The Commission affirmed this determination with modifications. Comm'n Notice (April 18, 2024). Specifically, the Commission "determined to remove from the consent order the withdrawn claims" and to "not include in the consent order the claim identified by [Staff] that was not asserted against any of the respondents." *Id.* at 2.

On January 9, 2024, I issued an Initial Determination granting Respondents' motion for summary determination due to lack of standing. Order No. 44. On April 24, 2024, the Commission vacated that determination and remanded the investigation for further proceedings "consistent with this opinion." EDIS Doc. ID 819556. In its opinion, the Commission found that "(1) constitutional

---

[4] Claims 12 and 14 of the '683 patent, claim 13 of the '578 patent, and claims 5 and 25 of the '593 patent were only asserted for domestic industry purposes and not for infringement. Compare Amended Complaint at ¶ 365 (identifying domestic industry claims) with *id.* at ¶ 8 (identifying infringement claims).

[5] Claims 3 and 11 of the '683 patent and claim 14 of the '578 patent were only asserted for domestic industry purposes and not for infringement. Compare Amended Complaint at ¶ 365 (identifying domestic industry claims) with *id.* at ¶ 8 (identifying infringement claims).

standing, the Article III requirements of the Constitution related to the authority of federal courts to adjudicate lawsuits, is not required at [the] Commission; and (2) there are genuine issues of material facts relating to [Complainant's] rights in the asserted patents." EDIS Doc. ID 819557 at 1.

The parties disagreed on the scope of the Commission's remand and the Commission opinion's effect on the investigation. After receiving briefing from the parties on the issue, I explained that "the Commission's opinion confirmed that there are two types of "standing" (constitutional and statutory) but that only one kind is applicable at the Commission." Order No. 50 at 4 (June 11, 2024). I concluded that "[t]he Commission's opinion did not change the law or adopt a new approach with respect to the question of whether a complainant can bring an investigation at the Commission." *Id.* I then found that Respondents waived their argument that Complainant failed to satisfy the requirement of Commission Rule 210.12 because Respondents did not address this issue in their pre-hearing brief, as required by my Ground Rules. *Id.; see also id.* at 5-7.

On June 14, 2024, I issued an Initial Determination terminating claim 20 of the '593 patent and the remaining asserted claims of the '683 patent. Order No. 51, *not reviewed*, Comm'n Notice (July 3, 2024).

Finally, on August 27, 2024, I issued an Initial Determination terminating claims 4, 21, and 22 of the '593 patent and claim 43 of the '578 patent. Order No. 65, *not reviewed*, Comm'n Notice (Sept. 26, 2024).

The evidentiary hearing was held on July 8-9, 2024 and July 15-17, 2024.

### B.    The Parties

#### 1.    Complainant

Complainant Samsung Display Co, Ltd. is a corporation organized and existing under the laws of the Republic of Korea. Complaint at ¶ 12. Complainant designs and manufactures AMOLED displays that are incorporated into Samsung Galaxy S series smartphones. *Id.* at ¶ 14.

#### 2.    Respondents

##### a)    Mianyang BOE

Respondent Mianyang BOE Optoelectronics Technology Co., Ltd. is located in the Sichuan province of China. EDIS Doc. ID 790927 at 3. It "designs, develops, and manufactures AMOLED replacement screens." *Id.*

##### b)    Injured Gadgets

Respondent Injured Gadgets, LLC is a company located in Norcross, Georgia. Am. Complaint at ¶ 20; Injured Gadgets' Corrected Response to Am. Complaint at ¶ 20. Injured Gadgets sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 21.

##### c)    Phone LCD Parts

Phone LCD Parts is a company located in Wayne, New Jersey. Am. Complaint at ¶ 43; Phone LCD Parts' Response to Am. Complaint at ¶ 43. Parts4LCD is a company also located in Wayne, New Jersey. Am. Complaint at ¶ 45; Phone LCD Parts' Response to Am. Complaint at ¶ 45. Parts4LCD is a d/b/a of Phone LCD Parts LLC. Phone LCD Parts' Response to Am. Complaint at ¶ 45. Both Phone LCD Parts and Parts4LCD sell replacement parts for mobile phones and tablets, including AMOLED displays. Am. Complaint.at ¶¶ 44, 46.

### d)    Wholesale Gadget Parts

Wholesale Gadget Parts, Inc. is a company located in Bixby, OK. Am. Complaint at ¶ 37; Wholesale Gadgets Response to Am. Complaint at ¶ 37. Wholesale Gadget Parts sells replacement parts for mobile phones and tablets, including AMOLED displays. Complaint at ¶ 38.

### e)    Group Vertical

Group Vertical, LLC  is a company located in Grand Rapids, Michigan. Complaint at ¶ 22. Group Vertical sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 23.

### f)    Electronics Universe

Electronics Universe Inc, d/b/a Fixez.com and Repairs Universe, Inc. is a company located in Las Vegas, Nevada. Am. Complaint at ¶¶ 24, 26. Electronics Universe does business under the names Repairs Universe and Fixez.com. Electronics Universe's Response to Am. Complaint at ¶¶ 24, 27. Both Repairs Universe and Fixez.com sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.*

### g)    LCTech

LCTech International Inc. (d/b/a/ SEGMobile.com) is a company located in City of Industry, CA. LCTech's Am. Complaint at ¶ 29. LCTech does business as SEGMobile.com. *Id.* LCTech sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 30.

### h)    Sourcely Plus

Sourcely Plus, LLC is a company located in Tempe, Arizona. Complaint at ¶ 31. Sourcely Plus sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 32.

### i)    eTech Parts Plus

eTech Parts Plus, LLC is a company located in Southlake, Texas. Am. Complaint at ¶ 34; Response to Am. Complaint at ¶ 34. eTech Parts Plus sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 34.

### j)    Parts4Cells

Parts4Cells, Inc. is a company located in Houston, Texas. Am. Complaint at ¶ 35; Parts4Cells' Response to Am. Complaint at ¶ 35. Parts4Cells sells replacement parts for mobile phones and tablets, including AMOLED displays. Am. Complaint at ¶ 36.

### k)    Captain Mobile Parts

Captain Mobile Parts, Inc. is a company located in Bixby, OK. Complaint at ¶ 39. Captain Mobile Parts sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 40.

### l)    DFW Imports

DFW Cellphone & Parts is a company located in Dallas, Texas. Am. Complaint at ¶ 41. DFW Cellphone & Parts is a fictitious name set up by DFW Imports LLC ("DFW Imports") located in Fork Bend, Texas. *Id.*; DFW Imports' Response to Am. Complaint at ¶ 41. DFW Cellphone & Parts sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.*

### m)    Mengtor

Mengtor Inc. is a company with offices located in El Monte, CA and Walnut, CA. Complaint at ¶ 47. Mengtor sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 48.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

### n)     Gadgetfix Corp.

Gadgetfix Corp. is a company located in Irvine, CA. Am. Complaint at ¶ 49; Gadgetfix's Response to Am. Complaint at ¶ 49. Gadgetfix sells replacement parts for mobile phones and tablets, including AMOLED displays. *Id.* at ¶ 49.

### C.     The Products At Issue

The products at issue are "active matrix organic light-emitting diode ('AMOLED') display panels and modules used as replacement displays for mobile devices comprising organic pixel elements for presenting information to a viewer which infringe one or more claims of the Asserted Patents, and components thereof, where AMOLED display modules refers to the assembly of an AMOLED display panel (containing light-emitting materials, pixel circuitry, and encapsulation layers on a substrate) with additional components such as a connector cable, one or more polarizing layers, window glass, and/or housing materials around the AMOLED display panel." 88 Fed. Reg. at 7,463; *see also* 19 C.F.R. § 210.10(b)(1).

### 1.     The Accused Products

Complainant accuses the following products of infringement:

| Respondent | Accused Product | Sample No. |
|---|---|---|
| Mianyang BOE Optoelectronic Technology Co., Ltd. | ▮ | BOE-PS-0009 |
| | ▮ | BOE-PS-0013 |
| | ▮ | BOE-PS-0005 |
| | ▮ | BOE-PS-0017 |
| | ▮ | BOE-PS-0029 |
| | ▮ | BOE-PS-0033 |
| | ▮ | ▮ |

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

| Respondent | Accused Product | Sample No. |
|---|---|---|
| | ███████ | ████████████ |
| | ██████ | BOE-PS-0025 |
| | █████ | BOE-PS-0021 |
| | ████████ | BOE-PS-0002 |
| Injured Gadgets, LLC | FX5 Hard OLED - Aftermarket OLED Screen Assembly for iPhone 12 / 12 Pro (Black), IP12-AS-FX5 | IG-IP12-AS-FX5-2 |
| | FX5 Hard OLED - Aftermarket OLED Screen Assembly for iPhone X (Black), IPX-AS-FX5-B | IG-IPX-AS-FX5-2 |
| | FX5 Hard OLED - Aftermarket OLED Screen Assembly for iPhone 11 Pro Max (Black), IP11PM-AS-FX5 | IG-IP11PM-AS-FX5-2 |
| | FX5 Hard OLED - Aftermarket OLED Screen Assembly for iPhone XS Max (Black), IPXSM-AS-FX5 | IG-IPXSM-AS-FX5-2 |
| | FX5 Hard OLED - Aftermarket OLED Screen Assembly for iPhone XS (Black), IPXS-AS-FX5 | IG-IPXS-AS-FX5-2 |
| Wholesale Gadget Parts, Inc. | OLED & Frame Assembly for Apple iPhone 12 & 12 Pro (Hard Evolve), AP04508 | WGP-AP04508-2 |
| | OLED & Frame Assembly for Apple iPhone 12 Pro Max (Hard Evolve), AP04509 | WGP-AP04509-2 |
| | OLED & Frame Assembly for Apple iPhone X (Hard Evolve), AP03118 | WGP-AP03118-2 |

| Respondent | Accused Product | Sample No. |
|---|---|---|
| | OLED & Frame Assembly for Apple iPhone XS Max (Hard Evolve), AP03641 | WGP-AP03641-2 |
| | OLED & Frame Assembly for Apple iPhone 11 Pro Max (Hard Evolve), AP04253 | WGP-AP04253-2 |
| Phone LCD Parts LLC, (d/b/a Parts4LCD) | iPhone X OLED Assembly (HARD / QV8) (Exclusive Oled Breakage Warranty), IPX-QV8-HRD | PLP-IPX-QV8-HRD-1 |
| | iPhone 11 Pro Max OLED Assembly (HARD / QV8) (Exclusive Oled Breakage Warranty), 11M-QV8-HRD | PLP-11M-QV8-HRD-1 |
| | iPhone 12 Pro / 12 OLED Assembly (HARD / QV8), 12P-QV8-HRD | PLP-12P-QV8-HRD-1 |
| DFW Imports, LLC (d/b/a/ DFW Cellphone and Parts | LCD IP 11 PROMAX HARD OLED MP+ | DFW-00369382-1 |
| Electronics Universe, Inc. d/b/a Fixez.com and Repairs Universe, LLC | VividFX Premium iPhone XS Max Hard OLED Display Assembly, 2-AP-6183 | FXZ-2-AP-6183-2 |
| eTech Parts Plus, LLC | Platinum Aftermarket Soft OLED Screen Assembly for use with iPhone 11 Pro (Black), 822-11573 | ETP-822-11573-1 |
| Gadgetfix Corp. | Supreme FHD Hard OLED Display Touch Digitizer Screen for iPhone XS Max, iXS-Max-Assy (Hard) | GF-iXS-Max-Assy-Hard-1 |
| Parts4Cells, Inc. | Brilliance Pro iPhone XS Max LCD With Touch HARD OLED Black, 302629 | P4C-302629-2 |

**CONFIDENTIAL MATERIAL OMITTED**

| Respondent | Accused Product | Sample No. |
|---|---|---|
| LCTech International Inc. (d/b/a SEGMobile) | (MP+) Hard OLED Assembly for iPhone XS Max - Black, 0101898200 | SM-0101898200-2 |
| Captain Mobile Parts, Inc. | Brilliance Po Phone 12 / 12 Pro | 304212 |
| Group Vertical, LLC | Touch Screen Digitizer and OLED for Apple iPhone 12 2020 – Hard OLED | PAI-12018 |
| Mengtor Inc. | OLED Screen Digitizer Assembly With Frame for iPhone 12 / 12 Pro (High Quality) – Black | PH-LCD-IP-001063BKA |
| Sourcely Plus, LLC | iPhone 12 / 12 Pro – Soft OLED | PH12P-XX032 |

Corrected Joint Statement Identifying Accused Products (EDIS Doc. ID 805209). The Accused Products from BOE are collectively referred to as "the BOE Accused Products." The Accused Products from Injured Gadget, Wholesale Gadget Parts, and Phone LCD Parts are collectively referred to as "the BLF Accused Products." The Accused Products from the Defaulting Respondents are collectively referred to as the "Defaulting Respondents' Accused Products."

2.      **Redesigns**

BOE has presented ▉ non-infringing alternative products (hereinafter, referred to as NIAs ▉). RIB at 2; EDIS Doc ID 805209. NIAs ▉ are redesigns of the pixel circuit, NIAS ▉ are redesigns of the GOA circuit, and NIAs ▉ are redesigns of the pixel arrangements. RX-0001C (Wei) at Q/A 10, 16, 22. Complainant accuses NIAs ▉ of infringing claim 47 of the '578 patent but does not accuse the remaining redesigns of infringement. *See, e.g.*, CIB at 8.

The Commission's test for determining whether a respondent has met its burden for adjudication of a redesigned or alternative product includes four factors: (1) whether the product is within the scope of the investigation; (2) whether it has been imported; (3) whether it is

CONFIDENTIAL MATERIAL OMITTED

sufficiently fixed in design; and (4) whether it has been sufficiently disclosed by the respondent during discovery. *Certain Human Milk Oligosaccharides & Methods of Producing the Same*, Inv. No. 337-TA-1120, Comm'n Op. at 18 (June 8, 2020) ("*Oligosaccharides*"). Additionally, the Commission has a "policy in favor of adjudicating redesigns to prevent subsequent and potentially burdensome proceedings that could have been resolved in the first instance in the original Commission investigation." *Id.*

Complainant argues that the redesigns should not be adjudicated. CIB at 5. Complainant first asserts that the redesigns are not fixed in design. *Id.* at 6. According to Complainant, "[a]ttempting to implement NIA█ in mobile device displays would require numerous further design choices and modifications affecting the circuits and pixel structures . . . all dependent on customer input." *Id.* Next, Complainant asserts that the redesigns were not sufficiently disclosed and notes that the samples provided by BOE were inadequate. *Id.* at 6-7. Finally, Complainant asserts that the redesigns "are outside this Investigation's scope, as they are not AMOLED 'display panel and modules used as replacement displays for mobile devices,' nor 'components thereof' as set forth in the NOI." *Id.* at 7.

BOE explains that it "disclosed [NIA█] during discovery, explained why they do not infringe, produced redesigned GDS files, Design Rule documents, and lighting demonstrations and test results describing each redesign, imported samples embodying each redesign for SDC to evaluate, and provided fact and expert testimony." RIB at 1. BOE also notes Complainant was able to evaluate the redesigns for infringement and that this ability "proves the NIAs should be adjudicated." *Id.* at 2.

Staff also believes that "the Redesigns are ripe for adjudication." SIB at 13. Staff argues that the redesigns are within the scope of the investigation because "[t]he evidence shows that the

CONFIDENTIAL MATERIAL OMITTED

Redesigns can be used in AMOLED displays for mobile devices." *Id.* at 14. Staff notes that "a prototype of each redesign has been imported into the U.S." *Id.* Staff further asserts that the redesigns are fixed in design as "there is evidence that they could be implemented in . . . displays without material changes." *Id.* Finally, Staff contends that "the Redesigns were timely disclosed" and notes that Complainant "never sought to compel additional discovery related to the Redesigns." *Id.* at 15.

For the reasons set forth below, I find that the Redesigned Products should be adjudicated in this Investigation, First, I note that it is undisputed that the second factor weighs in favor of adjudicating the redesigns. CIB at 6-7; RIB at 3; SIB at 14.

I further find that the first factor weighs in favor of adjudicating the redesigns. Complainant argues that the redesigned products do not meet the scope of the investigation as defined in the Notice of Institution ("NOI"). CIB at 7. The NOI defines the scope of the investigation as "active matrix organic light-emitting diode ('AMOLED') display panels and modules used as replacement displays for mobile devices comprising organic pixel elements for presenting information to a viewer which infringe one or more claims of the Asserted Patents, and components thereof, where AMOLED display modules refers to the assembly of an AMOLED display panel (containing light-emitting materials, pixel circuitry, and encapsulation layers on a substrate) with additional components such as a connector cable, one or more polarizing layers, window glass, and/or housing materials around the AMOLED display panel." 88 Fed. Reg. at 7,463. Respondents do not dispute that the redesigns are not "display panels and modules." *See, e.g.*, RX-0004C (Pattison) at Q/A 501 (noting that NIAs ███ are "modified pixel arrangements themselves, and not complete mobile device displays or panels"). As Respondents note, however, the NIAs "are replacements for the features accused of infringement." RIB at 2. Specifically, "NIA█ can

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

replace the Accused Products' pixel circuit, NIA █ can replace the Accused Products' GOA circuit, and NIA █ can replace the accused pixel layout." *Id*. To find that the redesigns cannot be adjudicated because they relate to features within a display module (rather than the whole module) would be to elevate form over substance. Given that the Commission has a policy in favor of adjudicating redesigns, I decline to find that this factor weighs against adjudication.

Nor am I persuaded by Complainant's additional arguments with respect to NIAs █████ █ As to these redesigns, Complainant asserts that they "are designed to 'be integrated in [an] in-car product . . . which are not 'mobile device[s].'" CIB at 7 (quoting CX-1612C at 89:4-90:16). The testimony cited by Complainant does not support the conclusion that these redesigns cannot be used in mobile devices. While Mr. Liheng Wei (who works in circuits development for Chengdu BOE, an affiliate of BOE) testified that



" he also specifically stated that ████████████████████████████ ████████████████████████████████████████." CX-1612 (Wei) at 89:4-90:16.

I next find that the third factor weighs in favor of adjudication. Complainant argues that the redesigns are "not complete mobile device displays or panels" and "instead are merely isolated pixel circuits (NIA █ ), stage circuits (NIA █ ), or pixel arrangements (NIA █ .)" CIB at 6. According to Complainant, these "'one-off engineering experiences' are not 'fixed in design' because adjudicable redesigns 'must be used with' completed products." *Id*. (quoting *Certain Unmanned Aerial Vehicles & Components Thereof*, Inv. No. 337-TA-1133, Comm'n Op., 2020 WL 5407477, at *13-14 (Sept. 8, 2020)). According to Complainant, implementing "NIA █ in mobile device displays would require numerous further design choices and modifications affecting the circuits and pixel structures . . . all dependent on customer input." *Id.*

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

The evidence demonstrates otherwise. Mr. Wei testified:



RX-0001C (Wei) at Q/A 9. Mr. Wei clarified that ███████████████████ for

any of the redesigns and that ██████████████████████████████

████████████████████████████████████████████████████████

███████████ *Id.* at Q/As 14 (NIAs ███, 20 (NIAs ███, 26 (NIAs ███. Given that the

redesigns could be implemented in displays without material changes, I find that this factor weighs

in favor of adjudication. *See Certain Mobile Devices with Multifunction Emulators*, Inv. No. 337-

TA-1170, Initial Determination at 10-16 (March 16, 2021) ("*Mobile Devices with Multifunction

Emulators*") (finding that the redesign was "sufficiently fixed in design" even though the design

did "not seem to be commercially feasible" and the respondent had not completed "testing

necessary to be released to the market"); *not reviewed in relevant part*, Comm'n Notice at 3-4

(May 17, 2021); *see also Certain Video Sec. Equip. & Sys*, Inv. No. 337-TA-1281, Initial

Determination, at 22 (Oct. 24, 2022) (indicating that the fact "a change could be made in the future

. . . is not sufficient for a finding that a redesign cannot be adjudicated" and noting that the

Commission used the word "sufficiently" and not "completely"); *not reviewed in relevant parti*,

Comm'n Notice at 3 (Jan. 12, 2023).

Finally, I find that the fourth factor weighs in favor of adjudication. BOE notes that it

"described the NIAs in its discovery responses, created and produced GDS files and Design

Review documents describing and implementing each redesign, embodied them in physical

CONFIDENTIAL MATERIAL OMITTED

devices, addressed them in its expert reports, and provided fact and expert depositions answering questions about the redesigns." RIB at 3 (citing RX-0001C (Wei) at Q/A 10-27). Complainant does not dispute this, but alleges that there were several deficiencies with the samples implementing the redesigns such as: (1) "███████████████████████████████" and the demonstration "██████████████████████████████████████";  (2) the samples lacked "██████████████████████████████";  (3) the samples for NIAs ██ "████████████████";  (4) the sample for NIA █ "██████████████ ██████████████";  and (5) "NIA █'s sample ████████████████."[6] *Id.* at 7. I do not find any of these arguments persuasive.

First, the fact that the equipment used to demonstrate the redesigns had issues with functionality does not mean that the redesigned themselves were not sufficiently disclosed. If Complainant was unable to obtain the information it needed to assess infringement, it could have – and should have – sought my assistance through a discovery case management conference.[7] I further note that Complainant was able to assess the redesigns for infringement, thus indicating that the discovery was sufficient. *Oligosaccharides*, at 20 n. 22 (explaining that discovery of a redesign is sufficient if it allows the "complainant to assess the features relevant to the asserted patent claims").

With respect to ████████████████████████████████, I note that these features are not claimed in the Asserted Patents. Thus, it is not relevant to the analysis as to whether the display modules demonstrating the redesigns had these features. As for Complainant's

---

[6] Complainant briefs the third and fourth factors together and thus some of these arguments are more applicable to the third factor. *See* CIB at 6-7.

[7] This includes Complainant's grievances with respect to the sample for NIA █. BOE opted to demonstrate this redesign via video. *See* RPX-0173C.

CONFIDENTIAL MATERIAL OMITTED

arguments about NIAs ⬛, the Commission does not require that a redesign have customers in order for it to be adjudicated. *See, e.g.*, *Mobile Devices with Multifunction Emulators*, Initial Determination at 10-16. Accordingly, I find that the redesigns were sufficiently disclosed.

For these reasons, I find that the Redesigned Products should be adjudicated in this Investigation.

### 3.     The Domestic Industry Products

Complainant asserts that two categories of products satisfy the domestic industry: AMOLED DI Products and Galaxy DI Products. The AMOLED DI Products including the following:



CIB at iv. The Galaxy DI Products include:

> Galaxy S20, Galaxy S20+, Galaxy S20 Ultra, Galaxy S20 FE, Galaxy S21, Galaxy S21+, Galaxy S21 Ultra, Galaxy S21 FE, Galaxy S22, Galaxy S22+, Galaxy S22 Ultra, Galaxy S23, Galaxy S23+, Galaxy S23 Ultra, Galaxy Z Fold 2, Galaxy Z Fold 3, Galaxy Z Fold 4, Galaxy Z Flip 3, Galaxy Z Flip 4.

*Id.* at v.[8]

## II.   PRELIMINARY ISSUES

### A.   Statutory Authority

To "establish[] the Commission's authority to investigate an alleged violation under section 337(a)(1)(B), a complainant must allege that a violation of section 337 has occurred, *i.e.*, that a respondent imported, sold for importation, or sold after importation an article that infringes a claim of a U.S. patent and that a domestic industry exists or is in the process of being established, among other statutory requirements." *Certain Liquid Transfer Devices with an Integral Vial Adapter,* Inv. No. 337-TA-1362, Comm'n Op. at 9 (July 26, 2024) ("*Liquid Transfer*"). In its Amended Complaint, Complainant alleged that all of the respondents except BOE violated Section 337. *See* Am. Compl. The Commission instituted the investigation and has thus determined that it has "statutory authority to investigate the alleged violation under section 337(a)(1)(B)." *Liquid Transfer* at 9 ("The Commission assures itself at institution that the complaint sufficiently states an alleged violation of Section 337"). With respect to BOE, the Commission determined that it had authority to investigate the allegations by allowing BOE to intervene as a respondent. Comm'n Notice (Mar. 22, 2023).

### B.   Importation

The statute defines a violation of section 337 as "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that . . . infringe a valid and enforceable United State patent."

---

[8] The parties submitted a chart indicating which Galaxy DI Products correspond to which AMOLED DI Products. *See* Joint Stipulation Regarding Representative Products (EDIS Doc. ID 808453) (hereinafter, "Representative Products Stipulation"). This chart also identifies representative products for each of the Asserted Patents. *Id.*

19 U.S.C. § 1337(a)(1)(B). Accordingly, "[t]o prevail under section 337, a complainant must prove that a respondent actually imported or sold for [or after] importation the articles at issue." *Certain Carbon and Alloy Steel Products*, Inv. No. 337-TA-1002, Order No. 103 at 33, *not reviewed*, Comm'n Notice, (Nov. 1, 2017).

The record demonstrates that the accused products have been imported into the United States, sold for importation, and/or sold within the United States after importation. *See, e.g.*, *Certain Road Milling Machines and Components Thereof*, Inv. No. 337-TA-1067, Order No. 23 at 14 (Feb. 15, 2018) ("an importation of even one accused product can satisfy the importation requirement of section 337"). Respondents stated that they "do not dispute the importation requirement" and submitted stipulations with respect to importation. RIB at 1; EDIS ID 807220 ¶¶ 2, 3, 5; EDIS Doc. ID 803421 ¶¶ 3-6; EDIS Doc ID 803422 ¶¶ 3-6; EDIS Doc. ID 803423 at ¶¶3-6. Thus, the importation requirement is met.

### C.    Commission Rule 210.12(a)(7)

Commission Rule 210.12(a)(7) requires that "at least one complainant is the owner or exclusive licensee of the subject intellectual property." 19 C.F.R. § 210.12(a)(7). Complainant asserts that "Rule 210.12(a)(7) is satisfied because SDC owns and is the patentee of all Asserted Patents." CIB at 4.

Respondents do not dispute that the Asserted Patents are assigned to Complainant. *See* RIB at 1.[9]

The evidence shows that each of the Asserted Patents has been assigned to Complainant.

---

[9] BOE has other arguments as to why Complainant does not satisfy Rule 210.12(a)(7) but, as noted above, I found that BOE waived these arguments by failing to include them in its pre-hearing brief.

JX-0002 ('593 patent indicating that it is assigned to Complainant); JX-0003 ('803 patent indicating that it is assigned to Complainant); JX-0005 ('578 patent indicating that it is assigned to Complainant); JX-0001 ('599 patent indicating that it is assigned to Samsung SDI Co., Ltd.); JX-0013 (assigning patents from Samsung SDI Co., Ltd. to Samsung Mobile Display Co., Ltd.); JX-0012 (assigning patents from Samsung Mobile Display Co., Ltd. to Samsung Display Co., Ltd.); *see also* JX-0011; JX-0014; JX-0015; JX-0017 (assignments of the patents); CX-1635C (Kim) at Q/A 42-51, 57. Yongseog Kim, a member of Complainant's IP Legal & Strategy Team confirmed that Complainant holds legal title to each of the patents and is the sole owner. CX-1635C (Kim) at Q/A 49-50. As such, I find that Commission Rule 210.12(a)(7) is satisfied.

## III.    LEGAL PRINCIPLES

### A.    Infringement

In a section 337 investigation, the complainant bears the burden of proving infringement of the asserted patent claims by a preponderance of the evidence. *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010). This standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc*., 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

#### 1.    Literal Infringement

Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). If any claim limitation is absent, there is no literal infringement of that claim as a matter of law. *Bayer AG v. Elan Pharm. Research Corp*., 212 F.3d 1241, 1247 (Fed. Cir. 2000).

### 2.    Doctrine of Equivalents

"[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997). "[T]he proper time for evaluating equivalency . . . is at the time of infringement, not at the time the patent issued." *Id*. at 37.

"The 'essential inquiry' in determining whether there has been infringement under this doctrine is whether 'the accused product or process contains elements identical or equivalent to each claimed element of the patented invention.'" *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1338 (Fed. Cir. 2011) (quoting *Warner–Jenkinson,* 520 U.S. at 40). An element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial to one of ordinary skill in the art. *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1360 (Fed. Cir. 2009); *AquaTex Indus. v. Techniche Sols.*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). In order to assess insubstantiality, a court considers whether an element of the accused product "performs substantially the same function in substantially the same way to obtain the same result" as the patented invention. *Am. Calcar,* 651 F.3d at 1338; *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008). A patentee alleging infringement under the doctrine of equivalents must submit particularized evidence as to equivalence and must explain specifically why the difference between the claimed invention and what the accused product actually does is "insubstantial." *Am. Calcar*, 651 F.3d at 1338.

Prosecution history estoppel can prevent a patentee from relying on the doctrine of equivalents when the patentee relinquished subject matter during prosecution of the patent, either by amendment or argument. *AquaTex*, 419 F.3d at 1382. In particular, "[t]he doctrine of

prosecution history estoppel limits the doctrine of equivalents when an applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to an examiner." *Id*.

### B.      Invalidity

A patent is presumed valid. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). A respondent who has raised patent invalidity as an affirmative defense has the burden of overcoming this presumption by clear and convincing evidence. *See Microsoft,* 564 U.S. at 95.

### 1.      35 U.S.C. § 102 (Anticipation)

Under 35 U.S.C. § 102, a claim is anticipated and therefore invalid when "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000), cert. denied, 532 U.S. 904 (2001). To be considered anticipatory, the prior art reference must be enabling and describe the applicant's claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

### 2.      35 U.S.C. § 103 (Obviousness)

Under 35 U.S.C. §103, a patent may be found invalid for obviousness if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. §103. Because obviousness is determined at the time of invention, rather than the date of application or litigation,

"[t]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011) ("*Star II*").

When a patent is challenged as obvious, the critical inquiry in determining the differences between the claimed invention and the prior art is whether there is an apparent reason to combine the known elements in the fashion claimed by the patent at issue. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417-418 (2007). The Federal Circuit has since held that when a patent is challenged as obvious, based on a combination of several prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) (citations omitted).

Obviousness is a determination of law based on underlying determinations of fact. *Star II*, 655 F.3d at 1374. The factual determinations behind a finding of obviousness include: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of non-obviousness. *KSR,* 550 U.S. at 399 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). These factual determinations are referred to collectively as the "*Graham* factors." Secondary considerations of non-obviousness include commercial success, long felt but unresolved need, and the failure of others. *Id.* When present, secondary considerations "give light to the circumstances surrounding the origin of the subject matter sought to be patented," but they are not dispositive on the issue of obviousness. *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l.*, 618 F.3d 1294, 1304-06 (Fed. Cir. 2010). A court must consider all the evidence from the *Graham* factors before

reaching a decision on obviousness. For evidence of secondary considerations to be given substantial weight in the obviousness determination, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *W. Union Co. v. MoneyGram Payment Sys. Inc.*, 626 F.3d 1361, 1372-73 (Fed. Cir. 2010) (citing *In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

### 3.    Written Description

The specification must provide a written description of the claimed invention that "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). Determining whether the written description requirement has been satisfied "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art[]" to determine whether the specification "show[s] that the inventor actually invented the invention claimed." *Id.* Compliance with the written description requirement is a question of fact and "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

### 4.    Enablement

The enablement requirement necessitates that the patentee disclose "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . .." pre-AIA 35 U.S.C. § 112, ¶ 1. The requirement "is met when at the time of filing the application one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d

1330, 1336 (Fed. Cir. 2013) (quoting *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988)). Thus, the relevant inquiry is "whether, with [the patentee's] patent specification as an initial guide, the hypothetical skilled artisan's knowledge of the surrounding art and ability to modestly experiment would have been sufficient to enable him to make and use [the claimed invention]." *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). Enablement is a question of law based on underlying factual findings and must be shown by clear and convincing evidence. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012).

### 5.    Indefiniteness

A claim must be definite. Pursuant to 35 U.S.C. § 112: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. In *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), the Supreme Court held that § 112, ¶ 2 requires "that a patent's claims, viewed in light of the specification and prosecution history inform those skilled in the art about the scope of the invention with reasonable certainty." (*Id.* at 2129.) A claim is required to "provide objective boundaries for those of skill in the art," and a claim term is indefinite if it "might mean several different things and no informed and confident choice is among the contending definitions." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). A patent claim that is indefinite is invalid. 35 U.S.C. § 282(b)(3)(A).

### i)    Domestic Industry Requirement

For a patent-based complaint, a violation of section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent . . . concerned, exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). This domestic industry requirement of section 337 is often described as having an economic prong and a technical prong. *InterDigital*

*Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); *Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, USITC Pub. 4120, 2009 WL 5134139 (Dec. 2009), Comm'n Op. at 12-14. The complainant bears the burden of establishing that the domestic industry requirement is satisfied. *See Certain Set-Top Boxes & Components Thereof*, Inv. No. 337-TA-454, ID at 294, 2002 WL 31556392 (June 21, 2002) (unreviewed by Commission in relevant part).

### 1.    Economic Prong

Section 337(a)(3) sets forth the following economic criteria for determining the existence of a domestic industry in such investigations:

> (3)    For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
> > (A)    significant investment in plant and equipment;
> > (B)    significant employment of labor or capital; or
> > (C)    substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Thus, section 337(a)(3) requires that investments be either "significant" or "substantial." The Federal Circuit has clarified that a quantitative analysis must be performed in order to make this determination. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015) ("The plain text of § 337 requires a quantitative analysis in determining whether a [complainant] has demonstrated a 'significant investment in plant and equipment' or 'significant employment of labor or capital.'"). There is no threshold amount that a complainant must meet. *See Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008) ("We emphasize that there is no minimum monetary expenditure that a complainant must demonstrate to qualify as a domestic industry under the 'substantial

investment' requirement of this section."); *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 39 (Aug. 1, 2007) ("*Male Prophylactic Devices*") ("[T]here is no mathematical threshold test."). Rather, the inquiry depends on "the facts in each investigation, the article of commerce, and the realities of the marketplace." *Certain Printing & Imaging Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011). As such, "[t]he determination takes into account the nature of the investment and/or employment activities, the industry in question, and the complainant's relative size." *Id.*

### 2.    Technical Prong

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. § 1337(a)(2) and (3); *Certain Microsphere Adhesives, Process for Making Same & Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8, 1996 WL 1056095 (Jan. 16, 1996). "The test for satisfying the 'technical prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). To prevail, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more claims of the patent. It is sufficient to show that the products practice any claim of that patent, not necessarily an asserted claim of that patent. *See Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 38 (Aug. 1, 2007).

## IV.    U.S. PATENT NO. 9,818,803

### A.    Overview

The '803 patent, entitled "Pixel Arrangement Structure for Organic Light Emitting Display Device" issued on November 14, 2017 to Sang-Shin Lee. JX-0003. The '803 patent discloses pixel arrangements for OLED displays. *Id.* The claims of the '803 patent are drawn to the Figure 1 embodiment. JX-0008.406.



FIG.1

JX-0003 at Fig. 1.

### 1.    Asserted Claims

Complainant asserts claims 5 and 21 of the '803 patent. CIB at 8. Because several of the asserted claims depend on non-asserted claims, these non-asserted claims are also included below:

1.  1[pre][10] A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:

    1[a] a plurality of pixels for displaying an image on the OLED display and comprising:

    1[b] a first pixel having a center coinciding with a center of a virtual square;

    1[c] a second pixel separated from the first pixel and having a center at a first vertex of the virtual square;

    1[d] another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels; and

    1[e] a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square,

    1[f] wherein the second pixel has a larger area than that of the third pixel, and

    1[g] wherein the first pixel is configured to emit green light.

2.  The pixel arrangement structure of claim 1,

    2[a] wherein the plurality of pixels further comprises another second pixel separated from the first pixel and having a center at a third vertex neighboring the second vertex of the virtual square, and

    2[b] wherein the second pixels are separated from each other by the first pixel.

3.  The pixel arrangement structure of claim 2,

    3[a] wherein the plurality of pixels further comprises another third pixel separated from the first pixel and having a center at a fourth vertex neighboring the third vertex of the virtual square, and

    3[b] wherein the third pixels are separated from each other by the first pixel.

4.  The pixel arrangement structure of claim 3, wherein the second pixels and the third pixels enclose the first pixel in the virtual square.

5.  The pixel arrangement structure of claim 4,

---

[10] For each of the Asserted Patents, I will follow the conventions used by both parties in Complainant's and Respondent Mianyang BOE's Identification of Undisputed Claim Limitations (EDIS Doc. ID 822767( (hereinafter, "Undisputed Claim Limitations").

5[a] wherein the first pixel, the second pixels, and the third pixels have polygonal shapes, and

5[b] each of the second pixels and each of the third pixels has a larger area than the first pixel.

21. The pixel arrangement structure of claim 1, wherein the second pixel has a larger area than that of the first pixel.

### 2. Claim Construction

I construed the following terms from the asserted claims as follows:

| Term | Claim(s) | Claim Construction |
|---|---|---|
| "coinciding with" | 1 | "occupying the same place in space" |
| "a third pixel separated from the first pixel" / "another third pixel separated from the first pixel" / "another third pixel separated from the first pixel" / "separated from each other by the first pixel" / "the second pixels and the third pixels enclose the first pixel in the virtual square" | 1-5 | The "first pixel" refers to the claim 1's "a first pixel" and does not refer to the claim 1's "another first pixel"/"the other first pixel." |
| "line" / "lines" | 1 | "straight line" / "straight lines" |
| "center"/ "centers" | 1-3 | center point(s), wherein there is only one center point per pixel |

Order No. 28 at 15.

### 3. Level of Ordinary Skill in the Art

I did not address the level of ordinary skill in the art for the '803 patent in the Markman Order, as the parties did not disagree on a construction for any term in this patent. I did, however, set forth the level of skill for the '578 patent. The '578 patent is a continuation of the '803 patent. *See* JX-0005. Complainant and Staff assert that the level of skill is the same for both patents. CIB

CONFIDENTIAL MATERIAL OMITTED

at 63; SIB at 17.[11] I therefore find that a person of ordinary skill in the art with respect to the '803 patent would have had a relevant degree in Electrical Engineering, Computer Engineering, Materials Science, Physics, or the like, and experience in electroluminescence and the design of active matrix displays or pixel arrangements for such displays.

### B. Infringement

Complainant asserts the following with respect to infringement of the '803 patent:

| Accused Products | Claims Infringed |
|---|---|
| ███████ | 5, 21 |
| ████████████████████ | 5, 21 |
| █████████████ | 21 |
| BLF Respondents' and Defaulting Respondents' Accused Products | 5, 21 |

CIB at 8. The parties agree that ████████████████████████████████████

Representative Products Stipulation at 3.

### 1. Methodology

BOE's primary argument with respect to the '803 patent is whether Complainant's expert, Dr. Ioannis Kymissis, applied an appropriate methodology in analyzing infringement based on teardowns of the Accused Products. Specifically, BOE asserts: (1) Dr. Kymissis improperly relied on another expert's flawed measurements; (2) Dr. Kymissis did not properly calculate the pixel centers; and (3) Dr. Kymissis improperly applied "irrelevant and arbitrary manufacturing and measurement tolerances." RIB at 5-9. Complainant and Staff disagree. *See* CIB at 8-10; 44-46;

---

[11] BOE did not address the appropriate level of skill.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

SIB at 22 ("In the Staff's view, Dr. Kymissis' determinations of pixel boundaries and centers are sufficiently reliable and accurate").

For the reasons set forth below, I disagree with BOE's criticisms of Dr. Kymissis' methodology. I note, however, that, even if these criticisms had some merit, Dr. Kymissis based his conclusions on more than just the teardown analyses. Dr. Kymissis "analyzed GDS files[12] reflecting the design of the pixel arrangement structure." CX-1628C-NCT-PSC (Kymissis) at Q/A 37. He also "considered other documents, deposition testimony, and Respondents' contentions." *Id.* I have considered all of this evidence in evaluating infringement and have not relied solely on Dr. Kymissis' analysis of the teardown images.

### a)     Reliance on Dr. Adam Fontecchio's Measurements

With respect to its first argument, BOE explains that "[t]he size and location of BOE's pixels is a key issue SDC must prove." RIB at 5. According to BOE, "Dr. Kymissis' failure to independently verify Dr. Fontecchio's information caused problems." *Id.* As an example, BOE asserts that, for the ▮ product, the ImageJ[13]-produced images fail "to accurately reflect boundaries of the pixel measured" and include "unnatural measurements" and "strange 'banana-shaped' artifacts.'" *Id.* at 6.

---

[12] Dr. Kymissis explained that "GDS is a file format commonly used in the industry for the design of integrated circuits. Both ▮ and ▮ ▮▮▮ ." CX-1628C-NCT-PSC (Kymissis) at Q/A 44.

[13] Dr. Kymissis explained that "ImageJ is an image processing program developed at the National Institutes of Health and is a commonly used tool for microscope image processing." CX-1628-NCT-PSC at Q/A 39.

I do not find that it was improper for Dr. Kymissis to rely on the measurements taken by Dr. Fontecchio. Dr. Fontecchio conducted teardowns using an optical microscope to capture pixel arrangement structure images. CX-1629C-NCT (Fontecchio) at Q/A 44-47. He then used software to obtain image properties, including pixel boundary outlines, pixel center coordinates, and pixel areas. *Id.*

Dr. Fontecchio described this process to Dr. Kymissis. CX-1628C-NCT-PSC (Kymissis) at Q/A 38. Dr. Kymissis believed that the teardowns performed by Dr. Fontecchio "were very professionally and expertly done." Tr. (Kymissis) at 131:15-19. Dr. Kymissis further noted that he "was satisfied with the quality of the images and with the process that was used to acquire them." *Id.* at 131:21-25. Thus, Dr. Kymissis did not simply accept Dr. Fontecchio's measurements without question. He assured himself that he was comfortable relying upon them.

Nor do I agree with BOE that Dr. Fontecchio's measurements were flawed. BOE criticizes Dr. Fontecchio's use of ImageJ, but the evidence shows that ImageJ is "a commonly used tool" that is "reliable and widely used in the scientific community." CX-1628C-NCT-PSC (Kymissis) at Q/A 39-41; *see also* CX-3427; CX-3428. Dr. Kymissis was familiar with ImageJ and used it in his own work. CX-1628C-NCT-PSC (Kymissis) at Q/A 42; *see also* Tr. (Kymissis) at 132:12-14 ("I agreed with the decision to use ImageJ. ImageJ is a well known and . . . well appreciated piece of software.").

I am also not persuaded by BOE's arguments that the use of ImageJ was inappropriate in this instance. BOE argues that the images "fail to accurately reflect boundaries of the pixels measured, include[] unnatural measurements, and strange 'banana-shaped' artifacts." RIB at 6. Dr. Kymissis credibly explained why he was not concerned with the "banana-shaped" artifacts or non-uniform shapes depicted next to some of the pixels:

CONFIDENTIAL MATERIAL OMITTED



CDX-00015C.002. Dr. Kymissis noted that the artifact is not part of the boundary of the pixel defining layer:



Tr. (Kymissis) at 133:21-134:13; *see also id.* at 137:17-22 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Because Dr. Kymissis explained why he was not concerned about the existence of the banana shape, I do not find the presence of such a shape to be evidence that ImageJ should not have been used.

Dr. Kymissis also explained why he was not concerned with the non-uniform borders depicted below:

CONFIDENTIAL MATERIAL OMITTED



RDX-0013C.4 (depicting RX-1090C). He testified that ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████." CX-1628C-NCT-PSC (Kymissis) at Q/A 139.[14] He further explained that "[b]ased

on all of the other evidence I mentioned, including the uniformity of the pixels in the arrangement

structure, this error does not affect my opinion." *Id.*

Because I find that Dr. Kymissis credibly explained why it was appropriate for him to rely

on ImageJ outputs, I find that BOE's criticisms of ImageJ lack merit.

###    b)    Center Calculation

BOE argues that Complainant's "pixel center calculations are . . . unreliable." RIB at 7.

According to BOE, Dr. Fontecchio's pixel measurements "relied on inaccurate border

measurements" and "assumed each pixel had 'uniform material.'" *Id.* BOE also asserts that

Complainant "did not use well-known and more reliable means for calculating the pixels' center

points, such as calculating a variable-weight centroid factoring in the pixel's luminance." *Id.* BOE

---

[14] Complainant notes that the R6 pixel is the same as the "23 pixel" depicted in RDX-0013.C.4. CRB at 4; *see also* CDX-0015C (showing a non-illuminated teardown image identifying the R6 pixel); RX-1090C.

**CONFIDENTIAL MATERIAL OMITTED**

further argues that Dr. Kymissis did not apply the centroid algorithm and instead "relied on software to generate center points." *Id.* at 8.

I find that Dr. Kymissis adequately explained his calculation of a pixel's center. He stated that ███████████████████████████████████████████████████████████

████████████████████████████." CX-1628C-NCT-PSC (Kymissis) at Q/A 49. He further explained: ███████████████████████████████████████████

█████████████████████████████████████ *Id.* at Q/A 51. He noted that ███████████████████████████████████████. *Id.*

Dr. Kymissis also credibly explained why he did not account ███████████████

███████████████████████████████████████████████████████████████

███████████████████████ *Id.* at Q/A 683; *see also* Tr. (Pattison) at 249:19-254:11 (conceding that the claims do not have limitations relating to luminance). He further stated that ███████

███████████████████████████████████████████████████████████████

█████████████████████" CX-1628C-NCT-PSC (Kymissis) at Q/A 683. I find Dr. Kymissis' explanation to be credible and therefore I reject BOE's contrary arguments.



### c)    Manufacturing Tolerance

BOE argues that Complainant "compounded its measurement errors by improperly applying irrelevant and arbitrary manufacturing and measurement tolerances." RIB at 8. According to BOE, "when SDC's measurements proved that the Accused Products and NIAs do not literally infringe, SDC ignored the evidence and relied on an arbitrary 2 micron tolerance." *Id.*

Dr. Kymissis did apply a ███████████████████████. CX-1628C-NCT-PSC (Kymissis) at Q/A 62. I do not agree, however, that it was improper for Dr. Kymissis to take manufacturing tolerances into account or that the tolerance he chose was improper. Rather, Dr.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Kymissis provided a detailed explanation as to why he took manufacturing tolerances into account.

He stated:



*Id.* at Q/A 61. Dr. Kymissis further noted that ████████████████████████████

████████████████████████████████████████████████████████ *Id.* at

Q/A 62. Dr. Kymissis' reliance on manufacturing tolerances is further supported by BOE's

corporate representative who testified that the ████████████████████████████

████████████████████████████████████████████." CX-1607C (Zhang)

at 255:15-17.

Dr. Kymissis also conducted checks on himself to limit the impact of manufacturing

deviations and measurement errors. ████████████████████████████████████████

████████████████████████████████████████." CX-1628-NCT-

PSC (Kymissis) at Q/A 67. ████████████████████████████████████████

████████████ *Id.* at Q/A 69.

Finally, Dr. Kymissis explained how one of skill in the art would understand that the patent

specification supports the idea that manufacturing tolerances can be considered. He testified:

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

> The Diamond Pixel patents[15] discuss challenges associated with manufacturing of pixel arrangements, and explain how the preferred embodiments use a FMM process, which a POSITA would understand results in variances and incorporates manufacturing tolerances. A POSITA will also understand that there will be measurement error in analyzing a manufactured product. A number of claim limitations recite aspects of a pixel arrangement structure using shapes (e.g., squares) and relationships (e.g., distances, or lines through centers of pixels). A POSITA would understand that these terms allow for typical manufacturing tolerances associated with FMM manufacturing processes. For example, a "square" to a POSITA is a four-sided shape that has equal-length sides within manufacturing tolerances. In general, my calculations for each product show that deviations from mathematically perfect objects or relationships are significantly less than 1 or 2 microns (after converting distances expressed in "pixels" to microns in the analyses for the teardown images), which is within the manufacturing tolerance and measurement error. This supports my opinion that such slight deviations are not relevant to whether the claim limitations are satisfied.

*Id.* at Q/A 70. For these reasons, I find that Dr. Kymissis has credibly explained why it was acceptable to consider manufacturing tolerances in his analysis.

In addition to finding Dr. Kymissis' explanation credible and persuasive, I find that BOE's argument should be rejected as demanding perfection that cannot exist. As Complainant notes, BOE's position would "interpret the claims such that *no* manufactured display could infringe." CIB at 46. No display will perfectly match the intended design, which is why there are manufacturing tolerances in the first place. *See, e.g.,* Tr. (Pattison) 266:11-15 (█████████████ ████████████████████████████████████████████████████ ███████████████████████ ).

I am also not persuaded by BOE's argument that "[a]ny tolerance must be based on the PDL [pixel defining layer], not the FMM [fine metal mask]. RRB at 6. According to BOE, fine metal mask manufacturing tolerances are "irrelevant because the pixel defining layer . . . , not the

---

[15] Dr. Kymissis defines the "Diamond Pixel Patents" as the '803, '578, and the (now terminated) '683 patents. CX-1628-NCT-PSC (Kymissis) at Q/A 2.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

FMM, defines the pixel's shapes and sizes, and there is no evidence of a PDL-manufacturing tolerance or that those FMM considerations are relevant to PDL-manufacturing." *Id.* at 6-7. The evidence shows, however, that ███████████████████████████████████

████████████████████ *See, e.g.*, Tr. (Kymissis) at 116:11-13 ███████████

███████████████████████████████ Dr. Kymissis testified that he relied on a 2020 paper (CX-3430) for the 2-micron tolerance and stated that the paper compares metal ablation and photolithography for production of masks. *Id.* at 111:4-9, 111:18-22; *see also id.* at 111:23-112:1. He noted that BOE may have been confused about the applicability of the paper and explained:

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████

Tr. (Kymissis) at 112:2-19. He further explained that the ███████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

---

[16] Dr. Kymissis clarified that "[e]rrors only get smaller over time as equipment gets better and processes improve" so the fact that the manufacturing tolerance came from a paper that post-dates the patent by nearly a decade indicates the selected manufacturing tolerance are conservative. Tr. (Kymissis) at 112:25-113:4.

<p style="color:red; text-align:center"><strong>CONFIDENTIAL MATERIAL OMITTED</strong></p>



*Id.* at 116:14-21; *see also id.* at 117:21-25

Dr. Kymissis also noted that the 2-micron number is supported by other evidence, such as testimony from BOE employees and BOE's own documents. *Id.* at 113:5-12. For these reasons, I do not agree with BOE's argument.

For all of the above reasons, I am not persuaded by BOE's criticisms of Dr. Kymissis' methodology.

**2.** ▮▮▮▮▮▮▮▮

**a)    Claim 5**

Claim 5 of the '803 patent depends on claim 4, which depends on claim 3, which depends on claim 2, which depends on claim 1. JX-0003 at cls. 1-5. Thus, to establish that any Accused Product meets the limitations of claim 5, Complainant must also establish that the limitations of claims 1, 2, 3, and 4 are met.

**i)    Limitations 1[pre] and 1[a]**

Limitations 1[pre] and 1[a] recite: "A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising: a plurality of pixels for displaying an image on the OLED display and comprising:" JX-0003 at cl. 1. BOE does not dispute that the ▮▮▮[17], and ▮▮▮ products meet these limitations. Undisputed Claim Limitations at 11-12. The evidence

---

[17] Complainant asserts that the ▮ product satisfies each limitation of claim 1 but does not accuse the ▮ of infringing claim 5. CIB at 8, 11. For efficiency and clarity, I will address whether the ▮ product meets the limitations of claim 1 in this section.

CONFIDENTIAL MATERIAL OMITTED

shows that these limitations are met. CX-1628C-NCT-PSC (Kymissis) at Q/As 75-76, 156-157, 228-229.

### ii)     Limitations 1[b] and 1[c]

Limitations 1[b] and 1[c] recite "a first pixel having a center coinciding with a center of a virtual square" and "a second pixel separated from the first pixel and having a center at a first vertex of the virtual square." JX-0003 at cl. 1.

Complainant asserts that the Accused Products have the "virtual square," as demonstrated by both Dr. Kymissis' teardown and the GDS file calculations. CIB at 14, 15. Complainant further notes that "[i]t is undisputed the claimed pixels are separated from each other as required by limitation 1[c]." *Id.*

BOE argues that Complainant "failed to prove any Accused Products practice [the] 'virtual square' limitations." RIB at 11. According to BOE, ████████████████████████████ ████████████████████████████████ *Id.* at 12.

Staff asserts that "Dr. Kymissis's determinations of pixel boundaries and centers are sufficiently reliable and accurate." SIB at 22. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy limitations 1[b] and 1[c]. *Id.*

The evidence shows that the ████████████ products have a "virtual square."[18] For the ██ the virtual square is shown in the below image:

---

[18] Staff notes that the parties have proposed different constructions for this term. SIB at 19. Neither Complainant nor BOE address the construction of "virtual square" in their briefs. *See* CIB 13-15; RIB 11-2; CRB at 6. Additionally, Staff asserts that "the differences between the proposed constructions do not affect the infringement, technical prong, and validity analysis for the '803 patent" and therefore states that the term need not be construed. SIB at 19. I will therefore not be providing a construction for this term.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



CDX-0015C.10. Complainant explains that the pixels forming the virtual square are as follows:



CIB at 14; *see also* CX-1628-NCT-PSC (Kymissis) at Q/A 77. Dr. Kymissis analyzed the

teardown image and "███████████████████████████████████

████████████" CX-1628-NCT-PSC (Kymissis) at Q/A 77. In order

████████████████████████████████████████████

████████████████████████████ *Id.* He stated that ███

████████████████████████████████████████████

████████████████████████" *Id.* He concluded that ███████

████████████████████████████████████████████

████████████████████████████ *Id.* He further

found that ███████████████████████████████ *Id.*; *see*

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

*also id.* at Q/A 78 ███████████████████████████████████

████████████████████████████████████████████████

████████

Dr. Kymissis confirmed this analysis by using the data from the █████████████

product. *Id.*at Q/A 77; *see also* CX-3975C-PSC. According to Dr. Kymissis: "████████

████████████████████████████████████████████████

████████████████████████" CX-1628C-NCT-PSC (Kymissis) at Q/A 77. Dr. Kymissis

also confirmed that the center of the virtual square coincides with the center of G2, noting: █████

████████████████████████████████████████████████

██████" *Id.* (citing CX-3957C-PSC).

Finally, Dr. Kymissis indicated that his opinions are "supported by the testimony of BOE's

corporate representative, Kai Zhang, who testified that the ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████ *Id.* at Q/A 77 (citing CX-1607C (Zhang) at 218-

219, 235-239).

Dr. Kymissis performed the same analyses for the ████████ products. *See* CX-1628-

NCT-PSC (Kymissis) at Q/A 158-159; 230-231. Accordingly, Dr. Kymissis demonstrated that the

████████████ products meet these limitations.[19]

---

[19] In its reply brief, BOE asserts that Complainant "violates G.R. 14.2 with respect to its conclusory analysis of ██████████ for several limitations." RRB at 5. I disagree. Complainant explained, for example, that "Dr. Kymissis performed the same analysis for ██████████, generated

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

I am not persuaded by BOE's noninfringement positions with respect to these limitations. BOE asserts that the ███████████████████████████████████████████ ████. RIB at 12. According to BOE, the █████████████████████████████. *Id.* BOE also asserts that Complainant's "measurements of the sides and angles confirm the Accused Products do not meet the virtual square limitations." *Id.*

BOE's argument is grounded in the idea that manufactured products will be geometrically perfect. As noted in section IV.B.1, one of skill would understand that there will be deviations from the designs in the manufactured products. So long as these deviations are within the provided manufacturing tolerances, they are acceptable. CX-1628C-NCT-PSC (Kymissis) at Q/As 61-62. Additionally, the █████████████████████████████████████████████ *Id.* at Q/A 77 (██████████████████████████████████████████████████ ██████████████████████████████████████████████ *see also* CX-3957C-PSC.

For these reasons, I find that the ██████████████ products meet limitations 1[b] and 1[c].

### iii)     Limitation 1[d]

Limitation 1[d] recites "another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels." JX-0003 at cl. 1.

---

corresponding images and calculations, and concluded these products likewise meet these limitations." CIB at 15; *see also* CX-1628C-NCT-PSC (Kymissis) at Q/As 158-159, 231-232 (explaining that he followed the same methodology as for the ███ BOE does not offer noninfringement positions specific to these products. *See* RIB 9-17; RRB 8-11. In such circumstances, it would be inefficient and unnecessary to require a complainant to set forth a limitation-by-limitation analysis for each product in its briefs.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

BOE's argument that this limitation is not met is the same as for limitations 1[b] and 1[c]. RIB at 11-12 (addressing limitations 1[b] – 1[e] together). For the reasons set forth above with respect to limitations 1[b] and 1[c], I am not persuaded by BOE's noninfringement argument.

The evidence shows that this limitation is met for the Accused Products. For the ████ product, Dr. Kymissis explained that G6 is "███████████████████████ █████████████████████████ █████████████:



CX-1628C-NCT-PSC (Kymissis) at Q/A 79. He further explained that ████████████ ██████████████████████████████████████████████ *Id.* Additionally, Dr. Kymissis "████████████████████████████████" and concluded that ████████████████████████████████████████████ █████████████████████████████████." *Id.*; *see also* CX-3904C; CX-3957C-PSC. Dr. Kymissis performed the same analysis for the ████ ████ products. *See* CX-1628C-NCT-PSC (Kymissis) at Q/As 160, 232.

Accordingly, I find that the ████████████ products meet limitation 1[d].

CONFIDENTIAL MATERIAL OMITTED

### iv)    Limitation 1[e]

Limitation 1[e] recites "a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square." JX-0003 at cl. 1.

BOE's argument that this limitation is not met is the same as for limitations 1[b] and 1[c]. RIB at 11-12 (addressing limitations 1[b] – 1[e] together). For the reasons set forth above with respect to limitations 1[b] and 1[c], I am not persuaded by BOE's noninfringement argument.

The evidence shows that this limitation is met for the Accused Products. For the █████ product, Dr. Kymissis explained that ██████████████████████████



██████████████████████████████ CX-1628C-NCT-PSC (Kymissis) at Q/A 80. He further confirmed that ████████████████████████████████████████

███)." *Id.* Dr. Kymissis performed the same analysis for the ██████████ products. *See id.* at Q/As 161, 233.

Accordingly, I find that the ██████████ products meet limitation 1[e].

### v)    Limitation 1[f]

Limitation 1[f] recites "wherein the second pixel has a larger area than that of the third pixel." JX-0003 at cl. 1.

Complainant asserts that "Dr. Kymissis confirmed each blue pixel has a larger area than each red pixel, which has a larger area than each green pixel, through teardown ██████████

██████████████████████████████████████" CIB at 19.

**CONFIDENTIAL MATERIAL OMITTED**

Staff asserts that "Dr. Kymissis's determinations of pixel boundaries and centers are sufficiently reliable and accurate." SIB at 22. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy limitation 1[f]. *Id.*

BOE does not address this limitation in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this limitation.

The evidence shows that this limitation is met. CX-1628C-NCT-PSC (Kymissis) at Q/A 81, 162, 234; *see also* CX-3904C; CX-3957C-PSC; CX-0189C.192; CX-1607C (Zhang) at 239:18-240:16. Accordingly, I find that the ████████████ products meet limitation 1[f].

### vi)    Limitation 1[g]

Limitation 1[g] recites "wherein the first pixel is configured to emit green light." JX-0003 at cl. 1. BOE does not dispute that the ████████████ products meet this limitation. Undisputed Claim Limitations at 11. The evidence shows that this limitation is met. CX-1628C-NCT-PCS at Q/A 82, 163, 235.

### vii)    Limitation 2[a]

Limitation 2[a] recites "wherein the plurality of pixels further comprises another second pixel separated from the first pixel and having a center at a third vertex neighboring the second vertex of the virtual square." JX-0003 at cl. 2

Complainant asserts that this claim limitation is met for the same reasons as with respect to 1[b] and 1[c]. CIB at 13.

Staff asserts that "Dr. Kymissis's determinations of pixel boundaries and centers are sufficiently reliable and accurate." SIB at 22. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy limitation 2[a]. *Id.*

**CONFIDENTIAL MATERIAL OMITTED**

BOE does not address this limitation in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this limitation.

The evidence shows that this limitation is met. CX-1628C-NCT-PSC (Kymissis) at Q/A Q/As 83, 164. Accordingly, I find that the ███████ products meet limitation 2[a].

### viii)   Limitation 2[b]

Limitation 2[b] recites "wherein the second pixels are separated from each other by the first pixel." JX-0003 at cl. 2. BOE does not dispute that the ███████ products meet this limitation. Undisputed Claim Limitations at 11. The evidence shows that this limitation is met. CX-1628C-NCT-PCS at Q/A 83, 164.

### ix)   Limitation 3[a]

Limitation 3[a] recites "wherein the plurality of pixels further comprises another third pixel separated from the first pixel and having a center at a fourth vertex neighboring the third vertex of the virtual square." JX-0003 at cl. 3.

Complainant asserts that this claim limitation is met for the same reasons as with respect to 1[b] and 1[c]. CIB at 13.

Staff asserts that "Dr. Kymissis's determinations of pixel boundaries and centers are sufficiently reliable and accurate." SIB at 22. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy limitation 3[a]. *Id.*

BOE does not address this limitation in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this limitation.

The evidence shows that this limitation is met. CX-1628C-NCT-PSC (Kymissis) at Q/A Q/A 84, 165. Accordingly, I find that the ███████ products meet limitation 3[a].

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

### x) Limitation 3[b]

Limitation 3[b] recites "wherein the third pixels are separated from each other by the first pixel." JX-0003 at cl. 3. BOE does not dispute that the ▮▮▮▮▮▮ products meet this limitation. Undisputed Claim Limitations at 11. The evidence shows that this limitation is met. CX-1628C-NCT-PCS at Q/A 84, 165.

### xi) Claim 4

Claim 4 recites "[t]he pixel arrangement structure of claim 3, wherein the second pixels and the third pixels enclose the first pixel in the virtual square." JX-0003 at cl. 4.

Complainant asserts that the evidence shows that this claim is met. CIB at 21-22. Staff agrees. SIB at 24.

BOE does not address this claim in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to the additional limitation of claim 4.

The evidence shows that the additional limitation of claim 4 is met. CX-1628C-NCT-PSC (Kymissis) at Q/A 85, 166. Accordingly, I find that the ▮▮▮▮▮▮ products meet claim 4.

### xii) Limitation 5[a]

Limitation 5[a] recites "wherein the first pixel, the second pixels, and the third pixels have polygonal shapes." JX-0003 at cl. 5.

Complainant asserts that the ▮▮▮▮▮▮ have pixels with "polygonal shapes." CIB at 23. Complainant notes that "the pixels have shapes with only straight sides – no sides are curved." *Id.* at 24. Even if the ▮▮▮▮▮▮ did not literally infringe, Complainant asserts that these products would infringe under the doctrine of equivalents. *Id.* at 25.

BOE argues that "[n]one of the Accused Products meet [5-a], which requires 'polygonal shapes.'" RIB at 12. BOE asserts that "polygonal shapes" should be defined as "planar shapes

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

(two-dimensional) having *only* straight sides." *Id.* (emphasis added). According to BOE, shapes with curved edges cannot be polygons. *Id.* at 13. BOE further asserts that Complainant's doctrine of equivalents argument is meritless. *Id.* at 15.

Staff argues that Complainant "has failed to shoulder its burden of proving that the Accused Products have pixels with 'polygonal shapes.'" SIB at 27. Staff notes that "Dr. Kymissis does not testify that the pixels shown in the teardowns of the Accused BOE Products have polygonal shapes." SIB at 24. "Rather, Dr. Kymissis opines that shapes shown in the GDS files for these products are polygonal." *Id.* ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ *Id.* at 25 (quoting Tr. (Kymissis) at 183:20-25). Staff also disagrees with Complainant's doctrine of equivalence argument, asserting that "[i]n essence, [Complainant] seeks to read 'polygonal shape' as 'shape.'" *Id.* at 27 n.3.

It is undisputed that the pixels of the Accused Products have rounded corners. For example, in the teardown image of ███ the pixels appear as follows:



CDX-0015C.10. The dispute is whether shapes with rounded corners can be considered "polygonal shapes." Complainant does not specifically set forth a construction of this phrase in its briefs,[20] but contends that one of skill "would understand 'polygonal' encompasses shapes with rounded corners." CIB at 24. BOE and Staff assert that the term means "planar shapes (two-dimensional) having only straight sides." RIB at 12; SIB at 19.

There is support in the record for a finding that one of skill would understand "polygon" to be "a shape with all straight sides." RX-1084C-NCT (Pattison) at Q/A 131 (stating that "[t]he basic geometrical definition of a polygon is a shape with all straight sides"). The patentee did not use the term "polygon," however, and instead chose the words "polygonal shape."

The specification provides some guidance as to the meaning of "polygonal shape." The figures included in the '803 patent depict pixels with straight sides and no curved corners:

---

[20] BOE and Staff state that Complainant's position is that "polygonal shapes" means "planar shapes (two dimensional) with straight sides." *See* RIB at 12; SIB at 19.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

FIG.1



JX-0003 at Fig. 1. The patent notes, however, that "even though each of the pixels are drawn as stereotypical polygonal shapes in the drawings, the present invention is not limited to this shape. That is, the shapes of the pixels may be modified to avoid interference with the other components of the OLED (e.g., wirings) within the spirt and scope of the amended claims." *Id.* at 3:41-46. Thus, it would be improper to limit "polygonal shape" to a stereotypical polygon. The patent does not, however, specifically indicate whether or not a shape with curved corners would meet this definition.

The record contains conflicting opinions on the issue from people of skill. Dr. Kymissis explains that ███████████████████████████████████████████ ████████████ CX-1628C-NCT-PSC (Kymissis) at Q/A 91. Dr. P. Morgan Pattison, on the

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

other hand, disagrees and opines that one of skill " ██████████████████████

████████████████████████████████████████████." RX-1084C-NCT

(Pattison) at Q/A 140.

I reject Dr. Pattinson's proposal. First, it does not account for the difference in the language

used in the patent ("polygonal shape" vs "polygon"). Nor does Dr. Pattison explain how his

proposed definition fits in with the specification's caveat that "polygonal shape" should not be

defined as a stereotypical polygon. Additionally, Dr. Pattison testified ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ *Id.* at 329:8-11.

I also find that Dr. Pattison's testimony, in general, lacked credibility. His testimony at the

hearing revealed that he took positions he knew to be contrary to the evidence and that he would

change his opinion as necessary to fit the circumstances. *See, e.g.*, Tr. (Pattinson) at 259:2-260:15

(██████████████████████████████████████████████████

██████████████████████████████████████████); *id.* at

328:21-329:7 (indicating that he applied a different understanding of "polygonal shape" in his

invalidity analysis than his infringement analysis). I therefore afford his testimony less weight.

*HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1370 n.4 (Fed. Cir. 2017).

Dr. Kymissis, on the other hand, appeared to be credible on the stand. He conceded points

when necessary and provided thorough explanations for why he reached his opinions. I thus give

his understanding that one of skill would understand a shape with rounded corners to qualify as a

"polygonal shape" more weight. Dr. Kymissis' understanding is also supported by other extrinsic

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

evidence. As even Dr. Pattison confirmed, ███████████████████████

███████████████ :



CX-0090C at 7 (BOE document); *see id.* at 4 ████████████████████████

████████████████████ ); Tr. (Pattison) at 325:13-326:1 ( ███████████████

██████████████████████████████████████████ );

*see id.* at 326:5-8 (testifying that BOE employees ██████████████████

████ "); *id.* at 323:17-324:5 (confirming that ████████████████████████

████████████████████████████████████████ ).

For these reasons, I will construe the term "polygonal shape" to have its plain and ordinary meaning that one of ordinary skill in the art would ascribe to that term when read in the context of the claim, specification, and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313–14 (Fed. Cir. 2005) (*en banc*). The plain and ordinary meaning of the term "polygonal shape" does not preclude rounded corners but does preclude a shape with a rounded side. *See* Tr. (Kymissis) at 184:5-7.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

The evidence shows that the pixels of the Accused Products have "polygonal shapes."[21] For example, with respect to the ▮▮▮ product, the pixels appear as follows:



CX-3456C; CX-3457C. As seen in the images, each of the shapes ▮▮▮▮▮▮▮▮ ▮▮▮. Dr. Kymissis' testimony confirms that one of skill would understand these shapes to be "polygonal shapes." CX-1628C-NCT-PSC (Kymissis) at Q/A 91; *see also id.* at Q/A 167.

I am not persuaded by Staff's arguments that Dr. Kymissis did not demonstrate that the pixels are polygonal shapes. According to Staff, "Dr. Kymissis does not testify that the pixels shown in the teardowns of the Accused BOE Products have polygonal shapes," but instead relies on the GDS files. SIB at 24. While Dr. Kymissis referenced the GDS files, he also testified that the images as shown in the teardown met the limitation. He testified that the pixels would meet the limitation under either Complainant's or BOE/Staff's proposal. CX-1628C-NCT-PSC (Kymissis) at Q/A 86 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[21] BOE asserts that Complainant's argument that claim 5 is met is conclusory. RRB at 5 (stating that "SDC offers only one conclusory statement to meet its burden to prove the accused pixels are polygonal" and that the remainder of the argument "purports to rebut BOE's argument"). I disagree that Complainant has violated Ground Rule 14.2. Complainant stated that the pixels have "polygonal shapes" and provided images confirming this. CIB at 23-24. Complainant further stated that "the pixels have shapes with only straight sides – no sides are curved." *Id.* at 24. Complainant then dedicated several pages to explaining why the existence of rounded corners does not lead to the opposite conclusion. CIB at 24-26; *see also* CRB at 6-10. This is sufficient for Complainant to meet its burden. Complainant did not merely state that the limitation is met but instead explained *why* it was met.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

He also confirmed that he did not agree that the ████████████████████████

████████████████." *Id.* at Q/A 90. Finally, he explained that ████████████████

████████████████████████████████████████████████████████████████

Tr. (Kymissis) at 204:16-19. Accordingly, I find that Complainant's have met their burden to show that the pixels are polygonal shapes.

Accordingly, I find that the ███████████ products meet this limitation.

### xiii)    Limitation 5[b]

Limitation 5[b] recites "each of the second pixels and each of the third pixels has a larger area than the first pixel." JX-0003 at cl. 5.

Complainant asserts that this limitation is met for the same reasons as for claim limitation 1[f]. CIB at 26.

BOE does not address this limitation in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this limitation.

The evidence shows that this limitation is met. CX-1628C-NCT-PSC (Kymissis) at Q/A Q/A 102, 169; *see also* CX-3094C; CX-3957C-PSC; CX-0189C.192; CX-1607C (Zhang) at 239:18-240:15. Accordingly, I find that the ███████████ products meet limitation 5[b].

### xiv)    Conclusion

For these reasons, I find that the ███████████ products infringe claim 5 of the '803 patent. I further find that the ███ product meets the limitations of claim 1.

### b)    Claim 21

Claim 21 recites "[t]he pixel arrangement structure of claim 1, wherein the second pixel has a larger area than that of the first pixel." JX-0003C. BOE does not dispute that the additional

CONFIDENTIAL MATERIAL OMITTED

limitation of claim 21 is met. Joint Notice Concerning Investigation Narrowing Efforts and Undisputed Claim Limitations (July 26, 2024) (EDIS Doc. ID 827355).

I previously found that the ███████████ products satisfy the limitations of claim 1. The evidence further shows that the ███████████ satisfy the additional limitation of claim 21. CX-1628C-NCT-PCS at Q/A 103-104, 170-171, 236.

Accordingly, I find that ███████████ products infringe claim 21.

### 3. Redesigned Products

BOE explains that "██████████████████████████████████████████████████ ██████████" RIB at 16. BOE notes that Complainant "does not allege–thus waived – that NIA██ infringe the '803 patent." *Id.*

Complainant does not introduce any evidence of infringement. As such, it has failed to meet its burden to show that NIA █████ infringe the '803 patent. *See Spansion*, 629 F.3d at 1349 (holding that complainant bears the burden of proving infringement of the asserted patent claims by a preponderance of the evidence).

### 4. BLF Accused Products

The BLF Respondents stipulated that Injured Gadgets IPXS-AS-FX5 is representative of all of the other BLF Accused Products. Supplemental Joint Stipulation Regarding Representative Products at 3 (EDIS Doc ID 822286) ("BLF Representative Products Stipulation"). The BLF Respondents also stated that they do not contest infringement of any of the asserted claims. The BLF Respondents' Identification of Undisputed Claim Limitations at ¶ 3 (EDIS Doc. ID 822745) ("The BLF Respondents dispute no claim limitation of the Asserted Claims with respect to infringement.") (hereinafter, "BLF Undisputed Limitations"). The evidence in the record shows

CONFIDENTIAL MATERIAL OMITTED

that the BLF Accused Products infringe claims 5 and 21 of the '803 patent. CX-1628C-NCT-PSC (Kymissis) at Q/As 402-423.

Nor am I persuaded that I should find noninfringement with respect to the BLF Respondents. Staff argues that the pixel arrangements in Injured Gadget's IPXS-AS-FX5 show that the "vertical corners of the red pixels appear to be substantially unrounded while the horizontal corners are substantially rounded." SIB at 25-26. Staff further asserts that "[e]ach corner of the green pixels is rounded." *Id.* at 26. Staff notes that "Dr. Kymissis has not articulated the degree of rounding that would have been expected by a POSITA." *Id.*

I am not concerned that Dr. Kymissis did not indicate what degree of rounding one of skill would find appropriate or expected. Dr. Kymissis analyzed the accused products to determine if they infringe. The fact that he did not set forth the precise boundaries as to whether other hypothetical shapes would infringe is not problematic. Additionally, even if the Commission were to find that Complainant did not show that the BLF Accused Products infringe claim 5, Staff does not dispute that the BLF Accused Products infringe claim 21. Thus, the ultimate conclusion of infringement of the '803 patent would not change.

### 5. Defaulting Respondents' Accused Products

Complainant has shown that the Defaulting Respondents' Accused Products meet the limitations of claims 5 and 21 of the '803 patent. CX-1628C-NCT-PSC (Kymissis) at Q/A 518-573. Accordingly, I find that the Defaulting Respondents' Accused Products infringe claims 5 and 21 of the '803 patent.

### 6. Conclusion

As set forth above, I find that the ▇▇▇▇▇ products, BLF Accused Products, and the Defaulting Respondents' Accused Products infringe claims 5 and 21 of the '803 patent. Because

CONFIDENTIAL MATERIAL OMITTED

███████████████████████, I find that █████ also infringes claims 5 and 21. I further find

that the ██ product infringes claim 21. Because ████████████████████, I find that ██ also

infringes claim 21. Finally, I find that NIA █████ do not infringe any asserted claim.

### C.    Technical Prong

Complainant asserts that the ██████████ practice claims 5 and 21 and that the

████████ practices claim 21. CIB at 52. The parties agreed that these █████ products are each

representative of other products, as shown below:



Representative Products Stipulation at 4-5.

CONFIDENTIAL MATERIAL OMITTED

Staff agrees that Complainant has demonstrated that the Domestic Industry products practice claim 21 but asserts that the ███████ products do not practice claim 5. SIB at 34-38. Staff explains that the Domestic Industry products do not practice claim 5 because the pixels are not "polygonal shapes." *Id.* at 37-38. Staff argues, however, that BOE's criticisms regarding Dr. Kymissis' methodology should be rejected. *Id.* at 34-35.

BOE includes a one paragraph argument as to why it disagrees that the technical prong is met for both the '803 and '578 patents. RIB at 17. For the '803 patent, BOE first argues that Complainant "did not meet its burden to prove DI because Dr. Kymissis' methodology for calculating the center points and ███████████ was flawed and inconsistent." *Id*. For the reasons set forth in Section IV.B.1., I reject this argument. Additionally, Dr. Kymissis credibly explained why ███████████ did not affect his analysis. CX-1628-NCT-PSC (Kymissis) at Q/A 585-590. Further, as Staff notes: "Dr. Kymissis compared the teardown results for the DI Products to the DI Products' GDS files and found that the teardown results were consistent with the GDS files." SIB at 35. ██████████████████████████ ████████████████████████ *Id.*[22]

Next, BOE argues that Complainant "failed to prove the DI Products meet the 'enclose' limitation of claim 4 . . . or feature 'polygonal shapes' required by claim 5." RIB at 17. Even if BOE was correct that Complainant did not show that the products practice the limitations of claims 4 and 5, Complainant has demonstrated that it meets the technical prong. Aside from the methodology argument addressed above, BOE does not make any argument specific to claim 21.

---

[22] Staff also argues that I should reject BOE's argument that Dr. Kymissis failed to account for the DI Products ███████████ SIB at 35. BOE did not make this argument in its briefs. RIB at 17. To the extent that BOE intended to maintain this argument, I find that it is waived.

CONFIDENTIAL MATERIAL OMITTED

*See* RIB at 17; RRB at 11. Further, the evidence shows that the ███████████ ███████████ practice claim 21. CX-1628-NCT-PSC (Kymissis) at Q/A 592-600, 610-611, 661-669-676, 679-681. A complainant need only show that its products practice one claim for the technical requirement to be met. *See Certain Soft-Edge Trampolines & Components Thereof*, Inv. No. 337-TA-908, Comm'n Op. at 54 (May 1, 2015) ("[T]he prevailing rule is that a complainant need only show that it practices one claim of an asserted patent . . . to meet the technical prong of the domestic industry requirement."); *see also Certain Printing & Imaging Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 25 (Nov. 2011) ("The technical prong concerns whether complainant practices at least one claim of the asserted patents."). Thus, it is unnecessary for Complainant to establish that its products practice additional claims.

For these reasons, I find that the technical prong is met for the '803 patent.

### D.    Invalidity

BOE asserts that the '803 patent is invalid because: (1) U.S. Patent No. 7,091,986 ("Phan") anticipates claims 1-4 and 21 (RIB at 34-37); (2) Phan and U.S. Patent No. 6,366,025 ("Yamada") render claim 5 obvious (RIB at 37-39); and (3) U.S. Patent No. 6,897,855 ("Matthies") and Yamada render the asserted claims obvious (RIB 39-41).

#### 1.    Phan

Complainant argues that Phan does not teach an OLED display, as required by limitations 1[pre] and 1[a]. CIB at 63. Complainant further asserts that Phan "does not disclose pixels arranged in a 'virtual square.'" *Id.* at 64.

Staff agrees that Phan does not disclose either an OLED display or the "virtual square" limitation. SIB at 40-43.

a) **Virtual Square**

The evidence shows that Phan discloses a quad pixel display, as can be seen in Figure 12:



**FIG. 12**

RX-0169 at Fig. 12, 5:55-60. Additionally, Phan discloses that subpixels can be resized, as shown in in Figure 11b:



FIG. 11a          FIG 11b

*Id.* at Fig. 11b. According to BOE, "[i]nserting the 11b structure into Fig. 12's display meets [1-b-[1-e], 2, and 3." RIB at 36.



*Id.*

Complainant argues that the resized pixels of 11b cannot be inserted into Figure 12 in the manner BOE claims. Complainant notes that Figure 12 "clearly shows spaces between quad-pixels" which are "necessary for the display to function." CIB at 64. "When replacing Figure 12's quad-pixels with copies of Figure 11b," however, BOE "improperly remove[] the spaces, contradicting Phan's teachings." *Id.*

Staff agrees that "Phan does not disclose the claimed 'virtual square.'" SIB at 42. Staff notes that the figure on which Dr. Pattison relies "does not appear in Phan" and is instead "Dr Pattison's purported implementation of Figure 12's pixel arrangement using Figure 11b's pixel." *Id.* at 43. Staff notes that this implementation "removes the gaps" and that "[r]etaining the gaps results in a pixel arrangement that does not satisfy the 'virtual square' limitations." *Id.*

I find that BOE has not proven, by clear and convincing evidence, that one of skill would insert the pixel of Figure 11b into the pixel arrangement of Figure 12 and remove the spaces.[23] In response to Complainant and Staff's arguments, BOE asserts that the figures are not drawn to scale

---

[23] If the spaces are not removed, Phan does not satisfy the "virtual square" limitation. CDX-0075C.11; CX-1241C (Kymissis) at Q/A 69; *see also* Tr. (Pattison) at 297:10-15 (acknowledging that Phan's pixels could be laid out in a way that would not form a virtual square).

and that one of skill "would arrange the sub-pixels and pixels so that there is equal spacing between them." RIB at 36-37. This does not address the issue, however. The issue is not whether Phan discloses that there should be equal spacing between the pixels but whether Phan discloses that one of skill would simply remove the spaces that Phan does disclose. BOE does not cite to support that one would do so. Additionally, the evidence shows that the spaces are necessary for the display to function. CX-1241C-NCT (Kymissis) at Q/A 74 ("Assuming Phan were actually directed to OLED display embodiments . . . , then Phan would need spaces between its adjacent quad pixels to provide room for power and signal lines."); Tr. (Kymissis) at 1119:22- 1120:24 (explaining why Phan require the spacing between the pixels to work).

Nor am I persuaded by BOE's arguments that "Phan's figures do not include markings to indicate what the spacing between pixels or sub-pixels should be" or that Complainant's "proposed spacing would . . . contradict Phan's teaching that dynamic pixels overlap the static pixels via even spacing between sub-pixels and adjacent pixels." RRB at 17. It is not Complainant's burden to show why its proposed spacing is correct. It is BOE that bears the burden to prove that one of skill would be motivated to remove the spaces that are shown in the figures of the patent. BOE has not done so.

Accordingly, I find that BOE has not shown that Phan anticipates the '803 patent.

### 2. Phan/Yamada

BOE asserts that it is undisputed that Phan teaches limitation 5[a]. RIB at 37. BOE further asserts that "Phan in view of Yamada teaches an arrangement that resizes (per Yamada) the pixels in Phan's square pixel arrangement." *Id.*

BOE makes no effort to explain how Yamada teaches the "virtual square" that I found was not disclosed in Phan. BOE does not address claim 1 (on which claim 5 depends) in its briefs. RIB

at 37-39; RRB at 18. Nor does it mention "virtual square." *Id.* As such, BOE does not meet its burden to show that Phan and Yamada render claim 5 obvious.

### 3.    Matthies/Yamada

BOE asserts that the combination of Matthies and Yamada renders the asserted claims obvious. RIB at 39. BOE also argues that "[a] POSITA would have been motivated, and have a reasonable expectation of success, to apply Yamada's teachings to Matthies." RIB at 23; *see also id.* at 41.

Complainant argues that "Yamada's AMOLEDs are fundamentally different" than Matthies' passive-matrix displays. CIB at 67. Complainant further asserts that "BOE's combination contravenes Matthies' design rules" and "would not simplify design or manufacturing." *Id.* at 69. According to Complainant, "[e]ven if POSITAs attempted combining these references, they would not arrive at the claimed pixel arrangements." *Id.*

Staff agrees BOE has failed to meet its burden. RIB at 50. Staff notes that Dr. Pattison offers two reasons that one would be motivated to modify the pixels of Matthies, but that "Matthies addresses both issues without varying pixel size." *Id.* at 48. Staff also notes that "varying pixel size by color would be inconsistent with Matthies' teachings." *Id.* at 49.

To successfully invalidate the asserted claims, BOE must provide "an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *see also InTouch Techs. v. VGO Commcn's*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) ("A reason for combining disparate prior art references is a critical component of an obviousness analysis.") BOE offers two reasons why one of skill would be motivated to combine Matthies and Yamada. Neither of these reasons is persuasive.

First, BOE argues that "Yamada addresses Matthies' concerns relating to 'aging' and 'decay' by simplifying balancing pixel luminance and pixel current." RIB at 24. BOE offers no explanation as to how Yamada addresses this problem. *See id*. Without more, BOE cannot meet its burden to show that one of skill would combine the references for this reason.

Second, BOE asserts that "Yamada simplifies Matthies' design by rendering obsolete the memory and circuits Matthies used to compensate for aging and decay." RIB at 34. BOE does not explain why this is so. Nor does BOE explain why one of skill would want to render the memory and circuits of Matthies obsolete. As Complainant notes, the evidence suggests that the circuits of Matthies are necessary for the display to function. CIB at 69. BOE does not adequately address this concern.

Thus, even if I were to find that the combination of Matthies and Yamada discloses all the limitations of the asserted claims, I find that BOE has not proven that one of skill would be motivated to combine the references.

Accordingly, I find that Matthies with Yamada does not render the asserted claims obvious.

### 4. Secondary Considerations

Secondary considerations of nonobviousness may rebut a prima facie case of obviousness. Here, where BOE has not made out a prima facie case of obviousness, there is no showing to rebut. Accordingly, I need not consider any secondary considerations of nonobviousness.

## V. U.S. PATENT NO. 11,594,578

### A. Overview

The '578 patent, entitled "Pixel Arrangement Structure for Organic Light Emitting Display Device" issued on February 28, 2023 to Sang-Shin Lee. JX-0005. The '578 patent discloses pixel

arrangements for OLED displays. *Id.* The claims of the '578 patent are drawn to the Figure 5

embodiment. JX-0010.166.



FIG.5

JX-0003 at Fig. 5.

### 1.    Asserted Claims

Complainant asserts claims 5, 10, 17, 40, 41, and 47 of the '578 patent. CIB at 8. Because

several of the asserted claims depend on non-asserted claims, these non-asserted claims are also

included below:

1.      1[pre] A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising:

1[a] a plurality of first pixels;

1[b] a plurality of second pixels; and

1[c] a plurality of third pixels,

1[d] wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

1[e] wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

1[f] wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

1[g] wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

1[h] wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets,

1[i] wherein the first lines and the second lines are alternately arranged,

1[j] wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

1[k] wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

1[l] wherein the third lines and the fourth lines are alternately arranged,

1[m] wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

1[n] wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels, and

1[o] wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

5.    The pixel arrangement structure of claim 1, wherein a shortest distance between the first pixels and the second pixels, and a shortest distance between the first pixels and the third pixels, are a same first length.

10.    The pixel arrangement structure of claim 1, wherein each of the second pixels has a larger area than each of the third pixels.

17.    The pixel arrangement structure of claim 1, wherein each of the first pixels has a smaller area than the second pixels and the third pixels.

40.    The pixel arrangement structure of claim 1,

40[a] wherein each of the first pixels has two elongated sides that are elongated in the third direction or a fourth direction crossing the third direction and different from the first and second directions, and two connection portions that connect the two elongated sides to each other at respective ends, and

40[b] wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two elongated sides.

41.    The pixel arrangement structure of claim 1, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in the third direction or a fourth direction crossing the third direction.

45.    45[pre] A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising:

45[a] a plurality of first pixels, wherein the first pixels have a shape comprising edges;

45[b] a plurality of second pixels; and

45[c] a plurality of third pixels,

45[d] wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

45[e] wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

45[f] wherein only one of the second pixels and the third pixels is included in a virtual quadrangle containing outer edges comprising some of the edges of a group of four neighboring ones of the plurality of first pixels, all portions of all others of the second pixels and the third pixels being outside of the virtual quadrangle, and

45[g] wherein a shortest distance between any two of the group of four neighboring ones of the plurality of first pixels is greater than a shortest distance between the only one of the second pixels and the third pixels included in the virtual quadrangle and a nearest one of the second pixels or the third pixels in a direction perpendicular to any side of the virtual quadrangle

47. The pixel arrangement structure of claim 45, wherein the virtual quadrangle does not cross any other of the first pixels, the second pixels, or the third pixels.

### 2. Claim Construction

I construed the following terms from the asserted claims as follows:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "line" / "lines" | 1 | "straight line" / "straight lines" |
| "center"/ "centers" | 1 | center point(s), wherein there is only one center point per pixel |
| "entirely offset" | 1 | Plain and ordinary meaning |
| "arranged along" | 1 | located on or near the length of a line extending in |
| "larger area" | 10 | Plain and ordinary meaning |
| "smaller area" | 17 | Plain and ordinary meaning |
| "virtual quadrangle" | 45, 47 | "quadrangle formed by imaginary lines that can be superimposed to describe relationships among pixels" |
| "wherein a shortest distance between any two of the group of four neighboring ones of the plurality of first pixels is greater than a shortest distance between the only one of the second pixels and the third pixels included in the virtual quadrangle and a nearest one of the second pixels or the third pixels in a direction perpendicular to any side of the virtual quadrangle" | 45 | "wherein a shortest distance between any two of the four neighboring first pixels (as defined previously in the claim) is greater than a shortest distance between the second or third pixel included in the virtual quadrangle and a nearest one of the second or third pixels in a direction perpendicular to any side of the virtual quadrangle" |

**CONFIDENTIAL MATERIAL OMITTED**

Order No. 28 at 15, 54, 58-59.

### 3.    Level of Ordinary Skill in the Art

I previously found that a person of ordinary skill in the art with respect to the '578 patent would have had a relevant degree in Electrical Engineering, Computer Engineering, Materials Science, Physics, or the like, and experience in electroluminescence and the design of active matrix displays or pixel arrangements for such displays. Order No. 28 at 13.

### B.    Infringement

Complainant asserts the following with respect to infringement of the '578 patent:

| Accused Products | Claims Infringed |
|---|---|
| ■■ | 5, 10, 17, 40 |
| ■■■■■■■■■ | 5, 10, 17, 40, 41 |
| ■■■■■■ | 5, 10, 40, 41 |
| ■■■■■■■ | 5, 10, 17, 40, 41 |
| NIA■■ | 47 |
| BLF Respondents' and Defaulting Respondents' Accused Products | 5, 10, 17, 40, 41 |

CIB at 8. The parties agree tha ■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■ Representative Product Stipulation at 3.

As with the '803 patent, BOE argues that Dr. Kymissis' methodology is flawed. RIB at 5-9 (asserting the same arguments for both patents). For the same reasons as set forth in Section IV.B.1, I am not persuaded by BOE's arguments.

CONFIDENTIAL MATERIAL OMITTED

1.    ███████████████    **Products**

### a)    Claim 5

Claim 5 of the '578 patent depends on claim 1. JX-0005 at cl. 5. Thus, to establish that any Accused Product meets the limitations of claim 5, Complainant must also establish that the limitations of claim 1 are met.

#### i)    Limitations 1[pre] – 1[e]

Limitations 1[pre] through 1[e] recite: "A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising: a plurality of first pixels; a plurality of second pixels; and a plurality of third pixels, wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels, wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights." JX-0005 at cl. 1. BOE does not dispute that the ███ ████████████████ products meet these limitations. Undisputed Claim Limitations at 12-13. The evidence shows that these limitations are met. CX-1628C-NCT-PCS (Kymissis) at Q/A 121-124, 190-193, 252-255, 332-335.

#### ii)    Limitations 1[f] and 1[g]

Limitations 1[f] and 1[g] recite "wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines," and "wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines." JX-0005 at cl. 1.

Complainant asserts that "█████████████████ meet these limitations, which relate to the arrangement of pixels in sets extending to form alternating lines." CIB at 27. BOE does not

CONFIDENTIAL MATERIAL OMITTED

address this limitation in its briefs. RIB at 9-11; RRB at 8-9. It has therefore waived any argument with respect to these limitations.

The evidence shows that these limitations are met. CX-1628C-NCT-PSC (Kymissis) at Q/As 125-126, 194-195, 256-257, 336-337. Accordingly, I find that the ██████████████ ██████ products meet limitations 1[f] and 1[g].

### iii)    Limitation 1[h]

Limitation 1[h] recites "wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets." JX-0005 at 1[h].

Complainant asserts that "████████████████████ have the required 'second line' passing through the pixel centers in one of the second sets." CIB at 30. Complainant argues ██ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████. *Id.* Complainant further argues that ██████ infringes under the doctrine of equivalents. *Id.*

BOE asserts that Complainant "relied on linear regressions to approximate a line that would pass near, not through, the claimed pixels' centers." RIB at 9. BOE also argues that the ██████ ████████████ products "████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ *Id.* With respect to the doctrine of equivalents, BOE argues that Complainant

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



"██████████████████████████████████

██████████████████." *Id.*[24]

Staff asserts that "BOE's criticisms of Dr. Kymissis' methodology should be rejected." SIB at 30. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy limitation 1[h]. *Id.*

I find that the Accused Products infringe this limitation. As Dr. Kymissis explained for the ████ product, he "██████████████████████████████

████████████████████████████████████

██████████████████████████████." CX-1628C-NCT-PSC (Kymissis) at Q/A 127. Dr. Kymissis referenced CDX-00015C.37 and noted that, in this image the "██████████████████████████████

██████████████████████████████████." *Id.*

---

[24] BOE argues that Complainant's explanation for how this limitation is met is conclusory. RRB at 5. I disagree. To establish infringement, Complainant needed to show that the second line passes through the pixel centers of the second set. For its affirmative case, Complainant ████████████████████ CIB at 30. Thus, Complainant presented a complete argument. Given that this limitation is not particularly complex, no further explanation was necessary and it was appropriate for Complainant to cite to Dr. Kymissis' testimony for the supporting details.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



CDX-0015C.37. Dr. Kymissis then explained that ███████████████████████

█████████████████████████████████████████████████████████████."

CX-1628C-NCT-PSC (Kymissis) at Q/A 127. He also confirmed this conclusion by using the ██

█████████████████████████████████████████████████████████

█████" *Id.*; *see also id.* at Q/A 196, 258, 338.

I am not persuaded by BOE's noninfringement arguments. BOE first argues that "SDC relied on linear regressions to approximate a line that would pass near, not through, the claimed pixels' centers." RIB at 9. Dr. Kymissis explained, however, that he ███████████████

█████████████████████████████████████████ CX-1628C-NCT-PSC

(Kymissis) at Q/A 688. He stated: ██████████████████████████████████

████████████████████████████████████████████████████████

*Id.* Dr. Kymissis also noted: ███████████████████████████████████████

██████████████████████████ *Id.* Thus, I am persuaded that the evidence shows that this

limitation is met.

**CONFIDENTIAL MATERIAL OMITTED**

Nor am I persuaded by BOE's arguments that the ███████████ products (collectively, "██████ ████████████████████████████████ ████████████████████████████████████████████████." RIB at 9. The annotated teardown image for the █████ product is shown below:



CDX-0018C.6. Dr. Kymissis explained that the ██████████████████████ ████████████████████████████████████████████ ██████████████████████ CX-1628C-NCT-PSC (Kymissis) at Q/A 338. He noted that ██████████████████████████████████████ ████████████████████████████████████ *Id.* As with the ███ he confirmed this analysis by using the GDS data. *Id.* That data showed that ███████████ ████████████████████████████████████████ *Id.* Thus, to the extent that ██████████████████████████████████████ ██████████████ *Id.* Additionally, Dr. Kymissis testified that a ██████████████ ████████████████████████████████████████

████████████████████ Tr. (Kymissis) at 155:18-24. I find this explanation to be sufficient for Complainant to meet its burden.

BOE also asserts that ██████████████████████████████████ ████████████████████████████). RRB at 8 (citing CX-3907C.8). Dr. Kymissis notes, however, that this data shows that ████████████████████████ ████████████████████████████████████████.” CX-1628C-NCT-PSC (Kymissis) at Q/A 338; *see also id.* at Q/ 688 (explaining that the ██████████████ ████████████████████████████.[25] BOE does not argue that this conclusion is wrong. Instead, BOE once again attempts to disregard the manufacturing tolerances.

Accordingly, I find that the ██████████████████ products meet limitation 1[h].

#### iv)    Limitation 1[i]

Limitation 1[i] recites “wherein the first lines and the second lines are alternately arranged.” JX-0005 at cl. 1. BOE does not dispute that the ████████████████ products meet this limitation. Undisputed Claim Limitations at 12-13. The evidence shows that this limitation is met. CX-1628C-NCT-PCS (Kymissis) at Q/A 128, 197, 259, 340.

#### v)    Limitations 1[j] and 1[k]

Limitations 1[j] and 1[k] recite “wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines” and “wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines.” JX-0005 at cl. 1.

---

[25] Dr. Kymissis explains that distances expressed in “pixels” can be converted to microns. CX-1628C-NCT-PSC (Kymissis) at Q/A 70; *see also* CX-3429 (scaling chart to calculate distances).

CONFIDENTIAL MATERIAL OMITTED

Complainant asserts that "████████████████ meet these limitations, which relate to the arrangement of pixels in sets extending to form alternating lines." CIB at 27.

BOE does not address these limitations in its briefs. RIB at 9-11; RRB at 8-9. It has therefore waived any argument with respect to these limitations.

The evidence shows that these limitations are met. CX-1628-NCT-PSC (Kymissis) at Q/As 129-130, 198-199, 260-261, 341-342.

Accordingly, I find that the ████████████████ products meet limitations 1[j] and 1[k].

### vi) Limitations 1[l] and 1[m]

Limitations 1[l] and 1[m] recite "wherein the third lines and the fourth lines are alternately arranged" and "wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction." JX-0005 at cl. 1. BOE does not dispute that the ████████████████ products meet these limitations. Undisputed Claim Limitations at 12-13. The evidence shows that these limitations are met. CX-1628C-NCT-PCS (Kymissis) at Q/As 131-132, 200-201, 262-263, 343-344.

### vii) Limitation 1[n]

Limitation 1[n] recites "wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels." JX-0005 at cl. 1.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Complainant argues that ███████████████ have the claimed 'region' required by this limitation." CIB at 30. Complainant explains that Dr. Kymissis's calculations are confirmed by both teardown data and GDS data. *Id.* at 31.

BOE does not address this limitation in its briefs. RIB at 9-11; RRB at 8-9. It has therefore waived any argument with respect to this limitation.

The evidence shows that this limitation is met. CX-1628-NCT-PSC (Kymissis) at Q/A 133, 202, 264, 345.

Accordingly, I find that the ███████████████ products meet limitation 1[n].

### viii)    Limitation 1[o]

Limitation 1[o] recites "wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixel that are nearest each other in one of the second sets." JX-0005 at cl. 1.

Complainant notes that "████████████████████████████
████████████████████████████████████████
██████████████████████████ CIB at 33.

BOE asserts that Complainant "relied on flawed methodologies to calculate the claimed shortest distance" and "thus, failed to prove [1-o]." RIB at 10.

Staff asserts that "BOE's criticisms of Dr. Kymissis' methodology should be rejected." SIB at 30. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy limitation 1[o]. *Id.* at 30-31.

As set forth above, I am not persuaded by BOE's criticism with respect to Dr. Kymissis' methodology. Additionally, the evidence shows that this limitation is met. For the ██ product, Dr. Kymissis explained:

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



CX-1629-NCT-PSC (Kymissis) at Q/A 134. Dr. Kymissis also performed calculations for both ▮

▮▮▮▮ He explained:

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



*Id.* Dr. Kymissis performed the same analysis for the ███████████ products. *See id.* at Q/As 203, 265, 346.

Accordingly, I find that the ███████████ products meet limitation 1[o].

### ix)     Claim 5

Claim 5 recites: "The pixel arrangement structure of claim 1, wherein a shortest distance between the first pixels and the second pixels, and a shortest distance between the first pixels and the third pixels, are a same first length." JX-0005 at cl. 5.

Complainant asserts that ████████████████████████ ███████████████████████████████████████ ████████████████████ CIB at 35.

BOE asserts that Complainant "fails to show the claimed 'same first length' distances are the 'same' – particularly for the ███████████ products." RIB at 10.

Staff asserts that "BOE's criticisms of Dr. Kymissis' methodology should be rejected." SIB at 30. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy claim 5. *Id.* at 30-31.

**CONFIDENTIAL MATERIAL OMITTED**

BOE's noninfringement argument with respect to the non-████ products is the same as for limitation 1[o]. *See* RX-1084C-NCT (Pattison) at Q/A 219 (opining that claim 5 is not met for the same reasons as limitation 1[o]). For the reasons set forth above with respect to limitation 1[o], I am not persuaded by BOE's arguments. Additionally, the evidence shows that this limitation is met. CX-1628-NCT-PSC (Kymissis) at Q/A 135, 204, 266.

BOE also asserts that this claim is not met for the ████ products. RIB at 10. Dr. Pattison notes that ██████████████████████████████████████████████████████████████ ██████████████████████████████████ RX-1084C-NCT (Pattison) at Q/A 220. Dr. Kymissis performed the calculations, however, and concluded that ███████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████ CX-1628C-NCT-PSC (Kymissis) at Q/A 347. Dr. Pattison does not assert that these measurements are inaccurate. RX-1084C-NCT (Pattison) at Q/A 220. It is not sufficient to simply assert that the measurements are impacted without data to support this opinion. As such, I find that the ████ product meets this limitation.

Accordingly, I find that the ████████████████ products meet the additional limitation of claim 5.

### x)    Conclusion

For these reasons, I find that the ████████████████ products infringe claim 5 of the '578 patent.

### b)    Claim 10

Claim 10 recites: "The pixel arrangement structure of claim 1, wherein each of the second pixels has a larger area than each of the third pixels." JX-0005 at cl. 10.

CONFIDENTIAL MATERIAL OMITTED

Complainant asserts that the additional limitation of claim 10 is met for the same reasons as discussed for claim limitation 1[f] of the '803 patent. CIB at 35.

Staff asserts that "BOE's criticisms of Dr. Kymissis' methodology should be rejected." SIB at 30. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy claim 10. *Id.* at 30-31.

BOE does not address the additional limitation of claim 10 in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this claim

The evidence shows that the additional limitation of claim 10 is met for the Accused Products. CX-1628-NCT-PSC (Kymissis) at Q/A 137, 206, 267, 349.

Accordingly, I find that the ███████████████ products infringe claim 10.

### c) Claim 17

Claim 17 recites: "The pixel arrangement structure of claim 1, wherein each of the first pixels has a smaller area than the second pixels and the third pixels." JX-0005 at cl. 17.

Complainant asserts that the additional limitation of claim 17 is met for the same reasons as discussed for claim limitation 1[f] of the '803 patent. CIB at 36.

Staff asserts that "BOE's criticisms of Dr. Kymissis' methodology should be rejected." SIB at 30. Accordingly, Staff believes that Complainant has shown that the Accused Products satisfy claim 17. *Id.* at 30-31.

BOE does not address the additional limitation of claim 17 in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this claim

The evidence shows that the additional limitation of claim 17 is met for the Accused Products. CX-1628-NCT-PSC (Kymissis) at Q/As 139, 207, 350.

Accordingly, I find that the ███████████████ products infringe claim 17.

CONFIDENTIAL MATERIAL OMITTED

d)      **Claim 40**

i)      **Limitation 40[a]**

Limitation 40[a] recites "wherein each of the first pixels has two elongated sides that are elongated in the third direction or a fourth direction crossing the third direction and different from the first and second directions, and two connection portions that connect the two elongated sides to each other at respective ends." JX-0005 at cl. 40.

Complainant asserts that Dr. Kymissis identified two elongated sides. CIB at 36. For the ██ product, Complainant explains that ████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

*Id.* (citing CX-1628C-NCT-PSC (Kymissis) Q/A 141). Complainant further asserts that ████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ *Id.*

BOE argues that the Accused Products do not infringe ████████████████████████
████████████████████████████████████████████████ " RIB at 10.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Staff states that Complainant "identifies the green pixels in the Accused BOE Products as the claimed 'first pixel.'" SIB at 32. Staff notes that "[a]lthough ███████████████████ the beginning and ending points of the elongated sides appear reasonably clear." *Id.* Staff further notes that "[t]he elongated sides are defined by the third and fourth directions, such that the elongated sides stop and start at the point that the edge of the pixel no longer extends in the third or fourth direction." *Id.* Thus, Staff believes that the Accused Products satisfy 40[a] and 40[b]. *Id.*

I am not persuaded by BOE's argument that the pixels lack sides. According to Dr. Pattison, ████████████████████████████████████████ RX-1084C-NCT (Pattison) at Q/A 228. He further stated: ████████████████████ ████████████████████████████████████████ ███████████████████████████ *Id.* Dr. Kymissis' careful analysis proves otherwise. First, Dr. Kymissis annotated a teardown image to show the two elongated sides:



CX-1628C-NCT-PSC (Kymissis) at Q/A 141. He explained that ████████████████ ████████████████████████████████████ ████████████████████ *Id.* He further stated that ████████████

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

██████████████████████████████████████████████████████

████████████████████ *Id.* He noted: ███████████████████

███████████████████████████████████████████████ *Id.*

Dr. Kymissis performed calculations to show that the sides are elongated. Specifically, he calculated ██████████████████████████████████████████████

██████████████████████ *Id.* He then



*Id.* Dr. Kymissis also █████████████████████████████████

█████████████████████████. *Id.* Finally, he performed similar analyses for the other products. *Id.* at Q/As 210, 270, and 353.

Accordingly, I find that the ███████████████ products meet limitation 40[a].

**ii)    Limitation 40[b]**

Limitation 40[b] recites "wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two elongated sides." JX-0005 at cl. 40.

Complainant asserts that "each connection portion is not a straight line and thus, is longer than a shortest (straight line) distance between the two elongated sides." CIB at 39.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

BOE asserts that Complainant ███████████████████████████████

████████████████████████████████████████████████████████████

█████████████████ RIB at 10.

For the reasons set forth with respect to limitation 40[a], I disagree with BOE's noninfringement position. The evidence shows that this limitation is met. CX-1628C-NCT-PSC (Kymissis) at Q/As 142, 211, 271, and 354.

Accordingly, I find that the ██████████████████ products meet limitation 40[b].

e)    **Claim 41**

Claim 41 recites: "The pixel arrangement structure of claim 1, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in the third direction or a fourth direction crossing the third direction." JX-0005 at cl. 41.

Complainant argues that ██████████████████████████████████

████████████████████████████████████████████████████████████

█████████ CIB at 39.



**PUBLIC VERSION**

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

*Id.* at 40. Complainant further asserts that ████████████████████████

████████ *Id.*

BOE does not address this limitation in its briefs. RIB at 11-17; RRB at 9-11. It has therefore waived any argument with respect to this limitation

The evidence shows that this limitation is met. CX-1628-NCT-PSC (Kymissis) at Q/As 212-213, 272-273, 355-356.

Accordingly, I find that the ███████████████ products infringe claim 41.

### 2. Redesigned Products

#### a) Claim 47

Complainant asserts that NIA █████ infringe claim 47. CIB at 8. Claim 47 of the '578 patent depends on claim 45. JX-0005 at cls. 47. Thus, to establish that NIAs █████ meet the limitations of claim 47, Complainant must also establish that the limitations of claim 45 are met.

#### i) Limitations 45[pre] – 45[e]

Limitations 45[pre] through 45[e] recite: "A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising: a plurality of first pixels, wherein the first pixels have a shape comprising edges; a plurality of second pixels; and a plurality of third pixels, wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels, wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights." JX-0005 at cl. 45. BOE does not dispute that NIAs █████ meet these limitations. Undisputed Claim Limitations at 13.[26] The evidence shows that these limitations are met. CX-1628C-NCT-PCS (Kymissis) at Q/As 396, 400.

---

[26] The parties do not include limitation 40[a] on this list, but BOE does not address this limitation in its briefs. RIB at 10-11; RRB at 9.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

### ii)     Limitation 45[f]

Limitation 45[f] recites "wherein only one of the second pixels and the third pixels is included in a virtual quadrangle containing outer edges comprising some of the edges of a group of four neighboring ones of the plurality of first pixels, all portions of all others of the second pixels and the third pixels being outside of the virtual quadrangle." JX-0005 at cl. 45.

Complainant argues that BOE is incorrect that the ███████████████████████ ███████████. CIB at 43. According to Complainant, ███████████████████████ ████████████████████████████ *Id.*

BOE asserts "[t]he claims and specification do not explain what 'comprising some of the edges' means, but the prosecution history confirms 'some of the edges' requires more than just a point." RIB at 10. BOE further argues that "the alleged virtual quadrangle" of █████████████ ████████████████████ *Id.* at 11. [27]

Staff does not believe ████████ satisfy this limitation. Staff explains: "████████████ ████████████████████████████████████████ ████████████████████████ SIB at 34. State notes that "'[e]dges' are not single points on the perimeters of the green pixels, but a side or facet of the pixel." *Id.*

Dr. Kymissis identified ██████ ███████████████████████████ ████████████████████████████████████

---

[27] In its reply brief, BOE changes its argument and asserts that NIAs ██████ lack a "virtual quadrangle containing [pixel's] outer edges." RRB at 9 (emphasis in original). According to BOE, ████████████████████████████████████████ *Id.* BOE did not make this argument in its pre-hearing brief and it is therefore waived. *See* RPHB at 237-238.

**CONFIDENTIAL MATERIAL OMITTED**

██████████████████████████████ CX-1628fC-NCT-PSC (Kymissis) at

Q/A 397. He further identified ███████████. *Id.* at Q/A 378, 397.



CDX-0023C.13. As can be seen in the above image, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████

The specification does not set forth whether a corner of a first pixel can satisfy the "outer edges comprising some of the edges of [the first pixels]" limitation. BOE asserts that "the prosecution history confirms 'some of the edges' requires more than just a point." RIB at 10. Specifically, BOE states: "During prosecution, SDC relied on 'Applicant-annotated' drawings – specifically, Figure 5 of the '578 Patent – showing virtual quadrangles 'containing each outer edge of a group of four neighboring ones of the plurality of first pixels' to traverse prior art." *Id.* at 10-11. BOE included the following images in its brief:



*Id.* at 11.[28] Staff also cites to the prosecution history in support of the statements that "[e]dges are not single points on the perimeter of the green pixels, but a side or facet of the pixel." SIB at 34 (citing JX.0010.678-.679; JX-00010.930-.931).

Neither BOE nor Staff cite to any statements in which the applicant indicated an intent for "edges" to specifically exclude an arrangement in which only the corners of the first pixels are within the outer edges of the virtual quadrangle. Neither cite to any discussion of corners in the context of the prior art that the applicant was intending to overcome. At most, the applicant's statements could be interpreted to mean that a single point is insufficient, but this is not the issue

---

[28] BOE also cites to an additional page of the prosecution history in support of its argument that "the prosecution history confirms 'some of the edges' requires more than just a point." RIB at 10 (citing JX-0010 at 1595. This page is the front page of a "Determination of Patent Term Adjustment under 35 U.S.C. 154(b." *Id.* BOE does not include a specific citation or explain how this portion of the history supports its argument. To the extent BOE was attempting to cite to the portion of the prosecution history shown in RDX-0013C.53 and cited by Dr. Pattison, that portion of the history shows that the applicant deleted the language "each outer edge of" and added "outer edges comprising some of the edges." RDX-0013C.53.

before me. Without any statement indicating a clear intent to exclude corners from the meaning of "some of the edges," I decline to read this exclusion into the claim.[29]

Staff also asserts that the prosecution history demonstrates that "'the edges' refers to entire 'edges' not portions of 'the edges.'" SRB at 6. Staff states that "to 'clarify the meaning' of limitation 45[f], the applicant 'provided an annotated version of Figure 5 showing a 'virtual quadrangle.'" *Id.*

---

[29] "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)). However, such disavowals will be found only if they constitute clear and unmistakable surrenders of subject matter. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,* 170 F.3d 1373, 1376 (Fed. Cir. 1999); *Litton Sys., Inc. v. Honeywell Inc.,* 140 F.3d 1449, 1458 (Fed. Cir. 1998).



JX-0010.679 (annotated by Staff for clarity). Staff notes: "As illustrated by the applicant, the outer edges of the 'virtual quadrangle' do not merely intersect edges of the neighboring pixels, they overlap the entire facets of the pixels." *Id.* at 7. I do not find that this history clearly shows that corners cannot constitute edges. While the applicant provided an example of a virtual quadrangle that meets the claims, there is no evidence that applicant intended to limit the claim scope to this example.

Staff also explains that the applicant annotated a figure of U.S. Pub. No. 2010/0045695 A1 (Elliott) to show that the limitation was not met because the virtual quadrangle contained both a second pixel (horizontal hatching) and a portion a third pixel (vertical hatching):



JX-0010.931. Staff notes that the applicant drew "'an alleged virtual quadrangle' having outer edges that overlap entire edges of the neighboring pixels." SRB at 8. According to Staff, "[u]nder SDC's current interpretation of the claim language, the applicant would not have been able to argue that the prior-art reference did not disclose the virtual quadrangle required under limitation 45[f]." *Id.* at 9. Staff states: "As shown below, under SDC's interpretation of the claim language, which is satisfied if the outer edges of the virtual quadrangle intersect edges of the neighboring pixels, the prior-art reference discloses a virtual quadrangle that encompasses only the second pixel (horizontal hatching), with all portions of all other second pixels (horizontal hatching) and third pixels (vertical hatching) being outside the virtual quadrangle." *Id.*

CONFIDENTIAL MATERIAL OMITTED



*Id.* at 10 (annotating JX-0010.931). Once again, the applicant did not specifically address whether the intersection of the outer edges of the virtual quadrangle with the corner of the first pixels satisfies the claim. I therefore do not interpret this statement as evidence that Complainant's understanding of the claims here is inconsistent with the prosecution record.

The evidence shows that one of skill in the art would understand "edges" to include corners. Dr. Kymissis opined that the pixel arrangement of NIA █ met this limitation. CX-1628C-NCT-PSC (Kymissis) at Q/A 397. Dr. Pattison also agreed that "edges" include corners. In a declaration submitted in an IPR proceeding, Dr. Pattinson asserted that a virtual quadrangle touching corners met the limitation. Tr. (Pattinson) at 265:22-266: ("Q: So just to be clear, you've told the Patent Office in your sworn IPR declaration that touching even just corners of first pixels is enough to meet the requirements of the 'some of the edges' of the virtual quadrangle, correct? A: Yes.").

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Accordingly, I find that Complainant has met its burden to show that NIAs ▮ meet limitation 45[f].

### iii)    Limitation 45[g]

Limitation 45[g] recites "wherein a shortest distance between any two of the group of four neighboring ones of the plurality of first pixels is greater than a shortest distance between the only one of the second pixels and the third pixels included in the virtual quadrangle and a nearest one of the second pixels or the third pixels in a direction perpendicular to any side of the virtual quadrangle." JX-0005 at cl. 45.

Complainant argues that "Dr. Kymissis confirmed that the first shortest distance is greater than the second shortest distance." CIB at 44.

BOE argues that Complainant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ RIB at 11. BOE states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ *Id.* In support of this argument, BOE cites to Dr. Pattison.[30]

Dr. Pattinson asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ RX-1084C-NCT (Pattison) at Q/A 256. According to Dr. Pattison, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *Id.* at Q/A 257. As Complainant notes, however, ▮▮▮▮▮▮▮▮▮



---

[30] Staff does not address this limitation. *See* SIB at 32-34.

**CONFIDENTIAL MATERIAL OMITTED**



CRB at 13. Dr. Kymissis identified the ███████████

████████████████████████████████████████████████

████ CX-1628-NCT-PSC (Kymissis) at Q/A 398; *see also id.* at Q/A 373-375, 400-401 (

██ Thus, the evidence demonstrated that this limitation is met.

Accordingly, I find that NIAs ██████ meet the limitations of claim 45.

>     **b)    Claim 47**

Claim 47 recites: "The pixel arrangement structure of claim 45, wherein the virtual quadrangle does not cross any other of the first pixels, the second pixels, or the third pixels." JX-0005 at cl. 47.

Complainant explains that, in NIA ██████ "the other pixels (besides G2, G3, G5, G6, and B4) are entirely outside the virtual quadrangle." CIB at 44.

BOE does not address the additional limitation of claim 47 in its briefs. RIB at 10-11; RRB at 9. It has therefore waived any argument with respect to this claim.

The evidence shows that the additional limitation of claim 47 is met. CX-1628C-NCT-PSC (Kymissis) at Q/A 398, 400.

Accordingly, I find that NIA ██████ meet the additional limitation of claim 47.

>     **c)    Conclusion**

For the reasons set forth above, I find that NIAs ██████ infringe claim 47.

>    **3.    BLF Accused Products**

The BLF Respondents stipulated that Injured Gadgets IPXS-AS-FX5 is representative of all of the other BLF Accused Products. BLF Representative Products Stipulation at 3. The BLF Respondents also stated that they do not contest infringement of any of the asserted claims. BLF

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Undisputed Limitations at ¶ 3 ("The BLF Respondents dispute no claim limitation of the Asserted Claims with respect to infringement."). The evidence in the record shows that the BLF Accused Products infringe claims 5, 10, 17, 40, and 41 of the '578 patent. CX-1628C-NCT-PSC (Kymissis) at Q/As 402-405, 440-465. Accordingly, I find that the BLF Accused Products infringe claims 5, 10, 17, 40, and 41 of the '578 patent.

### 4.    Defaulting Respondents' Accused Products

Complainant has shown that the Defaulting Respondents' Accused Products meet the limitations of claims 5, 10, 17, 40, and 41 of the '578 patent. CX-1628C-NCT-PSC (Kymissis) at Q/A 518-573. Accordingly, I find that the Defaulting Respondents' Accused Products infringe 5, 10, 17, 40, and 41 of the '578 patent.

### 5.    Conclusion

As set forth above, I find that the ▮▮▮ and ▮▮▮ products, BLF Accused Products, and the Defaulting Respondents' Accused Products infringe claims 5, 10, 17, 40, and 41 of the '578 patent. Because ▮▮▮ is representative of ▮▮▮ and ▮▮▮ is representative of ▮▮▮ and ▮▮▮ I find that ▮▮▮▮▮▮ also infringe claims 5, 10, 17, 40, and 41. I further find that the ▮ infringes claims 5, 10, 17, and 40, and the ▮ infringes claims 5, 10, 40, and 41. Because ▮ is representative of the ▮ I find that the ▮ also infringes claims 5, 10, 40, and 41. Finally, I find that NIAs ▮▮▮ infringe claim 47.

### C.    Technical Prong

Complainant asserts that the ▮▮▮▮▮ practice claims 5, 10, 17, 40, and 41 and that the ▮▮▮▮ practices claims 10 and 17. CIB at 52. The parties agreed that these ▮▮▮ products are each representative of other products, as shown below:

**CONFIDENTIAL MATERIAL OMITTED**

| The '803, '683, and '578 Patents | | |
|---|---|---|
| Group | Products[3] | Representative Product |



Representative Products Stipulation at 4-5.

Staff agrees that Complainant has demonstrated that the Domestic Industry products practice the asserted claims. SIB at 38. Staff argues that BOE's criticisms regarding Dr. Kymissis' methodology should be rejected. *Id*. Staff also contends that I should reject BOE's argument with respect to limitations 40[a] and [b]. *Id.* at 39.

BOE includes a one paragraph argument as to why it disagrees that the technical prong is met for both the '803 and '578 patents. RIB at 17. For the '578 patent, BOE reiterates its argument

CONFIDENTIAL MATERIAL OMITTED

that Complainant "did not meet its burden to prove DI because Dr. Kymissis' methodology for calculating the center points and ████████████████ was flawed and inconsistent." RIB at 17. For the reasons set forth in Section IV.C., I reject this argument.

Next, BOE argues that Complainant "failed to demonstrate the DI Products' non-polygonal shaped pixels meet claim 40 of the '578 patent" and that "[f]or claims 40 and 41" Complainant "failed to show clear points from which to determine where the pixels' sides start or stop." *Id.* Even if BOE was correct that Complainant did not show that the products practice the limitations of claims 40 and 41, Complainant has demonstrated that it meets the technical prong. Aside from the methodology argument addressed above, BOE does not make any argument specific to claims 5, 10, or 17. *See* RIB at 17; RRB at 11. Further, the evidence shows that the ███████████ practice claims 5, 10, and 17 of the '578 patent and that the ██████████ practices claims 10 and 17. CX-1628-NCT-PSC (Kymissis) at Q/A 628-646, 661-675, 678-681. As noted above, a complainant need only show that its products practice one claim for the technical requirement to be met. Thus, it is unnecessary for Complainant to establish that its products practice additional claims.

For these reasons, I find that the technical prong is met for the '578 patent.

### D.    Invalidity

BOE asserts that the '578 patent is invalid because: (1) Matthies and Yamada render claims 5, 10, 17, and 41[31] obvious (RIB at 17-25); (2) Matthies, Yamada, and U.S. Patent Pub. No. 2011/0234550 ("Hong") render claims 40, 45, and 47 obvious (*id.* at 25-29); (3) there is

---

[31] Both Complainant and Staff address whether this combination renders claims 45 and 47 obvious, but BOE does not address these claims in its briefs. RIB at 17-23.

insufficient written description for "sizes," "pixel arrangements," "spacing" and "orientations" (*id.* at 30-32) and (4) the "first"/ "second"/ "third"/"fourth" directions are indefinite (*id.* at 32-34).

### 1.    Matthies/Yamada

BOE asserts that the combination of Matthies and Yamada renders the asserted claims obvious. RIB at 17. BOE also argues that "[a] POSITA would have been motivated, and have a reasonable expectation of success, to apply Yamada's teachings to Matthies." RIB at 23.

Complainant asserts that one of skill "would not have been motivated to combine Matthies' tiled PMOLEDs with Yamada's purported teachings regarding AMOLEDs with reasonable expectation of success." CIB at 71. Complainant also asserts that the combination fails to teach the "pixel defining layer" of limitations 1[d] and 45[d], the "region" and "shortest distance" of limitations 1[n] and 1[o], that "one of the second lines passes through centers of the second pixels and third pixels" of limitation 1[h], and fails to teach the additional limitations of claims 5 and 41. CIB at 71-75.

Staff agrees with Complainant that BOE have not shown that one of skill would have been motivated to modify Matthies in view of Yamada. SIB at 51.

For the reasons set forth in Section IV.D.3, BOE has not shown that one of skill would be motivated to combine Matthies and Yamada. Accordingly, I find that Matthies with Yamada does not render claims 5, 10, 17, and 41 obvious.

### 2.    Matthies/Yamada/Hong

#### a)    Claim 40

Claim 40 recites: "The pixel arrangement structure of claim 1, wherein each of the first pixels has two elongated sides that are elongated in the third direction or a fourth direction crossing the third direction and different from the first and second directions, and two connection portions

that connect the two elongated sides to each other at respective ends, and wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two elongated sides." JX-0005 at cl. 40.

For this claim, BOE states: "Hong teaches claim 40's elongated shapes and shapes with truncated corners." RIB at 25. It further states: "Matthies/Yamada/Hong results in pixel arrangements that meet claim 40." *Id.* at 26. While BOE includes images in its brief, it does not provide a written explanation to show how the limitations of claim 40 are met.

At the conclusion of the evidentiary hearing, I warned the parties that "they should not attempt to simply cut all their arguments to the point where they become conclusory or have no detail." Tr. at 1129:8-10. I further noted: "Any arguments that do get cut, to the point where they are conclusory or lack any detail, will be deemed waived under Ground Rule 14.2, unless they relate only to undisputed limitations." *Id.* at 1129:13-16.

I find that BOE has waived the argument that this combination renders claim 40 obvious pursuant to Ground Rule 14.2. While I realize that these limitations are not particularly complex and that images do provide useful information, it is simply a step too far to merely state a conclusion that a limitation is met without *any* explanation as to how. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312 (Fed Cir 2006) (citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.... Especially not when the brief presents a passel of other arguments.... Judges are not like pigs, hunting for truffles buried in briefs.")

I therefore find that BOE has not shown, by clear and convincing evidence, that Matthies, Yamada, and Hong render claim 40 obvious.[32]

### b)    Claims 45 and 47

Complainant disputes that limitations 45[f], 45[g], and claim 47 are met by this combination. *See also* CIB at 78-79 (arguing that the limitations of 45[f], 45[g], and 47 are not obvious, as BOE has "not identified any teaching of a 'virtual quadrangle' or the 'shortest distance' limitation in the prior art").

As with claim 40, BOE simply states that the combination teaches the limitations and includes an image. RIB at 26, 27 ("Matthies/Yamada/Hong teaches 45[f]" and "Matthies/Yamada/Hong teaches 45[g]"). For the reasons set forth above, I find that BOE has waived its arguments pursuant to Ground Rule 14.2.

### 3.    Secondary Considerations

Secondary considerations of nonobviousness may rebut a prima facie case of obviousness. Here, where BOE has not made out a prima facie case of obviousness, there is no showing to rebut. Accordingly, I need not consider any secondary considerations of nonobviousness.

### 4.    Written Description

BOE asserts two written description arguments. First, BOE argues that "[n]othing in the '578 specification shows the inventor contemplated a 'region' with the negative limitation that it be "entirely offset' from second/third pixels." RIB at 30. According to BOE, "[t]he applicant tacitly conceded the specification fails to disclose this limitation by submitting new figures with

---

[32] Even if I had not found that BOE waived its arguments, I would find that it does not meet its burden to show that the combination renders claim 40 obvious. Complainant sets forth various reasons why this combination fails to disclose claim 40, which BOE does not sufficiently address. *See* CIB at 76-78; CRB at 21.

previously unseen annotations, which are not part of the specification." *Id.* at 31. Second, BOE argues that nothing in the specification shows a virtual quadrangle with a second or third pixel situation within its borders and "all portions of all others . . . being outside" the borders. *Id.* As with the previous argument, BOE asserts that "during prosecution the applicant submitted new figures with new annotations to explain the claims to the examiner." *Id.* at 32.

Complainant argues that these arguments were not raised in BOE's pre-hearing brief and are therefore waived pursuant to Ground Rule 11.2. CRB at 23. Complainant further notes that BOE's arguments "lack merit." *Id.* Complainant explains that "[w]ritten description must be evaluated from the perspective of POSITAs," yet, "Dr. Pattison offered no supporting testimony." *Id.*

Staff agrees that these arguments were not disclosed in BOE's prehearing brief and should therefore be deemed abandoned or withdrawn. SRB at 14.

BOE's pre-hearing brief contains only one paragraph with respect to written description:

> (a)     All "sizes," "pixel arrangements," "spacing," and "orientations" (All Claims)
>
> As explained above, every claim recites pixel arrangements that include an endless variety of potential pixel sizes, arrangements, spacings, orientations, and densities (*i.e.*, aperture ratios). The thin specification fails to demonstrate the patentee possessed the full scope of the claimed inventions, including for example arrangements with aperture ratios up to and surpassing 80%. RX-0004C (Pattison), Q76. Therefore, the claims lack written description. *Ariad Pharms.*, 598 F.3d at 1351.

RPHB at 277. As can be seen in this paragraph, BOE did not make the arguments that it is now asserting regarding written description. I therefore find that BOE waived these arguments, pursuant to Ground Rule 11.2.

### 5.    Indefiniteness

Claims 1 and 45 each require pixels arranged in "sets" extending along "first," "second," "third," and "fourth" directions. BOE asserts that "[a] claim may be invalid as indefinite when (1) different known methods exist for calculating a claimed parameter; (2) nothing in the record suggests using one method in particular, and (3) application of the different methods result in materially different outcomes for the claim's scope." RIB at 32 (quoting *Saso Golf, Inc. v. Nike, Inc.*, 843 F. App'x 291, 296 (Fed. Cir. 2021)). According to BOE, "[c]laims reciting the 'first direction" are indefinite because a given pixel arrangement could both infringe and not infringe depending on which direction is identified as the 'first' direction." *Id*. BOE notes that, "during prosecution, the Examiner identified anticipatory prior art RX-0185 (US2010/0045695 (Elliot))." *Id.* at 33. BOE explains that "[t]he patentee traversed Elliott by adding the now-claimed 'region . . . entirely offset' limitation and limiting the 'first direction' to horizontal so Elliott would not read on the new limitation." *Id.* BOE asserts that "if the 'first direction were vertical, Elliott discloses the claim, including the new 'region . . . entirely offset' limitation. *Id.*

Complainant argues that BOE mischaracterizes the prosecution history. CIB at 87. Complainant explains that "[t]he applicant was merely responding to the *examiner's* identification of horizontal as the first direction in a reference." *Id.* [33]

---

[33] Both Complainant and Staff's arguments appear to be directed to an assertion that the use of ordinal terms would render the claims indefinite because one of skill would not understand which term is first, which is second, etc. *See, e.g.*, CRB at 23 ("Both experts readily evaluated the Accused Products and prior art with no confusion regarding the claim's meaning of scope."). This is, however, different than the argument that BOE is making.

Staff "submits that [BOE has] failed to show that [this term] is indefinite." SIB at 52. Staff notes that "ordinals are commonly used in claim drafting to distinguish between repeated instances of the same element." *Id.* at 53.

BOE have not demonstrated, by clear and convincing evidence, that choosing one first direction over another will change the result in either an infringement or invalidity analysis. Dr. Pattinson referenced the following image from Elliott as an example of a situation in which an arrangement would infringe if one direction was considered first and not infringe if the other direction was considered first:



RDX-0004.6

RX-0004C (Pattinson) at Q/A 87. According to Dr. Pattison, "had the 'first' and 'second' direction been reversed, the claimed region would not overlap those second and third pixels." *Id.* at Q/A 87. Dr. Pattison does not provide support for this statement, however, or demonstrate that the other elements would be met if the first and second direction were reversed. *See* CX-1241C-NCT

(Kymissis) at Q/A 322 ("I note that Dr. Pattison does not show that all the other elements would have been . . . met if the directions had been 'reversed…'"). The clear and convincing evidentiary standard requires more than simply accepting an expert's word without any proof that his conclusion is accurate. Because the record is not clear that different methods would, in fact, result in different outcomes, I decline to find the claim invalid as indefinite.

## VI.    U.S. PATENT NO, 7,414,599

### A.    Overview

The '599 patent, entitled "Organic Light Emitting Device Pixel Circuit and Driving Method Therefor" issued on August 19, 2008 to Ho-Kyoon Chung; Yang-Wan Kim; Choon-Yul Oh; Oh-Kyong Kwon; and Sang-Moo Choi. JX-0001. The '599 patent is assigned to Samsung SDI Co., Ltd. *Id.* The patent discloses "a pixel circuit in an organic light emitting device capable of realizing high gradation by self-compensating a threshold voltage of a transistor that drives an electroluminescent (EL) element." JX-0001 at 1:14-21. The disclosed circuit has a threshold voltage compensation transistor (T33) connected to the gate and drain of the driving transistor (T31):



FIG. 3

*Id.* at Fig. 3; 6:19-51.

### 1.     Asserted Claims

Complainant asserts claims 2, 3, 13, 15, and 16 of the '599 patent. CIB at 92, 110. Because

several of the asserted claims depend on non-asserted claims, these non-asserted claims are also

included below:

1.     1[pre] A pixel circuit in an organic light emitting device, comprising:

1[a] a first transistor for delivering a data signal voltage in response to a current scan line signal;

1[b] a second transistor for generating a driving current depending on the data signal voltage delivered through the first transistor;

1[c] a third transistor for detecting and self-compensating threshold voltage deviation in the second transistor;

1[d] a fifth transistor for providing a power supply voltage for the second transistor in response to a current light-emitting signal;

1[e] a sixth transistor which is coupled in series between the second transistor and an electroluminescent element and for providing the driving current for the electroluminescent element through the second transistor in response to the current light-emitting signal; and

1[f] a capacitor for storing the data signal voltage delivered to the second transistor,

1[g] wherein the electroluminescent element emitts [sic] light corresponding to the driving current generated through the second transistor.

2. The pixel circuit in the organic light emitting device of claim 1, further comprising: a fourth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal.

3. The pixel circuit in the organic light emitting device of claim 1, wherein the first transistor is composed of a PMOS transistor including a gate to which the current scan line signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor.

7. 7[pre] A pixel circuit in an organic light emitting device, comprising:

7[a] a first transistor for delivering a data signal voltage in response to a current scan line signal;

7[b] a second transistor for programming the data signal voltage and for generating a driving current in response to a programmed data signal when light is emitted;

7[c] a third transistor for providing the data signal voltage for the second transistor in response to the current scan signal;

7[d] a capacitor for maintaining the data signal voltage programmed onto the second transistor;

7[e] a fourth transistor for delivering a power supply voltage to the second transistor when the light is emitted;

7[f] a fifth transistor for delivering the driving current, provided from the second transistor, in response to the data signal voltage when the light is emitted; and

7[g] an electroluminescent element for emitting light corresponding to the driving current delivered through the fifth transistor,

7[h] wherein the third transistor connects the second transistor in the form of a diode in response to the current scan signal so that the second transistor detects and compensates its threshold voltage deviation in itself.

13.     13[a] The pixel circuit in the organic light emitting device of claim 7, wherein the fourth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the second transistor; and

13[a] the fifth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source coupled to the second transistor, and a drain coupled to the electroluminescent element.

15.     15[pre] A pixel circuit in an organic light emitting device, comprising:

15[a] a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied;

15[b] a second transistor whose source is coupled to a drain of the first transistor;

15[c] a third transistor whose drain and source are connected between a gate and a drain of the second transistor;

15[d] a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor;

15[e] a fifth transistor including a gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element;

15[f] the electroluminescent element having the one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and

15[g] a capacitor in which one terminal of the capacitor is coupled to the gate of the second transistor and a power supply voltage is applied to the other terminal of the capacitor.

16.     16[a] The pixel circuit in the organic light emitting device of claim 15, further comprising: a sixth transistor including a gate to which a scan signal just before the current scan signal is applied;

16[b] a source coupled to the one terminal of the capacitor; and

16[c] a drain to which an initialization voltage is applied.

## 2.     Claim Construction

I construed the following term from the asserted claims as follows:

| Term | Claim(s) | Claim Construction |
|------|----------|--------------------|
| "current scan line signal"/ "current scan signal" | 1, 7 | Plain and ordinary meaning, i.e., "scan signal of the current scan line (i.e., SCAN[n])" |
| "current light-emitting signal" | 1, 15 | Plain and ordinary meaning, i.e., "light emitting signal of the current emission line (i.e., EMI[n])" |
| "fourth initialization transistor" / "sixth initialization transistor" | 2 | Fourth transistor, which is an initialization transistor<br><br>Sixth transistor, which is an initialization transistor |
| "scan signal just before the current scan signal" / "scan line just before the associated scan line" | 2, 16 | Plain and ordinary meaning, i.e.,<br><br>"scan signal of the immediately previous scan line (i.e., SCAN[n-1])"<br><br>"the immediately previous scan line (i.e., the (n-1)th scan line)" |
| "self-compensating threshold voltage deviation in the second transistor" (claim 1) / "the second transistor detects and compensates its threshold voltage deviation in itself" (claim 7) | 1, 7 | Plain and ordinary meaning, i.e., "eliminating or nearly eliminating the effect of a threshold voltage deviation of the particular second transistor" |
| "fifth transistor" | 1 | "a transistor that is not a first, second, third, or sixth transistor as defined in claim 1" |
| "sixth transistor" | 1 | "a transistor that is not a first, second, third, or fifth transistor as defined in claim" |
| "grounded" | 15 | "coupled to a reference voltage" |

Order No. 28 at 14, 43, 48. I also found that an additional generic transistor is implicit in claim 1.

*Id.* at 43.

### 3. Level of Ordinary Skill in the Art

I previously found that a person of ordinary skill in the art with respect to the '599 patent would have had a relevant degree in Electrical Engineering, Computer Engineering, Materials Science, Physics, or the like, and experience in active matrix display design and electroluminescence. Order No. 28 at 13.

**CONFIDENTIAL MATERIAL OMITTED**

### B.   Infringement

Complainant asserts the following with respect to infringement of the '599 patent:

| Accused Products | Claims Infringed |
|---|---|
| ██████████████████████████ | 2-3, 15-16 |
| ██████ | 3, 15 |
| BLF Respondents' and Defaulting Respondents' Accused Products | 2-3, 13, 15-16 |

CIB at 92, 110, 111. Complainant further asserts that █████████████████

████████████████████████████████████ *Id.* at 93.

As an initial matter, BOE asserts that Complainant cannot apply its analysis of the █████

███ products to the other products. RIB at 52. According to BOE, Complainant ██████████

███████████████████████████ *Id.* BOE explains that "[t]his

██████████████████████████████████████████

███████████ *Id.*

Complainant argues that ██████████████████████

███████████████████████████████████████

█████████████ CIB at 97.[34]

I disagree with BOE that Complainant failed to analyze ████████████████

███████████████████████ Dr. Fontecchio testified that he "reviewed the

---

[34] BOE also asserts that Complainant waived its arguments with respect to the ██████ products by failing to address them in its initial brief. RRB at 29. Complainant's initial brief does, however, set forth its affirmative case that the █████████████████ CIB at 97. Complainant also addressed the alleged differences between each of the products. *Id.* at 93-97.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

███████████████████████████████████████████████ ” and that ███████████████

████████████████████████████████████████████████████████████████

███████████████ CX-1629C-NCT (Fontecchio) at Q/A 88; *see also id.* at Q/A 85. He further

testified that ████████████████████████████████████████████████████

███████████████████████████████████████ . *Id.* at Q/A 94.

BOE claims that this testimony is insufficient. It asserts that Dr. Fontecchio's "conclusory"

statements are wrong. RIB at 53. According to BOE, █████████████████████████

███████████████████████ *Id.*

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

CX-0194C.148; CX-0054C.43. BOE does not cite to any testimony in support of this attorney

argument, however. Nor does it explain the differences between the two diagrams or comment on

the significance of these differences. *See* RIB at 52-53; RRB at 29-30. Thus, there is no evidence

in the record to contradict Dr. Fontecchio's testimony that, while █████████████████████

███████████████████████████████████████████████████ CX-1629C-NCT

(Fontecchio) at Q/A 85. As such, I decline to find that Complainant failed to meet its burden to

show that its analysis of the ██████████ products cannot apply to other products.

BOE also asserts that Dr. Fontecchio ████████████████████████████████████

RIB at 53. Dr. Fontecchio did admit that he did not have the timing diagram for ██████ CX-

**CONFIDENTIAL MATERIAL OMITTED**

1629C-NCT (Fontecchio) at Q/A 85 ( ████████████████████████████

████████████████████████████████████████ It is unclear how

the lack of this diagram impacts the infringement analysis, however. BOE generally asserts that

████████████████████████████████████████████

████████ RIB at 52. BOE does not, however, assert that Complainant failed to establish that

any particular limitation was met due to the lack of timing information. *See id.* at 52-53; RRB at

29-30. Additionally, Dr. Fontecchio testified ████████████████████████

████████████ CX-1629C-NCT (Fontecchio) at Q/A 94. He also provided a specific

explanation ████████████████████████████████████

*Id.* at Q/A 217-249 ████████████████████████████████

████████████████ For these reasons, I decline to find that the inability of Dr.

Fontecchio to rely on the timing diagram meant that Complainant did not meet its burden.

1. **BOE Accused Products**

a) **Claims 2 and 3**

Claims 2 and 3 of the '599 patent each depend on claim 1. JX-0001 at cls. 1-3. Thus, to

establish that any Accused Product meets the limitations of claims 2 and 3, Complainant must also

establish that the limitations of claim 1 are met.

i) **Limitation 1[pre], 1[a], 1[b], 1[d], 1[e], 1[f], and 1[g]**

Limitations 1[pre], 1[a], and 1[b] recite: "A pixel circuit in an organic light emitting device,

comprising: a first transistor for delivering a data signal voltage in response to a current scan line

signal; a second transistor for generating a driving current depending on the data signal voltage

delivered through the first transistor." JX-0001 at cl. 1. Limitations 1[d], 1[e], 1[f], and 1[g] further

recite: "a fifth transistor for providing a power supply voltage for the second transistor in response

CONFIDENTIAL MATERIAL OMITTED

to a current light-emitting signal; a sixth transistor which is coupled in series between the second transistor and an electroluminescent element and for providing the driving current for the electroluminescent element through the second transistor in response to the current light-emitting signal; and a capacitor for storing the data signal voltage delivered to the second transistor, wherein the electroluminescent element emitts [sic] light corresponding to the driving current generated through the second transistor." JX-0001 at cl. 1.

BOE does not dispute that any of the Accused Products meet limitation 1[pre]. Undisputed Claim Limitations at 14. It further does not dispute that the ███████ meet limitations 1[a], 1[b], and 1[d] through 1[g]. *Id.* Other than the argument regarding representativeness addressed above, BOE does not address these limitations with respect to the ████████████, ████████████████ products and has therefore waived any such arguments. RIB at 42-55; RRB at 18-30. The evidence shows that these limitations are met. CX-1629C-NCT (Fontecchio) at Q/As 75-110, 115-122, 176--210, 217-227, 231-237.

### ii) Limitation 1[c]

Limitation 1[c] recites "a third transistor for detecting and self-compensating threshold voltage deviation in the second transistor." JX-0001 at cl. 1. As noted above, the parties agreed that "self-compensating threshold voltage deviation in the second transistor" means "eliminating or nearly eliminating the effect of a threshold voltage deviation of the particular second transistor." Order No. 28 at 14.

Complainant asserts that "[e]ach BOE Accused Product has" the ████████████████ ████████████████. CIB at 98-99. According to Complainant, ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



*Id.* at 98. Complainant states that "█████

███████████████████████████████████

███████████ *Id.* Complainant further asserts that "BOE's

documents describe" the structure of the Accused Products ███████

████████" *Id.* at 99.

BOE argues that ███████████████████████

███████████████████████████████████

███████ RIB at 42. According to BOE, "███████████

███████████████████████ *Id.* BOE states that the

███████████████████████████████

██████████" *Id.* at 43. Instead, ███████████████

██████████ *Id.* at 44. BOE also asserts that "███████████

████████ RRB at 19.

Staff argues that Complainant "has not shown that any accused product satisfies limitation 1[c]." SIB at 59. Staff notes that "[t]here is no expert testimony that the Accused Products satisfy the agreed upon construction for the 'self-compensating' . . . term[] of claim 1." *Id.* at 60.

I find that Complainant has not met its burden to show that the Accused Products meet limitation 1[c]. First, Dr. Fontecchio does not directly testify that the █████████████

██████████████████████████████████ He

states that he applies the claim construction, but only uses the term "self-compensating" and does not use the terms "eliminating" or "nearly eliminating" in connection with his analysis. *See* CX-1629C-NCT (Fontecchio) at Q/A 68, 111-114, 158-161. While these are certainly not magic words that *must* be used to show infringement, the testimony must at least be clear that the claim term –

**PUBLIC VERSION**

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

as construed (an agreed upon construction) – is met. Here, the testimony is not clear and I must therefore find that Complainant did not meet its burden. *See Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347, 1357-58 (Fed. Cir. 2011) ("BSC correctly argues that we must disregard the testimony of Cordis' expert that the NIR stent has two crests and a trough because . . . that testimony was based on an incorrect understanding of the claim construction."); *c.f.* also *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. 2022-1815, 2024 WL 4558613, at *13 (Fed. Cir. Oct. 24, 2024) ("While our precedent doesn't necessarily require an expert's testimony to be an *ipsis verbis* recitation of the claim, Dr. Selker's identified result is also too generalized, unclear, and unconnected to the claimed invention.").

Second, as Staff notes, Complainant does not appear to allege that the ██████████████ ███████████████████████████████████████████████████████████ *See* SRB at 17. Instead, Complainant argues that the ███████████████████████████████████████ ████████████████ Thus, as Staff puts it: █████████████████████████████████ ██████████████████████████████ SRB at 18.

Complainant does not resolve this question with evidence. In its brief, Complainant states: ███████████████████████████████████████████████████████████████████████ ████████████████████████████ CIB at 101. That is not the relevant inquiry. BOE does not appear to dispute that "nearly eliminating" is different from "eliminating" and that some deviation is allowed under the agreed-upon construction. Complainant does not, however, introduce evidence as to the benchmark one of skill would use for determining whether the threshold voltage deviation was "nearly eliminated." As Staff notes, "[t]here is no evidence of the viewpoint of a POSITA regarding the degree of reduction needed to constitute near elimination of the threshold voltage deviation." SRB at 18.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



Instead, Complainant cites to simulation data from a ███████████ document that states that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ CIB at 101 (citing RX-0141C.77). Dr. Fontecchio does not comment on the ███████████████ or opine that it constitutes a near elimination of threshold voltage deviation. Without context in which to place this amount, it is not probative of whether or not the BOE products infringe.

Accordingly, I find that Complainant has not met its burden to show that limitation 1[c] is met by any of the Accused Products.

### iii)    Claims 2 and 3

Claims 2 and 3 depend on claim 1. Because I find that claim 1 is not met, claims 2 and 3 cannot be infringed. *See Muniauction Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328-29 n.5 (Fed. Cir. 2008) ("A conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims.")

### b)    Claim 15

### i)    15[pre]-15[e] and 15[g]

Limitations 15[pre], 15[a], 15[b], 15[c], 15[d], and 15[e] recite: "A pixel circuit in an organic light emitting device, comprising: a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied; a second transistor whose source is coupled to a drain of the first transistor; a third transistor whose drain and source are connected between a gate and a drain of the second transistor; a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor; a fifth transistor including a

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element." JX-0001 at cl. 15. Limitation 15[g] further recites: "a capacitor in which one terminal of the capacitor is coupled to the gate of the second transistor and a power 5 supply voltage is applied to the other terminal of the capacitor." *Id*.

BOE does not dispute that any of the Accused Products meet limitation 15[pre], 15[b], 15[c], or 15[g]. Undisputed Claim Limitations at 14. It further does not dispute that the ████ ████ meet limitations 15[a], 15[d], or 15[e]. *Id*. Other than the argument regarding representativeness addressed above, BOE does not address these limitations with respect to the ████████████████████████ and has therefore waived any such arguments. RIB at 42-55; RRB at 18-30. The evidence shows that these limitations are met. CX-1629C-NCT (Fontecchio) at Q/A 75-94, 139-145, 152, 176-195, 205-210, 217-222, 239-245, 249.

### ii)    15[f]

Limitation 15[f] recites "the electroluminescent element having the one terminal coupled to the drain of the fifth transistor and the other terminal grounded." JX-0001 at cl. 15. As noted above, I construed "grounded" to have its plain and ordinary meaning, *i.e.*, "couped to a reference voltage."

Complainant asserts that ████████████████████████ ████████████████████████ ████ CIB at 107. Complainant notes that BOE's argument that ████████████ ████████████ is incorrect as "████████████████████ ████████████████████████

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

██████ *Id.* at 108. Complainant also asserts that BOE's argument that ████████████

████████████████████████████████████ and, even if not waived,

"is plainly wrong." CRB at 27; *see also* CIB at 108.

BOE argues that its products do not infringe ████████████████████

████████████████████████ RIB at 45. BOE asserts that "████████

████████████████████████████████████████████

████████████████████████████████████████████

████ *d.* at 46. BOE also asserts that "████████████████████████

████████████ *Id.*

Staff believes that Complainant has shown that this limitation is satisfied. SIB at 62. Staff

notes that Dr. Fontecchio opined that, even ████████████████████, it acts

as a reference voltage. *Id.* Staff further argues that BOE has waived the argument ████████

████████████████████████████ and that "even if the

argument is considered on its merits, it fails." SRB at 20.

I find that the evidence shows that this limitation is met. With respect to the ██████

Dr. Fontecchio testified that the "████████████████████████████

████████████████████████████████████████████

████████████████████████████████ CX-1629C-NCT

(Fontecchio) at Q/A 146. He further explained that ████████████████

████████████████████████" and ████████████████

████████████████ *Id.* He noted that ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

███████████████████████████████████████████████████████

████████████████████. at Q/A 148.

BOE makes several arguments for why there is no infringement of this limitation. First, BOE argues that the Accused Product's ███████████████████████████ ████████████████ RIB at 47-49. BOE also argues ███████████████ ███████████████████████ *Id.* at 49. In its reply brief, BOE asserts that Complainant ████████████████████████████████████████████████████████ ███████████████████████████████████." RRB at 23, 24. None of these arguments were included in BOE's pre-hearing brief. *See* RPHB at 34-35. Accordingly, they are waived pursuant to Ground Rule 11.2.[35]

Next, BOE argues that ████████████████████████████████. RIB at 50. According to BOE, Dr. Fontecchio ████████████████████████████████ █████. *Id.* I disagree. Dr. Fontecchio explained in his testimony how this limitation was met and BOE has no expert testimony to rebut Dr. Fontecchio's opinion. CX-1629C-NCT (Fontecchio) at Q/A 146-148. Instead, BOE cites to the testimony of two of its employees. RIB at 50 (citing RX-1080C (Zhang) at Q/A 89-91; RX-1081C (Dong) at Q/A 29-30). While these employees both testified that BOE ████████████████████████████████, I cannot simply accept testimony from BOE's witness on its face, without supporting evidence or further details.

Finally, BOE asserts that ████████████████████████████████ ██████ RIB at 50. I am not persuaded by this argument. Dr. Fontecchio explained why █ ████████████████████████████████████████████

---

[35] BOE's pre-hearing brief included less than two pages of arguments on whether the Accused Products contain a grounded EL element terminal.



CX-1629C-NCT (Fontecchio) at Q/A 175. BOE argues that this conclusion is supported with "erroneous assertions and insufficient evidence." RIB at 51. According to BOE, Dr. Fontecchio ████████████████████████████████████████████████████████ ████████████████████████████████." *Id.* During cross-examination, Dr. Fontecchio readily admitted that his testimony was not as precise as it should have been. He explained ████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Tr. (Fontecchio) at 649:15-18. He then clarified that ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* at 651:4-10. With this clarification, I do not find that Dr. Fontecchio relied on the wrong period.

BOE also asserts that Dr. Fontecchio's ████████████████████████████ ████████████████████ RIB at 52. BOE states that ████████████████████ ████████████ *Id.* In support of this argument, BOE cites to the testimony of Mr. Zhang and the cross-examination of Dr. Fontecchio. Mr. Zhang did testify that ████████████████ ████████████████████████████████ RX-1080C (Zhang) at Q/A 90. As Complainant notes, however, Mr. Zhang never actually stated that ████████████████████ ████████ CRB at 30. Nor did Mr. Zhang cite to any documents that confirmed his opinion. *Id.* Further, this uncorroborated testimony is contradicted by Mr. Zhang's deposition, in which he testified:

CONFIDENTIAL MATERIAL OMITTED

████ ███████████████████████████████████

████ ██████████████████████████████ .

CX-1615C at 81:9-12.

Nor do I agree that Dr. Fontecchio's testimony support BOE's understanding. During cross-examination, Dr. Fontecchio was asked:

████ ████████████████████████████████████████

████ ████████████████████████

Tr. (Fontecchio) at 658:6-9. This testimony is not evidence that █████████████

████

Because I do not agree with BOE's arguments, I find that Complainant has established that the ████████████████████████████████████ meet limitation 15[f].

### iii) Conclusion

For these reasons, I find that the ████████████████████████████ ████████████████ products infringe claim 15 of the '599 patent.

### c) Claim 16

Claim 16 recites: "The pixel circuit in the organic light emitting device of claim 15, further comprising: a sixth transistor including a gate to which a scan signal just before the current scan signal is applied; a source coupled to the one terminal of the capacitor; and a drain to which an initialization voltage is applied." JX-0001 at cl. 16.

BOE does not dispute that the ███████████ products meet the additional limitations of claim 16. Undisputed Claim Limitations at 14. The evidence shows that these limitations are met. CX-1629C-NCT (Fontecchio) at Q/As 75-94, 153-156, 176.

**CONFIDENTIAL MATERIAL OMITTED**

BOE further does not dispute that the ███████████████ products meet limitations 16[b] and 16[c]. Undisputed Claim Limitations at 14. BOE does not address limitation 16[a] in its briefs with respect to these products and has therefore waived any such argument that this limitation is not met. Additionally, the evidence shows that these limitations are met. CX-1629C-NCT (Fontecchio) at Q/A 75-94, 177-191.

BOE does set forth noninfringement arguments with respect to ███████████. Of relevance here, the parties agreed that "scan line just before the current scan signal" means "the immediately previous scan line (i.e., the (n-1)th scan line" and I adopted that construction. Order No. 28 at 14.

### i) ██████

Complainant asserts that █████ meets limitation 16[a] under the doctrine of equivalents. CIB at 109 (stating that ██████ infringes for the same reasons as discussed above for 2[a]); *see also id.* at 106. For its argument for how this limitation is met, Complainant states, in full:

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

*Id.* at 106.

BOE asserts that █████ does not meet this limitation. BOE explains that Complainant's infringement theory "is an end-run around of the claim construction requiring the 'immediately previous' signal." RIB at 53. BOE also argues that Complainant's argument "fails because

███████████████████████████████████████

███████████████ *Id.* at 54.

CONFIDENTIAL MATERIAL OMITTED

Staff argues that Complainant waived its argument that the ███ product meets claim 16 under the doctrine of equivalents. SRB at 22.

I find that Complainant has not met its burden to show that ███ meets the limitations of claim 16. As shown above, Complainant's doctrine of equivalents argument consists of two sentences and does not explain precisely how the limitation is met under the doctrine of equivalents. Complainant's argument therefore does not comply with Ground Rule 14.2. As such, I find that ███ does not infringe claim 16.

### ii) ███

Complainant asserts that ███ meets limitation 16[a] both literally and under the doctrine of equivalents. CIB at 109 (stating that ███ infringes for the same reasons as discussed above for 2[a]); *see also id.* at 105. For its argument for how this limitation is met, Complainant states, in full:



*Id.* at 105.

BOE argues that there is no literal infringement of claim 16 because ███████ ██████████████" RIB at 54. BOE asserts that Complainant's "DOE argument parallels its ███ DOE argument and fails for the same reason." *Id.*

Staff notes that "[a]lthough the ███████████████ ███████' SDC's expert, Dr. Fontecchio, opines that the timing diagram for the

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

████████████████████████████████████████████████████████████.” SIB at 63. According to Staff, however, "Dr. Fontecchio's opinions regarding the ████ product are inconsistent with his opinions regarding the prior-art reference Sakamoto." *Id.* There, "Dr. Fontecchio acknowledges that the ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 64. Staff also argues that Complainant waived its DOE arguments pursuant to Ground Rule 14.2. SRB at 22.

I first find that Complainant has not shown that ██████ literally meets limitation 16[a]. To show that this limitation is met, Complainant must demonstrate that the product has "a sixth transistor including a gate to which [the immediately previous scan line (i.e., the (n-1)th scan line] is applied." Complainant acknowledges that, in ██████████████████████████████████

████████████████████████████████████████████████████████████

██ CIB at 105 (citing CX-1615C-PSC (Dong) at 96:4-7). Asserting that a product infringes because it is "equivalent" to a claim limitation is not literal infringement. *See, e.g., Warner-Jenkinson Co.*, 520 U.S. at 21 (explaining that a product or process can infringe even when there is not literal infringement if "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention"). As such, Complainant has not met its burden to show literal infringement.

Nor has Complainant met its burden to show that ██████ meets claim limitation 16[a] under the doctrine of equivalents. As with ████ Complainant's argument here is too conclusory. *See* CIB at 106 (stating only that the difference between ██ and ██████ is "unsubstantial," but failing to explain how ████ performs substantially the same function in substantially the same way to obtain the same result" as the patented invention).

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

As such, I find that Complainant has not shown that ▮▮▮▮▮ infringes claim 16.

### 2.   Redesigned Products

BOE asserts that ▮▮▮▮▮▮ do not infringe the '599 patent. RIB at 54. BOE explains that "[a]ll asserted claims require two transistors act in response to the same 'circuit light-emitting signal,'" but "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ *Id.* at 55. BOE further asserts that NIAs ▮ do not infringe claims 2 and 16 ▮▮▮▮▮▮▮▮▮▮▮." *Id.*

Complainant does not introduce any evidence of infringement. As such, it has failed to meet its burden to show that NIAs ▮▮▮▮ infringe the '599 patent. *See Spansion*, 629 F.3d at 1349 (holding that complainant bears the burden of proving infringement of the asserted patent claims by a preponderance of the evidence).

### 3.   BLF Accused Products

The BLF Respondents stipulated that Wholesale Gadget Parts' WGP-AP03118 is representative of all of the other BLF Accused Products. Supplemental BLF Representative Products Stipulation at 3. The BLF Respondents also stated that they do not contest infringement of any of the asserted claims. BLF Undisputed Limitations at ¶ 3 ("The BLF Respondents dispute no claim limitation of the Asserted Claims with respect to infringement.").

For the reasons set forth in section VI.B.1, however, I find that Complainant has not established that the BLF Accused Products meet the "self-compensating" limitation of 1[c]. As with the BOE Accused Products, Dr. Fontecchio does not directly testify that the third transistor detects and nearly eliminates the effect of a threshold voltage deviation of the particular second transistor. *See* CX-1629C-NCT (Fontecchio) at Q/As 267-268. As such, Complainant does not meet its burden to show that this limitation is met.

CONFIDENTIAL MATERIAL OMITTED

Likewise, claim 13 depends from claim 7, which also requires a third transistor connected to the second transistor "so that the second transistor detects and compensates its threshold voltage deviation in itself." JX-0001 at cl. 7. For the same reasons, I find that Complainant has not met its burden to show that this limitation is met.

The evidence in the record, however, shows that BLF Accused Products meet the limitations of claims 15 and 16 of the '599 patent. CX-1629C-NCT (Fontecchio) at Q/A 250- 260, 293-312. Accordingly, I find that the BLF Accused Products infringe claims 15 and 16 of the '599 patent.

### 4.    Defaulting Respondents' Accused Products

Complainant has shown that the Defaulting Respondents' Accused Products meet the limitations of claims 15 and 16 of the '599 patent. CX-1629C-NCT (Fontecchio) at Q/A 313-315.

For the same reasons as set forth above, I find that Complainant has not shown that the Defaulting Respondents' Accused Products meet claims 2, 3, or 13.[36]

Accordingly, I find that the Defaulting Respondents' Accused Products infringe claims 15 and 16 of the '599 patent.

### 5.    Conclusion

As set forth above, I find that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ products, BLF Accused Products, and the Defaulting Respondents' Accused Products infringe

---

[36] Commission Rule 210.16(c) provides "[t]he facts alleged in the complaint will be presumed to be true with respect to the defaulting respondent," but this is true only when a complainant seeks relief against a respondent, as opposed to a GEO. *See* 19 C.F.R. § 210.16(c); *see also* 19 U.S.C. § 1337(g)(1) (explaining that if "the complainant seeks relief limited solely to that person . . . the Commission shall presume the facts alleged in the complaint to be true.")

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

claims 15 and 16 of the '599 patent. I further find that the ████████████████ products

infringe claim 15. Finally, I find that NIAs ████████ do not infringe any asserted claim.

### C.    Technical Prong

Complainant asserts that the ██████████████████ practice claims 2-3 and 15-16 and

that the ████████ practices claims 3 and 15. CIB at 112. The parties agreed that these four products

are each representative of other products, as shown below:

---

[37] The parties refer to this product in different ways. *See, e.g.*, CIB at 112████████████ CX-
1629C-NCT (Fontecchio) at Q/A 404 ████████████ Representative Product Stipulation
████████; RIB at xxiii ████████████████████████ SIB at 12 ████████████ I
will refer to the product as the ██████████████

**PUBLIC VERSION**

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



Representative Products Stipulation at 5.

Staff agrees that Complainant has shown that the DI Products practice claims 15 and 16 but disagrees that the DI Products practice claims 2 or 3. SIB at 64.

BOE makes two arguments with respect to technical prong. One of BOE's arguments is that Complainant failed to show that all four representative products practice the claims. RIB at

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

56. BOE explains that Dr. Fontecchio analyzed only ██████████████████

████████████████████████████████████████████████████████████████

████████████████

    I do not agree with BOE's criticisms of Dr. Fontecchio's analysis. Dr. Fontecchio analyzed the evidence for each DI Product and explained why the differences between the products was immaterial. First, Dr. Fontecchio presented a claim-by-claim analysis as to how the ██ practices the asserted claims. CX-1629C-NCT (Fontecchio) at Q/A 334-386.[38] Next, Dr. Fontecchio explained how the pixel circuits of the other two product groups are nearly identical to the ███ pixel circuit. *Id.* at Q/A 395 (testifying that the pixel circuits of the ███ "are identical [to the ███ with the exception that the ██ pixel circuit has an additional initialization voltage source, as opposed to the single initialization source in the ██ pixel circuit"); *see also id.* at Q/A 404 ("[T]he ████████████████████████████████████████████████████████████████ ████████████████████████████████████ He also explained that both the ██████████████████████ practice the asserted claims for the same reasons as with respect to the ██ product. *Id.* at Q/As 394, 404. As Complainant notes, BOE has not argued that this analysis is incorrect. Nor has it identified other differences between the products. *See* CIB at 112 (asserting that there is "no contrary evidence" that the ██████████████████████ in a material way); CRB at 32 (noting that "BOE identifies no relevant differences" between the DI products and that "Dr. Fontecchio's analysis is unrebutted"). As such, I find that Complainant has shown that both the ██████████ practice the '599 patent.

---

[38] He also performed a claim-by-claim analysis with respect to the ██████. CX-1629C-NCT (Fontecchio) at Q/A 406-432.

**CONFIDENTIAL MATERIAL OMITTED**

BOE also asserts that Complainant "assumes its DI Products practice threshold-voltage compensation based entirely on the circuit structure" and "fail[s] to consider how [the circuit] operates." RIB at 55. BOE argues: "Because there is no evidence the capacitor charges for an adequate period, SDC does not  - and cannot – prove the DI Products 'eliminat[e] or nearly eliminate[e]' threshold-voltage deviations." *Id.*

Even if BOE is correct that Complainant does not show that the products practice this limitation, Complainant has demonstrated that it meets the technical prong. BOE does not dispute that ███████████ practice claim 15 and that the ███ practices claim 16 and, as noted above, I reject BOE's argument with respect to the ██████████ *See* RIB at 55-56; RRB at 30. Further, the evidence shows that the ██████████████ practice claim 15 and that the █████████ practice claim 16. CX-1629C-NCT (Fontecchio) at Q/A 318-340, 374-393, 394-402, 403-405, 406, 424-440. As stated above, a complainant need only show that its products practice one claim for the technical requirement to be met. Thus, it is unnecessary for Complainant to establish that its products practice additional claims.

For these reasons, I find that the technical prong has been satisfied for the '599 patent.

### D.    Invalidity

BOE asserts that the '599 patent is invalid because: (1) U.S. Patent Pub. No. 2003/0132931 A1 ("Kimura") renders the asserted claims obvious (RIB at 59-68); (2) Kimura and U.S. Patent Pub. No. 2003/0067424 ("Akimoto") render the asserted claims obvious (*id.* at 68); (3) U.S. Patent Pub. No. 2004/0056257 A1 ("Sakamoto") renders the asserted claims obvious (*id.* at 68-72); (4) Sakamoto and Akimoto render the claims obvious (*id.* at 72); and (5) claims 15-16 are invalid for lack of written description and enablement. *Id.* at 72-73.

The opinions of BOE's primary invalidity expert, Dr. Daniel Foty, were stricken in a previous order. Order No. 60 (July 2, 2024).[39] While BOE introduced the testimony of another expert, Mr. Thomas Credelle, Mr. Credelle did not opine as to how the prior art references disclose each limitation of the asserted claims. *See generally* RX-0006C (Credelle). Due to the fact that Dr. Foty's testimony was struck, both Complainant and Staff assert that BOE cannot meet its burden to show invalidity. CIB at 119; SIB at 66.

### 1.    Kimura

BOE argues that "Kimura renders all Asserted/DI Claims obvious." RIB at 59. According to BOE, Kimura expressly teaches "[r]eplacing nMOS switching transistors with pMOS." *Id.* at 60. BOE includes images for many of the limitations to show how each is disclosed by Kimura. *Id.* at 60, 61-67 BOE also argues that one of skill would be motivated "to make Kimura's pixel circuit all-pMOS" and that "[t]here was more than a reasonable likelihood of success in using an all-pMOS implementation." *Id.* at 60-61.

Complainant argues that Kimura does not disclose or suggest various claim limitations. CIB at 119, 120. According to Complainant, BOE's argument is primarily "based on Kimura's Figure 33 embodiment, which Kimura acknowledges is flawed." *Id.* at 119. Complainant further asserts that "POSITAs would not be motivated to make the significant modifications necessary to replace each PMOS transistor with an NMOS transistor, eliminating the circuit's CMOS character, ignoring relevant differences in those transistors, and contravening Kimura's teachings." *Id.* at 119-120. Complainant notes that BOE's argument "offers attorney assertions, without explanation

---

[39] This order was based on a motion *in limine* that Dr. Foty does not qualify as a person of ordinary skill in the art under the definition I adopted in Order No. 28. *See* Order No. 60 (July 2, 2024).

and improperly rel[ies] on Dr. Foty's demonstratives." CRB at 36. Complainant further states that BOE "fails to link Kimura's disclosures to the limitations." *Id.*

Staff argues that "Dr. Fontecchio's specific criticisms of [BOE's] invalidity arguments are unrebutted by a POSITA." SIB at 66. Staff explains that the only witness testimony that BOE cites is that of Mr. Credelle, who provided conclusory testimony that does "little more than stating that he agrees with the now-excluded opinions" of Dr. Foty. SRB at 23. Staff notes: "Without evidence of the perspective of a POSITA, Respondents have not met their burden of showing by clear and convincing evidence that the asserted claims would have been obvious." SIB at 66.

I find that BOE has failed to meet its burden to show that Kimura renders the asserted claims obvious. For many limitations, BOE provides only conclusory statements as to how Kimura discloses the limitation. For example, with respect to limitation 15[a], BOE states: "Kimura renders this obvious." RIB at 61. It then cites to the following images: [40]

 

---

[40] As Complainant notes in its reply brief, these images include annotations in red and yellow. CRB at 34. These annotations are from demonstratives in Dr. Foty's testimony, which was struck. *Id.* Thus, even setting aside the other issues addressed in this section, it was improper for BOE to rely on the annotated version of these figures.

*Id.* at 62. BOE does not explain *how* the figures disclose the claim limitation. *Id.*; *see also id.* at

62-63 (providing similar conclusory testimony for limitations 15[b], 15[c], and 15[d]); *id.* at 68

(conclusory testimony for claims 2 and 3). Accordingly, BOE cannot meets its burden to show

invalidity by clear and convincing evidence. *See e.g. Ecolochem, Inc. v. S. Cal. Edison Co.*, 227

F.3d 1361, 1372 (Fed. Cir. 2000) ("Broad conclusory statements regarding the teaching of []

references, standing alone, are not 'evidence.'"); *see also Certain Semiconductor Chips with*

*Minimized Chip Package Size & Prods. Containing Same (III)*, Inv. 337-TA-630, Initial

Determination, 2009 WL 3092628, at *82 (U.S.I.T.C. Aug. 28, 2009) ("The ALJ finds that, by

simply making cursory assertions and conclusory arguments comprised of two paragraphs,

Respondents have blatantly failed to meet the clear and convincing standard necessary to invalidate

[the patent].").

Nor can BOE establish that one of skill would be motivated to modify Kimura. With respect

to motivation, BOE provides a bulleted list of apparent reasons one of skill would modify the pixel

circuit of Kimura:

> **Motivation to Modify.** There was additional motivation for a POSITA to make Kimura's
> pixel circuit all-pMOS:
>
> - "[A]ny polarity may be used" for switching transistors.  RX-0083 ¶¶[0396], [0434],
>   [0438], [0445], [0649].
>
> - Making the fifth transistor pMOS enables "higher speed."  *Id.* ¶[0670].
>
> - pMOS devices in "close proximity" to the driving transistor "increase[s] the aperture
>   ratio" and "reduce[s]… dispersion."  *Id.* ¶[0432].
>
> - A POSITA's knowledge that single species is simpler and cheaper to manufacture.
>   RX-0084, 12:30-49.
>
> There was more than a reasonable likelihood of success in using an all-pMOS
> implementation.  RX-0006C (Credelle) Q24.

RIB at 60-61. Such conclusory statements are insufficient. *Acoustic Tech, Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1366, 1375 (Fed. Cir. 2020) (explaining that conclusory expert testimony and attorney argument cannot constitute substantial evidence of a motivation to combine"). Additionally, as seen above, BOE does not support its arguments regarding motivation with citations to expert testimony. In cases such as this one – where the technology is complex – such testimony is necessary for a party to meet its burden. *See, e.g.*, *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, at 1369-70 (Fed. Cir. 2012) ("Although expert testimony regarding motivation to combine is not always required, the technology at issue here is not the type of technology where common sense would provide the motivation to combine these references.").

As such, I find that BOE has not established that Kimura renders obvious the asserted claims of the '599 patent.

### 2.    Kimura/Akimoto

BOE asserts that "Akimoto confirms and bolsters a POSITA's knowledge that nMOS/pMOS switching transistors are interchangeable." RIB at 68. BOE further asserts that "Akimoto's disclosure would have further motivated a POSITA to make Kimura's pixel circuits all-pMOS with a reasonable expectation of success." *Id.*

Complainant argues Kimura does not disclose or suggest various claim limitations and that "BOE did not cite Akimoto as disclosing any limitation." CIB at 120. Complainant further asserts that "POSITAs would not look to modify Kimura's pixel circuits based on Akimoto, whose circuits are materially different and incompatible with Kimura's, nor have a reasonable expectation of success." *Id.*

Staff asserts that BOE has failed to meet its burden for the same reasons as set forth above with respect to Kimura. SIB at 66.

I first find that BOE's argument is waived per Ground Rule 14.2. BOE includes only two sentences regarding this obviousness combination. A two-sentence argument cannot set forth BOE's complete obviousness argument "in detail."

Even if BOE had not waived its arguments, however, I would find that BOE cannot meet its burden to show that the '599 patent is invalid due to the combination of Kimura and Akimoto. BOE's two sentences on the issue do not address how the combination discloses all the limitations or why one of skill would be motivated to combine the references. RIB at 68. Nor does the cited testimony fill these gaps. In his witness statement, Mr. Credelle states that he "agree[s] with Dr. Foty's discussion of this combination, his conclusion that a POSITA would have been motivated to combine Kimura and Akimoto, and the other related issues he has discussed." RX-0006C (Credelle) at Q/A 25. Because Dr. Foty's testimony was struck, Mr. Credelle's reference of this testimony is not useful evidence.

Accordingly, I find that BOE has not established that Kimura and Akimoto render obvious the asserted claims of the '599 patent.

### 3.    Sakamoto

BOE argues that "Sakamoto renders the Asserted/DI Claims obvious." RIB at 68. BOE asserts that Sakamoto expressly teaches "[r]eplacing nMOS switching transistors with pMOS." *Id.* BOE includes images for many of the limitations to show how each is disclosed by Sakamoto. *Id.* at 68-71.

Complainant argues that Sakamoto does not disclose or suggest various claim limitations. CIB at 120-121 (arguing that Sakamoto lacks a third transistor that meets the claim limitations and "does not teach or suggest the initialization transistor of claims 2 or 16"). Complainant further asserts that "POSITAs would not be motivated to eliminate the CMOS design of Sakamoto's

Figure 5B circuit nor make the significant modifications necessary to replace each PMOS transistor with an NMOS transistor, which disregards relevant differences in those transistors, benefits of CMOS, and Sakamoto's teachings." *Id.*

Staff asserts that BOE has failed to meet its burden for the same reasons as set forth above with respect to Kimura. SIB at 66.

BOE's analysis for this reference suffers from the same problems as Kimura. For limitations 15[a], 15[b], and 15[d], BOE simply states that Sakamoto renders the limitation obvious and includes an image. RIB at 69. For claims 2 and 3, BOE does even less. *Id.* at 72 (stating only that "Sakamoto discloses Claim 2's transistor" and "[t]he [15-a] and [15-b] analysis applies to Claim 3 because they are substantially identical."). As explained in Section VI.D.1, such an analysis is insufficient for BOE to meet its burden. It also constitutes waiver under my Ground Rules.

Additionally, certain of BOE's arguments rely on the testimony of Dr. Foty. *See* RIB at 70 ("As Dr. Foty would have testified, a POSITA would have found it obvious that the second terminal would be grounded to e.g., 0V."); *id.* at 71 ("As Dr. Foty would have testified, Sakamoto renders obvious a sixth transistor including a gate to which scan[n-1], i.e., Qj, is applied."). Because Dr. Foty's testimony was struck, BOE cannot rely on this testimony to meet its burden

I find that BOE has not established that Sakamoto renders obvious the asserted claims of the '599 patent.

### 4.    **Sakamoto/Akimoto**

BOE's entire argument with respect to this combination consists of one sentence: "Sakamoto in view of Akimoto renders obvious an all-pMOS configuration of Sakamoto's circuit.

§IV.C.2.b; RX-0006C (Credelle) Q27." RIB at 72; *see also* RRB at 30 (offering no further argument with respect to this combination).

Complainant argues that Sakamoto does not disclose or suggest various claim limitations and that "BOE did not argue Akimoto teaches or suggests any limitation." CIB at 120-121. Complainant further asserts that "POSITAs would not look to modify Sakamoto's circuits based on Akimoto, whose circuits are materially different and incompatible with Sakamoto's, nor have a reasonable expectation of success." *Id.*

Staff asserts that BOE has failed to meet its burden for the same reasons as set forth above with respect to Kimura. SIB at 66.

I first find that BOE's argument is waived per Ground Rule 14.2. A one sentence argument cannot set forth BOE's complete obviousness argument "in detail."

Even if BOE had not waived its arguments, however, I would find that BOE cannot meet its burden to show that the '599 is invalid due to the combination of Sakamoto and Akimoto. BOE's single sentence does not address how the combination discloses all the limitations or why one of skill would be motivated to combine the references. RIB at 72. Nor does the cited testimony fill these gaps. In his witness statement, Mr. Credelle states that he "agree[s] with Dr. Foty's discussion of this combination, his conclusion that a POSITA would have been motivated to combine Sakamoto and Akimoto, and the other related issues he has discussed." RX-0006C (Credelle) at Q/A 27. Because Dr. Foty's testimony was struck, BOE cannot rely on this testimony to meet its burden

As such, BOE has not shown that Sakamoto with Akimoto renders the asserted claims obvious.

### 5.  Secondary Considerations

Secondary considerations of nonobviousness may rebut a prima facie case of obviousness. Here, where BOE has not made out a prima facie case of obviousness, there is no showing to rebut. Accordingly, I need not consider any secondary considerations of nonobviousness.

### 6.  § 112

BOE's full § 112 argument as is follows:

> The ALJ construed "grounded' as "coupled to a reference voltage" but SDC interprets it to include coupling to a nonuniform and changing "reference voltage" through a 30-megaohm resistor. §IV.A.2 In view of SDC's interpretation of "grounded," Claims 15-16 are invalid because the specification (i) lacks adequate written-description support for its full scope and (ii) fails to enable its full scope. RX-0006C (Credelle) Q36.

RIB at 72-73; *see also* RRB at 30 (offering no further argument with respect to § 112).

Complainant argues that Dr. Fontecchio established that the '599 patent "provides adequate written description for, and enables, claims 15-16" and that "BOE presented no contrary evidence." CIB at 123; *see also* CRB at 38.

Staff notes that "[w]hether a patent complies with the written description and enablement requirements is viewed from the perspective of a POSITA." SIB at 67. Staff explains that the only evidence from the perspective of one of skill comes from Dr. Fontecchio "who testified that [the] specification supported the claims." *Id.* Staff further asserts that BOE's arguments "do not comply with the ground rules' requirement that contentions be set forth 'in detail' and should be deemed abandoned or withdrawn." SRB at 25.

I find that BOE's argument is too conclusory under my Ground Rules. Again, BOE offers only two sentences which fail to set forth any detail at all with respect to its arguments. Accordingly, BOE has waived the argument that the '599 patent is invalid under 35 U.S.C. § 112.

Additionally, BOE does not support its arguments with the testimony of one of skill in the art. BOE cites to Q/A 36 of Mr. Credelle's witness statement, but, in this testimony, Mr. Credelle simply notes that he agrees with Dr. Foty's opinion. RX-0006C (Credelle) at Q/A 36 ("I agree with Dr. Foty's discussions on the topic . . . both because the specification lacks adequate written description support for the full scope of the claims and because the specification fails to enable the full scope of the claims…"). As noted above, Dr. Foty's testimony was struck. The record therefore does not include the testimony with which Mr. Credelle apparently agrees and Mr. Credelle's testimony is of little value. Because the question of whether a patent complies with the written description and enablement requirements is viewed from the perspective of one of skill, the failure to cite to such evidence means that BOE cannot meet its burden. *See Ariad*, 598 F.3d at 1351.

Accordingly, BOE has not shown that claims 15 and 16 of the '599 patent are invalid under 35 U.S.C. § 112.

## VII.    U.S. PATENT NO. 9,330,593

### A.    Overview

The '593 patent, entitled "Stage Circuit and Organic Light Emitting Display Using the Same" issued on May 3, 2016 to Hwan-Soo Jang. JX-0002. The '593 patent is assigned to Complainant. *Id.* The '593 patent generally relates to "stage circuit structures that . . . have a reduced number of transistors and can output scan signals based on first and second clock signals and the output signal of a previous stage circuit." Am Comp. at ¶ 83.

#### 1.    Asserted Claims

Complainant asserts claim 6 of the '593 patent. CIB at 124, 138. Because claim 6 depends on claims 1 and 2, these non-asserted claims are also included below:

1.     1[pre] A stage circuit having a first input terminal, a second input terminal, a third input terminal, and an output terminal, the stage circuit comprising:

1[a] an outputting unit having a first node and a second node, the outputting unit to supply a voltage of a first power supply to the output terminal according to a voltage applied to the first node and a signal of the third input terminal to the output terminal according to a voltage applied to the second node;

1[b] a first driver to control the voltage of the second node in accordance with signals of the first input terminal, the second input terminal, and the third input terminal; and

1[c] a second driver to control the voltage of the first node in accordance with the signal of the second input terminal and the voltage of the second node, wherein

1[d] the signal of the third input terminal directly controls an on/off operation of a transistor, the transistor included in the first driver.

2.     2[a] The stage circuit as claimed in claim 1, wherein the first input terminal receives an output signal of a previous stage circuit or a start signal,

2[b] wherein the second input terminal receives a first clock signal, and

2[c] wherein the third input terminal receives a second clock signal.

6.     6[a] The stage circuit as claimed in claim 2, wherein the first driver includes:   a first transistor between the first input terminal and the second node, the first transistor having a gate electrode coupled to the second input terminal; and

6[b] a second transistor and a third transistor serially positioned between the second node and the first power supply,

6[c] wherein a gate electrode of the second transistor is coupled to the third input terminal, and

6[d] wherein a gate electrode of the third transistor is coupled to the first node.

**2.     Claim Construction**

I construed the following term from the asserted claims as follows:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "directly controls" | 1 | Plain and ordinary meaning, i.e., "controls with no intervening circuit elements" |

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "node" | 1 | Plain and ordinary meaning, which is "a point or area of interconnection between two or more components." |
| "an outputting unit having a first node and a second node, the outputting unit to supply a voltage of a first power supply to the output terminal according to a voltage applied to the first node and a signal of the third input terminal to the output terminal according to a voltage applied to the second node" | 1 | Plain and ordinary meaning |
| "a first driver to control the voltage of the second node in accordance with signals of the first input terminal, the second input terminal, and the third input terminal" | 1 | Plain and ordinary meaning, wherein "driver" is 'an electronic circuit used to power or control something." |
| "a second driver to control the voltage of the first node in accordance with the signal of the second input terminal and the voltage of the second node" | 1 | Plain and ordinary meaning, wherein "driver" is 'an electronic circuit used to power or control something." |

Order No. 28 at 14-15, 18, 24-25, 33, 37.

### 3.    Level of Ordinary Skill in the Art

I previously found that a person of ordinary skill in the art with respect to the '593 patent would have had a relevant degree in Electrical Engineering, Computer Engineering, Materials Science, Physics, or the like, and experience in active matrix display design and electroluminescence. Order No. 28 at 12.

**CONFIDENTIAL MATERIAL OMITTED**

### B.    Infringement

Complainant asserts that the ▮▮▮ the BLF Accused Products, and the Defaulting Respondents Accused Products each infringe claim 6 of the '593 patent. CIB at 124, 138. Complainant further asserts that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[41] *Id.*

### 1.    BOE Accused Products

#### a)    Limitations 1[b] and 1[c]

Limitations 1[b] and 1[c] recite: "a first driver to control the voltage of the second node in accordance with signals of the first input terminal, the second input terminal, and the third input terminal; and a second driver to control the voltage of the first node in accordance with the signal of the second input terminal and the voltage of the second node, wherein." JX-0002 at cl. 1.

Complainant does not have any testimony from Dr. Fontecchio showing that these limitations are met.[42] *See* CX-1629C-NCT (Fontecchio) at 145-149 (indicating that the entirety of Dr. Fontecchio's opinions with respect to these limitations were struck).[43] While expert testimony is not required in every case to show literal infringement, it is "generally required in cases involving complex technology." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 n.

---

[41] BOE argues that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. RIB at 73. As set forth below, I find that Complainant has not shown that the ▮▮▮ infringes. As such, it is unnecessary to determine if Complainant has shown that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[42] Complainant claims that BOE and Staff dispute limitations 1[b] and 1[c] "only for an alternative theory based on ▮▮▮ CRB at 38; *see also id.* at 40. Complainant does not have expert testimony on *any* theory of infringement, whether that theory be its alternative or its main theory. Even if BOE does not set forth a noninfringement argument, it is still Complainant's burden to show that the limitations are met.

[43] These opinions were struck in Order No. 55. This order was based on a motion *in limine* from BOE that moved to struck "entirely new '593 patent infringement theories" that were not disclosed in Dr. Fontecchio's expert report. *See* Order No. 55 (July 2, 2024).

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

7 (Fed. Cir. 2007).[44] The '593 patent involves circuits and is thus not the type of technology for which a lay person can readily assess infringement.

To overcome the lack of expert testimony, Complainant cites to the testimony of a BOE fact witness, Kai Zhang. CIB at 131-132. There is a disconnect, however, between the claim language and Mr. Zhang's testimony. Although the claim language requires a first driver, second driver, second node, and a first, second, and third input terminal, Mr. Zhang does not use these terms in his testimony. Mr. Zhang's testimony thus does not explain *how* BOE's products correspond to the claim limitations. At most, Mr. Zhang provides factual background on the operation of the BOE products but this testimony does not support a conclusion of infringement.

Further, Mr. Zhang's testimony does not provide sufficient support even for the conclusions that Complainant reaches. For example, for limitation 1[b], Complainant asserts that

████████████████████████████████████████████████████████████

███████████████████████" and further asserts ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ . ████████████████████████████████████████████████████

████████████████████████████████████████████████ .

---

[44] Complainant notes that there is no "per sue rule that expert testimony is required to prove infringement." CRB at 42 (citing *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004)). I am not finding that Complainant failed to meet its burden due solely to the lack of expert testimony. Instead, as explained more fully below, Complainant failed to meet its burden because the evidence was insufficient to show that the claim limitations were met.

**CONFIDENTIAL MATERIAL OMITTED**

Other statements in Complainant's brief suffer from similar flaws. As another example, with respect to limitation 1[c], Complainant makes statements about how the circuits work, but the cited testimony does not sufficiently support Complainant's conclusion. For example, Complainant states that "█████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████ In support of these statements, Complainant cites to both the testimony above and another portion of Mr. Zhang's cross-examination. *Id.* (citing Tr. (Zhang) at 822:25-823:11, 830:15-25). In the newly cited testimony, Mr. Zhang confirmed that: ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ It is possible that one of ordinary skill in the art when reading this testimony would understand it to provide sufficient support for Complainant's conclusions, but without expert testimony, that is only an assumption. A lay person reading Mr. Zhang's testimony would not reach the conclusion that ████████████████ ████████████████████████████████████████████████████████ ████████████████████████ The technology here is complex. This is not, for example, a situation in which I can easily draw conclusions based on the facts to support a finding of infringement. Here, I would need to make too many assumptions and have a specific understanding regarding the functioning of circuits (similar to that of one of skill in the art) to make the connection between Mr. Zhang's testimony and Complainant's conclusions. For these reasons, I find that Complainant has not established that the ██ products meets limitations 1[b] or 1[c].

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Because Complainant cannot show how the ███ products meets all of the limitations of claim 1, it cannot show that the ███ product meets dependent claim 6. As such, I find that ███ does not infringe claim 6. Additionally, because Complainant relies on ███ as a representative product, I find that Complainant has not shown that any of the BOE Accused Products infringe claim 6.

### 2. Redesigned Products

BOE explains that it ████████████████████████████████████

████████████.” RIB at 76. BOE asserts that NIA █ does not meet limitation 1[c]. *Id.*



Complainant does not introduce any evidence of infringement. As such, it has failed to meet its burden to show that NIAs ████ infringe the '593 patent. *See Spansion*, 629 F.3d at 1349 (holding that complainant bears the burden of proving infringement of the asserted patent claims by a preponderance of the evidence).

### 3. BLF Accused Products

The BLF Respondents stipulated that Wholesale Gadget Parts' WGP-AP03118 is representative of all of the other BLF Accused Products. BLF Representative Products Stipulation at 4. The BLF Respondents also stated that they do not contest infringement of any of the asserted claims. BLF Undisputed Limitations at ¶ 3 ("The BLF Respondents dispute no claim limitation of the Asserted Claims with respect to infringement.").

CONFIDENTIAL MATERIAL OMITTED

Staff explains that "[t]he circuit diagrams prepared by Dr. Fontecchio for the Accused Products are substantially similar." SIB at 70. Thus, "Staff believes that the infringement disputes raised with respect to the Accused BOE Products apply equally to the Non-BOE Accused Products." *Id.* at 72.

I disagree with Staff that I should find noninfringement of the BLF Accused Products based on noninfringement arguments made with respect to the BOE Accused Products. Staff identifies two noninfringement positions with respect to claim 6. Neither of these noninfringement arguments apply here, despite the similarity in circuits. ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ There is no evidence to rebut these opinions. Thus, I am not persuaded that these noninfringement argument should prevail here.

Second, Staff's brief explains that Complainant did not meet its burden to show that limitations 1[b] and 1[c] were met by the BOE Accused Products because the only evidence supporting these limitations was excluded. SIB at 74 ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ *id.* at 75 ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ Dr. Fontecchio's evidence with respect to the BLF Accused Products was not struck and no party has argued that the evidence is insufficient to show infringement. CX-1629C-NCT (Fontecchio) at

CONFIDENTIAL MATERIAL OMITTED

Q/As 558-603. Thus, I am likewise not persuaded that this noninfringement argument merits a finding of noninfringement with respect to the BLF Accused Products. Accordingly, I find that the BLF Accused Products infringe claim 6 of the '593 patent.

### 4. Defaulting Respondents' Accused Products

Complainant has shown that the Defaulting Respondents' Accused Products meet the limitations of claim 6 of the '593 patent. CX-1629C-NCT (Fontecchio) at Q/As 642-645. Accordingly, I find that the Defaulting Respondents' Accused Products infringe claim 6 of the '593 patent.

### 5. Conclusion

As set forth above, I find that the BLF Accused Products and the Defaulting Respondents' Accused Products infringe claim 6 of the '593 patent. I further find that the BOE Accused Products and NIAs ███ do not infringe claim 6.

### C. Technical Prong

Complainant asserts that the ███ practices claim 6 of the '593 patent. CIB at 140. The parties agreed that the ███ is representative of other products, as shown below:

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



Representative Products Stipulation at 6.

BOE explains that "Dr. Fontecchio's flawed analysis was struck," and therefore Complainant is "unable to meet its burden to prove that S22 meets [1-a]/[1-b]/[1-c]." RIB at 77. BOE further asserts that, even if the evidence was not struck, Complainant's arguments "fail for the same reason that SDC was unable to prove infringement." *Id.*

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Staff agrees that Complainant "has not shown that the DI products satisfy limitations 1[b]–[c]." SIB at 76. Staff explains that "[t]he only evidence cited by SDC in support of its contention that the DI products have a 'first driver' that 'control[s] the voltage of [node N2a] in accordance with signals of the first input terminal, the second input terminal, and the third input terminal' as required by limitation 1[b] was struck." *Id.* at 77-78. Similarly, "[t]he only evidence cited by SDC in support of its contention the DI Products have a 'second driver' that 'control[s] the voltage of the first node in accordance with the signal of the second input terminal and the voltage of [node N2A]' as required by limitation 1[c] was also excluded." *Id.* at 78.

Complainant does not have any testimony from Dr. Fontecchio showing that the S22 Ultra practices limitations 1[b] and 1[c] of the '593 patent. CX-1629C-NCT (Fontecchio) at 206-210 (redacted testimony regarding these limitations). As it did with infringement, Complainant attempts to supplant its evidence with citations to a fact witness, Hwan-Soo Jang. Mr. Jang's testimony does not support Complainant's conclusions, however. For example, Complainant asserts that "[w]hen ▇ is ON, the signal of ▇▇▇▇▇ provided through ▇ to second node ▇" CIB at 143. Complainant cites to Q/A 21 of Mr. Jang's testimony, but this testimony does not mention ▇ at all. CX-1631C-NCT at Q/A 21. Additionally, Complainant states that "[w]hen ▇▇▇▇ signal is low, ▇ turns on, and ▇▇▇▇ signal is provided to ▇" CIB at 143. Complainant cites to an additional Q/A, but Mr. Jang does not reference ▇ in this testimony either. CX-1631C-NCT at Q/A 24. As was the case with respect to infringement, there needs to be testimony connecting the facts to which Mr. Jang testifies to the conclusion that Complainant draws from these facts. Here, there is not.

Similar problems occur with the remainder of Complainant's citations to Mr. Jang. As such, I find that Complainant has not established that the S22 Ultra practices limitations 1[b] or

1[c]. As such, Complainant has not established that any of the Domestic Industry Products practice the '593 patent.

### D.    Invalidity

BOE asserts that the '593 patent is invalid because: (1) U.S. Patent Pub. No. 2007/0063950 ("Shin") and U.S. Patent Pub. No. 2005/0185752 A1 ("Sasaki") renders claim 6 obvious (RIB at 79-81); (2) the terms "first node" and "second node" are invalid for lack of written description (*id.* at 84-85); and (3) "outputting unit," "first driver," and "second driver" are indefinite  *Id.* at 85.

As with the '599 patent, the opinions of BOE's primary invalidity expert, Dr. Foty, were struck. Order No. 60 (July 2, 2024). Likewise, BOE's other expert, Mr. Credelle, did not opine as to how the prior art references disclose each limitation of the asserted claims. *See generally* RX-0006C (Credelle). For these reasons, both Complainant and Staff assert that BOE cannot meet its burden to show that the patent is obvious. CIB at 150; SIB at 78.

### 1.    Shin/Sasaki

BOE argues that "Shin/Sasaki renders obvious claim 6." RIB at 79. According to BOE, Complainant "does not dispute that the combined Shin/Sasaki stage circuit discloses claims 1-2 and 6." *Id.* at 81. BOE further asserts that "[a] POSITA would have been motivated to combine Shin/Sasaki, by adding the 'anti-reversal' circuitry of Sasaki's Figure 4 embodiment . . . to Shin's Figure 11 embodiment, to ensure that the node voltage at the gate of Shin's transistor M2 is not 'reversed' during the control sequence." *Id.* at 79.

Complainant argues that "BOE presented no evidence or opinion showing how Shin and/or Sasaki purportedly disclose or render obvious any limitation of claim 6." CIB at 150. Complainant notes that "BOE does not provide any limitation-by-limitation analysis and relies on what Dr.

Foty's struck opinions allegedly 'would have constituted.'" CRB at 43. Complainant also asserts that "POSITAs would not have combined Shin and Sasaki." CIB at 150.

Staff argues that BOE's arguments with respect to motivation are "not supported by the testimony providing the viewpoint of a POSITA." SIB at 78. Staff explains that Dr. Foty's testimony was excluded and Mr. Credelle's testimony is "conclusory" and "does little more than state that he agrees with the excluded opinions of Dr. Foty." *Id.* Staff further asserts that BOE's argument with respect to motivation should be found waived pursuant to Ground Rule 14.2. SRB at 32.

I find that BOE has failed to meet its burden to show that Shin and Sasaki render claim 6 obvious. While BOE argues that Complainant does not dispute these limitations, BOE still bears the burden of proof.[45] By failing to cite to evidence or provide any explanation for how the limitations were disclosed by the references, BOE cannot show that this combination renders claim 6 obvious.[46]

Nor can BOE establish that one of skill would be motivated to combine Shin and Sasaki. BOE cites to the testimony of Mr. Credelle that one of skill would have been so motivated. RIB at 81. In this testimony, however, Mr. Credelle offers two opinions with respect to motivation. First, he states that he "agree[s] with Dr. Foty's discussion of this combination, his conclusion that a

---

[45] Even if limitations are undisputed, the party bearing the burden must cite to evidence. In fact, during a case management conference, BOE's counsel expressed that it was his understanding that "even if the private parties were to agree that a limitation was undisputed for purposes of invalidity or infringement, the party with the burden of proof would still need to provide some evidence . . . in order for the Commission to have a record to support the ultimate finding. 5/2/24 Tr. at 43:22-44:2. I confirmed that "if there's an agreement that something is uncontested, there can be a very short statement about that limitation or a citation even to expert testimony," but noted that "the burden still exists." *Id.* at 44:7-16.

[46] BOE has also waived its arguments per my Ground Rules.

POSITA would have been motivated to combine Shin and Sasaki, and the other related issues he has discussed." RX-0006C (Credelle) at Q/A 28. Because Dr. Foty's testimony was struck, any reference to the testimony is not probative.

Second, Mr. Credelle identifies his own motivation for combining the references. He states that "another motivation to combine Shin and Sasaki is to prevent floating nodes by adding an anti-reversal circuit comprising serially coupled transistors which can achieve stable output waveforms without distortion." RX-0006C (Credelle) at Q/A 28. According to Mr. Credelle, "distorted waveforms may cause errors in shifting gate signals to the next rows." *Id.* The evidence shows, however, that Shin already included a capacitor which addressed any potential floating state of the node. CX-1242C-NCT (Fontecchio) at Q/A 221. Dr. Fontecchio also testified that "a POSA would also recognize downsides, as adding elements to a circuit may increase complexity, decrease stability, and lower process yield." *Id.* Mr. Credelle does not adequately address this testimony. Accordingly, BOE does not establish, by clear and convincing evidence, that one would be motivated to combine the references.

As such, I find that BOE has not established that Shin and Sasaki render obvious claim 6 of the '593 patent.

### 2.    Secondary Considerations

Secondary considerations of nonobviousness may rebut a prima facie case of obviousness. Here, where BOE has not made out a prima facie case of obviousness, there is no showing to rebut. Accordingly, I need not consider any secondary considerations of nonobviousness.

### 3.    Written Description

BOE states that "[t]he ALJ adopted SDC's construction of 'node' – 'a point or area of interconnection between two or more components.'" RIB at 84. According to BOE, "[i]f SDC

applies 'node' so broadly as to cover 'nodes' encompassing intervening circuit elements . . . , its claims are invalid because there is no written description showing inventor Jang was in possession of that 'invention' and a POSITA would not know what the claimed 'nodes' are." *Id.* at 84-85.

Complainant argues that "BOE presented no evidence of failure to meet § 112." CIB at 152. Complainant states that "Mr. Credelle only conclusory asserts he 'agree[s] with Dr. Foty's discussion on the topic,' but notes that Dr. Foty's discussion "is not in evidence." *Id.*

Staff "believes that SDC's interpretation of the claims is incorrect." SIB at 79.

I first find that BOE's argument is too conclusory under my Ground Rules. BOE's entire argument consists of two sentences, an image, and a footnote.[47] Accordingly, BOE has waived the argument that the '593 patent is invalid under 35 U.S.C. § 112 for lack of written description.

Additionally, BOE does not support its arguments with the testimony of one of skill in the art. Because the question of whether a patent complies with the written description and enablement requirements is viewed from the perspective of one of skill, the failure to cite to such evidence means that BOE cannot meet its burden. *See Ariad*, 598 F.3d at 1351.

Accordingly, BOE has not shown that the '593 patent is invalid under 35 U.S.C. § 112 for lack of written description.

### 4.    Indefiniteness

According to BOE, Complainant "argues [1a-c]'s 'outputting unit,' 'first driver,' and 'second driver' encompass anything that affects or is affected by the voltage of some part of the circuit." RIB at 85. BOE asserts that "[u]nder SDC's interpretation, a POSITA would not know

---

[47] BOE's argument also appears conditional. BOE does not assert that the claim terms, as construed, lack written description. Instead, it asserts that an argument could be made, depending on Complainant's interpretation of the claims. RIB at 84 (stating that the term lacks written description "*[i]f* SDC applies 'node' so broadly…" but not stating that SDC did so).

what the outputting unit or first or second driver are because there is no way to judge the extend of control required by each unit or driver (as opposed to other circuit components) and the component's inputs and outputs are thus arbitrary, which renders the claims indefinite." *Id.*

Complainant argues that "BOE presented no evidence of failure to meet § 112." CIB at 152. Complainant states that "Mr. Credelle only conclusory asserts he 'agree[s] with Dr. Foty's discussion on the topic," but notes that Dr. Foty's discussion "is not in evidence." *Id.*

Staff "believes that SDC's interpretation of the claims is incorrect." SIB at 79.

I find that BOE's argument is too conclusory under my Ground Rules. BOE's entire argument consists of two sentences and fails to explain how the claim was indefinite. Accordingly, BOE has waived the argument that the terms "outputting unit," "first driver," or "second driver" are invalid as indefinite.

## VIII. ECONOMIC PRONG

Complainant asserts that there are three types of investments that satisfy the economic prong: (1) investments by its affiliate Samsung Electronics America ("SEA"); (2) investments in its U.S. based R&D lab, Samsung Display America Lab ("SDAL"), and (3) investments by its supplier Universal Display Corporation ("UDC"). CIB at 152-153.[48]

---

[48]Complainant states that "[t]he DI Products are discussed jointly because each DI Product practices at least one claim of each Asserted Patent." CIB 153 n.7. Respondents assert that Complainant's analysis is problematic if "the ALJ finds some, but not all, DI Products satisfy the technical prong for a particular Asserted Patent." RIB at 86. As noted above, I found that each of the representative DI Products practiced at least one claim of the '803, '578, and '599 patents. As such, it is appropriate not to conduct a separate analysis for each patent. *See Zircon Corp. v. Int'l Trade Comm'n*, 101 F.4th 817, 824 (Fed. Cir. May 8, 2024) ("In cases in which all the domestic industry products practice all the asserted patents, it follows from the language of section 337 and our case law that the complainant could satisfy the economic prong as to all asserted patents based on the entire product group."). I further note that, although I found that the technical prong was not met for the '593 product, none of the domestic industry products practice only that patent. *See* Representative Products Stipulation.

Complainant relies on investments in two categories of DI Products: (1) the AMOLED DI Products, which are displays modules manufactured by Complainant; [49] and (2) the Galaxy DI Products, which are Galaxy mobile devices manufactured by SEC that incorporate the AMOLED DI Products. Respondents and Staff assert that only investments in the first category of products should be included in the economic analysis, while Complainant asserts that it can rely on either category of products. I must therefore begin the analysis by defining the relevant domestic industry.

### A.    Relevant Domestic Industry

A domestic industry is generally defined in terms of the patented article. *See, e.g.*, *Certain Modular Structural Systems*, Inv. No. 337-TA-164, Comm'n Op., USITC Pub. 1668, at 12 (June 1984). The "articles requirement sometimes requires the Commission to determine what the appropriate domestic industry articles are." *Certain Integrated Circuit Chips and Products Containing The Same*, Inv. No. 337-TA-859, Comm'n Op. at 36 (Aug. 22, 2014) ("*Integrated Circuit Chips*") (*citing Certain Video Game Systems & Wireless Controllers and Components Thereof*, Inv. No. 337-TA-770, Comm'n Op. at 66-70 (Oct. 28, 2013) ("*Video Game*")); *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Comm'n Op. at 33-35

---

[49] Both Respondents and Staff assert that the patented article is an AMOLED panel, and not the AMOLED DI Products. RIB at 89; SIB at 81. Thus, as Staff notes "the AMOLED DI Products are downstream or secondary products incorporating the patented article," while "the AMOLED DI Products are components of Galaxy DI Products, which are tertiary products, i.e., a second tier of downstream products, incorporating the secondary product (the display module)." SIB at 81-82. Neither Staff nor Respondents argue, however, that it is inappropriate to establish a domestic industry based on the AMOLED DI Products. RX-1085C (Herrington) at Q/A 48 (arguing that "the AMOLED DI Products . . . are the appropriate article of commerce by which to evaluate the domestic industry"); RRB at 34 ("AMOLED DI Products . . . are the proper DI article"); SIB at 83 (asserting that "the relevant domestic industry can be defined in terms of display modules, such as the AMOLED DI Products").

(July 12, 2013), *rev'd on other grounds sub nom.*, *Lelo, Inc. v. ITC*, 786 F.3d 879 (Fed. Cir. 2015)). "The Commission has held that in certain circumstances, the realities of the marketplace require[] a modification" of that principal. *Certain Magnetic Tape Cartridges & Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 48 (Apr. 9, 2019) (internal quotations and citations omitted) ("*Magnetic Tape*"). Thus, in some exceptional circumstances, the Commission recognizes expenditures in a downstream product where a patented article "is not itself an actual article of commerce, but is physically incorporated as a component in a downstream article of commerce." *Video Game* at 66. In such circumstances, the Commission may, depending on the facts of each particular investigation, extend the relevant industry to the downstream article. *Id.*

The Commission has determined that the realities of the marketplace warrant crediting domestic investments in a handful of cases. The Commission summarized much of this history in *Magnetic Tape*. It noted that, in *Certain Personal Computers & Components Thereof*, the Commission credited domestic investments in a personal computer (the downstream product) when the software (the patented article) was an essential component of the computer and the computer could not be used without the software. Comm'n Op. at 48 (citing *Certain Personal Computers & Components Thereof*, Inv. No. 337-TA-140, USITC Pub. 1504, Comm'n Op. at 41 (Mar. 1984)). Next, the Commission discussed *Certain Double-Sided Floppy Disk Drives & Components Thereof*, a case in which the Commission credited domestic investments in a double-sided floppy disk drive (the downstream product) instead of limiting the domestic industry to the head assemblies incorporated in the disk drives (the patented article) "because it is the importation and sale of the disk drives that compete directly with the domestic activities of the patentee." *Id.* at 48 (citing *Certain Double-Sided Floppy Disk Drives & Components Thereof*, Inv. No. 337-TA-215, USITC Pub. 1860, Comm'n Op. at 17-18 (Oct. 15, 1985) ("*Floppy Disk Drives*")).

The Commission also discussed more recent cases in which investments in a downstream product were credited. The Commission stated:

> In a more recent example, the Commission in *Video Game Systems* found that the specification of the asserted patents made clear that the technology of the patented invention involved "a wand having certain transmitter and motion-sensitive circuitries that interact wirelessly with receivers or actuators distributed throughout the play facility." Comm'n Op. at 67-68. The Commission determined that the complainant was entitled to rely on expenses related to 'the claimed wand, [the] electronic receivers within the MagiQuest effect, and the relevant main server software that coordinates these effects," *id.* at 73, "which are central to enabling [the complainant] to exploit the technology of the claimed toy wands, but not on expenses relating to the entire MagiQuest attraction," *id.* at 70, such as the "physical space, design themes, physical props, other peripheral items, and sales and training staff," *id.* at 68.

*Id.* at 48-49. The Commission then discussed a 2014 decision in which an ALJ credited domestic investments in an S9 flow generator (the downstream product) because it found that the flow general "'is central to enabling [complainant] to exploit the patented technology of the H5i humidifier" given that the humidifier 'is designed to work only with the S9 flow generator,' and some of the 'H5i humidifiers are sold in a 'co-pack' with an S9 flow generator." *Id.* at 49 (citing *Certain Sleep-Disordered Breathing Treatment Systems & Components Thereof*, Inv. No. 337-TA-890, Initial Determination at 147 (Sept. 16, 2014)*, not reviewed in relevant part*, Comm'n Op. at 45 n.13 (Jan. 20, 2015) ("*Sleep-Disordered Breathing*")).

After discussing this precedent, the Commission concluded: "In sum, the Commission has credited domestic investments when they are made with respect to an 'essential,' 'necessary,' and/or 'integral' part of the article covered by the patent claims and/or is 'central to enabling' exploitation of the article covered by the patent claims." *Id.* at 50. The Commission also articulated the factors to consider in conducting this analysis. It stated: "Factors to consider regarding the realities of the marketplace analysis include whether the patented technology is sold as a separate

CONFIDENTIAL MATERIAL OMITTED

entity or article of commerce; whether it is an essential component of the downstream product; and whether the domestic industry activities have a direct relationship to exploitation of the patented technology." *Id.* at 48. Given this guidance from the Commission, I analyze each of the three factors below.

### 1.    Sold as a Separate Entity or Article of Commerce

Complainant argues that "the AMOLED DI Products can only be used in their corresponding Galaxy DI Products." CIB at 155. According to Complainant, "[t]he AMOLED DI Products are sold only from SDC to SEC as components for incorporation into the corresponding Galaxy DI Products, or as replacement parts for those Galaxy DI Products; they have no other use." *Id.*

Respondents assert that "[d]isplays are separate and distinct articles of commerce from phones." RIB at 87. According to Respondents, "[s]ince a distinct market exists for replacement displays, downstream phones are not DI articles." *Id.* Respondents also explain that the "alleged collaboration [between SDC and SEC] has no bearing on whether 'the patented technology is sold as a separate entity or article of commerce." RRB at 36.

Staff asserts that "both AMOLED panels and AMOLED DI Products are themselves articles of commerce." SIB at 82. Staff notes that display modules are sold to both distributors (for use as replacement displays) and by display manufacturers to mobile device OEMs, such as ███ ███████████ (for use in both new mobile devices and as replacement displays). *Id.* at 82-83. Staff therefore "believes that the relevant industry can be defined in terms of the display modules, such as the AMOLED DI Products." *Id.* at 83.

The evidence shows that the AMOLED DI Products are sold as separate articles of commerce. Complainant sells the AMOLED DI Products to SEC in arm's-lengths transactions.

**CONFIDENTIAL MATERIAL OMITTED**

Tr. (Kim) at 565:16-19 ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████ *see also* Tr. (Cho) at 611:16-19, 613:5-8. ███████████

███████████████████████████████████████████████████████████

███████████████████. CX-1627C (Vander Veen) at Q/A 34; CX-1603C (Sheppard Dep.)

at 118:8-14; CX-1633C (Cho) at Q/A 4; RX-1085C (Herrington) at Q/A 54, 59. ███████

███████████████████████████████████ CX-1603C (Sheppard Dep.) at 176:16-

22, 197:9-13; Tr. (Vander Veen) at 425:22-426:10. Thus, as Respondents note, "a distinct market

exists for replacement displays." RIB at 87. The AMOLED DI Products themselves are a product

that can be exploited from an economic perspective, even apart from their use in a Galaxy phone.

███████████████████████████████████████. RX-1085C (Herrington)

at Q/A 59; CX-1603C (Sheppard) at 118:8-14. When this occurs, ███████████████

███████████████████████████████████████ RX-1085C

(Herrington) at Q/A 59; CX-1603C (Sheppard) at 176:16-22. Further, the articles that Complainant

seeks to exclude are themselves the display modules – as opposed to a downstream product. *See*

*Floppy Disk Drives* (finding the definition of the products sought to be excluded to be relevant in

the analysis). As a whole, the evidence suggests that the AMOLED DI Products are, in fact, a

separate article of commerce.

Despite this finding, it is unclear if this factor weighs against crediting domestic

investments in the Galaxy DI Products. Even in situations in which the Commission has found that

a product is sold as a separate entity, the Commission concluded that a complainant could rely on

investments in a downstream product. For example, in *Sleep-Disordered Breathing*, the ALJ noted

that the patented article – the H5i humidifier – is "sometimes sold separately." Initial

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Determination at 149; *see also id.* 9 (noting that "the H5i humidifier and S9 flow generator are actually sold by [complainant] as separate articles"). Nevertheless, the ALJ found that the complainant could rely on the S9 flow generator because the H5i humidifier "cannot function on its own, and cannot practice the claims . . . without an S9 flow generator." *Id.* at 149; *see also Magnetic Tape*, Comm'n Op. at 52 (noting that, "[i]n *Floppy Disk Drives*, the Commission affirmed the ALJ's decision to define the domestic industry as the domestic operations devoted to the manufacture of double-sided floppy disk drives, rather than the head assemblies, even though the ALJ found the patent at issue was directed to the head assembly, and the head assembly was a separate article of commerce"). Thus, the fact that the downstream product was essential to the patented product was determinative, while the question of whether the patented article is a separate article of commerce carried less weight.

For these reasons, I do not consider this factor to weigh either for or against extending the domestic industry to the downstream product.

### 2. Essential Component of Downstream Product

Complainant asserts that "the AMOLED DI Products are indisputably central, essential components of the Galaxy DI Products, providing the means by which users interact with the smartphones' functionality." CIB at 155. Complainant also states that "the Galaxy DI Products are sold exclusively with, and cannot function properly without, their corresponding AMOLED DI Products." *Id.*

Respondents argue that ████████████████████████████████ ████████ RIB at 88. According to Respondents, ████████████████████████ ████████████ AMOLED DI displays ████████████████████████ RRB at 37. Respondents

CONFIDENTIAL MATERIAL OMITTED

further disagree that the fact that the AMOLED DI Products are customized for use in Galaxy phones favors a finding that the displays are essential components. RIB at 88.

I find that the AMOLED DI Products are essential components of the Galaxy DI Products. The evidence shows that the AMOLED DI Products are customized to work in the Galaxy DI Products and that the Galaxy DI Products are unable to function without the displays. *See, e.g.*, CX-1629-NCT (Fontecchio) at Q/A 38-39.

I am not persuaded by Respondents' argument that other displays can be used in place of AMOLED displays. In support of this statement, Respondents cite to the testimony of Coleman Bazelon and Mr. Herrington, as well as to Complainant's interrogatory responses. *See* RIB at 88 (citing Tr. (Bazelon) at 756:7-14; RX-1085C (Herington) at Q/A 60; Tr. (Herrington) at 969:18-24; RX-0714C.23). None of this evidence shows that ████████████████████████████ ███████████████████████████████████████. Instead, it shows only that, in theory, the Galaxy DI Products could be modified to operate with different displays. The fact that it is theoretically possible to modify a product so that it could work with other components does negate a finding that the existing component is essential.

Accordingly, I find that this factor weighs in favor of extending the domestic industry to the Galaxy DI Products.

### 3.    Direct Relationship of Exploitation of the Patented Technology

Complainant asserts that "the benefits of the Asserted Patents are exploited by the AMOLED DI Products only through their corresponding Galaxy DI Product." CIB at 153. It further notes that "it is undisputed (i) the claimed inventions (displays) can only be practiced if used in a device providing requisite input signals and power, and (ii) the Asserted Patents offer particular benefits for use in smartphones." *Id.* at 156. Complainant states: "The very purpose of

CONFIDENTIAL MATERIAL OMITTED

an AMOLED DI Product is to display useful information to a user," which is "impossible without it being assembled as an integral part into its corresponding Galaxy DI Product and into the hands of consumers." *Id.*

Respondents argue that "SEA's domestic activities regarding Galaxy DI Products have nothing to do with the patented technology in the display's pixel arrangement, stage circuits, or pixel circuits." RIB at 89. Respondents explain that "the Asserted Patents apply to a stand-alone display panel (which includes the pixel arrangement and the scan and circuit drivers) and do not cover the additional components in a display module, much less in a Galaxy smartphone." *Id.*

Staff contends that this factor is "[p]erhaps the most important." SIB at 86. Staff notes that SEA's activities pertaining to the Galaxy DI Products "do not have a 'direct relationship' to the patented pixel arrangements, pixel circuits, and stage circuit." *Id.* Staff notes that Complainant's expert, Dr. Vander Veen, "places SEA's investments into ▮ functional groups," but that the "relationship between the patented technology and the activities performed by these groups is extremely attenuated." *Id.*

The Commission has stated that when a downstream product is essential to the use of the patented article a direct relationship to that component is shown:

> If a patented article practices the patent claim, but the patented article cannot function on its own without a non-patented product, or in other words the non-patented product is essential to the practice of the patented article, then the non-patented product necessarily has a direct relationship to the exploitation of the patented technology. In this case, while the claimed subject matters of the Media Patents can be practiced without a tape drive, there is no dispute that the tape media is useless without a tape drive. In other words, the tape drive is necessary to bring the patented technology to the consumer market.

*Magnetic Tape*, Comm'n Op. at 56. In *Magnetic Tape*, the Commission also rejected the respondent's argument that, in prior cases, while the patents "did not 'directly claim' components

of the separate article of commerce . . . those components were expressed in the claims in a manner that made them necessary to define the invention claimed." *Id.* Instead, the Commission noted that, in both *Sleep-Disordered Breathing* and *Video Game*, "the complainants were entitled to rely on expenses that were needed to ensure that the patented articles could be used by consumers." *Id.* at 57.

I do not, however, read this opinion as indicating that the Commission assumes that all investments in the non-patented product can be included in the domestic industry. For example, in *Magnetic Tape*, the respondent and Staff argued that "investments in maintenance [and] research and development" were too "far removed from the technology protected by the patent." Comm'n Op. at 54. The Commission disagreed but reached its conclusion based on the evidence in the record showing that the investments had a "direct relationship to exploitation of the patented technology." *Id; see also id.* at 55 (explaining that "Sony has established that IBM's domestic 3592 drive development work is devoted to improving the interoperability of the 3592 tape media with drives"). The Commission also noted that the specifications for the two patents at issue "make clear that Sony's claimed inventions are intended to improve the performance of tape media when they are used in conjunction with tape drives." *Id.* at 54. Thus, a complainant cannot simply state that the patented article cannot function on its own without a non-patented product and expect each and every investment in the non-patented article to be credited. Instead, there must be some showing that the domestic industry investments either have a direct relationship to the exploitation

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

of the patented technology or are necessary to ensure that the patented articles could be used by consumers.[50]

I find that Complainant has not made such a showing here. As Staff notes, the domestic activities fall into ██ categories:



---

[50] Respondents cite to *Certain Printing & Imaging Devices*, Inv. No. 337-TA-690, Comm'n Op., 2011 WL 1303160, at *15 (Feb. 7, 2011) ("*Printing & Imaging Devices*") for the proposition that "[w]hen domestic activities do not have a direct relationship to exploitation of the patented technology, this weighs against including those unrelated activities in DI." RIB at 88. *Printing & Imaging Devices* did not address whether to extend the "article protected by the patent" to a downstream product. Instead, in *Printing & Imaging Devices*, the Commission discussed the determination of whether an investment was "significant in relation to the articles protected by the intellectual property right concerned." 2011 WL 1303160, at *15. While both use the phrase "articles protected" by an intellectual property right, they are different inquiries. Additionally, I note that *Magnetic Tape* does not discuss *Printing & Imaging Devices*, thus further indicating that the Commission does not consider the analysis conducted with respect to whether investments are significant or substantial to be the same as the analysis that should be applied when determining whether the realities of the marketplace warrant extending the investments to a downstream product.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



SIB at 86-87. Complainant does not, however, demonstrate how any of these activities relate to the exploitation of the patented technologies or show how the investments are necessary to ensure that the patented articles (*i.e.* the displays) could be used by consumers. *See, e.g.*, CIB at 160-161 (providing brief explanations for the different categories but failing to articulate the relationship between these investments and the exploitation of the patented technologies); *see also id.* at 162 (making only a conclusory allegation that "[e]ach of these U.S.-based activities of SEA and its employees . . . ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████"); *see also* CRB at 50. Complainant instead states that "the AMOLED display cannot be used without the Galaxy smartphone" (*see* CIB at 153) and therefore assumes that all investments are properly considered.

Such a showing would be particularly helpful here where some of the claimed investments appear to be far removed from the patented technology. One of the categories of investments is ██████████████████ CIB at 160. According to Complainant, ███████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ Complainant does not provide a further description of what these investments even are or describe how they

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

relate to bringing the Galaxy DI Products to the market.[51] Complainant also includes investments in its ████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*

Once again, Complainant does not show why investments in training should be considered. *See also Video Game*, Comm'n Op. at 68 (declining to find that the articles protected by the patents extended to investments in training retail personnel). Without such evidence, I find that Complainant has not met its burden to show that this factor weighs in favor of extending the domestic industry to the Galaxy phones.

Further, the circumstances of this case present a complicated picture that underlines the importance of establishing such a relationship. This is not a case in which the "imported product is a component of a complete downstream product." *Video Game*, Comm'n Op. at 67. Both the

████████████████████████████████████████████████

██████████████████████████████████████ CX-1636C-NCT-PSC (Pyon) at Q/A 13. ███████████████████████████████

---

[51] Complainant does cite to the testimony of Dr. Vander Veen after its description of this category. CIB at 160. My Ground Rules do not, however, permit parties to forgo making arguments in their brief and instead cite to evidence. Ground Rule 14.2. Additionally, even if this testimony were considered, it does not provide the link between the investments and the exploitation of the patented technology. Dr. Vander Veen's testimony indicates that these ████████████ ████████████████████████████████████████████████ ████████ CX-1627C-NCT (Vander Veen) at Q/A 50. He then asserts ████ ████████████████████████████████████████████████ ████████████ While consumers may desire these features, neither Complainant nor Dr. Vander Veen have demonstrated that the investments are necessary to ensure that the patented articles could be used by consumers. Instead, they seem more akin to the "physical space, design themes, physical props, other peripheral items, and sales and training staff" that the Commission found could not be included in *Video Game*. Comm'n Op. at 68.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



██████. *Id.* Complainant ████████████████████████████. While Complainant and ██████

████████████████████████████████████████████████████████████████████████

██████████████. Tr. (Kim) at 565:16-19; Tr. (Cho) at 611:16-19, 613:5-8. Complainant also

████████████████████████████████████████████. *See, e.g.*, CX-1635C (Kim)

at Q/A 10-11. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████. Tr.

(Kim) at 574:23-575:5. ████████████████████████████████████████████

████████████████████████████.[52] RX-1085C (Herrington) at Q/A 54; Tr. (Vander Veen) at

424:9-11. At the time this occurs, the Galaxy DI Products are ████████████████ Tr. (Vander

Veen) at 461:1-16. As such, the facts of this investigation are distinguishable from other instances

in which the Commission has extended the domestic industry to downstream products. *See Video

Game*, Comm'n Op. at 67 (distinguishing cases that extended the domestic industry to the

downstream product because those cases "involve[d] complainants that assemble a product in the

United States that contains a patented component").

Accordingly, I find that this factor weighs against extending the domestic industry to the

Galaxy DI Products.

**4.    Conclusion**

For the reasons sets forth above, I find that factor two weighs in favor of including

investments in the DI Galaxy Products in the domestic industry analysis, factor three weighs

against such inclusion, and factor one is neutral.

---

[52] As noted above, ████████████████████████████████████████████████████
CX-1603C (Sheppard Dep.) at 118:8-14

CONFIDENTIAL MATERIAL OMITTED

The Commission does not explicitly indicate what weight each of these factors has. Its precedence, however, suggests that the third factor is the most important. In *Magnetic Tape*, the Commission indicated that it has "credited domestic investments when they are made with respect to an 'essential,' 'necessary,' and/or 'integral' part of the article covered by the patent[53] and/or is 'central to enabling' exploitation of the article covered by the patent claims." Comm'n Op. at 50. Additionally, in *Video Game*, the Commission explained that the "[m]ore important[]" inquiry is whether the alleged domestic industry activities "have a direct relationship to exploitation of the patented technology." Comm'n Op. at 67. A domestic industry may not extend to activities that are "far removed from the technology protected by the patent." *Id.* As such, I find that factor three carries great weight. Thus, I conclude that, overall, the facts here do not demonstrate that the realities of the marketplace warrant extending the domestic industry analysis to the downstream product.

Additionally, while not part of the three-factor test articulated by the Commission, I note that there does not appear to be precedent that allows a complainant to rely on a customer's investments in a downstream product. *See* SRB at 36. As noted above, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

*See, e.g.*, CX-1635C (Kim) at Q/A 10 (explaining that SEC and SEC are "separate and distinct companies that operate independently"); Tr. (Vander Veen) at 420:10-14 (SEA is a subsidiary of

---

[53] I note that this is different from the second factor. While both use the word "essential," the second factor determines whether the patented technology is an essential component of a downstream product while, here, the Commission considers whether the domestic investments in the downstream product are "essential" (or necessary or integral) to the patented article as covered by the claims.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

SEC). Complainant also ███████████████████████████████. CX-1635C (Kim)

at Q/A 11 ████████████████████████████████████████████████

██████████████████████████████████████████”). Nor does Complainant

assert that ███████████████████████. *See* Tr. (Vander Veen) at 421:11-14 (███

████████████████████████████████████). Thus, the facts here can be

distinguished from other instances in which the definition was expanded. *See, e.g.*, *Magnetic Tape*,

Comm'n Op. at  39 (complainant relied on investments by a company that had expressly licensed

the asserted patents and that had "authorization to manufacture articles and/or have articles

manufactured on IBM's behalf that are both protected by the Asserted Patents and that would

otherwise be subject to a claim of infringement but for Sony's authorization"); *Video Game*,

Comm'n Op. at 64-70 (complainant relied on its own investments and those of its licensees); *Sleep-

Disordered Breathing* Initial Determination at 149 (complainant relied on its own investments in

the H5i humidifier and the co-pack that also includes the S9 Flow Generator); *Certain Artificial

Eyelash Extension Sys., Prods., & Components Thereof*, Inv. No. 337-TA-1226,, Initial

Determination at 117-123 (Oct. 28, 2021) (complainant relied on its own investments in its

argument that the domestic industry should be expanded); *Certain Personal Computers &

Components Thereof*, Inv. No. 337-TA-140, USITC Pub. 1504, Comm'n Op. at 41 (Mar. 1984)

(complainant relied on its own investments in personal computers). While I reached the conclusion

that the domestic industry should not be expanded without consideration of this lack of precedence,

it is unclear if an expansion of the domestic industry would even be permissible in situations such

as this one. Thus, I give less weight to this set of facts, but I do consider it to weigh against

extending the domestic industry to the downstream products.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Finally, Complainant's theory assumes that the default is to extend the domestic industry to the downstream products. That is not so. Such an extension is the exception to the rule. *See, e.g.*, *Certain Modular-Structural Systems*, Comm'n Op. at 12 (explaining that a domestic industry is generally defined in terms of the patented article). It is not automatic. *Video Game*, Comm'n Op. at 66 (Oct. 28, 2013) (explaining that, in certain circumstances, "the Commission **may**, depending on the facts of each particular investigation, extend the relevant 'industry' to a downstream article of commerce incorporating the patented component") (emphasis added). Given the complications of this investigation addressed above, I find that such an extension is not warranted here.

## B.    SEA

For its first economic prong theory, Complainant relies on investments in the Galaxy DI Products by SEA. *See* CIB at 159-164. Because I find that it was improper to rely on investments in the Galaxy DI Products, Complainant did not meet its burden to show that the economic prong has been met under this theory. *See* Tr. (Vander Veen) at 420:21-25 (acknowledging that he did not present an analysis of SEA's investments based on the AMOLED DI Products).

## C.    SDAL

Complainant's second economic prong theory relies on investments in the AMOLED DI Products by SDAL. SDAL is a research and development center located in California. CX-1632C (Park) at Q/A 6. It ███████████████████████████████████████████ *Id.* at Q/A ████████████████████████████ ███████████████████████████████████ and therefore ███████████████████ ██████████████████ *Id.* Complainant has identified approximately ████████████ █████████████████████████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

██████. CX-1627C-NCT (Vander Veen) at Q/As 95-96. Complainant states that ████████

█████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

CDX-0002C.NCT.20; *see also* CX-1627C-NCT (Vander Veen) at Q/A 99. Complainant contends that these investments are both qualitatively and quantitatively significant. CIB at 166.

Respondents assert that there are numerous problems with Complainant's reliance on SDAL's investments to prove a domestic industry: (1) "SDC's witnesses do not believe displays are the appropriate article"; (2) "SDAL's investments are not 'with respect to the articles protected by the patent"; (3) "SDC's allocation methodology is flawed and overstated"; (4) "The purported SDAL DI expenses are overstated, unsupported, and/or not cognizable"; (5) SDAL's investments are unrelated to the asserted patents and therefore entitled to less weight"; (6) "SDAL's investments are not qualitatively significant"; and (7) "SDAL's investments are not quantitatively significant." RIB at 97-104. Finally, Respondents assert that Complainant waived its arguments regarding SDAL pursuant to Ground Rule 14.2. RRB at 44.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Staff states that "SDC's allocations of SDAL investments appear to be inflated." SIB at 89. Staff notes that "[i]t is unclear which – if any – of the research projects relied on by SDC were implemented in the AMOLED DI Products." *Id.* Staff further asserts that SDAL's investments are not quantitatively significant. *Id.* According to Staff, Complainant's first two comparisons "compare SDAL with itself, and the third compares SDAL with an SDC research facility in Japan." *Id.* Staff states that "[t]hese comparisons fail to show that SDC's U.S. investments in the AMOLED DI Products are significant." *Id.* Staff also argues that Complainant has not shown qualitative significance as ████████████████████████████████████████ ████████████████████████████ *Id.* at 92.

Even assuming that Complainant properly allocated qualifying investments, I find that Complainant did not meet its burden to show that SDAL's investments are either qualitatively or quantitatively significant.

### 1.    Qualitative Significance

Complainant includes one sentence about qualitative significance in its briefs: "Because SDAL provides key contributions to SDC's R&D work related to the AMOLED DI Products and its location in the U.S. facilitates those contributions, SDAL's DI investments and activities are qualitatively significant." CIB at 166; *see also* CRB at 57 (not directly addressing qualitative significance and simply asserting that "SDAL's investments are significant"). This statement is conclusory and fails to explain *how* the investments are significant. It does not, for example, identify what "key contributions" SDAL purportedly provides or how these "key contributions" relate to the AMOLED DI Products. As such, Complainant has waived this argument pursuant to Ground Rule 14.2.

**CONFIDENTIAL MATERIAL OMITTED**

Even if Complainant had not waived this argument, the evidence does not show that SDAL's investments are qualitatively significant. The evidence shows that most of the SDAL projects have not been implemented in DI Products. RX-1085C (Herrington) at Q/A 126-127. Rather, as Staff explains, SDAL's research projects generally fall into three categories: ███ █████████████████████████████████████████████████████████████ ████████████████ SIB at 89 (citing CX-1632C-NCT (J. Park) at Q/A 33). Mr. Park did not specifically explain how any of these projects related to the AMOLED DI Products. CX-1632C-NCT (J. Park) at Q/A 33, 58, 61, 64.[54] ███████████████████████████ ████████████████████████████████████████████████████████████. *Id.* at Q/A 65-66. ████████████████████████████████████████████████ █████████████████████████ As such, Complainant has not met its burden to show that SDAL's investments are qualitatively significant.

### 2. Quantitative Significance

As with qualitative significance, Complainant only includes one sentence in its brief with respect to quantitative significance: "SDC's U.S. R&D investments in the AMOLED DI Products are quantitatively significant compared to (i) total investments in SDAL, (ii) SDAL's total investments in R&D, and (iii) the budget of SDAL's sister lab in Japan (SDJL), a reasonable

---

[54] During re-direct, Mr. Park provide some testimony as to how these categories relate to AMOLED displays. This testimony, however, was very general and conclusory. Tr. (Park) at 598:5-16 ████████████████████████████████████████████████████████████ ████████████████████████████████ *also id.* at 598:17-599:8 ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

PUBLIC VERSION

**CONFIDENTIAL MATERIAL OMITTED**

comparator." CIB at 166.[55] This statement is also conclusory. It simply states that the investments are significant but fails to address why or provide any detail. As such, Complainant has waived this argument pursuant to Ground Rule 14.2.

Because Complainant failed to show qualitative and quantitative significance of SDAL's investments, it did not meet its burden to show that the economic prong has been met under this theory.

### D.    UDC

Complainant's final economic prong theory relies on investments in the AMOLED DI Products by UDC. UDC is a United States corporation headquartered in New Jersey. CX-1604C (███ Dep.) at 17:9-13. UDC develops and supplies in the United States phosphorescent organic light-emitting diodes materials ("PHOLED" or "dopants") for OLED displays. *Id.* at 17:14-22. UDC supplies red and green dopants to SDC. *Id.* at 91:7-14.

Complainant asserts that its "reliance on UDC is consistent with Commission precedent finding investments in U.S.-subcontracted components and services may satisfy the DI requirement." CIB at 167. According to Complainant, UDC provides ██████████ ████████████ and "SDC's purchases of dopants undoubtedly lead to increased investment in personnel and other R&D and manufacturing expenditures by UDC." *Id.* Complainant asserts that UDC's allocated investments in the AMOLED DI Products are as follows:

---

[55] Complainant's reply brief adds very little. It states: ████████████ ████████████████████████████████ CRB at 57.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



CDX-0002C-NCT.25; *see also* CX-1627C-NCT (Vander Veen) at Q/A 124. Complainant contends that these investments are qualitatively significant as the dopants are ███████

████████████████████████████ CIB at 170. ████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

    Respondents argue that I should reject Complainant's DI theory based on UDC's investments for five reasons: (1) "UDC's investments are not creditable to SDC under [*Lelo Inv. v. ITC*, 786 F.3d 879 (Fed. Cir. 2015)]"; (2) Complainant's "purported UDC DI expenses are overstated"; (3) "Dr. Vander Veen's allocation methodology is flawed and unreliable"; (4) Complainant "has not established UDC's investments are qualitatively significant"; and (5) Complainant "has not established UDC's investments are quantitatively significant." RIB at 105-111.

Staff agrees with Respondents that Complainant cannot demonstrate a domestic industry based on UDC's investments. Staff argues that "SDC's purchases of PHOLEDs from UDC are not cognizable under *Lelo*." SIB at 93. Staff further asserts that Complainant has not shown that UDC's investments are either quantitatively or qualitatively significant. *Id.* at 94-95.

### 1.    Qualifying Investments

A complainant cannot rely on its purchase of "off-the-shelf" products to establish a domestic industry. *See, e.g.*, *Lelo*, 786 F.3d at 885 (stating that "[t]he purchase of so called 'crucial' components from third-party U.S. suppliers are insufficient to satisfy the 'significant investment' or 'significant employment of labor or capital' criterial of § 337 where there is an absence of evidence that connects the costs of the components to an increase of investment or employment in the United States"). A complainant can, however, rely on investments made by third parties if there is evidence to show that the third party's investments are attributable to the domestic industry products. *See Certain Solid State Storage Drives, Stacked Elecs. Components, & Prods. Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 24 (June 29, 2018) ("In contrast to the 'retailer' suppliers in *Lelo*, who simply sold 'off-the-shelf' components, the evidence shows that the third-party entities here are, in fact, contractors, who provide specialized services, and do not simply sell 'off-the-shelf' products"); *id.* at 26 ("[C]onsistent with *Lelo*, the record contains data indicating the labor and capital attributable to the services provided to BNI for work related to the Altima I drive."); *see also Certain Collapsible Sockets for Mobile Elec. Devices & Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 18-19 (July 9, 2018) ("Since *Lelo*, the Commission has found evidence insufficient where the complainant relied on supplier payments without providing evidence regarding its suppliers' relevant investments in the complainant's products.").

CONFIDENTIAL MATERIAL OMITTED

Here, the record contains evidence with respect to the investments UDC makes to manufacture and develop dopants. CX-3093C; *see also* CX-1627C-NCT (Vander Veen) at Q/A 113. UDC did not, however, produce evidence that shows specific investments in the dopants used in the Domestic Industry Products. Instead, Dr. Vander Veen performed two allocations to determine the amount. First, Dr. Vander Veen sought to determine what percentage of UDC's work was attributable to Complainant using information on UDC's revenues. CX-1627C-NCT (Vander Veen) at Q/As 121-122. Second, Dr. Vander Veen sought "to identify the work correlated specifically to materials used in the Samsung Display AMOLED DI Products." *Id.* at Q/A 121. The second allocation was performed ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████" *Id.* at Q/A 123. The results of these calculations are shown in the chart included above.

I find, however, that there are flaws in Dr. Vander Veen's analysis. His analysis assumes that the dopants sold by UDC all count as qualifying investments, *i.e.*, they are not "off-the-shelf" components and are instead customized products, such that the investments can be attributed to the AMOLED DI Products. While the products may not be "off-the-shelf" in the colloquial sense, I do not find it to be a binary choice between "off-the shelf" and customized. In this case, the evidence shows that certain dopants are more akin to "off the shelf" than they are akin to being characterized as "customized," as those terms are defined by the Commission. In other words, the evidence does not support a finding that they are customized products. While Complainant asserts that ██████████████████████████████████████████████████████████████████ ████████████████████████ the evidence it cites is not sufficient to establish that this statement is true. CIB at 167. First, it cites to testimony from SDC employee Jin-Kyong Ham. *Id.* (citing Tr.

**CONFIDENTIAL MATERIAL OMITTED**

(Ham) at 377:10-17, 382:25-384:14; CX-1634C (Ham) at Q/A 9, 15-17, 25-29). Ms. Ham testified

that ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████e. Tr. (Ham) at 377:10-17, 382:25-

383:13, 383:17-384:13; CX-1634C (Ham) at Q/A 9, 15-17, 24-29. Complainant also cites to the

testimony of Dr. Vander Veen. CIB at 167 (citing CX-1627C (Vander Veen) at Q/A 102-103). Dr.

Vander Veen likewise confirmed his understanding that █████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████ CX-1627C-NCT (Vander Veen) at Q/As 102-103. Finally, Complainant cites

to the deposition testimony of ██████████ UDC's CFO. CIB at 167 (citing CX-1604C (██████)

at 136:2-14). ██████████ testified that ████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████. CX-1604C (██████ at 136:2-14.

The evidence shows that at least some of the dopants used in the domestic industry products

were preexisting. As Respondents explain: ████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ for non-

DI phones. RIB at 106; *see* Tr. (Vander Veen) at 434:22-25 (confirming that ██████████

███████████████████████); *see also* Tr. (Ham) at 376:20-25 (agreeing that it appears that

███████████████████████████████████). Further, ███████████████████

███████████████████████████" RIB at 106.; *see* Tr. (Vander Veen) at 434:22-

25 (confirming that ███████████████████████████). Thus, while ████████████

███████████████████████████████████████████████████████████████████████

the evidence does not show that ████████████████████████████████████████████

CONFIDENTIAL MATERIAL OMITTED

█████████.[56] Without this connection, one cannot rely on allocations such as the ones performed by Dr. Vander Veen. Instead, allocating investments in this way would necessarily include investments related to dopants that were not developed for the DI products, but instead were essentially "off the shelf" dopants that already existed. Because the allocated investment amount includes non-qualifying investments, I cannot find that Complainant met its burden to prove a domestic industry based on the investments by UDC.

### 2.    Quantitative Significance

I also find that Complainant has not demonstrated that UDC's investments are quantitatively significant. Complainant bases its significance argument on the fact that ████████ ████████████████████████████"[57] CIB at 170. This analysis does not demonstrate the significance of the investments with respect to the Domestic Industry Products. As Staff notes: "The only thing that this comparison shows [is] that UDC is based primarily in the U.S." SIB at 94.[58]

---

[56] Complainant does not dispute this evidence. Instead it asserts that the fact ████████ ████████████████████████ CRB at 57. But if a product was customized to be used in a non-DI product, it is difficult to see how those investments can be attributed to the AMOLED DI Products. The statute specifies that the investments must be with respect to the articles protected by the patent. 19 U.S.C. § 1337(a)(3). It does indicate that a domestic industry can be found based on the investments of the complainant generally. Complainant does not offer an answer to this concern.

[57] Both Respondents and Staff address two other theories regarding quantitative significance that Complainant set forth in its pre-hearing brief. RIB at 111; SIB at 94-95. Complainant waived these theories by failing to assert them in its post-hearing brief. Ground Rule 14.2.

[58] This is different than the scenario where all the investments in a domestic industry product occurred in the United States. In that case, one could say the U.S. investments were significant on the grounds that there are not any foreign investments. Here, there are numerous other types of investments in the Domestic Industry Products that occur outside of the United States.

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

For these reasons, I find that Complainant did not meet its burden to show that the economic prong has been met under this theory.

**E.    Conclusion**

I find that Complainant has not shown that the economic prong of the domestic industry requirement is satisfied

**IX.    CONCLUSIONS OF LAW**

1.    The importation or sale requirement of section 337 has been satisfied.

2.    Commission Rule 210.12(a)(7) has been satisfied.

3.    The ███████████ products, the BLF Accused Products, and the Defaulting Respondents' Accused Products infringe claims 5 and 21 of U.S. Patent No. 9,818,803.

4.    The █████ products infringe claim 21 of U.S. Patent No. 9,818,803.

5.    NIAs ████ do not infringe U.S. Patent No. 9,818,803.

6.    The technical prong of the domestic industry requirement for U.S. Patent No. 9,818,803 has been satisfied.

7.    Claims 1-4 and 21 of U.S. Patent No. 9,818,803 are not invalid under 35 U.S.C § 102 for anticipation.

8.    Claims 5 and 21 of U.S. Patent No. 9,818,803 are not invalid under 35 U.S.C § 103 for obviousness.

9.    The ████████████████ products, the BLF Accused Products, and the Defaulting Respondents' Accused Products infringe claims 5, 10, 17, 40, and 41 of U.S. Patent No. 11,594,578.

10.    The █ product infringe claims 5, 10, 17, and 40 of U.S. Patent No. 11,594,578.

11.    The ██████ products infringe claims 5, 10, 40, and 41 of U.S. Patent No. 11,594,578.

12.    NIAs ████ infringe claim 47 of U.S. Patent No. 11,594,578.

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

13. The technical prong of the domestic industry requirement for U.S. Patent No. 11,594,578 has been satisfied.

14. Claims 5, 10, 17, 40, 41, 45, and 47 of U.S. Patent No. 11,594,578 are not invalid under 35 U.S.C § 103 for obviousness.

15. U.S. Patent No. 11,594,578 is not invalid for lack of written description.

16. U.S. Patent No. 11,594,578 is not invalid for indefiniteness.

17. The ███████████████████████ products, the BLF Accused Products, and the Defaulting Respondents' Accused Products infringe claims 15 and 16 of U.S. Patent No. 7,414,599.

18. The ███████████████ products infringe claim 15 of U.S. Patent No. 7,414,599.

19. NIAs█████ do not infringe U.S. Patent No. 7,414,599.

20. The technical prong of the domestic industry requirement for U.S. Patent No. 7,414,599 has been satisfied.

21. Claims 2, 3, 13, 15, and 16 of U.S. Patent No. 7,414,599 are not invalid under 35 U.S.C § 103 for obviousness.

22. U.S. Patent No. 7,414,599 is not invalid under 35 U.S.C. § 112.

23. The ████████████████████████████ products and NIAs█████ do not infringe claim 6 of U.S. Patent No. 9,330,593.

24. The BLF Accused Products and the Defaulting Respondents' Accused Products infringe claim 6 of U.S. Patent No. 9,330,593.

25. The technical prong of the domestic industry requirement for U.S. Patent No. 9,330,593 has not been satisfied.

26. Claim 6 of U.S. Patent No. 9,330,593 is not invalid under 35 U.S.C § 103 for obviousness

27. U.S. Patent No. 9,330,593 is not invalid for lack of written description.

28. U.S. Patent No. 9,330,593 is not invalid for indefiniteness.

29. The economic prong of the domestic industry requirement has not been satisfied.

## X.    RECOMMENDED DETERMINATION ON REMEDY AND BOND

The Commission's Rules provide that the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event the Commission finds a violation of section 337 and the amount of bond to be posted by respondents during Presidential review of any Commission remedies. *See* 19 C.F.R. § 210.42(a)(l)(ii).

### A.    General Exclusion Order

Section 337(d)(2) provides that a general exclusion order ("GEO") may issue in cases where (a) a general exclusion from entry of articles is necessary to prevent circumvention of an exclusion order limited to products of named respondents; or (b) there is a widespread pattern of violation of Section 337 and it is difficult to identify the source of infringing products. 19 U.S.C. § 1337(d)(2). The statute essentially codifies Commission practice under *Certain Airless Paint Spray Pumps and Components Thereof*, Inv. No. 337-TA-90, Comm'n Op. at 18-19, USITC Pub. 119 (Nov. 1981) ("*Spray Pumps*"). *See Certain Neodymium-Iron-Boron Magnets, Magnet Alloys, and Articles Containing the Same,* Inv. No. 337-TA-372 ("*Magnets*"), Comm'n Op. on Remedy, the Public Interest and Bonding at 5 (USITC Pub. 2964 (1996)) (statutory standards "do not differ significantly" from the standards set forth in *Spray Pumps*). In *Magnets*, the Commission confirmed that there are two requirements for a general exclusion order: (1) a "widespread pattern of unauthorized use;" and (2) "certain business conditions from which one might reasonably infer that foreign manufacturers other than the respondents to the investigation may attempt to enter the U.S. market with infringing articles." *Id.* The focus now is primarily on the statutory language itself and not an analysis of the *Spray Pump* factors. *Ground Fault Circuit Interrupters and Prods. Containing Same*, Inv. No. 337-TA-615, Comm'n Op. at 25 (Mar. 9, 2009).

Complainant submits that a GEO is appropriate in this Investigation. CIB at 171. Respondents disagree. RIB at 112. Staff disagrees that a GEO is warranted for AMOLED displays manufactured for OEMs and used by the OEMs as replacement displays. SIB at 97. Staff asserts, however, that a GEO covering AMOLED displays that are not manufactured for OEMs and are instead sold on the aftermarket is warranted. *Id.* at 98.

### 1.    Circumvention of a Limited Exclusion Order

Complainant argues that "[f]actors warranting a GEO to prevent LEO circumvention include 'expansive supply chains'; 'use of third parties to import and source the products'; 'sourcing imported accused products from domestic suppliers'; 'use of generic . . . packaging'; 'masking of identities and product sources'; 'Internet operations'; 'operat[ing] under multiple names'; and 'low barriers of entry and ease of replication of operations." CIB at 171 (quoting *Certain Luxury Vinyl Tile & Components Thereof*, Inv. No. 337-TA-1155, Comm'n Op. at 9-11 (Oct. 5, 2020).

Respondents assert that Complainant "has not alleged unsuccessful attempts to address infringement" and has not established that "any Respondent would evade an LEO." RIB at 113. Respondents note that "BOE voluntary intervened . . . and spent time and money developing redesigns." *Id.*

Staff supports a GEO issued for AMOLED displays that are not manufactured for OEMs and are instead sold on the aftermarket. SIB at 98. Staff does not, however point to any evidence that any respondent would circumvent the limited exclusion order.

The evidence does not demonstrate that a GEO is warranted due to circumvention of a limited exclusion order. BOE voluntarily intervened in this Investigation. Order No. 7 (Mar. 13, 2023), *not reviewed*, Comm'n Notice (Mar. 23, 2023). The BLF Respondents incurred expenses

to participate in this investigation. It is unlikely that these respondents would appear and expend resources to challenge Complainant's contentions if they intended to later circumvent any exclusion orders that may be entered. Nor is there evidence that the defaulting respondents would circumvent the limited exclusion order ("LEO"). While ten respondents defaulted, seven of these respondents filed Notices of Intent to Default. EDIS Doc. ID 795043 (Capitan Mobile Parts); EDIS Doc. ID 800042 (Electronics Universe d/b/a Fixez.com and Repairs Universe); EDIS Doc. ID 801052 (DFW Imports LLC d/b/a DFW Cellphone and Parts); EDIS Doc. ID 800907 (Parts4Cells Inc.); EDIS Doc. ID 801054 (Gadgetfix Corp.); EDIS Doc ID 800359 (LCTech International Inc. d/b/a SEGMobile.com);  EDIS Doc. ID 801172 (eTech Parts Plus). Given that these seven entities made the effort to appear in the investigation and decided to default only due to cost, it is less likely that they would ignore LEOs. Additionally, the Commission has stated that evidence that a party defaulted is not alone sufficient to establish that a GEO is necessary to prevent circumvention of a limited exclusion order. *Certain Apparatus & Methods of Opening Containers*, Inv. No. 337-TA-1255, Comm'n Op. at 12 (May 6, 2022) ("While the Commission agrees that the Defaulting Respondents' ignoring of the proceedings below suggests future noncompliance with a LEO directed to them, the Commission notes that such evidence alone is insufficient to establish that a GEO is necessary to prevent circumvention of a LEO directed to respondents found in default.").

Complainant cites to *Certain Luxury Vinyl Tile & Components Thereof* for the proposition that the Commission considers various factors when determining the likelihood that a respondent will circumvent an LEO. In that investigation, however, the complainant sought a GEO against ten respondents who had defaulted. Comm'n Op. at 2. The situation is different when a majority of the respondents appeared in the investigation and many of those respondents participated. Additionally, in *Luxury Vinyl*, the Commission explained that "the Defaulting Respondents have

**CONFIDENTIAL MATERIAL OMITTED**

altered their corporate structures, changed their names or addresses, created new entities, or operated under multiple names." *Id.* at 9. Here, there is not evidence that respondents have attempted to evade identification by adopting such methods. Rather, Complainant's arguments rest on speculation and assumptions. *See, e.g.*, CIB at 171 (asserting that "Respondents could easily re-route Accused Products through these opaque supply chains").[59] I also note that Complainant does not make any specific allegations that the three respondents who defaulted and did not appear (Group Vertical, Sourcely Plus, and Mengtor) have shown any indication that they will attempt to circumvent the LEO.

For these reasons, I find that the evidence does not support a finding that a general exclusion order is necessary to prevent circumvention of an LEO directed to the Respondents.

### 2.     Widespread Pattern of Unauthorized Use

Complainant asserts that "[t]he number of Respondents . . . and Accused Products . . . demonstrates a pattern of violation." CIB at 175. Complainant further asserts that "[s]upply chain complexity underscores the pattern" that "retailers sell Covered Products online from unidentified sources," "new infringers can easily enter the market," and that "attempts to evade Customs are common." *Id.*

---

[59]   Complainant asserts that "certain Respondents have faced forfeiture actions involving Customs," but the document to which Complainant cites is from former respondent Mobile Defenders. CIB at 175 (citing CX-1105C.15). Additionally, the document indicates that Mobile Defenders believed that the forfeiture was based on a misunderstanding. CX-1105C.15

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMITTED

Respondents argue that "there cannot be widespread violation because SDC (the patentee), ██████████████████████ and BOE (subject to LEO) manufacture around 90% of AMOLED displays." RIB at 112.

I find that there is not sufficient evidence to show a widespread pattern of unauthorized use with respect to AMOLED displays. Mr. Herrington testified that "[t]he manufacturers of AMOLED displays, or panels, for mobile devices are known, limited, and tracked extensively by industry analysts." RX-1085C (Herrington) at Q/A 193. He explained that, according to data produced by both Complainant and BOE, a ████████ AMOLED display manufacturers "comprised over ████ of the market, based on units shipped." *Id.* at Q/A 194 (citing RX-0031C). ████████ these display manufacturers are responsible for "████████████ of the market for AMOLED displays for smartphones." *Id.* ████████████████████████████████ ██████████████████████████. *Id.* Complainant did not cite to evidence to contradict this testimony. Thus, the evidence shows that ████████████ of AMOLED displays would be manufactured by entities that would not be subject to an LEO or would not have a legal right to practice the patents. Complainant has not shown how this amounts to a "*widespread* pattern of unauthorized use."

Nor does the evidence show that the manufactured AMOLED display products will be imported by companies other than the Respondents. Complainant asserts that the supply chains are opaque and that discovery "revealed ████████ replacement-display suppliers." CIB at 171. The so-called "opaque" part of the supply chain relates to the entities that purchase manufactured AMOLED display products from manufacturers and sell them to distributors overseas. As BOE notes, the fact that this part of the supply chain may be opaque is irrelevant. What matters is whether the identity of the companies that import the AMOLED displays into the United States is

opaque. The evidence shows that it is not. Complainant's expert, Dr. Bazelon, favorably cited evidence that the Respondents in this Investigation are the "major – and possibly the only – distributors of Covered Products in the U.S." CX-1245C (Bazelon) at Q/A 10, 17. If this is true, then it is not possible for there to be a "widespread pattern" of other entities that would attempt to import infringing products into the United States. As Respondents note, "an LEO will cover both the source of replacement displays and their importation into the U.S." RRB at 48.

### 3. Conclusion

For these reasons, I recommend against issuing a GEO.

### B. Limited Exclusion Order

If the Commission determines that a GEO is not warranted, Complainant requests that LEOs issue against each respondent. CIB at 171.

Respondents do not disagree that LEOs would be an appropriate remedy but indicate that "[a]ny LEO should be subject to . . . carve-outs, certifications, and tailoring." RIB at 112.

Staff asserts that "[i]f a violation is found, an LEO is warranted with respect to infringing AMOLED display modules and panels imported for use as replacement displays." SIB at 98. Staff also "submits that it would be appropriate to include" certification provisions which would allow an importer "to certify that the articles it seeks to import are not excluded from entry under the exclusion order" because there are redesigns adjudicated not to infringe and to "allow the importer to certify that a display is not being used as a replacement display." *Id.*

I recommend entry of an LEO. I further recommend that the LEO should include a certification provision. *See Certain Multiple Mode Outdoor Grills & Parts Thereof*, Inv. No. 337-TA-895, Comm'n Op. at 56 (Feb. 20, 2015) ("[I]t has been Commission practice for the past several years to include certification provisions in all exclusion orders to aid . . . CBP in enforcing

the Commission's remedial orders."). I do not, however, recommend that the LEO should specifically exempt redesigns, other non-infringing products, or licensed products or note that the exclusion order is limited to the patent(s)/claims(s) found to be infringed. Such exemptions are unnecessary, as these products can be certified to CBP as non-infringing. *See Certain Robotic Floor Cleaning Devices & Components Thereof*, Inv. No. 337-TA-1252, Comm'n Op. at 73 (Apr. 13, 2023) ("Nor does the Commission need to carve out an exemption for products that were adjudicated as non-infringing because those products would not be subject to the exclusion order and can be certified to CBP as non-infringing.").

### 1.    Limiting LEOs to Replacement Displays

Respondents further request that any exclusion order "be limited to replacement displays per the NOI and SDC's Amended Complaint and Public Interest Statements." RIB at 118. Specifically, "[d]isplays installed in downstream products or to be used for testing or other non-replacement purposes should be excluded." *Id.*

Complainant previously indicated that the plain language description of the accused products is "active matrix organic light-emitting diode ('AMOLED') display panels and modules used as replacement displays for mobile devices comprising organic pixel elements for presenting information to a viewer which infringe one or more claims of the Asserted Patents, and components thereof." 88 Fed. Reg. 7,463 (Feb. 3, 2023). As such, the scope of the investigation is limited to replacement displays. *See* CIB at 178 ("Any remedial order should cover the NOI's definition of 'covered articles,' encompassing replacement AMOLED displays (panels and modules) for mobile devices"). I therefore recommend that the exclusion order include a certification provision which would allow the importer to certify that a display is not being imported for use as a replacement display. *See Certain Automated Mech. Transmission Sys.*, Inv. No. 337-TA-503, Comm'n Op.,

CONFIDENTIAL MATERIAL OMITTED

2005 WL 8152027, at * 3 (May 9, 2005) ("[T]he scope of the remedy is dependent upon the scope of the investigation, which is determined by the notice of investigations.").

Respondents also assert that the Commission "should expressly carve-out testing by mobile device providers in the U.S." RIB at 119. I recommend that the Commission adopt such a carve-out. As Mr. Herrington explained:

> [I]n order to become a supplier of screens for OEM devices, I understand Respondent Mianyang BOE may need to manufacture sample display screens for OEM customers to test prior to purchasing. These screens would not be imported into the US for replacement purposes, but instead for testing and validation to determine whether they are suitable to be included as original displays in a particular type of OEM device.

RX-0005C (Herrington) at Q/A 68. Thus, such phones are not replacement displays and are not within the scope of the investigation. As noted above, I therefore recommend that the exclusion order include a certification provision which would allow the importer to certify that such displays are not being imported for use as a replacement display.

### 2.    License

BOE asserts that ▮▮▮▮ has a license to the Asserted Patents and therefore "[a]ny remedy should carve-out sales to or importations by ▮▮▮▮/other licenses." RIB at 114.

Complainant disagrees that BOE's display sales are licensed. CIB at 179. According to Complainant, "[t]he Agreement does not license third parties to supply components, let alone replacement components." *Id.*

I do not agree that the record supports a finding that ▮▮▮▮ has a license to the Asserted Patents. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

█████████████████████████████████████████████████████████████

███████████████████████████

BOE argues that ████████████████████████████ and thus the Accused

Products fall within the scope,[60] but BOE's argument is conclusory. RIB at 115. BOE does not

cite to any law or evidence, other than the Agreement itself, regarding the scope of the agreement.

*See Id.* at 114-115. ████████████████████████████



███████████████████ BOE does not introduce evidence that refutes this understanding of

the agreement. Accordingly, BOE has not established that the ██████████████ provides a

license to the BOE displays sold to ███████

## C.    Cease and Desist Orders

Section 337(f)(1) provides that the Commission may issue cease and desist orders ("CDO")

to respondents found to be in violation. *See* 19 U.S.C. § 1337(f)(1).

### 1.    BLF Respondents

Complainant argues that CDOs are warranted against the BLF Respondents because each

maintains commercially significant domestic inventory. CIB at 177. Staff agrees that "a CDO is

appropriate against any BLF Respondent found in violation." SIB at 99.

---

[60] ███████████████████████████████████████████████████████
████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

The BLF Respondents stipulated that they maintain inventories of the Accused Products in the United States. *See* CX-1324C; CX-1325C; CX-1326C. Further, testimony from the corporate representatives for the BLF Respondents supports a finding that the inventory is significant. For example, Injured Gadget's corporate representative, ███████████, testified that Injured Gadget's "goal is to maintain a ████████ amount of inventory." CX-1619C (████████ at 175:7-176:4. The representatives for Phone LCD Parts and Wholesale Gadgets provide similar testimony. *See* CX-1626C (█████ at 106:6-109:19 (testifying that Phone LCD Parts generally maintains ██████████████████); CX-1605C (██████ at 141:9-17 (testifying that Wholesale Gadgets goal is to maintain ███████████████████). As such, I recommend that CDOs issue against the BLF Respondents.

### 2. Defaulting Respondents

Complainant also seeks CDOs against the Defaulting Respondents. CIB at 177. When a party has been found in default, the Commission infers commercially significant domestic inventories or significant domestic operations with respect to the infringing articles. *Certain Plant-Derived Recombinant Serum Albumins ('rHsa") & Prods. Containing Same*, Inv. No. 337-TA-1238, Comm'n Op. at 66 (Oct. 11, 2022) ("In the case of named respondents in the United States who have been found in default or who have not participated in the investigation, the Commission has inferred commercially significant domestic inventories or significant domestic operations with respect to the infringing articles"). Accordingly, I recommend that CDOs issue against each of the Defaulting Respondents.

### 3. BOE

Finally, Complainant seeks a CDO against BOE. CIB at 177. Complainant notes that BOE maintains inventory through its related entity, BOE Technology America ("BOEA"). *Id.*

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

Complainant asserts that "BOEA supports Accused Product sales to ███ including through importing samples and discussions regarding meeting ███ technical specifications." *Id.*

BOE disputes that a CDO is necessary. RIB at 114. BOE notes that it ████████ ██████████████████████████ itself and that Complainant "is not entitled to a CDO simply because BOE has an affiliated company in the U.S." *Id.* BOE also argues that Complainant "fails to identify any evidence BOE would use its U.S. operations to undermine an exclusion order." *Id.*

Staff "does not view the extent and nature of BOEA's U.S. activities as being sufficient justification for a CDO." SIB at 99. Staff notes that Complainant "does not allege that BOEA sells, imports, or maintains inventories of replacement AMOLED displays for mobile devices." *Id.*

I find that Complainant has not established that CDOs should issue against BOE. Complainant does not cite to any evidence indicating the inventory levels in the United States. *See* CIB at 177. At most, the evidence shows that BOE has an affiliated company with a U.S. presence, but the evidence cited by Complainant does not demonstrate that this presence is "significant." *See* RX-1082C (Mu) at Q/A 5-9; CX-1069C (Mu) at 22:21-24:5, 140:2-142:16, 144:10-145:10, 162:14-22. Instead, the evidence supports the opposite conclusion: that BOE's presence in the U.S. is limited. *See* RX-1082C (Mu) at Q/A 5-9 (testimony that BOE does not have significant domestic operations in the U.S., that ████████████████ to support accused devices, and that BOE Technology America ██████████████████████████████████); CX-1069C (Mu) at 22:21-24:5, 140:2-142:16, 144:10-145:10, 162:14-22 (testimony indicating that BOE Technology America ████████████████████████ ████████ and that ████████████████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

█████). As such, Complainant has not met its burden to demonstrate that a CDO is warranted against BOE.

It is therefore my recommendation that a CDO should issue in this Investigation against the BLF Respondents and the Defaulting Respondents but should not issue against BOE.

**D.    Bond**

Complainant does not seek a bond.

**E.    Public Interest**

In connection with this Recommended Determination, and pursuant to Commission Rule 210.50(b)(1), 19 C.F.R. § 210.50(b)(1), the Commission ordered that the presiding administrative law judge

> shall take evidence or other information and hear arguments from the parties or other interested persons with respect to the public interest in this investigation, as appropriate, and provide the Commission with findings of fact and a recommended determination on this issue, which shall be limited to the statutory public interest factors set forth in 19 U.S.C. 1337(d)(1), (f)(1), g(1).

Before issuing a remedy for a violation of section 337, the Commission must consider the effect of the remedy on the following public interest factors: (1) the public health and welfare; (2) competitive conditions in the U.S. economy; (3) the U.S. production of articles that are like or directly competitive with those that are the subject of the investigation; and (4) United States consumers. 19 U.S.C. §§ 1337(d)(1), f(1). The Commission begins this analysis with the understanding that the public interest favors the protection of intellectual property rights by excluding infringing products. *See, e.g.*, *Certain Magnetic Data Storage Tapes & Cartridges Containing the Same (II)*, Inv. No. 337-TA-1076, Comm'n Op. at 64 (June 20, 2019). It is rare for the Commission to determine that the public interest considerations outweigh the patent holder's rights. *See Spansion Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1360 (Fed. Cir. 2010). The

Commission can, however, tailor the remedy to minimize the impact on the public interest. *See, e.g., Certain Personal Data & Mobile Commc'ns Devices & Related Software*, Inv. No. 337-TA-710, Comm'n Op. at 83 (delaying the effective date of an exclusion order based on competitive conditions in the U.S. economy).

Respondents do not argue that the public interest weighs against issuing any remedy. Instead, Respondents assert that "[t]he Commission should exercise its discretion to include a certification provision and carve-outs to protect the public interest." RIB at 115. Staff agrees. SIB at 103 ("If a violation is found, in the Staff's view public interest considerations favor certain carve-outs but do not favor denying relief entirely or delaying the effective date of an exclusion order"); *see also* SRB at 42.

### 1.    Public Health and Welfare

In their pre-hearing brief, Respondents asserted that any remedial order would impede the health and welfare by reducing access to telemedicine and education. RPHB at 385. Respondents do not maintain this argument in their post-hearing brief.

Complainant contends that the public health and welfare would not be negatively impacted by a remedy. CIB at 180. Staff notes that any concern for consumers "is adequately addressed by the carve-outs . . . and the availability of the redesigned products." SIB at 103.

Respondents do not cite to any evidence that remedial orders would negatively impact the public health and welfare. Additionally, I am persuaded by Staff's argument that any such concerns could be adequately addressed by the repair carve out addressed below. It is therefore my recommendation that this factor does not weigh against the issuance of remedial orders.

### 2.    Competitive Conditions in the United States Economy

Respondents do not address this factor. Complainant asserts that "[e]nforcing IP rights promotes competitive conditions in the economy." CIB at 180. Staff asserts that "reasonable substitutes for the excluded products will be available, as BOE has already designed around the patents." SIB at 104.

Respondents do not cite to any evidence that remedial orders would negatively impact the competitive conditions in the United States economy. It is therefore my recommendation that this factor does not weigh against the issuance of remedial orders.

### 3.    Production of Like or Competitive Articles in the U.S.

Respondents do not address this factor. Complainant asserts that "consumers would continue to have many lawful sources of replacement displays" and notes that "there are no domestic display manufacturers." *Id.* Staff "is unaware of any evidence showing the production of like and competitive articles in the U.S. or that any such production will occur in the foreseeable future." SIB at 104. Staff therefore asserts that this factor "does not favor or disfavor denying or delaying relief the effective date of an exclusion order." *Id.*

Respondents do not cite to any evidence regarding this factor. It is therefore my recommendation that this factor does not weigh for or against the issuance of remedial orders.

### 4.    Effect on U.S. Consumers

Complainant asserts that "the remedies will not adversely affect U.S. consumers." CIB at 180. Complainant states that "Respondents' contrary arguments lack evidentiary support and are predicated solely on incorrect speculation that the remedies will cause a supply shortfall, constrict consumer choice, and increase prices." *Id.*

Respondents argue that Complainant cannot meet demand. RIB at 115. Respondents further state: "Even assuming SDC had capacity to replace excluded displays, there is no evidence it would do so, let alone within a timeframe that would not harm U.S. consumers." *Id.* at 116. Respondents also note that "[i]f SDC eventually began to supply these replacement displays, the lack of alternative supply would drive up the price." *Id.* at 117. Finally, Respondents assert that the requested remedies "are contrary to the Right to Repair and would cause widespread non-performance of contracts and warranties." *Id.*

Staff asserts that Complainant's argument that it can satisfy demand "suffers from two flaws." SIB at 104. "First, SDC relies on an unreliable estimate that significantly undercounts the number of displays potentially excluded." *Id.* "Second, SDC has not shown that it has the capacity or willingness to undertake the design and customization efforts necessary for SDC to provide displays for mobile devices for which it does not already manufacture replacement displays." *Id.*

As an initial matter, I find that the following facts are undisputed: (1) "Internet access is very important" to United States consumers. Tr. (Bazelon) at 753:23-25: (2) "[T]here are some U.S. consumers whose only device to access the Internet is a smartphone." *Id.* at 754:6-9; (3) A damaged display "could prevent a U.S. consumer from using" their smartphone. *Id.* at 754:13-755:1; and (4) It is "beneficial to U.S. consumers to be able to repair their Smartphones by replacing damaged displays." *Id.* at 755:2-7. Taking these facts together, I find that it is in the public interest for U.S. consumers to have the ability to repair damaged displays. As such, it is necessary to consider whether U.S. consumers would have that ability if remedial orders were put into effect, whether the "right to repair" has an impact on the remedy, and whether the evidence shows that prices would increase if a remedy was implemented.

CONFIDENTIAL MATERIAL OMITTED

### a)     Capacity to Replace Displays

The parties dispute whether U.S. consumers would have access to a sufficient supply of replacement displays if remedial orders were put into effect. There are several underlying factual issues involved in this analysis: (1) the number of displays that would be covered by an exclusion order; (2) whether Complainant would have sufficient manufacturing capacity to replace the displays covered by the exclusion order; and (3) whether any shortfall in the capacity of Complainant to replace the covered displays could be overcome in other ways.

### i)     Number of Covered Displays

Complainant estimates that approximately ▉▉▉▉ products would be covered by a remedial order. Complainant bases this estimate on testimony from Dr. Bazelon, who stated that "U.S. demand for the Covered Products impacted by the requested remedial orders should be less than ▉▉▉▉ displays annually." CX-1245C (Bazelon) at Q/A 16. Dr. Bazelon's estimate, however, excludes ▉▉▉▉▉▉▉▉▉▉. *Id.* at Q/A 11. The evidence shows, however, that BOE sells replacement displays to both ▉▉▉▉▉▉. CX-1635C (Kim) at Q/A 11; CX-3992C at 7-10. While the record does not include data regarding the number of such displays, it is apparent that Dr. Bazelon's estimate undercounts the displays that would be excluded if BOE was no longer permitted to provide replacement displays to entities ▉▉▉▉▉▉▉▉ ▉▉ I therefore find that Dr. Bazelon's estimate of products that would be covered by a remedial order is unreliable.

Staff argues that "over 10.23 million replacement displays could be subject to the requested remedial orders." SIB at 107. Staff explains that "[i]n 2017, 50 million smartphone owners accidentally 'broke' their displays." *Id.* at 106 (citing CX-870.1). Staff notes that "[s]ixty-two percent – or 31 million – of smartphones with damaged displays were repaired." SIB at 106 (citing

**CONFIDENTIAL MATERIAL OMITTED**

CX-870.2). Staff further states that ████████████████████████████████████

████████████████████████████████████ *Id.* at 107. Thus, Staff asserts that ██

████████████████████████████████████████ *Id.*

I am not persuaded that Staff's estimate is reliable either. The source upon which Staff relies indicates that 38% "of smartphone owners with a cracked screen don't get them fixed." CX-0870.2. This does not mean that 62% of consumers have their displays replaced, however. Instead, some of those consumers purchase an entirely new phone. Dr. Bazelon estimates that as much as 44%-64% of the 62% of consumers choose this option. CX-1245C (Bazelon) at Q/A 19-21; *see also* Tr. (Bazelon) at 776:4-6 (testifying that between 36-56% of consumers repair their display).

Respondents assert that a more accurate estimate would be that between 3.7 million and 7.7 million users replace their displays annually. *See* RIB at 116. Complainant does not set forth an argument for why this amount would be incorrect. CIB at 180-181 (asserting only that, under either estimate, it would have the capacity to fulfill replacement displays); CRB at 61-62. I therefore find that it is more accurate to say that approximately 3.7-7.7 million displays would be covered by any remedial order.

### ii)    Complainant's Capacity to Supply Displays

Complainant asserts that, regardless of the number of covered displays, it "has more than sufficient capacity to satisfy demand." CIB at 181. According to Complainant, it "had capacity to manufacture ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ *Id.*

**CONFIDENTIAL MATERIAL OMITTED**

Respondents doubt that Complainant's capacity information is accurate. Respondents assert that "SEC's Annual Business Reports show SDC is operating at 100% capacity for OLED panel manufacturing." RIB at 116. Respondents further note that the evidence upon which Dr. Bazelon relies is litigation-created and "includes estimates and assumption that make it impossible to determine SDC's planned capacity." *Id.* Respondents also assert that "there is no evidence" that Complainant would be able to replace excluded displays "within a timeframe that would not harm U.S. consumers." *Id.*[61]

Staff argues that "SDC has not shown that it has the capacity or willingness to undertake the design and customization efforts necessary for SDC to provide displays for mobile devices for which it does not already manufacture replacement displays." *Id.*

Even taking Complainant's capacity numbers at face value, the evidence shows that Complainant could not simply replace covered replacement displays with displays it has in inventory or is prepared to manufacture. *See* CX-1627C (Vander Veen) at Q/A 21 ("displays are manufactured to be used in particular mobile devices, and cannot be used interchangeably"). The evidence shows: ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[61] Respondents argue that there is evidence that Complainant ████████████ ████████ RIB at 116. Respondents' argument here is conclusory and is thus waived. Additionally, the only evidence cited by Respondents is the cross-examination of Dr. Bazelon. Such testimony was permitted over an objection, but only for impeachment purposes and was not to be used as substantive evidence. Tr. (Bazelon) at 765:13-768:19.

**PUBLIC VERSION**
<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Accordingly, the evidence shows that there would be some delay in supplying replacement screens to U.S. consumers if a remedial order was entered, even if the evidence is not clear on the length of the delay.[62]

Further, there is no evidence that Complainant would agree to manufacture such displays. Complainant did not introduce any testimony from witnesses providing such assurances. *See* SIB at 108 ("There is no evidence that SDC ██████████ (or even BOE with its redesigns) would be able to or willing to manufacture replacement displays for products for which it does not already manufacture displays").

I also find that the evidence does not conclusively show that Complainant has the capacity to replace displays. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

████████████████████████████████████

_____

████ Complainant asserts tha ████████████████████████████████████

████████████████████████████████████████████████ CRB at 63. Complainant does not provide its own estimate of the time it would take to begin supplying displays for these phones.

PUBLIC VERSION

<span style="color:red">**CONFIDENTIAL MATERIAL OMITTED**</span>



Thus, the evidence is not sufficient for me to find that Complainant has the capacity to satisfy demand for replacement displays. *See, e.g.* Tr. (Bazelon) at 761:14-762:6 (acknowledging that most companies track their maximum existing capacity but that he did not ask Complainant for this information).[63]

### iii)    Other Ways to Replace Covered Products

Complainant suggests that, even if it were unable to replace the number of covered displays, any shortfall could be met in other ways. Specifically, Complainant asserts that:

---

[63]

CONFIDENTIAL MATERIAL OMITTED

██████████████████████ █ ██████████████████████

████████████████████████

    There is not sufficient evidence to show that other companies could help to satisfy the demand for covered displays. ██████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

    Finally, the evidence does not demonstrate that consumers could obtain replacement displays from pulls, refurbished displays, and service packs. Complainant cites to evidence that,

---

[64] Complainant explains that pulls are "undamaged displays taken from one device and put in another," refurbished displays are "removed from damaged devices and refurbished," and "service packs" are "new replacement-display assemblies manufactured by or for OEMs and resold by third parties." CIB at 180 n. 12.

CONFIDENTIAL MATERIAL OMITTED

████████████████████████████████████████████████████

████████████████████████████████. CRB at 64 (citing CX-1245C (Bazelon) at Q/A

13-14). The capacity of the Distributor Respondents is, however, irrelevant because, if an

exclusion order is entered, the Distributor Respondents may not be able to sell these displays. *See*

SIB at 108 ("[T]he pulls, service packs, and refurbished displays would only potentially fall

outside of the exclusion order if the displays had been manufactured by SDC ████████"); *see* Tr.

(Bazelon) at 783:5-784:5, 785:19-23 (testifying that pulls, refurbished screens, and service packs

that include a display that was not manufactured by Samsung Display ████████████████████

████████████ would still be potentially covered by an exclusion order). Complainant does not

cite to any evidence indicating how many of these displays fall into that category. Additionally,

the record does not contain evidence that there are pulls, service packs, and refurbished displays

for all of the models of displays that would be excluded.

Accordingly, I find that the evidence does not show that either Complainant or other

entities would be able to fulfil the demand for replacement displays if remedial orders were

entered.

### b)     Right to Repair

Respondents argue that "[t]o promote U.S. competition, President Biden prioritized the

'right to repair,' including limited repair restrictions on smartphones." RIB at 117. Respondents

assert that "[t]he Requested Remedies in this Investigation are in opposition to public policy

objectives promoted by [this] right to repair legislation." *Id.* Respondents also assert that remedial

---

[65] Complainant defines "Distributor Respondents" as: Captain Mobile Parts, DFW Imports, eTech
Parts, Electronics Universe, Gadgetfix, Group Vertical, Injured Gadgets, LCTech, Mengtor,
MobileSentrix, Mobile Defenders, Parts4Cells, Phone LCD Parts, Sourcely Plus, and Wholesale
Gadget Parts. CIB at v.

orders "would result in limited access to and higher cost for replacement displays," such that "repair companies may be unable to meet warranty and insurance claims." *Id.* at 118. Thus, "warranty and insurance contracts Americans purchased to ensure their smartphones work" would be devalued. *Id.*

Complainant argues that "[t]he remedies are fully consistent with right-to-repair laws or policies." CIB at 183. Complainant states that "[t]he FTC has said 'assertion of IP rights does not appear to be a significant impediment to independent repair" and notes that the FTC "has never brought an enforcement action related to repair restrictions that would negate IP rights." *Id.* Finally, Complainant asserts that "the 'right to repair' must be considered alongside other policy goals, including U.S. interest in reducing supply-chain risks and dependence on China due to national security concerns and unfair trade practices by Chinese state-owned companies like BOE." *Id.*

Staff asserts that "any potential negative effects on the ability of U.S. consumers [to] purchase displays for self-repairs will be adequately mitigated by the proposed carve-outs and the potential availability of redesigns." SIB at 104 n. 14.

As noted above, it appears to be mostly undisputed that functioning smartphones are essential to U.S. consumers. The "right to repair" initiatives underline this fact. Respondents do not argue that the right to repair initiatives would prevent the ITC from entering remedies against display modules that are found to be infringing. I am therefore not persuaded that the right to repair separately weighs in favor of finding that remedies would adversely impact U.S. consumers.

### c)     Price Increase

Respondents assert that "SDC's prices are already higher than BOE." RIB at 116-117. According to Respondents, "[i]f SDC eventually began to supply these replacement displays, the lack of alternative supply would drive up the price." *Id.* at 117.

Complainant asserts that "[e]xcluding lower-priced infringing products is not a cognizable PI harm." CIB at 183. Complainant also states that "Respondents failed to substantiate the remedies would affect price." *Id.* at 183-184.

The evidence does not show that the price would necessarily increase if Complainant was able to manufacture a sufficient number of displays to replace the displays excluded by remedial orders. Respondents cite to Mr. Herrington, who testified that "increased prices will impact the entire supply chain, including OEM mobile device manufacturers, downstream distributors, independent repair shops, and the U.S. consumer." RX-0005 (Herrington) at Q/A 27. He further explained that "[i]t is a basic economic principle that, a decrease in the supply of a product, in the presence of unchanged consumer demand, results in higher prices." *Id.* at Q/A 37. Mr. Herrington did not, however, provide any specifics on the possible increase in price. As noted below, I recommend a carve-out to fulfill warranty and insurance contracts. Thus, the premise underlying Mr. Herrington's testimony may not come to fruition. As such, I do not find that a potential price increase weighs in favor of further modifying any remedial order.

### d)     Conclusion

For the reasons set forth above, it is my recommendation that this factor weighs against the issuance of remedial orders.

CONFIDENTIAL MATERIAL OMITTED

### 5.     Scope and Duration of Remedial Orders

Because I recommend a finding that remedial orders would have a negative effect on U.S. consumers, I must also consider whether the scope of the duration of remedial orders could be modified to address this effect. Respondents suggest that I recommend certain carve-outs and delay the entry of any exclusion order.

### a)     Warranty Carve-Out

Respondents argue that "[i]f an exclusion order issues, the Commission . . . should grant an exemption to allow BOE and its customers to fulfill service and warranty obligations." RIB at 118. Staff agrees that such a carve-out is appropriate. SIB at 100.

Given the public interest factors discussed above, I recommend an exemption with respect to displays imported for replacement under existing warranties and insurance contracts, existing supply contracts to repair shops, and existing supply contracts to entities supplying replacement displays to U.S. consumers for "do-it-yourself" repairs. The evidence shows that such an exemption would alleviate burdens on consumers so that they have functioning devices. RX-0005C (Herrington) at Q/A 23, 27, 38, 54-55, 60, 67 (explaining that "[a] tailored exclusion order ensuring that OEMs, ████████, may continue to receive AMOLED displays for mobile devices in order to meet the needs of their warranty customers will ease the burden on U.S. consumers who have purchased extended warranties").

### b)     Delay of Remedial Order

Respondents also request that the Commission "delay entry of any exclusion order." RIB at 119. According to Respondents, "[a] delay is warranted given BOE's reliance on the NIAs, particularly since SDC does not argue the redesigns infringe three of the four patents." *Id.* at 120.

Complainant argues that "[d]elayed enforcement is . . . unwarranted." CIB at 179. Complainant states: "BOE has not specified the length of delay it seeks, alleged a material number of consumers would benefit, or identified products or customers for its redesign concepts." *Id.*

Staff does not believe that a delay is necessary "given that BOE has already redesigned around the Asserted Patents and in view of the carve-outs" recommended by Staff. SIB at 101.

As Staff notes, Respondents do not state how long of a delay would be necessary. Additionally, I believe that any harm to the public interest will be mitigated by the carve-outs I already recommended. Accordingly, I do not recommend a delay in the effective date of any exclusion order.

## XI.    INITIAL DETERMINATION ON VIOLATION

For the reasons set forth above, it is my Initial Determination that no violation of section 337 of the Tariff Act, as amended, has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof.

I hereby certify to the Commission this Initial Determination and the Recommended Determination.

The Secretary shall serve the confidential version of this Initial Determination upon counsel who are signatories to the Protective Order (Order No. 1) issued in this investigation. A public version will be served at a later date upon all parties of record.

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review pursuant to 19 C.F.R. §

210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the Initial Determination or certain issues therein.

## XII.    ORDER

Within seven days of the date of this document, the parties shall jointly submit a single proposed public version of this document with any proposed redactions indicated in red. If the parties submit excessive redactions, they may be required to provide declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in 19 C.F.R. § 201.6(a). To the extent possible, the proposed redactions should be made electronically, in a single PDF file using the "Redact Tool" within Adobe Acrobat. The proposed redactions should be submitted as "marked" but not yet "applied." The proposed redactions should be submitted via email to Moore337@usitc.gov and not filed on EDIS.

Bryan F. Moore
Administrative Law Judge

Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For
Mobile Devices, And Components Thereof; Inv. No. 337-TA-1351 (Violation)                    337-1351 Violation

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the parties listed have entered an appearance in the above captioned
investigation, and a copy of the PUBLIC CERTIFICATE OF SERVICE was served upon the following parties
via first class mail and air mail where necessary.

| Document | Security | Document Type | Official Rec'd | Title |
|---|---|---|---|---|
| 838816 | Public | ID/RD - Final on Violation | 12/09/2024 12:53 PM | Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond |

Service Date:          December 09, 2024

_____
/s

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN ACTIVE MATRIX ORGANIC LIGHT-EMITTING DIODE DISPLAY PANELS AND MODULES FOR MOBILE DEVICES, AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1351** |

**NOTICE OF INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Administrative Law Judge Bryan F. Moore

(November 15, 2024)

On this date, I issued the final initial determination in this matter. 19 C.F.R. §§ 210.10(b), 210.42(a)(1)(i). As explained in that determination, I found that no violation of section 337 of the Tariff Act of 1930, as amended, has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof based on infringement of U.S. Patent Nos. 9,818,803, 7,414,599, 9,330,593 and 11,594,578.

**SO ORDERED.**

Bryan F. Moore
Administrative Law Judge



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

June 6, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *7,414,599*
ISSUE DATE: *August 19, 2008*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Sylvia Holley
Certifying Officer



US007414599B2

(12) **United States Patent**  (10) Patent No.: **US 7,414,599 B2**
Chung et al.  (45) Date of Patent:  **Aug. 19, 2008**

(54) **ORGANIC LIGHT EMITTING DEVICE PIXEL CIRCUIT AND DRIVING METHOD THEREFOR**

(75) Inventors: **Ho-Kyoon Chung**, Yongin-si (KR); **Yang-Wan Kim**, Seoul (KR); **Choon-Yul Oh**, Gunpo-si (KR); **Oh-Kyong Kwon**, Seoul (KR); **Sang-Moo Choi**, Suwon-si (KR)

(73) Assignee: **Samsung SDI Co., Ltd.**, Suwon-si (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 674 days.

(21) Appl. No.: **10/886,014**

(22) Filed: **Jul. 6, 2004**

(65) **Prior Publication Data**
US 2005/0017934 A1     Jan. 27, 2005

(30) **Foreign Application Priority Data**
Jul. 7, 2003   (KR) ...................... 10-2003-0045610

(51) **Int. Cl.**
*G09G 3/30*     (2006.01)
(52) **U.S. Cl.** ...................................... 345/76; 315/169.3
(58) **Field of Classification Search** ... 315/169.1–169.4; 345/76–83
See application file for complete search history.

(56) **References Cited**
U.S. PATENT DOCUMENTS

6,091,203 A    7/2000  Kawashima et al.
6,229,506 B1 *  5/2001  Dawson et al. ................. 345/82
6,362,798 B1    3/2002  Kimura et al.
2003/0067424 A1    4/2003  Akimoto et al.
2004/0041750 A1 *  3/2004  Abe ............................. 345/76

(Continued)

FOREIGN PATENT DOCUMENTS

CN        1361510 A    7/2002

(Continued)

OTHER PUBLICATIONS

Korean Patent Abstracts, Publication No. 1020020025842 A, dated Apr. 4, 2002, in the name of Katsuya Anzai et al.

(Continued)

*Primary Examiner*—Alexander Eisen
*Assistant Examiner*—Hoai-Quan T Ho
(74) *Attorney, Agent, or Firm*—Christie, Parker & Hale, LLP

(57)     **ABSTRACT**

A pixel circuit in an organic light emitting device capable of realizing high gradation representation by self-compensating a threshold voltage, and a method for driving the same. The pixel circuit includes an electroluminescent element for emitting light in response to an applied driving current. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor generates a driving current to drive the electroluminescent element in response to the data signal voltage. A third transistor connects the second transistor in the form of a diode in response to a current scan signal to self-compensate the threshold voltage of the second transistor. A capacitor stores the data signal voltage delivered to the second transistor. A fourth transistor delivers a power supply voltage to the second transistor in response to a current light-emitting signal. A fifth transistor provides the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

18 Claims, 5 Drawing Sheets



SDC-1351-00000002
JX-0001.2

**US 7,414,599 B2**

Page 2

### U.S. PATENT DOCUMENTS

2004/0145547 A1 *    7/2004    Oh .............................. 345/76

### FOREIGN PATENT DOCUMENTS

| EP | 1 220 191 | 7/2002 |
|----|-----------|--------|
| JP | 2000-347621 | 12/2000 |
| JP | 2002-215096 | 7/2002 |
| JP | 2002-244617 | 8/2002 |
| JP | 2003-173165 | 6/2003 |
| JP | 2003-202833 | 7/2003 |
| JP | 2003-223138 | 8/2003 |
| JP | 2004-133240 | 4/2004 |
| KR | 2002-0025842 | 4/2002 |

### OTHER PUBLICATIONS

Office Action dated Dec. 1, 2006 for corresonding Chinese Patent Application No. 200410063736.X (including English translation).

Korean Patent Abstracts, Publication No. 1020020056353 A; Publication Date: Jul. 10, 2002; in the name of Kwon.

European Search Report dated Apr. 23, 2007, for EP 04090270.2, in the name of Samsung SDI Co., Ltd.

Patent Abstracts of Japan, Publiction No. 2000-347621, dated Dec. 15, 2000, in the name of Yuji Kondo, et al.

Patent Abstracts of Japan, Publiction No. 2002-215096, dated Jul. 31, 2002, in the name of Oh-Kyong Kwon.

Patent Abstracts of Japan, Publiction No. 2002-244617, dated Aug. 30, 2002, in the name of Naoaki Furumiya.

Patent Abstracts of Japan, Publiction No. 2003-173165, dated Jun. 20, 2003, in the name of Aoki Yoshiaki.

Patent Abstracts of Japan, Publiction No. 2003-202833, dated Jul. 18, 2003, in the name of Hajime Kimura, et al.

Patent Abstracts of Japan, Publiction No. 2003-223138, dated Aug. 8, 2003, in the name of Hajime Kimura.

Patent Abstracts of Japan, Publiction No. 2004-133240, dated Apr. 30, 2004, in the name of Shin Asano.

* cited by examiner

SDC-1351-00000003

JX-0001.3

# FIG. 1
## (PRIOR ART)



# FIG. 2
## (PRIOR ART)



SDC-1351-00000004

JX-0001.4

FIG. 3



FIG. 4



INITIALIZATION    PROGRAMMING    EMITTING
PERIOD              PERIOD          PERIOD

# FIG. 5



SDC-1351-00000006

JX-0001.6

# FIG. 6



SDC-1351-00000007

JX-0001.7

# FIG. 7



SDC-1351-00000008

JX-0001.8

US 7,414,599 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# ORGANIC LIGHT EMITTING DEVICE PIXEL CIRCUIT AND DRIVING METHOD THEREFOR

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of Korean Patent Application No. 2003-45610, filed Jul. 7, 2003, the disclosure of which is hereby incorporated herein by reference in its entirety.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a flat panel display and, more specifically, to a pixel circuit in an organic light emitting device capable of realizing high gradation by self-compensating a threshold voltage of a transistor that drives an electroluminescent (EL) element, and a method for driving the same.

### 2. Description of the Related Art

Normally, an organic light emitting device may be classified into a passive matrix organic light emitting diode (OLED) and an active matrix OLED (AMOLED), and can be classified into a current driving OLED and a voltage driving OLED depending on the manner in which the EL element is driven.

A typical AMOLED is generally composed of a plurality of gate lines, a plurality of data lines, a plurality of power lines, and a plurality of pixels connected to the lines and arranged in a matrix form. Each pixel is normally composed of: an EL element; two transistors, in which one is a switching transistor for transferring a data signal while the other is a driving transistor for driving the EL element depending on the data signal; and one capacitor for maintaining the data voltage.

Although this AMOLED has an advantage in that power consumption is low, current intensity flowing through the EL element changing over time, causing display nonuniformity, can be a problem. This results from a change in voltage between the gate and the source of the driving transistor for driving the EL element, namely, the threshold voltage of the driving transistor, which leads to a change in the current flowing through the EL element. Since the threshold voltage of a thin film transistor for the driving transistor changes depending on manufacturing process parameters, it becomes difficult to manufacture transistors in the AMOLED so that all of the transistors have the same threshold voltage. Thus, there are threshold voltage deviations between pixels.

In order to solve this voltage deviation problem, a method has been developed for compensating the threshold voltage depending on manufacturing process parameters by adding a transistor for threshold voltage compensation. U.S. Pat. No. 6,229,506 ('506 patent) discloses an organic light emitting device for compensating the threshold voltage deviation. The '506 patent discloses a pixel structure in which a current source adjusts a voltage between the source and the gate of a driving transistor with respect to an overdrive voltage thereof and compensates the threshold voltage deviation of the driving transistor. The organic light emitting device in the '506 patent performs a two-step operation involving a data load (data write) step and a continuous light-emitting step, in which a current source adjusts a voltage between the source and the gate of the driving transistor with respect to the overdrive voltage and compensates the threshold voltage deviation of the driving transistor.

However, the organic light emitting device as described above employs a current driving approach for driving the EL element which depends on a data signal current level applied from the current source and has difficulty in charging a data line. Because a parasitic capacitance of the data line is relatively larger while the current level of the data signal provided from the current source is relatively small, the data becomes unstable as well as considerably long time is required to charge the data line.

In order to solve the data line charging problem in the current driving approach, an organic light emitting device having a mirror type pixel structure has been proposed. FIG. 1 shows a pixel circuit of a voltage driving manner having a mirror type in a conventional voltage driving organic light emitting device.

Referring to FIG. 1, the pixel circuit comprises first P-type transistor T11 in which the gate of the first transistor is connected to current scan signal SCAN[n] applied to an associated scan line of a plurality of gate lines. Data signal VDATAm applied to an associated data line of a plurality of data lines is applied to its source. Second P-type transistor T12 in which a previous scan signal SCAN[n-1] is applied to a scan line just before the current scan line is applied to its gate. Initialization voltage Vinti is applied to its drain. Third and fourth P-type transistors T13 and T14 have a mirror type configuration. Fifth N-type transistor T15 in which previous scan signal SCAN[n-1] is applied to its gate has its drain coupled to the drain of fourth transistor T14. EL element EL11 is connected between fifth transistor T15 and ground voltage VSS. First capacitor C11 is connected between the gate and the source of fourth transistor T14.

Operation of the pixel in the organic light emitting device having the above-described structure will be described with reference to an operation waveform diagram of FIG. 2. Here, it is assumed that a scan line to be currently driven is the n-th scan line. A scan signal applied to the n-th scan line is SCAN [n]. A scan line driven before the current scan line is the (n-1)th scan line. A scan signal applied to the (n-i)th scan line is SCAN[n-1].

First of all, in initializing the operation, if predetermined levels of previous scan signal SCAN[n-1] and current scan signal SCAN[n] are applied thereto, that is, if a low level of previous scan signal SCAN[n-1] and a high level of current scan signal SCAN[n] are applied thereto, transistor T12 is turned on and transistors T11 and T15 are turned off, such that mirror-type transistors T13 and T14 are also turned off. Accordingly, the data stored in capacitor C11 is initialized through transistor T12 to initialization voltage Vinti.

Meanwhile, in programming data, if predetermined levels of previous scan signal SCAN[n-1] and current scan signal are applied thereto, that is, if a high level of previous scan signal SCAN[n-1] and a low level of current scan signal SCAN[n] are applied thereto, transistor T12 is turned off and transistor T11 is turned on, such that mirror-type transistors T13 and T14 are turned on.

Thus, a data signal voltage level VDATAm applied to the data line is transferred through transistor T13 to the gate of driving transistor T14. At this time, since transistor T15 is turned on by previous scan signal SCAN[n-1], a driving current corresponding to the data signal voltage VDATAm applied to the gate of driving transistor T14 flows into EL element EL 11 for its light-emitting.

The voltage applied to the gate of transistor T14 becomes $VDATA-V_{TH(T13)}$, and the current flowing through EL element EL11 is represented by the following Expression 1.

SDC-1351-00000009
JX-0001.9

US 7,414,599 B2

3

$$I_{EL11} = \frac{\beta}{2}\left(V_{GS(T14)} - V_{TH(T14)}\right)^2 \qquad (1)$$

$$= \frac{\beta}{2}\left(V_{DD} - V_{DATA} + V_{TH(T13)} - V_{TH(T14)}\right)^2$$

Where, $I_{EL\ 11}$ represents the current flowing through organic EL element EL 11, $V_{GS(T14)}$ represents a voltage between the source and the gate of transistor T14, $V_{TH(T13)}$ represents a threshold voltage of transistor T13, $V_{DATA}$ represents a data voltage, and $\beta$ represents a constant value, respectively.

At this time, if threshold voltages of transistors T13 and T14 for the current mirror are identical with each other, i.e., if $V_{TH(T13)}=V_{TH(T14)}$, the threshold voltage of the transistor can be compensated, thereby maintaining the driving current of EL element EL 11 to be uniform.

However, although transistors T13 and T14 configuring the current mirror are arranged adjacent to each other on a substrate in the voltage driving manner of the current mirror type as described above, it is very difficult to obtain the same threshold voltage due to the manufacturing process parameters of TFT. Therefore, there is a problem that it is difficult to obtain a uniform driving current due to deviation of the threshold voltage of TFT, resulting in degraded image quality.

A technique for solving the image quality degradation due to the threshold voltage deviation between TFTs for the current mirror in the voltage driving manner of the current mirror type as described above is disclosed in U.S. Pat. No. 6,362, 798 ('798 patent). In the '798 patent, a compensating thin film transistor having a diode form is connected to a gate of the driving transistor in order to compensate the threshold voltage of the driving transistor. However, there is a problem with the '798 patent that when threshold voltages of this thin film transistor for compensation and the thin film transistor for driving EL element drive are different from each other, threshold voltage deviation of the driving transistor is not compensated, as well.

## SUMMARY OF THE INVENTION

The present invention, therefore, addresses the aforementioned problem of the prior art, and provides a pixel circuit in an organic light emitting device capable of detecting and self-compensating threshold voltage deviations, and a method for driving the same.

Further in accordance with the present invention a pixel circuit in an organic light emitting device is provided capable of compensating threshold voltage deviations regardless of manufacturing process parameters, and a method for driving the same.

Still further in accordance with the present invention a pixel circuit in an organic light emitting device is provided which is capable of allowing a driving current flowing through an EL element to be uniform regardless of threshold voltage deviation between respective pixels, and a method for driving the same.

Yet still further in accordance with the present invention a pixel circuit in an organic light emitting device is provided capable of realizing high gradation representation regardless of threshold voltage deviation between respective pixels, and a method for driving the same.

According to one aspect of the invention, there is provided a pixel circuit in an organic light emitting device. A first transistor delivers a data signal voltage in response to a cur-

4

rent scan line signal. A second transistor generates a driving current depending on the data signal voltage delivered through the first transistor. A third transistor detects and self-compensates threshold voltage deviations in the second transistor. A capacitor for stores the data signal voltage delivered to the second transistor. An electroluminescent element emits light corresponding to the driving current generated through the second transistor.

According to another aspect of the invention, there is provided a pixel circuit in an organic light emitting device. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor programs the data signal voltage and generates a driving current in response to the programmed data signal when light is emitted. A third transistor provides the data signal voltage for the second transistor in response to the current scan signal. A capacitor maintains the data signal voltage programmed onto the second transistor. A fourth transistor delivers a power supply voltage to the second transistor when the light is emitted. A fifth transistor delivers the driving current, provided from the second transistor, depending on the data signal voltage when the light is emitted. An electroluminescent element emits light corresponding to the driving current delivered through the fifth transistor. The third transistor connects the second transistor in the form of a diode in response to the current scan signal, so that the second transistor detects and compensates its threshold voltage deviation in itself.

The first transistor is composed of a PMOS transistor including a gate to which the current scan line signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor. The second transistor is composed of a PMOS transistor including a gate coupled to one terminal of the capacitor, a source coupled to the first transistor, and a drain coupled to the electroluminescent element. The third transistor is composed of a PMOS transistor including a gate to which the current scan signal is applied, and a drain and a source which are coupled to the gate and the drain of the second transistor, respectively, so that the second transistor is connected in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor. The fourth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the second transistor. The fifth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source coupled to the second transistor, and a drain coupled to the electroluminescent element.

According to yet another aspect of the invention, there is provided pixel circuit in an organic light emitting device. An electroluminescent element emits light depending on an applied driving current. A first transistor delivers a data signal voltage in response to a current scan line signal. A second transistor for generates a driving current to drive the electroluminescent element in response to the data signal voltage. A third transistor connects the second transistor in the form of a diode in response to a current scan signal to self-compensate a threshold voltage of the second transistor. A capacitor stores the data signal voltage delivered to the second transistor. A fourth transistor delivers a power supply voltage to the second transistor in response to a current light-emitting signal. A fifth transistor provides the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

According to yet still another aspect of the invention, there is provided a pixel circuit in an organic light emitting device.

Appx000270

SDC-1351-00000010

JX-0001.10

US 7,414,599 B2

5

A first transistor includes a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied. A second transistor has its source coupled to a drain of the first transistor. A third transistor has its drain and source connected between a gate and a drain of the second transistor. A fourth transistor includes a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor. A fifth transistor includes a gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element. The electroluminescent element has one terminal coupled to the drain of the fifth transistor and the other terminal grounded. A capacitor has one terminal coupled to the source of the second transistor. A power supply voltage is applied to the other terminal of the capacitor.

According to yet still another aspect of the invention, there is provided a pixel circuit in an organic light emitting device having a plurality of data lines, a plurality of scan lines, a plurality of power lines, and a plurality of pixels each connected to one associated data line, scan line and power line of the plurality of data lines, scan lines and power lines. Each pixel comprises: a first transistor including a gate to which a current scan signal to be applied to the associated scan line is applied, and a source to which a data signal voltage from the data line is applied; a second transistor whose source is coupled to a drain of the first transistor; a third transistor whose drain and source are connected between a gate and a drain of the second transistor, respectively; a fourth emitting transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage from the power line is applied, and a drain coupled to the source of the second transistor; a fifth transistor including a gate to which the current light-emitting signal is applied, and a source coupled to the drain of the second transistor; an electroluminescent element including one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and a capacitor including one terminal coupled to the gate of the second transistor, and the other terminal to which the power supply voltage from the power line is applied.

According to yet still another aspect of the invention, there is provided a method of driving a pixel in an organic light emitting device having a plurality of data lines, a plurality of scan lines, a plurality of power lines, and a plurality of pixels each connected to an associated one data line, scan line and power line of the plurality of data lines, scan lines and power lines. The method comprises: performing initialization in response to a scan signal applied to a scan line just before the associated scan line; compensating threshold voltage deviation in response to a scan signal applied to the associated scan line, and programming a data voltage applied from the associated data line, regardless of the threshold voltage deviation; and generating a driving current corresponding to the data voltage to emit an electroluminescent (EL) element in response to a current light-emitting signal.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a circuit construction of a pixel in a conventional organic light emitting device.

FIG. 2 is a waveform diagram for explaining operation of the pixel in the conventional organic light emitting device.

FIG. 3 illustrates a circuit construction of a pixel in an organic light emitting device according to an embodiment of the present invention.

6

FIG. 4 is a waveform diagram for explaining operation of the pixel in the organic light emitting device according to the embodiment of the present invention, as shown in FIG. 3.

FIGS. 5 to 7 are pixel construction diagrams for explaining initialization operation, program operation and light-emitting operation of a pixel in an organic light emitting device according to an embodiment of the present invention.

## DETAILED DESCRIPTION

The organic light emitting device in accordance with the present invention includes a plurality of gate lines; a plurality of data lines; a plurality of power lines; and a plurality of pixels each arranged in an associated gate line, data line and power line of the plurality of gate lines, data lines and power lines. FIG. 3 shows only one pixel arranged in an associated gate line (the n-th gate line), data line (the m-th data line) and power line (the m-th power line).

Referring to FIG. 3, each pixel in the organic light emitting device according to the present invention is composed of six transistors T31-T36, one capacitor C31 and electroluminescent (EL) element EL31. That is, each pixel includes organic electroluminescent device EL31 for emitting light corresponding to an applied driving current; first switching transistor T32 for switching data signal voltage VDATAm, applied to the associated data line, in response to current scan line signal SCAN[n] applied to the associated scan line; driving transistor T31 for supplying a driving current of the organic electroluminescent device corresponding to the data signal voltage inputted to its gate through first switching transistor T32; threshold voltage compensation transistor T33 for compensating the threshold voltage of driving transistor T31; and capacitor C31 for storing the data signal that is applied to the gate of driving transistor T31.

First switching transistor T32 is composed of a P-type thin film transistor in which current scan signal SCAN[n], applied to the associated scan line, is applied to its gate, data signal voltage VDATAm, applied to the associated data line, is applied to its source, and its drain is connected to the source of driving transistor T31.

Driving transistor T31 is composed of a P-type thin film transistor in which its gate is connected to one terminal of capacitor C31 and its drain is connected to one terminal of EL element EL31. Threshold voltage compensation transistor T33 is composed of a P-type thin film transistor in which its drain and source are connected to the gate and drain of driving transistor T31, respectively, and a current scan signal scan [n] is applied to the gate of transistor T33. Power supply voltage VDD from the associated power line is provided for the other side of capacitor C31.

Further, each pixel comprises second switching transistor T35 for providing power supply voltage VDD for driving transistor T31 in response to current light-emitting signal EMI[n], and third switching transistor T36 for providing a driving current, generated through driving transistor T31, for EL element EL31 in response to current light-emitting signal EMI[n].

Second switching transistor T35 is composed of a P-type thin film transistor in which current light-emitting signal EMI [n] is applied to its gate, the power supply voltage from the associated power supply voltage line is applied to its source, and its drain is connected to the source of driving transistor T32. Third switching transistor T36 is composed of a P-type thin film transistor in which current light-emitting signal EMI [n] is applied to its gate, its source is coupled to the drain of driving transistor T31, and the drain of transistor T36 is

Appx000271

SDC-1351-00000011

JX-0001.11

US 7,414,599 B2

7

coupled to one terminal of EL element EL31. The other terminal of EL element EL31 is grounded.

Moreover, each pixel includes initialization transistor T34 for initializing the data signal stored in capacitor C31 in response to a previous scan signal SCAN[n-1] applied to a scan line just before the associated scan line. Transistor T34 is composed of a P-type thin film transistor in which previous scan signal SCAN[n-1] is applied to its gate, its source is coupled to the one terminal of capacitor C31, and initialization voltage Vinti is applied to its drain.

Operation of the pixel having the above-described configuration according to the present invention will be described with reference to FIGS. 4 to 7.

First, in an initialization operation, during an initialization period in which previous scan signal SCAN[n-1] is of a low level, and current scan signal SCAN[n] and light-emitting signal EMI[n] are of high level as shown in FIG. 4, since transistor T34 is turned on by the low level of previous scan signal SCAN[n-1], and transistors T31-T33 and T35-T36 are turned off by the high level of current scan signal SCAN[n] and current light-emitting EMI[n], an initialization path (as indicated by a solid line shown in FIG. 5) is formed. Accordingly, the data signal that has been stored in capacitor C31, namely, a gate voltage of driving transistor T31, is initialized.

Next, in a data program operation, during a programming period in which current scan signal scan [n-1] is at a high level, current scan signal SCAN[n] is at a low level and current light-emitting signal EMI[n] is at a high level as shown in FIG. 4, transistor T34 is turned off, and transistor T33 is turned on by the low level of current scan signal SCAN[n], such that driving transistor T31 is connected in the form of a diode.

Since switching transistor T32 is also turned on by current scan signal SCAN[n], and switching transistors T35 and T36 are turned off by current light-emitting signal EMI[n], such that a data program path (as indicated by a solid line shown in FIG. 6) is formed. Accordingly, data voltage VDATAm applied to the associated data line is provided for the gate of driving transistor T31 through threshold voltage compensation transistor T33.

Since driving transistor T31 is in the diode connection, VDATAm-V$_{TH(T31)}$ is applied to the gate of transistor T31 and the gate voltage is stored in capacitor C31, such that the program operation is completed.

Finally, in a light-emitting operation, during an light-emitting period in which previous scan signal SCAN[n-1] is of high level, current scan signal SCAN[n] becomes a high level, and then current light-emitting signal EMI[n] becomes a low level as shown in FIG. 4, an light-emitting path (as indicated by the solid line as shown in FIG. 7) is formed. That is, since switching transistors T35 and T36 are turned on by the low level of current light-emitting signal EMI[n], initialization transistor T34 is turned off by the high level of previous scan signal SCAN[n-1], and threshold voltage compensation transistor T33 and switching transistor T32 are turned off by the high level of current scan signal SCAN[n]. Accordingly, a driving current generated in response to the data signal voltage applied to the gate of driving transistor T31 is provided through transistor T31 for organic EL element EL31, such that the light-emitting of organic EL element EL31 occurs.

At this time, the current into organic EL element EL31 is represented by the following Expression 2.

8

$$I_{EL31} = \frac{\beta}{2}\left(V_{GS} - V_{TH(M31)}\right)^2 \qquad (2)$$

$$= \frac{\beta}{2}\left(V_{DD} - V_{DATA} + V_{TH(M31)} - V_{TH(M31)}\right)^2$$

Where, $I_{EL31}$ represents the current flowing into organic EL element EL31, $V_{GS}$ represents a voltage between the source and the gate of transistor T31, $V_{TH(T31)}$ represents a threshold voltage of transistor T31, $V_{DATA}$ represents a data voltage, and β represent a constant value, respectively.

As can be seen from the Expression 2, the driving current flows through EL element EL31, corresponding to the data signal voltage applied to the data line regardless of the threshold voltage of current driving transistor T31. That is, because the present invention detects and self-compensates the threshold voltage deviation in current driving transistor T31 through transistor T33, it is possible to finely control the current flowing into the organic EL element, thereby providing the high gradation of the organic EL element.

Further, if the data for a previous frame time has a high level of voltage and the data for a next frame time has a low level of voltage, the data signal can be no longer applied to the gate node of transistor T31 owing to the diode connection property of transistor T31, and thus switching transistor T34 is placed to initialize the gate node of transistor T31 into a predetermined level Vinti per frame.

As described above, driving transistor T31 in the present invention can self-compensate the threshold voltage deviation by detecting its own threshold voltage.

Although the embodiment of the present invention illustrates the pixel circuit composed of six transistors and one capacitor, the present invention is applicable to all constructions for detecting and self-compensating a threshold voltage. Moreover, the pixel circuit can be configured of a NMOS transistor, a CMOS transistor or the like other than the PMOS transistor.

According to the embodiment of the present invention as described above, there are advantages that it is possible to realize high gradation by detecting and self-compensating the threshold voltage deviation in the driving transistor as well as to solve a charging problem in the data line by driving the driving transistor in the voltage driving manner.

Although the present invention has been described with reference to the exemplary embodiments thereof, it will be appreciated by those skilled in the art that it is possible to modify and change the present invention variously without departing from the spirit and scope of the present invention as set forth in the following claims.

What is claimed is:

1. A pixel circuit in an organic light emitting device, comprising:

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for generating a driving current depending on the data signal voltage delivered through the first transistor;

a third transistor for detecting and self-compensating threshold voltage deviation in the second transistor;

a fifth transistor for providing a power supply voltage for the second transistor in response to a current light-emitting signal;

a sixth transistor which is coupled in series between the second transistor and an electroluminescent element and for providing the driving current for the electrolumines-

SDC-1351-00000012

JX-0001.12

US 7,414,599 B2

9

cent element through the second transistor in response to the current light-emitting signal; and

a capacitor for storing the data signal voltage delivered to the second transistor,

wherein the electroluminescent element emits light corresponding to the driving current generated through the second transistor.

2. The pixel circuit in the organic light emitting device of claim 1, further comprising:

a fourth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current light emitting signal.

3. The pixel circuit in the organic light emitting device of claim 1, wherein the first transistor is composed of a PMOS transistor including a gate to which the current scan line signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor.

4. The pixel circuit in the organic light emitting device of claim 1, wherein the second transistor is composed of a PMOS transistor including a gate coupled to one terminal of the capacitor, a source coupled to the first transistor, and a drain coupled to the electroluminescent element.

5. The pixel circuit in the organic light emitting device of claim 4, wherein the third transistor is composed of a PMOS transistor including a gate to which the current scan signal is applied, and a drain and a source which are coupled to the gate and the drain of the second transistor, respectively, so that the third transistor connects the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor.

6. The pixel circuit in the organic light emitting device of claim 1, further comprising:

a voltage source for providing the data signal voltage through the first transistor for the second transistor.

7. A pixel circuit in an organic light emitting device, comprising:

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for programming the data signal voltage and for generating a driving current in response to a programmed data signal when light is emitted;

a third transistor for providing the data signal voltage for the second transistor in response to the current scan signal;

a capacitor for maintaining the data signal voltage programmed onto the second transistor;

a fourth transistor for delivering a power supply voltage to the second transistor when the light is emitted;

a fifth transistor for delivering the driving current, provided from the second transistor, in response to the data signal voltage when the light is emitted; and

an electroluminescent element for emitting light corresponding to the driving current delivered through the fifth transistor,

wherein the third transistor connects the second transistor in the form of a diode in response to the current scan signal so that the second transistor detects and compensates its threshold voltage deviation in itself.

8. The pixel circuit in the organic light emitting device of claim 7, further comprising:

a sixth initialization transistor for discharging the data signal voltage stored in the capacitor in response to a scan signal just before the current scan signal upon initialization.

9. The pixel circuit in the organic light emitting device of claim 7, wherein the first transistor is composed of a PMOS transistor including a gate to which the current scan line

10

signal is applied, a source to which the data signal voltage is applied, and a drain coupled to the second transistor.

10. The pixel circuit in the organic light emitting device of claim 7, wherein the second transistor is composed of a PMOS transistor including a gate coupled to one terminal of the capacitor, a source coupled to the first transistor, and a drain coupled to the electroluminescent element.

11. The pixel circuit in the organic light emitting device of claim 10, wherein the third transistor is composed of a PMOS transistor including a gate to which the current scan signal is applied, and a drain and a source which are coupled to the gate and the drain of the second transistor, respectively, so that the third transistor connects the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor.

12. The pixel circuit in the organic light emitting device of claim 7, further comprising:

a voltage source for providing the data signal voltage through the first transistor for the second transistor.

13. The pixel circuit in the organic light emitting device of claim 7, wherein the fourth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the second transistor; and

the fifth transistor is composed of a PMOS transistor including a gate to which the current light-emitting signal is applied, a source coupled to the second transistor, and a drain coupled to the electroluminescent element.

14. A pixel circuit in an organic light emitting device, comprising:

an electroluminescent element for emitting light in response to an applied driving current;

a first transistor for delivering a data signal voltage in response to a current scan line signal;

a second transistor for generating a driving current to drive the electroluminescent element in response to the data signal voltage;

a third transistor for connecting the second transistor in the form of a diode in response to the current scan signal to self-compensate a threshold voltage of the second transistor;

a capacitor for storing the data signal voltage delivered to the second transistor;

a fourth transistor for delivering a power supply voltage to the second transistor in response to a current light-emitting signal; and

a fifth transistor for providing the driving current, provided from the second transistor, for the electroluminescent element in response to the current light-emitting signal.

15. A pixel circuit in an organic light emitting device, comprising:

a first transistor including a gate to which a current scan signal is applied, and a source to which a data signal voltage is applied;

a second transistor whose source is coupled to a drain of the first transistor;

a third transistor whose drain and source are connected between a gate and a drain of the second transistor;

a fourth transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage is applied, and a drain coupled to the source of the second transistor;

a fifth transistor including a gate to which the current light-emitting signal is applied, a source coupled to the drain of the second transistor, and a drain coupled to one terminal of an electroluminescent element;

SDC-1351-00000013
JX-0001.13

US 7,414,599 B2

11

the electroluminescent element having the one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and

a capacitor in which one terminal of the capacitor is coupled to the gate of the second transistor and a power supply voltage is applied to the other terminal of the capacitor.

**16.** The pixel circuit in the organic light emitting device of claim **15**, further comprising:

a sixth transistor including a gate to which a scan signal just before the current scan signal is applied;

a source coupled to the one terminal of the capacitor; and a drain to which an initialization voltage is applied.

**17.** A pixel circuit in an organic light emitting device having a plurality of data lines, a plurality of scan lines, a plurality of power lines, and a plurality of pixels each connected to one associated data line, scan line and power line of the plurality of data lines, scan lines and power lines, each pixel comprising:

a first transistor including a gate to which a current scan signal to be applied to the associated scan line is applied, and a source to which a data signal voltage from the data line is applied;

a second transistor whose source is coupled to a drain of the first transistor;

12

a third transistor whose drain and source are connected between a gate and a drain of the second transistor, respectively;

a fourth emitting transistor including a gate to which a current light-emitting signal is applied, a source to which a power supply voltage from the power line is applied, and a drain coupled to the source of the second transistor;

a fifth transistor including a gate to which the current light-emitting signal is applied, and a source coupled to the drain of the second transistor;

an electroluminescent element including one terminal coupled to the drain of the fifth transistor and the other terminal grounded; and

a capacitor including one terminal coupled to the gate of the second transistor, and the other terminal to which the power supply voltage from the power line is applied.

**18.** The pixel circuit in the organic light emitting device of claim **17**, further comprising:

a sixth transistor including a gate to which a scan signal to be applied to a scan line just before the associated scan line is applied, a source coupled to the one terminal of the capacitor, and a drain to which an initialization voltage is applied.

* * * * *

SDC-1351-00000014
JX-0001.14

**JX-0003**



## THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 21, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *9,818,803*
ISSUE DATE: *November 14, 2017*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Curtis Goffe
Certifying Officer

SDC-1351-00000030
JX-0003.1



US009818803B2

(12) **United States Patent**
Lee

(10) **Patent No.:** **US 9,818,803 B2**
(45) **Date of Patent:** **Nov. 14, 2017**

(54) **PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE**

(75) Inventor: **Sang-Shin Lee**, Yongin-si (KR)

(73) Assignee: **Samsung Display Co., Ltd.**, Yongin-si (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **13/614,197**

(22) Filed: **Sep. 13, 2012**

(65) **Prior Publication Data**

US 2013/0234917 A1     Sep. 12, 2013

(30) **Foreign Application Priority Data**

Mar. 6, 2012    (KR) ...................... 10-2012-0022967

(51) **Int. Cl.**
    *G09G 3/32*        (2016.01)
    *H01L 27/32*       (2006.01)
(52) **U.S. Cl.**
    CPC ...... *H01L 27/3216* (2013.01); *H01L 27/3218* (2013.01)
(58) **Field of Classification Search**
    USPC .................................................. 345/82, 419
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,366,025 | B1 | 4/2002 | Yamada | |
| 6,867,549 | B2 * | 3/2005 | Cok et al. | 315/169.3 |
| 6,882,364 | B1 | 4/2005 | Inuiya et al. | |

| | | | | |
|---|---|---|---|---|
| 7,274,383 | B1 * | 9/2007 | Brown Elliot | 345/694 |
| 8,026,669 | B2 * | 9/2011 | Kawasaki et al. | 315/169.3 |
| 8,330,352 | B2 * | 12/2012 | Sung et al. | 313/504 |
| 8,350,468 | B2 * | 1/2013 | Ko et al. | 313/506 |
| 8,354,789 | B2 * | 1/2013 | Kim | H01L 27/3218 313/504 |
| 2002/0015110 | A1 | 2/2002 | Brown Elliott | |
| 2002/0070909 | A1 | 6/2002 | Asano et al. | |
| 2002/0113195 | A1 * | 8/2002 | Osada | 250/208.1 |
| 2003/0128179 | A1 * | 7/2003 | Credelle | G02F 1/133514 345/88 |
| 2004/0108818 | A1 | 6/2004 | Cok et al. | |
| 2004/0183764 | A1 | 9/2004 | Kim et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 437 110 A | 10/2007 |
| JP | 10-39791 | 2/1998 |

(Continued)

OTHER PUBLICATIONS

EPO Search Report dated Jul. 8, 2013, for corresponding European Patent application 13157562.3, (6 pages).

(Continued)

*Primary Examiner* — Kwang-Su Yang
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**

A pixel arrangement structure of an OLED display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

**21 Claims, 5 Drawing Sheets**



SDC-1351-00000031

JX-0003.2

## US 9,818,803 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2005/0001542 A1 | 1/2005 | Kiguchi | |
| 2005/0162079 A1 | 7/2005 | Sakamoto | |
| 2006/0152531 A1 * | 7/2006 | Lin | G09G 3/3225 |
| | | | 345/613 |
| 2008/0001525 A1 | 1/2008 | Chao et al. | |
| 2008/0001527 A1 | 1/2008 | Koo et al. | |
| 2008/0273793 A1 | 11/2008 | Oishi | |
| 2008/0308819 A1 | 12/2008 | Louwsma et al. | |
| 2009/0302331 A1 * | 12/2009 | Smith et al. | 257/88 |
| 2010/0033084 A1 | 2/2010 | Ko et al. | |
| 2010/0133994 A1 * | 6/2010 | Song | H01L 27/3211 |
| | | | 313/504 |
| 2010/0171440 A1 * | 7/2010 | Satou et al. | 315/294 |
| 2011/0012820 A1 * | 1/2011 | Kim et al. | 345/82 |
| 2011/0291550 A1 | 12/2011 | Kim et al. | |
| 2012/0056531 A1 | 3/2012 | Park et al. | |
| 2012/0086330 A1 | 4/2012 | Umeda et al. | |
| 2012/0287605 A1 * | 11/2012 | Chen | H01L 27/322 |
| | | | 362/97.1 |
| 2012/0313844 A1 | 12/2012 | Im et al. | |
| 2012/0319564 A1 * | 12/2012 | Ghosh et al. | 313/500 |
| 2013/0037827 A1 | 2/2013 | Levermore et al. | |
| 2013/0127689 A1 * | 5/2013 | Gollier | G02F 1/133504 |
| | | | 345/32 |
| 2015/0192834 A1 | 7/2015 | Morinaga et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2000-235891 | 8/2000 |
| JP | 2004-507773 | 3/2004 |
| JP | 2004-192813 | 7/2004 |
| JP | 2006-309182 | 11/2006 |
| JP | 2008-015521 | 1/2008 |
| JP | 2011-076760 | 4/2011 |
| KR | 10-0742370 B1 | 7/2007 |
| KR | 10-0807524 | 2/2008 |
| KR | 10-2008-0111130 | 12/2008 |
| KR | 10-2009-0017910 | 2/2009 |
| KR | 10-2011-0023996 | 3/2011 |
| KR | 10-2011-0106565 | 9/2011 |
| KR | 10-2011-0129531 | 12/2011 |

| | | |
|---|---|---|
| KR | 10-2012-0022967 | 3/2012 |
| TW | I328207 | 8/2010 |
| WO | WO 2004/073356 A1 | 8/2004 |
| WO | WO 2005/067352 A1 | 7/2005 |

OTHER PUBLICATIONS

Korean Patent Abstracts, Publication No. 1020030031207A, dated Apr. 21, 2003 for corresponding Korean Patent 10-0807524 listed above.

EPO Search Report dated Jul. 9, 2014, for European Patent application 14155124.2, (8 pages).

*Korean Patent Abstracts for Korean Publication 1020070055908 dated May 31, 2007, to Korean Patent 10-0742370 dated Jul. 24, 2007, listed above.

EPO Search Report dated Dec. 20, 2013 for European Patent application 13178648.5, (9 pages).

U.S. Office action dated Aug. 29, 2014, for cross reference U.S. Appl. No. 14/059,356, (18 pages).

SIPO Office action dated Mar. 11, 2015, for corresponding Chinese Patent application 201310035429.X, (7 pages).

Taiwan Office action dated Mar. 30, 2015, for corresponding Taiwanese Patent application 102101000, (7 pages).

U.S. Office action dated Jun. 30, 2015, for cross reference U.S. Appl. No. 13/872,018, (22 pages).

U.S. Office action dated Feb. 29, 2016, for cross reference U.S. Appl. No. 13/872,018, (15 pages).

U.S. Office action dated Oct. 16, 2015, for cross reference U.S. Appl. No. 13/872,018, (16 pages).

KIPO Office action dated Jul. 11, 2016, with English translation, for corresponding Korean Patent application 10-2016-0047800, (11 pages).

U.S. Office Action dated Sep. 2, 2016 for U.S. Appl. No. 13/872,018 (15 sheets).

U.S. Office action dated Aug. 5, 2016, for related U.S. Appl. No. 15/090,591 (11 pages).

English Abstract of TW 2008-02221 A, also published as TW I328207, listed above.

TIPO Office Action dated Oct. 11, 2016, for corresponding Taiwanese Patent Application No. 102124953 (6 pages).

U.S. Office Action dated May 11, 2017, issued in cross-reference U.S. Appl. No. 13/872,018 (16 pages).

* cited by examiner

SDC-1351-00000032
JX-0003.3

# FIG.1



SDC-1351-00000033
JX-0003.4

# FIG.2



# FIG.3



SDC-1351-00000035

FIG.4



SDC-1351-00000036

JX-0003.7

# FIG.5



SDC-1351-00000037

JX-0003.8

US 9,818,803 B2

1

## PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE

### CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application claims priority to and the benefit of Korean Patent Application No. 10-2012-0022967, filed in the Korean Intellectual Property Office on Mar. 6, 2012, the entire content of which is incorporated herein by reference.

### BACKGROUND

1. Field

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an organic light emitting diode (OLED) display.

2. Description of the Related Art

A display device is a device that displays an image. Recently, an OLED display has been drawing attention. The OLED display has a self-luminous characteristic. Because the OLED display does not need a separate light source, unlike a liquid crystal display, it can have a relatively smaller thickness and weight than liquid crystal displays. In addition, the OLED display exhibits high-quality characteristics such as low power consumption, high luminance, high response speed, etc.

In general, the OLED display includes a plurality of pixels for emitting light of different colors. The plurality of pixels emit light to display an image. Here, the pixel refers to a minimum unit for displaying the images. For instance, there may be a gate line, a data line, and a power line such as a driving power line to drive each pixel. In addition, there may be an insulation layer such as a pixel definition layer to define an area and a shape of each pixel. Further, each pixel may be positioned between its neighboring pixels.

An organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM). When reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated. On the other hand, when increasing the gap between the pixels to improve the deposition reliability, the aperture ratio of the pixel may be deteriorated.

The above information disclosed in this Background section is only for enhancement of understanding of the background of the invention. Therefore, it may contain information that does not form the prior art that is already known in this country to a person of ordinary skill in the art.

### SUMMARY

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an OLED display. More particularly, aspects relate to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels. An exemplary embodiment of the present invention provides a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels.

According to an exemplary embodiment of the present invention, a pixel arrangement structure of an organic light emitting diode display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated

2

from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

The second pixel may include a pair of second pixels. The second pixels may be separated from each other by the first pixel.

The third pixel may include a pair of third pixels. The third pixels may be separated from each other by the first pixel.

The second pixels and the third pixels may enclose the first pixel in the virtual square.

The first pixel, the second pixels, and the third pixels may have polygonal shapes. The second pixels and the third pixels may have a larger area than the first pixel.

The first pixel may have a quadrilateral shape. The second pixels and the third pixels may have hexagonal or octagonal shapes.

The second pixels and the third pixels may have octagonal shapes.

The second pixels and the third pixels may have a same area. A distance between the first pixel and the second pixels, a distance between the first pixel and the third pixels, and a distance between the second pixels and the third pixels may be a same first length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a second length that is longer than the first length.

The second pixels may have a larger area than the third pixels. A distance between the second pixels and the third pixels may be a first length. A distance between the first pixel and the second pixels, and a distance between the first pixel and the third pixels may be a same second length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other. A distance between the neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other.

The second pixels may have a larger area than the third pixels.

The third pixels may have a larger area than the second pixels.

The first pixel, the second pixel, and the third pixel may be configured to emit different color lights.

The first pixel, the second pixel, and the third pixel may be configured to emit green light, blue light, and red light, respectively.

According to an exemplary embodiment of the present invention, the pixel arrangement structure of the OLED display improves the aperture ratio of the pixel while efficiently setting up the gap between the pixels.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a view of a pixel arrangement structure of an OLED display according to a first exemplary embodiment.

SDC-1351-00000038

JX-0003.9

US 9,818,803 B2

3

FIG. 2 is a view of a pixel arrangement structure of an OLED display according to a second exemplary embodiment.

FIG. 3 is a view of a pixel arrangement structure of an OLED display according to a third exemplary embodiment.

FIG. 4 is a view of a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment.

FIG. 5 is a view of a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment.

DETAILED DESCRIPTION

Several exemplary embodiments according to the present invention are described hereinafter in detail with reference to the accompanying drawings to allow one of a person of ordinary skill in the art to practice the invention without undue experimentation. The present invention can be embodied in several different forms, and is not limited to exemplary embodiments that are described herein.

In order to clarify the description of embodiments of the present invention, parts that are not related to the embodiments may be omitted. In addition, the same elements or equivalents are referred to with the same reference numerals throughout the specification. For example, the same reference numerals are used for the elements having the same constructions throughout. Such elements are representatively described in a first exemplary embodiment, and in remaining exemplary embodiments, only different constructions from those of the first exemplary embodiment may be described.

Further, since sizes and thicknesses of constituent members shown in the accompanying drawings are arbitrarily given for better understanding and ease of description, the present invention is not limited to the illustrated sizes and thicknesses. In addition, unless explicitly described to the contrary, the word "comprise" and variations such as "comprises" or "comprising" will be understood to imply the inclusion of stated elements but not the exclusion of any other elements.

Nevertheless, even though each of the pixels are drawn as stereotypical polygonal shapes in the drawings, the present invention is not limited to this shape. That is, the shapes of the pixels may be modified to avoid interference with the other components of the OLED (e.g., wirings) within the spirit and scope of the appended claims.

A pixel arrangement structure (or pixel arrangement) of an OLED display according to a first exemplary embodiment will be described with reference to FIG. 1. FIG. 1 is a view schematically showing a portion of pixels forming an OLED display.

As shown in FIG. 1, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Here, the pixel refers to a minimum unit for displaying an image (for example, the minimum addressable unit of the display).

Further, among the first pixels 100, the second pixels 200, and the third pixels 300, power lines for driving each of the pixels, such as a gate line, a data line, a driving power line, and the like, may be located. In addition, an insulation layer, such as a pixel defining layer, for defining each of the pixels may be disposed. Finally, an OLED including an anode, an organic emission layer, and a cathode to correspond to each of the first pixels 100, the second pixels 200, and the third pixels 300 may be disposed. These configurations are technologies known in the art and further description thereof is

4

omitted for ease of description. A shape of each of the pixels may be defined by the power lines, the pixel defining layer, the anode, or the like, but is not limited thereto.

In the pixel arrangement of FIG. 1, each of the first pixels 100 has a smaller area than neighboring second pixels 200 and third pixels 300, and has a quadrilateral (i.e., four-sided) shape among polygon shapes. For example, in the pixel arrangement of FIG. 1, each of the first pixels 100 has the same quadrilateral shape (e.g., a square or rhombus). The first pixels 100 are spaced apart from each other and arranged in rows, such as along a first virtual straight line VL1. The first pixels 100 emit green light, and may include an organic emission layer for emitting green light.

The second pixels 200 are arranged diagonally with respect to the first pixels 100, such as at first vertices P1 along one diagonal of a virtual square VS having one of the first pixels 100 as a center point (or center) of the virtual square VS. In a similar fashion, the third pixels 300 are arranged diagonally with respect to the first pixels 100, such as at second vertices P2 along the other diagonal of the virtual square VS.

In the virtual square VS, each of the second pixels 200 is separated from the first pixel 100, and is centered at one of the first vertices P1 of the virtual square VS. Each of the second pixels 200 has a larger area than the neighboring first pixel 100 and has an octagonal (i.e., eight-sided) shape. In FIG. 1, the second pixels 200 each have the same octagonal shape. In addition, the second pixels 200 are arranged diagonally and separated from each other by the first pixels 100. The second pixels 200 emit blue light, and may include an organic emission layer for emitting blue light.

In a similar fashion, in the virtual square VS, each of the third pixels 300 is separated from the first pixel 100 and the second pixels 200, and is centered at one of the second vertices P2 neighboring the first vertices P1 of the virtual square VS. Each of the third pixels 300 has a larger area than the neighboring first pixel 100 and the same area as each of the second pixels 200. Further, the third pixels have an octagonal shape (e.g., similar to or the same as the second pixels 200). In FIG. 1, the third pixels 300 each have the same octagonal shape. In addition, the third pixels 300 are arranged diagonally and separated from each other by the first pixels 100. The third pixels 300 emit red light, and may include an organic emission layer for emitting red light.

The third pixels 300 and the second pixels 200 are spaced apart from each other and alternately arranged in rows, such as along a second virtual straight line VL2. In a similar fashion, the third pixels 300 and the second pixels 200 are spaced apart from each other and alternately arranged in columns. Accordingly, in the virtual square VS, two of the second pixels 200 having their corresponding centers positioned at the first vertices P1 and two of the third pixels 300 having their corresponding centers positioned at the second vertices P2 to enclose a corresponding one of the first pixels 100 (e.g., in the virtual square VS).

As described above, the center of each of the second pixels 200 is positioned at one of the first vertices P1 of the virtual square VS. In addition, the center of the corresponding first pixel 100 is the center of the virtual square VS. Further, the center of each of the third pixels 300 is positioned at one of the second vertices P2. Moreover, the second pixels 200 and the third pixels 300 each have the same area.

As a non-limiting example, the distance (e.g., a shortest distance) between one of the first pixels 100 and an adjacent one of the second pixels 200 is a first length L1, the distance between one of the first pixels 100 and an adjacent one of the

SDC-1351-00000039
JX-0003.10

US 9,818,803 B2

5                                                                                            6

third pixels 300 is the same first length L1, and the distance between one of the second pixels 200 and an adjacent one of the third pixels 300 is the same first length L1, as shown in FIG. 1. In addition, the distance (e.g., a shortest distance) between the neighboring first pixels 100 is a second length L2 that is longer than the first length L1. It should be noted that L1, L2, L3, . . . may be used throughout to represent shortest distances between corresponding pixels.

Therefore, the gap of the first length L1 is formed between adjacent pairs of the first pixels 100 and the second pixels 200, between adjacent pairs of the first pixels 100 and the third pixels 300, and between adjacent pairs of the second pixels 200 and the third pixels 300. In addition, the gap of the second length L2 that is longer than the first length L1 is formed between the neighboring ones of the first pixels 100. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, a manufacturing time and manufacturing cost of the entire OLED display may be reduced and the display quality of the image of the OLED display may be improved.

As described above, in the pixel arrangement structure of the OLED display of FIG. 1, the first pixels 100, the second pixels 200, and the third pixels 300 have polygonal shapes (e.g., the first pixels have a quadrilateral shape and the second pixels and the third pixels 300 have an octagonal shape). In addition, it is worth considering that the deposition process of the organic emission layer is one of the unique manufacturing characteristics of the OLED display. Accordingly, to improve the deposition reliability of the organic emission layer in the deposition process using the fine metal mask and to improve the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300, the center of each of the first pixels 100 is positioned at the center of a virtual square VS formed by a first pair of diagonal vertices P1 and a second pair of diagonal vertices P2. In the virtual square VS, the centers of a pair of the second pixels 200 are positioned at the first vertices P1, and the centers of a pair of the third pixels 300 are positioned at the second vertices P2.

In addition, in the pixel arrangement structure of the OLED display of FIG. 1, the first pixels 100, the second pixels 200, and the third pixels 300 respectively emit green, blue, and red light. However, in pixel arrangement structures of other OLED displays, the first pixels 100, the second pixels 200, and the third pixels 300 may emit light of different colors. For example, at least one of the second pixels 200 or the third pixels may emit white light.

Next, a pixel arrangement structure of an OLED display according to a second exemplary embodiment will be described with reference to FIG. 2. Parts that are different from the exemplary embodiment of FIG. 1 will be described, while the description of parts that are equivalent to the first exemplary embodiment may be omitted. For better comprehension and ease of description, constituent elements of the second exemplary embodiment that are the same as or similar to those of the first embodiment of FIG. 1 will have the same reference numerals.

As shown in FIG. 2, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. The plurality of first pixels 100 have the same quad-

rilateral shape (e.g., a parallelogram). In addition, the second pixels 200 have a larger area than the third pixels 300. The second pixels 200 and the third pixels 300 may have polygonal shapes, such as octagonal or hexagonal (i.e., six-sided).

In a similar fashion to that of FIG. 1, the centers of a pair of the second pixels 200 are positioned at first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 2, the second pixels 200 have a larger area than the third pixels 300.

As a non-limiting example, the distance between adjacent ones of the second pixels 200 and the third pixels 300 is a third length L3, while the distance between each of the first pixels 100 and adjacent ones of the second pixels 200 or the third pixels 300 have a same fourth length L4. In addition, the distance between neighboring ones of the first pixels 100 is a fifth length L5 that is longer than the third length L3 and the fourth length L4.

Accordingly, the gap of the fourth length L4 is formed between adjacent pairs of the first pixels 100 and the second pixels 200, and between adjacent pairs of the first pixels 100 and the third pixels 300. In addition, the gap of the third length L3 is formed between adjacent pairs of the second pixels 200 and the third pixels 300. Further, the gap of the fifth length L5 that is longer than the third length L3 and the fourth length L4 is formed between the neighboring ones of the first pixels 100. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. 2, the second pixels 200 that emit blue have the shortest life span among the first pixels 100, the second pixels 200, and the third pixels 300. Accordingly, the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display of FIG. 2 provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a third exemplary embodiment will be described with reference to FIG. 3. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the third exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 3, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a quadrilateral shape (e.g., a parallelogram) and are symmetrical to each other. In addition, the second pixels 200 have a larger area than the third pixels

SDC-1351-00000040
JX-0003.11

US 9,818,803 B2

7

300. The second pixels 200 and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. 1-2, the centers of a pair of the second pixels 200 are positioned at first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 3, the neighboring first pixels 100 have a quadrilateral shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by placing each of the first pixels 100 between a pair of the second pixels 200 and between a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. 3, the second pixels 200 that emit blue have the shortest life span among the first pixels 100, the second pixels 200, and the third pixels 300. Accordingly, the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment will be described with reference to FIG. 4. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments will be omitted. For better comprehension and ease of description, constituent elements of the fourth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 4, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the third pixels 300 have a larger area than the second pixels 200. The second pixels 200 and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. 1-3, the centers of a pair of the second pixels 200 are positioned at the first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 4, the neighboring first pixels 100 have a quadrilateral shape and are symmetrical to each other, while the third pixels 300 have a larger area than the second pixels 200. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels

8

300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Next, a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment will be described with reference to FIG. 5. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fifth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 5, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a octagonal shape and are symmetrical to each other. In addition, the second pixels 200 have a larger area than the third pixels 300. The second pixels 200 and the third pixels 300 may have quadrilateral shapes (e.g., rhombus).

In a similar fashion to that of FIGS. 1-3, the centers of a pair of the second pixels 200 are positioned at the first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 5, the neighboring first pixels 100 have a octagonal shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

While this invention has been described in connection with what is presently considered to be practical exemplary embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, and equivalents thereof.

DESCRIPTION OF SOME SYMBOLS

first pixels 100, second pixels 200, third pixels 300

What is claimed is:

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel having a center coinciding with a center of a virtual square;

a second pixel separated from the first pixel and having a center at a first vertex of the virtual square;

another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the

SDC-1351-00000041
JX-0003.12

US 9,818,803 B2

9 | 10

second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels; and

a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square,

wherein the second pixel has a larger area than that of the third pixel, and

wherein the first pixel is configured to emit green light.

2. The pixel arrangement structure of claim 1,

wherein the plurality of pixels further comprises another second pixel separated from the first pixel and having a center at a third vertex neighboring the second vertex of the virtual square, and

wherein the second pixels are separated from each other by the first pixel.

3. The pixel arrangement structure of claim 2,

wherein the plurality of pixels further comprises another third pixel separated from the first pixel and having a center at a fourth vertex neighboring the third vertex of the virtual square, and

wherein the third pixels are separated from each other by the first pixel.

4. The pixel arrangement structure of claim 3, wherein the second pixels and the third pixels enclose the first pixel in the virtual square.

5. The pixel arrangement structure of claim 4, wherein the first pixel, the second pixels, and the third pixels have polygonal shapes, and

each of the second pixels and each of the third pixels has a larger area than the first pixel.

6. The pixel arrangement structure of claim 5, wherein the first pixel has a quadrilateral shape, and

the second pixels and the third pixels have hexagonal or octagonal shapes.

7. The pixel arrangement structure of claim 6, wherein the second pixels and the third pixels have octagonal shapes.

8. The pixel arrangement structure of claim 7, wherein a shortest distance between the first pixel and corresponding ones of the second pixels, a shortest distance between the first pixel and corresponding ones of the third pixels, and a shortest distance between each of the second pixels and corresponding ones of the third pixels are a same first length.

9. The pixel arrangement structure of claim 8, wherein the first pixel comprises a plurality of first pixels,

the plurality of first pixels have a same quadrilateral shape, and

a shortest distance between neighboring pixels of the plurality of first pixels is a second length that is longer than the first length.

10. The pixel arrangement structure of claim 6, wherein each of the second pixels has a larger area than each of the third pixels,

a shortest distance between each of the second pixels and corresponding ones of the third pixels is a same first length, and

a shortest distance between the first pixel and corresponding ones of the second pixels, and a shortest distance between the first pixel and corresponding ones of the third pixels are a same second length.

11. The pixel arrangement structure of claim 10, wherein the first pixel comprises a plurality of first pixels,

the plurality of first pixels have a same quadrilateral shape, and

a shortest distance between neighboring pixels of the plurality of first pixels is a third length that is longer than the first length and the second length.

12. The pixel arrangement structure of claim 10, wherein the first pixel comprises a plurality of first pixels,

neighboring pixels of the plurality of first pixels have quadrilateral shapes that are symmetrical to each other, and

a shortest distance between the neighboring pixels of the plurality of first pixels is a third length that is longer than the first length and the second length.

13. The pixel arrangement structure of claim 6, wherein the first pixel comprises a plurality of first pixels, and

neighboring pixels of the plurality of first pixels have quadrilateral shapes that are symmetrical to each other.

14. The pixel arrangement structure of claim 13, wherein each of the second pixels has a larger area than each of the third pixels.

15. The pixel arrangement structure of claim 5, wherein the first pixel has an octagonal shape, and

the second pixels and the third pixels have quadrilateral shapes.

16. The pixel arrangement structure of claim 15, wherein each of the second pixels has a larger area than each of the third pixels,

a shortest distance between each of the second pixels and each of the third pixels is a same first length, and

a shortest distance between the first pixel and each of the second pixels, and a shortest distance between the first pixel and each of the third pixels are a same second length.

17. The pixel arrangement structure of claim 16, wherein the first pixel comprises a plurality of first pixels, and

neighboring pixels of the plurality of first pixels have octagonal shapes that are symmetrical to each other.

18. The pixel arrangement structure of claim 17, wherein a shortest distance between the neighboring pixels of the plurality of first pixels is a third length that is longer than the first length and the second length.

19. The pixel arrangement structure of claim 1, wherein the first pixel, the second pixel, and the third pixel are configured to emit different color lights.

20. The pixel arrangement structure of claim 19, wherein the second pixel and the third pixel are configured to emit blue light and red light, respectively.

21. The pixel arrangement structure of claim 1, wherein the second pixel has a larger area than that of the first pixel.

* * * * *

SDC-1351-00000042
JX-0003.13



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**March 8, 2023**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,594,578*
ISSUE DATE: *February 28, 2023*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Sylvia Holley
Certifying Officer

SDC-1351-00132909
JX-0005.1



US011594578B2

(12) **United States Patent**
Lee

(10) **Patent No.:** **US 11,594,578 B2**
(45) **Date of Patent:** **Feb. 28, 2023**

(54) **PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE**

(71) Applicant: **Samsung Display Co., Ltd.**, Yongin-si (KR)

(72) Inventor: **Sang-Shin Lee**, Yongin-si (KR)

(73) Assignee: **Samsung Display Co., Ltd.**, Yongin-si (KR)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/505,536**

(22) Filed: **Jul. 8, 2019**

(65) **Prior Publication Data**

US 2019/0333970 A1    Oct. 31, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/811,599, filed on Nov. 13, 2017, now Pat. No. 10,854,683, which is a continuation of application No. 13/614,197, filed on Sep. 13, 2012, now Pat. No. 9,818,803.

(30) **Foreign Application Priority Data**

Mar. 6, 2012    (KR) ........................ 10-2012-0022967

(51) **Int. Cl.**
*G09G 3/32*    (2016.01)
*H01L 27/32*    (2006.01)
(52) **U.S. Cl.**
CPC ...... *H01L 27/3216* (2013.01); *H01L 27/3218* (2013.01)
(58) **Field of Classification Search**
CPC ........................ H01L 27/3218; H01L 27/3216

USPC ................................................... 345/82, 419
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,491,863 | A | 1/1985 | Kurahashi |
| 4,642,619 | A | 2/1987 | Togashi |
| 4,965,565 | A | 10/1990 | Noguchi |
| 5,113,274 | A | 5/1992 | Takahashi et al. |
| 5,142,392 | A | 8/1992 | Ueki et al. |
| 5,461,503 | A | 10/1995 | Deffontaines et al. |
| 5,485,293 | A | 1/1996 | Robinder |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1726593 A | 1/2006 |
| CN | 1874000 A | 12/2006 |

(Continued)

OTHER PUBLICATIONS

Office action issued in U.S. Appl. No. 15/811,599 by the USPTO, dated Jul. 19, 2019, 19 pages.

(Continued)

*Primary Examiner* — Kwang-Su Yang
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**

A pixel arrangement structure of an OLED display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

**92 Claims, 5 Drawing Sheets**



US 11,594,578 B2

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,742,129 | A | 4/1998 | Nagayama et al. |
| 6,198,507 | B1 | 3/2001 | Ishigami |
| 6,326,981 | B1 | 12/2001 | Mori et al. |
| 6,366,025 | B1 | 4/2002 | Yamada |
| 6,552,706 | B1 | 4/2003 | Ikeda et al. |
| 6,747,618 | B2 | 6/2004 | Arnold et al. |
| 6,838,819 | B2 | 1/2005 | Kim et al. |
| 6,867,549 | B2 | 3/2005 | Cok et al. |
| 6,882,364 | B1 | 4/2005 | Inuiya et al. |
| 6,933,976 | B1 | 8/2005 | Suzuki |
| 6,950,115 | B2 | 9/2005 | Brown Elliott |
| 7,075,242 | B2 | 7/2006 | Miller et al. |
| 7,110,031 | B2 * | 9/2006 | Kondo ................. H04N 9/045 |
| | | | 348/272 |
| 7,187,425 | B2 | 3/2007 | Yamazaki |
| 7,215,347 | B2 * | 5/2007 | Phan ................... G09G 3/2074 |
| | | | 345/694 |
| 7,230,594 | B2 | 6/2007 | Miller et al. |
| 7,274,383 | B1 | 9/2007 | Brown Elliot |
| 7,291,970 | B2 | 11/2007 | Kuwabara |
| 7,301,273 | B2 | 11/2007 | Dedene et al. |
| 7,397,485 | B2 | 7/2008 | Miller et al. |
| 7,612,811 | B2 * | 11/2009 | Takeuchi ........... H01L 27/14621 |
| | | | 348/272 |
| 7,646,430 | B2 * | 1/2010 | Brown Elliott .... G06T 3/4023 |
| | | | 348/458 |
| 7,710,484 | B2 * | 5/2010 | Oda ................... H04N 5/3728 |
| | | | 348/297 |
| 7,755,652 | B2 | 7/2010 | Credelle et al. |
| 7,982,786 | B2 * | 7/2011 | Nishida ................. G02B 5/008 |
| | | | 348/272 |
| 8,026,669 | B2 | 9/2011 | Kawasaki et al. |
| 8,118,633 | B2 | 2/2012 | Yuasa |
| 8,134,583 | B2 | 3/2012 | Credelle |
| 8,294,711 | B2 | 10/2012 | Brown Elliott et al. |
| 8,330,352 | B2 | 12/2012 | Sung et al. |
| 8,334,859 | B2 | 12/2012 | Liu et al. |
| 8,350,468 | B2 | 1/2013 | Ko et al. |
| 8,354,789 | B2 | 1/2013 | Kim et al. |
| 8,363,072 | B2 | 1/2013 | Hong et al. |
| 8,395,157 | B2 | 3/2013 | Park et al. |
| 8,405,692 | B2 | 3/2013 | Brown Elliott et al. |
| 8,456,496 | B2 | 6/2013 | Credelle |
| 8,519,910 | B2 | 8/2013 | Park et al. |
| 8,519,917 | B2 | 8/2013 | Ryu et al. |
| 8,552,635 | B2 | 10/2013 | Kim et al. |
| 8,587,003 | B2 | 11/2013 | Ando |
| 8,754,913 | B2 | 6/2014 | Hwang et al. |
| 8,853,016 | B2 | 10/2014 | Park et al. |
| 8,866,707 | B2 | 10/2014 | Koyama et al. |
| 8,883,532 | B2 | 11/2014 | Ando |
| 9,041,625 | B2 | 5/2015 | Hwang et al. |
| 9,398,205 | B2 * | 7/2016 | Cote ................. H04N 9/04557 |
| 9,431,469 | B2 | 8/2016 | Park et al. |
| 9,837,476 | B2 | 12/2017 | Park et al. |
| 10,403,211 | B2 | 9/2019 | Hai et al. |
| 10,854,683 | B2 | 12/2020 | Lee |
| 2002/0015110 | A1 | 2/2002 | Brown Elliott |
| 2002/0070909 | A1 | 6/2002 | Asano et al. |
| 2002/0113195 | A1 | 8/2002 | Osada |
| 2002/0140833 | A1 | 10/2002 | Hirai |
| 2003/0117423 | A1 | 6/2003 | Brown-Elliott et al. |
| 2003/0128179 | A1 | 7/2003 | Credelle |
| 2003/0128225 | A1 * | 7/2003 | Credelle ........... G02F 1/133514 |
| | | | 345/694 |
| 2003/0218618 | A1 | 11/2003 | Phan |
| 2004/0036421 | A1 | 2/2004 | Arnold et al. |
| 2004/0046714 | A1 | 3/2004 | Brown Elliott |
| 2004/0108818 | A1 | 6/2004 | Cok et al. |
| 2004/0113875 | A1 | 6/2004 | Miller et al. |
| 2004/0183764 | A1 | 9/2004 | Kim et al. |
| 2004/0246426 | A1 | 12/2004 | Wang et al. |
| 2005/0001542 | A1 | 1/2005 | Kiguchi |
| 2005/0162079 | A1 | 7/2005 | Sakamoto |
| 2005/0225575 | A1 | 10/2005 | Elliott et al. |
| 2006/0119738 | A1 | 6/2006 | Kido |
| 2006/0152531 | A1 | 7/2006 | Lin et al. |
| 2007/0164335 | A1 * | 7/2007 | McKee ............ H01L 27/14641 |
| | | | 438/70 |
| 2007/0230818 | A1 * | 10/2007 | Messing .............. G09G 3/2003 |
| | | | 382/275 |
| 2008/0001525 | A1 | 1/2008 | Chao et al. |
| 2008/0001527 | A1 | 1/2008 | Koo et al. |
| 2008/0018765 | A1 | 1/2008 | Choi et al. |
| 2008/0273793 | A1 | 11/2008 | Oishi |
| 2008/0308819 | A1 | 12/2008 | Louwsma et al. |
| 2009/0027377 | A1 | 1/2009 | Kwon |
| 2009/0302331 | A1 | 12/2009 | Smith et al. |
| 2009/0321727 | A1 | 12/2009 | Yutani et al. |
| 2010/0033084 | A1 | 2/2010 | Ko et al. |
| 2010/0045695 | A1 * | 2/2010 | Brown Elliott ...... G09G 3/2003 |
| | | | 345/589 |
| 2010/0117528 | A1 * | 5/2010 | Fukuda ............ H01L 27/322 |
| | | | 313/505 |
| 2010/0117936 | A1 * | 5/2010 | Lhee .................. H01L 27/3211 |
| | | | 345/76 |
| 2010/0133994 | A1 | 6/2010 | Song et al. |
| 2010/0171440 | A1 | 7/2010 | Satou et al. |
| 2010/0253608 | A1 | 10/2010 | Kim et al. |
| 2010/0315318 | A1 | 12/2010 | Lee et al. |
| 2011/0012820 | A1 | 1/2011 | Kim et al. |
| 2011/0018858 | A1 | 1/2011 | Ryu et al. |
| 2011/0084955 | A1 | 4/2011 | Kim |
| 2011/0115772 | A1 | 5/2011 | Chung |
| 2011/0177640 | A1 | 7/2011 | Han et al. |
| 2011/0215302 | A1 * | 9/2011 | Lhee .................. H01L 51/5265 |
| | | | 257/40 |
| 2011/0216056 | A1 | 9/2011 | Yoo et al. |
| 2011/0260951 | A1 | 10/2011 | Hwang et al. |
| 2011/0291549 | A1 | 12/2011 | Kim et al. |
| 2011/0291550 | A1 | 12/2011 | Kim et al. |
| 2011/0298836 | A1 | 12/2011 | Komiya et al. |
| 2011/0316892 | A1 | 12/2011 | Sung et al. |
| 2012/0049726 | A1 | 3/2012 | Yoo et al. |
| 2012/0056531 | A1 | 3/2012 | Park et al. |
| 2012/0086330 | A1 | 4/2012 | Umeda et al. |
| 2012/0176298 | A1 | 7/2012 | Suh et al. |
| 2012/0287605 | A1 | 11/2012 | Chen et al. |
| 2012/0313844 | A1 | 12/2012 | Im et al. |
| 2012/0319564 | A1 | 12/2012 | Ghosh et al. |
| 2013/0002911 | A1 | 1/2013 | Miyashita et al. |
| 2013/0037827 | A1 | 2/2013 | Levermore et al. |
| 2013/0057521 | A1 | 3/2013 | Kim |
| 2013/0106891 | A1 * | 5/2013 | Matsueda ........... G09G 3/2003 |
| | | | 345/589 |
| 2013/0127689 | A1 | 5/2013 | Collier |
| 2014/0191202 | A1 | 7/2014 | Shim et al. |
| 2015/0187273 | A1 | 7/2015 | Chang et al. |
| 2015/0192834 | A1 | 7/2015 | Morinaga et al. |
| 2016/0124557 | A1 | 5/2016 | Choi |
| 2016/0171930 | A1 | 6/2016 | Song et al. |
| 2016/0190166 | A1 | 6/2016 | Kim et al. |
| 2019/0333970 | A1 | 10/2019 | Lee |
| 2020/0394955 | A1 | 12/2020 | Lee |
| 2022/0319406 | A1 | 10/2022 | Lee |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101009304 A | 8/2007 |
| CN | 100439989 C | 12/2008 |
| CN | 100448020 C | 12/2008 |
| CN | 101449382 A | 6/2009 |
| CN | 102354479 A | 2/2012 |
| CN | 103311266 A | 9/2013 |
| CN | 203260586 U | 10/2013 |
| CN | 105206647 A | 12/2015 |
| EP | 0 322 106 A2 | 6/1989 |
| EP | 1168448 A2 | 1/2002 |
| EP | 1450408 A2 | 8/2004 |
| EP | 2 637 209 A1 | 9/2013 |
| GB | 2 437 110 A | 10/2007 |
| JP | 02-000826 A | 1/1990 |

SDC-1351-00132911

JX-0005.3

## US 11,594,578 B2
Page 3

(56)        **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 03-078390 | A | 4/1991 |
| JP | 3-36239 | | 5/1991 |
| JP | 8-227276 | A | 9/1996 |
| JP | 08-335060 | A | 12/1996 |
| JP | 09-182091 | A | 7/1997 |
| JP | 10-39791 | A | 2/1998 |
| JP | 2000-235891 | | 8/2000 |
| JP | 2001-33757 | A | 2/2001 |
| JP | 2001-54127 | A | 2/2001 |
| JP | 2001-76881 | A | 3/2001 |
| JP | 3203907 | B2 | 9/2001 |
| JP | 2001-290441 | A | 10/2001 |
| JP | 2003-203770 | A | 7/2003 |
| JP | 2004-507773 | | 3/2004 |
| JP | 2004-179028 | A | 6/2004 |
| JP | 2004-192813 | | 7/2004 |
| JP | 2005-5227 | A | 1/2005 |
| JP | 2005-62416 | A | 3/2005 |
| JP | 2005-63787 | A | 3/2005 |
| JP | 2005-515505 | A | 5/2005 |
| JP | 2006-18195 | A | 1/2006 |
| JP | 2006-163316 | A | 6/2006 |
| JP | 2006-309182 | | 11/2006 |
| JP | 2007-156126 | A | 6/2007 |
| JP | 2008-015521 | | 1/2008 |
| JP | 2008-277264 | A | 11/2008 |
| JP | 2008-298966 | A | 12/2008 |
| JP | 2008-300367 | | 12/2008 |
| JP | 2009-230096 | A | 10/2009 |
| JP | 2010-3880 | A | 1/2010 |
| JP | 2010-153173 | A | 7/2010 |
| JP | 2011-076760 | | 4/2011 |
| JP | 2011-198761 | A | 10/2011 |
| JP | 2012-15129 | A | 1/2012 |
| JP | 2012-19206 | A | 1/2012 |
| JP | 2012-028170 | A | 2/2012 |
| JP | 2012-79631 | A | 4/2012 |
| JP | 5177957 | B2 | 4/2013 |
| KR | 10-2004-0096706 | A | 11/2004 |
| KR | 10-2006-0118868 | A | 11/2006 |
| KR | 10-0742370 | B1 | 7/2007 |
| KR | 10-0807524 | | 2/2008 |
| KR | 10-2008-0111130 | | 12/2008 |
| KR | 10-2009-0017910 | | 2/2009 |
| KR | 10-2009-0049515 | A | 5/2009 |
| KR | 10-2011-0023996 | | 3/2011 |
| KR | 10-2011-0039773 | A | 4/2011 |
| KR | 10-1056258 | B1 | 8/2011 |
| KR | 10-2011-0106565 | | 9/2011 |
| KR | 10-2011-0108050 | A | 10/2011 |
| KR | 10-2011-0117613 | A | 10/2011 |
| KR | 10-2011-0129531 | | 12/2011 |
| KR | 10-2012-0000887 | A | 1/2012 |
| KR | 10-2012-0014074 | A | 2/2012 |
| KR | 10-2012-0022967 | | 3/2012 |
| KR | 10-1332495 | B1 | 11/2013 |
| KR | 10-2020-0000840 | A | 1/2020 |
| TW | 200305126 | A | 10/2003 |
| TW | I277930 | B | 4/2007 |
| TW | I328207 | | 8/2010 |
| WO | WO 03/053068 | A2 | 6/2003 |
| WO | WO 03/060870 | A1 | 7/2003 |
| WO | WO 2004/073356 | A1 | 8/2004 |
| WO | WO 2005/067352 | A1 | 7/2005 |

OTHER PUBLICATIONS

English Abstract of TW 2008-02221 A, also published as TW I328207.
EPO Search Report dated Jul. 8, 2013, for corresponding European Patent application 13157562.3, (6 pages).
EPO Search Report dated Dec. 20, 2013 for European Patent application 13178648.5, (9 pages).

EPO Search Report dated Jul. 9, 2014, for European Patent application 14155124.2, (8 pages).
JPO Office action dated Feb. 16, 2016, for corresponding Japanese Patent application 2012-108855, (5 pages).
Korean Patent Abstracts, Publication No. 1020030031207A, dated Apr. 21, 2003 for corresponding Korean Patent 10-0807524.
Korean Patent Abstracts for Korean Publication 1020070055908 dated May 31, 2007, to Korean Patent 10-0742370 dated Jul. 24, 2007.
KIPO Office action dated Jul. 11, 2016, with English translation, for corresponding Korean Patent application 10-2016-0047800, (11 pages).
SIPO Office action dated Mar. 11, 2015, for corresponding Chinese Patent application 201310035429.X, (7 pages).
Taiwan Office action dated Mar. 30, 2015, for corresponding Taiwanese Patent application 102101000, (7 pages).
TIPO Office Action dated Oct. 11, 2016, for corresponding Taiwanese Patent Application No. 102124953 (6 pages).
EPO Communication Pursuant to Article 94(3) EPC, for Patent Application No. 13 178 648.5, dated Jan. 31, 2019, 8 pages.
U.S. Office action dated Aug. 29, 2014, for cross reference U.S. Appl. No. 14/059,356, (18 pages).
U.S. Office action dated Jun. 30, 2015, for cross reference U.S. Appl. No. 13/872,018, (22 pages).
U.S. Office action dated Oct. 16, 2015, for cross reference U.S. Appl. No. 13/872,018, (16 pages).
U.S. Office action dated Feb. 29, 2016, for cross reference U.S. Appl. No. 13/872,018, (15 pages).
U.S. Office action dated Aug. 5, 2016, for related U.S. Appl. No. 15/090,591 (11 pages).
U.S. Office Action dated Sep. 2, 2016 for U.S. Appl. No. 13/872,018 (15 sheets).
U.S. Office Action dated May 11, 2017, issued in cross-reference U.S. Appl. No. 13/872,018 (16 pages).
U.S. Office Action dated Mar. 19, 2018, issued in U.S. Appl. No. 15/688,760 (13 pages).
U.S. Office Action dated Sep. 3, 2019, issued in U.S. Appl. No. 16/261,437 (11 pages).
U.S. Office Action dated Oct. 21, 2020, issued in U.S. Appl. No. 16/882,384 (24 pages).
U.S. Office Action dated Apr. 13, 2021, issued in U.S. Appl. No. 17/005,753 (22 pages).
U.S. Final Office Action dated Nov. 24, 2021, issued in U.S. Appl. No. 17/005,753 (13 pages).
U.S. Office Action dated Nov. 3, 2022, issued in U.S. Appl. No. 17/808,984 (25 pages).
U.S. Office Action dated Nov. 10, 2022, issued in U.S. Appl. No. 17/865,304 (23 pages).
Chinese Office action dated Sep. 13, 2022, issued in corresponding Chinese Patent Application No. 201910040602.2 (9 pages).
U.S. Office Action dated Oct. 14, 2022, issued in U.S. Appl. No. 17/808,982 (25 pages).
U.S. Office Action dated Oct. 14, 2022, issued in U.S. Appl. No. 17/808,983 (23 pages).
U.S. Office Action dated Sep. 19, 2022, issued in U.S. Appl. No. 17/808,985 (25 pages).
U.S. Office Action dated Jul. 8, 2022, issued in U.S. Appl. No. 17/005,753 (48 pages).
U.S. Restriction Requirement from U.S. Appl. No. 13/614,197, dated Aug. 18, 2014, 7 pages.
U.S. Advisory Action from U.S. Appl. No. 13/614,197, dated May 18, 2015, 3 pages.
U.S. Office Action from U.S. Appl. No. 13/614,197, dated Dec. 2, 2015, 11 pages.
U.S. Advisory Action from U.S. Appl. No. 13/614,197, dated Feb. 5, 2016, 3 pages.
U.S. Ex Parte Quayle Action from U.S. Appl. No. 13/614,197, dated Jan. 5, 2017, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 13/614,197, dated Mar. 22, 2017, 7 pages.
U.S. Notice of Allowance from U.S. Appl. No. 13/614,197, dated Jul. 11, 2017, 7 pages.

SDC-1351-00132912

JX-0005.4

(56)     **References Cited**

OTHER PUBLICATIONS

U.S. Restriction Requirement from U.S. Appl. No. 13/872,018, dated Nov. 5, 2014, 8 pages.

U.S. Office Action from U.S. Appl. No. 13/872,018, dated Oct. 16, 2015, 15 pages.

U.S. Advisory Action from U.S. Appl. No. 13/872,018, dated Dec. 8, 2015, 3 pages.

U.S. Office Action from U.S. Appl. No. 13/872,018, dated Jun. 23, 2016, 12 pages.

U.S. Advisory Action from U.S. Appl. No. 13/872,018, dated Nov. 14, 2016, 3 pages.

U.S. Patent Board Decision from U.S. Appl. No. 13/872,018, dated Dec. 2, 2019, 8 pages.

U.S. Notice of Allowance from U.S. Appl. No. 13/872,018, dated Feb. 19, 2020, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 13/872,018, dated May 28, 2020, 5 pages.

U.S. Office Action from U.S. Appl. No. 14/059,356, dated Jun. 18, 2015, 15 pages.

U.S. Notice of Allowance from U.S. Appl. No. 14/059,356, dated Sep. 10, 2015, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 14/059,356, dated Nov. 25, 2015, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 14/059,356, dated Apr. 27, 2016, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 15/090,591, dated Feb. 13, 2017, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 15/688,760, dated Sep. 14, 2018, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 15/688,760, dated Jan. 30, 2019, 5 pages.

U.S. Restriction Requirement from U.S. Appl. No. 15/811,599, dated Mar. 28, 2018, 7 pages.

U.S. Notice of Allowance from U.S. Appl. No. 15/811,599, dated Feb. 14, 2019, 7 pages.

U.S. Office Action from U.S. Appl. No. 15/811,599, dated Jan. 21, 2020, 18 pages.

U.S. Notice of Allowance from U.S. Appl. No. 15/811,599, dated Mar. 31, 2020, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 15/811,599, dated Jul. 10, 2020, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Jan. 10, 2020, 6 pages.

U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Apr. 27, 2020, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Aug. 14, 2020, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Dec. 28, 2020, 5 pages.

Decision by the Intellectual Property Trial and Appeal Board (IPTAB) of the Korean Intellectual Property Office (KIPO) on Patent Cancellation Request of Korean Patent No. KR 2115531 (corresponding to U.S. Pat. No. 9,818,803) dated Mar. 16, 2021, 12 pages.

English translation of Decision by the Intellectual Property Trial and Appeal Board (IPTAB) of the Korean Intellectual Property Office (KIPO) on Patent Cancellation Request of Korean Patent No. KR 2115531 (corresponding to U.S. Pat. No. 9,818,803) dated Mar. 16, 2021, 15 pages.

English translation of Petition for Patent Invalidation of Chinese Patent No. ZL20131035429.X (corresponding to U.S. Pat. No. 9,818,803) dated Dec. 22, 2020, 31 pages.

English translation of Petition for Patent Invalidation of Chinese Patent No. ZL201510595095.0 (corresponding to U.S. Pat. No. 9,818,803) dated Jan. 22, 2021, 26 pages.

U.S. Final Office Action dated Jan. 4, 2023, issued in U.S. Appl. No. 17/808,985 (27 pages).

* cited by examiner

SDC-1351-00132913

JX-0005.5

# FIG.1



SDC-1351-00132914

JX-0005.6

FIG.2



SDC-1351-00132915

JX-0005.7

# FIG.3



# FIG.4



SDC-1351-00132917

JX-0005.9

# FIG.5



SDC-1351-00132918

JX-0005.10

US 11,594,578 B2

**1**

# PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application is a continuation of U.S. patent application Ser. No. 15/811,599, filed Nov. 13, 2017, which is a continuation of U.S. patent application Ser. No. 13/614,197, filed Sep. 13, 2012, now U.S. Pat. No. 9,818,803, which claims priority to and the benefit of Korean Patent Application No. 10-2012-0022967, filed Mar. 6, 2012, the entire content of all of which is incorporated herein by reference.

## BACKGROUND

### 1. Field

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an organic light emitting diode (OLED) display.

### 2. Description of the Related Art

A display device is a device that displays an image. Recently, an OLED display has been drawing attention. The OLED display has a self-luminous characteristic. Because the OLED display does not need a separate light source, unlike a liquid crystal display, it can have a relatively smaller thickness and weight than liquid crystal displays. In addition, the OLED display exhibits high-quality characteristics such as low power consumption, high luminance, high response speed, etc.

In general, the OLED display includes a plurality of pixels for emitting light of different colors. The plurality of pixels emit light to display an image. Here, the pixel refers to a minimum unit for displaying the images. For instance, there may be a gate line, a data line, and a power line such as a driving power line to drive each pixel. In addition, there may be an insulation layer such as a pixel definition layer to define an area and a shape of each pixel. Further, each pixel may be positioned between its neighboring pixels.

An organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM). When reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated. On the other hand, when increasing the gap between the pixels to improve the deposition reliability, the aperture ratio of the pixel may be deteriorated.

The above information disclosed in this Background section is only for enhancement of understanding of the background of the invention. Therefore, it may contain information that does not form the prior art that is already known in this country to a person of ordinary skill in the art.

## SUMMARY

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an OLED display. More particularly, aspects relate to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels. An exemplary embodiment of the present invention provides a pixel

**2**

arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels.

According to an exemplary embodiment of the present invention, a pixel arrangement structure of an organic light emitting diode display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

The second pixel may include a pair of second pixels. The second pixels may be separated from each other by the first pixel.

The third pixel may include a pair of third pixels. The third pixels may be separated from each other by the first pixel.

The second pixels and the third pixels may enclose the first pixel in the virtual square.

The first pixel, the second pixel, and the third pixels may have polygonal shapes. The second pixels and the third pixels may have a larger area than the first pixel.

The first pixel may have a quadrilateral shape. The second pixels and the third pixels may have hexagonal or octagonal shapes.

The second pixels and the third pixels may have octagonal shapes.

The second pixels and the third pixels may have a same area. A distance between the first pixel and the second pixels, a distance between the first pixel and the third pixels, and a distance between the second pixels and the third pixels may be a same first length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a second length that is longer than the first length.

The second pixels may have a larger area than the third pixels. A distance between the second pixels and the third pixels may be a first length. A distance between the first pixel and the second pixels, and a distance between the first pixel and the third pixels may be a same second length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other. A distance between the neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other.

The second pixels may have a larger area than the third pixels.

The third pixels may have a larger area than the second pixels.

The first pixel, the second pixel, and the third pixel may be configured to emit different color lights.

The first pixel, the second pixel, and the third pixel may be configured to emit green light, blue light, and red light, respectively.

SDC-1351-00132919

JX-0005.11

US 11,594,578 B2

3

According to an exemplary embodiment of the present invention, the pixel arrangement structure of the OLED display improves the aperture ratio of the pixel while efficiently setting up the gap between the pixels.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a view of a pixel arrangement structure of an OLED display according to a first exemplary embodiment.

FIG. 2 is a view of a pixel arrangement structure of an OLED display according to a second exemplary embodiment.

FIG. 3 is a view of a pixel arrangement structure of an OLED display according to a third exemplary embodiment.

FIG. 4 is a view of a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment.

FIG. 5 is a view of a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment.

## DETAILED DESCRIPTION

Several exemplary embodiments according to the present invention are described hereinafter in detail with reference to the accompanying drawings to allow one of a person of ordinary skill in the art to practice the invention without undue experimentation. The present invention can be embodied in several different forms, and is not limited to exemplary embodiments that are described herein.

In order to clarify the description of embodiments of the present invention, parts that are not related to the embodiments may be omitted. In addition, the same elements or equivalents are referred to with the same reference numerals throughout the specification. For example, the same reference numerals are used for the elements having the same constructions throughout. Such elements are representatively described in a first exemplary embodiment, and in remaining exemplary embodiments, only different constructions from those of the first exemplary embodiment may be described.

Further, since sizes and thicknesses of constituent members shown in the accompanying drawings are arbitrarily given for better understanding and ease of description, the present invention is not limited to the illustrated sizes and thicknesses. In addition, unless explicitly described to the contrary, the word "comprise" or variations such as "comprises" or "comprising" will be understood to imply the inclusion of stated elements but not the exclusion of any other elements.

Nevertheless, even though each of the pixels are drawn as stereotypical polygonal shapes in the drawings, the present invention is not limited to this shape. That is, the shapes of the pixels may be modified to avoid interference with the other components of the OLED (e.g., wirings) within the spirit and scope of the appended claims.

A pixel arrangement structure (or pixel arrangement) of an OLED display according to a first exemplary embodiment will be described with reference to FIG. 1. FIG. 1 is a view schematically showing a portion of pixels forming an OLED display.

As shown in FIG. 1, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Here, the pixel refers to a minimum unit for displaying an image (for example, the minimum addressable unit of the display).

4

Further, among the first pixels 100, the second pixels 200, and the third pixels 300, power lines for driving each of the pixels, such as a gate line, a data line, a driving power line, and the like, may be located. In addition, an insulation layer, such as a pixel defining layer, for defining each of the pixels may be disposed. Finally, an OLED including an anode, an organic emission layer, and a cathode to correspond to each of the first pixels 100, the second pixels 200, and the third pixels 300 may be disposed. These configurations are technologies known in the art and further description thereof is omitted for ease of description. A shape of each of the pixels may be defined by the power lines, the pixel defining layer, the anode, or the like, but is not limited thereto.

In the pixel arrangement of FIG. 1, each of the first pixels 100 has a smaller area than neighboring second pixels 200 and third pixels 300, and has a quadrilateral (i.e., four-sided) shape among polygon shapes. For example, in the pixel arrangement of FIG. 1, each of the first pixels 100 has the same quadrilateral shape (e.g., a square or rhombus). The first pixels 100 are spaced apart from each other and arranged in rows, such as along a first virtual straight line VL1. The first pixels 100 emit green light, and may include an organic emission layer for emitting green light.

The second pixels 200 are arranged diagonally with respect to the first pixels 100, such as at first vertices P1 along one diagonal of a virtual square VS having one of the first pixels 100 as a center point (or center) of the virtual square VS. In a similar fashion, the third pixels 300 are arranged diagonally with respect to the first pixels 100, such as at second vertices P2 along the other diagonal of the virtual square VS.

In the virtual square VS, each of the second pixels 200 is separated from the first pixel 100, and is centered at one of the first vertices P1 of the virtual square VS. Each of the second pixels 200 has a larger area than the neighboring first pixel 100 and has an octagonal (i.e., eight-sided) shape. In FIG. 1, the second pixels 200 each have the same octagonal shape. In addition, the second pixels 200 are arranged diagonally and separated from each other by the first pixels 100. The second pixels 200 emit blue light, and may include an organic emission layer for emitting blue light.

In a similar fashion, in the virtual square VS, each of the third pixels 300 is separated from the first pixel 100 and the second pixels 200, and is centered at one of the second vertices P2 neighboring the first vertices P1 of the virtual square VS. Each of the third pixels 300 has a larger area than the neighboring first pixel 100 and the same area as each of the second pixels 200. Further, the third pixels have an octagonal shape (e.g., similar to or the same as the second pixels 200). In FIG. 1, the third pixels 300 each have the same octagonal shape. In addition, the third pixels 300 are arranged diagonally and separated from each other by the first pixels 100. The third pixels 300 emit red light, and may include an organic emission layer for emitting red light.

The third pixels 300 and the second pixels 200 are spaced apart from each other and alternately arranged in rows, such as along a second virtual straight line VL2. In a similar fashion, the third pixels 300 and the second pixels 200 are spaced apart from each other and alternately arranged in columns. Accordingly, in the virtual square VS, two of the second pixels 200 having their corresponding centers positioned at the first vertices P1 and two of the third pixels 300 having their corresponding centers positioned at the second vertices P2 to enclose a corresponding one of the first pixels 100 (e.g., in the virtual square VS).

As described above, the center of each of the second pixels 200 is positioned at one of the first vertices P1 of the

SDC-1351-00132920

JX-0005.12

US 11,594,578 B2

5

virtual square VS. In addition, the center of the corresponding first pixel **100** is the center of the virtual square VS. Further, the center of each of the third pixels **300** is positioned at one of the second vertices P2. Moreover, the second pixels **200** and the third pixels **300** each have the same area.

As a non-limiting example, the distance (e.g., a shortest distance) between one of the first pixels **100** and an adjacent one of the second pixels **200** is a first length L1, the distance between one of the first pixels **100** and an adjacent one of the third pixels **300** is the same first length L1, and the distance between one of the second pixels **200** and an adjacent one of the third pixels **300** is the same first length L1, as shown in FIG. **1**. In addition, the distance (e.g., a shortest distance) between the neighboring first pixels **100** is a second length L2 that is longer than the first length L1. It should be noted that L1, L2, L3, . . . may be used throughout to represent shortest distances between corresponding pixels.

Therefore, the gap of the first length L1 is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, between adjacent pairs of the first pixels **100** and the third pixels **300**, and between adjacent pairs of the second pixels **200** and the third pixels **300**. In addition, the gap of the second length L2 that is longer than the first length L1 is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, a manufacturing time and manufacturing cost of the entire OLED display may be reduced and the display quality of the image of the OLED display may be improved.

As described above, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** have polygonal shapes (e.g., the first pixels **100** have a quadrilateral shape and the second pixels **200** and the third pixels **300** have an octagonal shape). In addition, it is worth considering that the deposition process of the organic emission layer is one of the unique manufacturing characteristics of the OLED display. Accordingly, to improve the deposition reliability of the organic emission layer in the deposition process using the fine metal mask and to improve the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300**, the center of each of the first pixels **100** is positioned at the center of a virtual square VS formed by a first pair of diagonal vertices P1 and a second pair of diagonal vertices P2. In the virtual square VS, the centers of a pair of the second pixels **200** are positioned at the first vertices P1, and the centers of a pair of the third pixels **300** are positioned at the second vertices P2.

In addition, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** respectively emit green, blue, and red light. However, in pixel arrangement structures of other OLED displays, the first pixels **100**, the second pixels **200**, and the third pixels **300** may emit light of different colors. For example, at least one of the second pixels **200** or the third pixels may emit white light.

Next, a pixel arrangement structure of an OLED display according to a second exemplary embodiment will be described with reference to FIG. **2**. Parts that are different from the exemplary embodiment of FIG. **1** will be described,

6

while the description of parts that are equivalent to the first exemplary embodiment may be omitted. For better comprehension and ease of description, constituent elements of the second exemplary embodiment that are the same as or similar to those of the first embodiment of FIG. **1** will have the same reference numerals.

As shown in FIG. **2**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. The plurality of first pixels **100** have the same quadrilateral shape (e.g., a parallelogram). In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels **300** may have polygonal shapes, such as octagonal or hexagonal (i.e., six-sided).

In a similar fashion to that of FIG. **1**, the centers of a pair of the second pixels **200** are positioned at first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. **2**, the second pixels **200** have a larger area than the third pixels **300**.

As a non-limiting example, the distance between adjacent ones of the second pixels **200** and the third pixels **300** is a third length L3, while the distance between each of the first pixels **100** and adjacent ones of the second pixels **200** or the third pixels **300** have a same fourth length L4. In addition, the distance between neighboring ones of the first pixels **100** is a fifth length L5 that is longer than the third length L3 and the fourth length L4.

Accordingly, the gap of the fourth length L4 is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, and between adjacent pairs of the first pixels **100** and the third pixels **300**. In addition, the gap of the third length L3 is formed between adjacent pairs of the second pixels **200** and the third pixels **300**. Further, the gap of the fifth length L5 that is longer than the third length L3 and the fourth length L4 is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. **2**, the second pixels **200** that emit blue have the shortest life span among the first pixels **100**, the second pixels **200**, and the third pixels **300**. Accordingly, the second pixels **200** have a larger area than the third pixels **300**, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display of FIG. **2** provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a third exemplary embodiment will be described with reference to FIG. **3**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of

SDC-1351-00132921

US 11,594,578 B2

7

the third exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 3, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the second pixels 200 have a larger area than the third pixels 300. The second pixels 200 and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. 1-2, the centers of a pair of the second pixels 200 are positioned at first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 3, the neighboring first pixels 100 have a quadrilateral shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by placing each of the first pixels 100 between a pair of the second pixels 200 and between a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. 3, the second pixels 200 that emit blue have the shortest life span among the first pixels 100, the second pixels 200, and the third pixels 300. Accordingly, the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment will be described with reference to FIG. 4. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fourth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 4, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the third pixels 300 have a larger area than the second pixels 200. The second pixels 200 and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. 1-3, the centers of a pair of the second pixels 200 are positioned at the first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another

8

of the virtual square VS. However, in FIG. 4, the neighboring first pixels 100 have a quadrilateral shape and are symmetrical to each other, while the third pixels 300 have a larger area than the second pixels 200. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Next, a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment will be described with reference to FIG. 5. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fifth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 5, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have an octagonal shape and are symmetrical to each other. In addition, the second pixels 200 have a larger area than the third pixels 300. The second pixels 200 and the third pixels 300 may have quadrilateral shapes (e.g., rhombus).

In a similar fashion to that of FIGS. 1-3, the centers of a pair of the second pixels 200 are positioned at the first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 5, the neighboring first pixels 100 have an octagonal shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

While this invention has been described in connection with what is presently considered to be practical exemplary embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, and equivalents thereof.

SDC-1351-00132922

JX-0005.14

US 11,594,578 B2

9 | 10

DESCRIPTION OF SOME SYMBOLS

first pixels **100**, second pixels **200**, third pixels **300**

What is claimed is:

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising:

a plurality of first pixels;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets,

wherein the first lines and the second lines are alternately arranged,

wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

wherein the third lines and the fourth lines are alternately arranged,

wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

2. The pixel arrangement structure of claim 1, wherein one of the first lines passes between the second pixels and the third pixels in corresponding adjacent ones of the second sets.

3. The pixel arrangement structure of claim 1, wherein one of the third lines passes between the second pixels and the third pixels in corresponding adjacent ones of the fourth sets.

4. The pixel arrangement structure of claim 1, wherein one of the fourth lines passes between the first pixels in corresponding adjacent ones of the third sets.

5. The pixel arrangement structure of claim 1, wherein a shortest distance between the first pixels and the second pixels, and a shortest distance between the first pixels and the third pixels, are a same first length.

6. The pixel arrangement structure of claim 1, wherein the first pixels are configured to emit green light, the second pixels are configured to emit blue light, and the third pixels are configured to emit red light.

7. The pixel arrangement structure of claim 1, wherein each of the second pixels has a same area as each of the third pixels.

8. The pixel arrangement structure of claim 7, wherein a shortest distance between the first pixels and the second pixels, a shortest distance between the second pixels and the third pixels, and a shortest distance between the first pixels and the third pixels, are a same first length.

9. The pixel arrangement structure of claim 8, wherein a shortest distance between neighboring ones of the plurality of first pixels is a second length that is greater than the first length.

10. The pixel arrangement structure of claim 1, wherein each of the second pixels has a larger area than each of the third pixels.

11. The pixel arrangement structure of claim 1, wherein each of the third pixels has a larger area than each of the second pixels.

12. The pixel arrangement structure of claim 1, wherein the first pixels, the second pixels, and the third pixels have polygonal shapes.

13. The pixel arrangement structure of claim 12, wherein neighboring ones of the plurality of first pixels have octagonal shapes that are symmetrical to each other.

14. The pixel arrangement structure of claim 12, wherein the second pixels and the third pixels have octagonal shapes.

15. The pixel arrangement structure of claim 14, wherein each of the second pixels have a same octagonal shape.

16. The pixel arrangement structure of claim 14, wherein each of the third pixels have a same octagonal shape.

17. The pixel arrangement structure of claim 1, wherein each of the first pixels has a smaller area than the second pixels and the third pixels.

18. The pixel arrangement structure of claim 1, wherein:

some of the second pixels are spaced from, and alternately arranged with, some of the first pixels in a fifth set of pixels aligned along the third direction;

the third pixels are spaced from the first pixels and the second pixels;

some of the third pixels are alternately arranged with some of the first pixels in a sixth set of pixels aligned along a fourth direction crossing the third direction;

the fifth set of pixels and the sixth set of pixels intersect at one of the first pixels that is in both the fifth set and the sixth set; and

the first pixels are different in size from at least one of the second pixels or the third pixels.

19. The pixel arrangement structure of claim 18, wherein the first pixels are configured to produce green light, the second pixels are configured to produce blue light, and wherein the third pixels are configured to produce red light.

20. The pixel arrangement structure of claim 18, wherein the first pixels are smaller in size than at least one of the second pixels or the third pixels.

21. The pixel arrangement structure of claim 18, wherein the second pixels are different in size from the third pixels.

22. The pixel arrangement structure of claim 18, wherein a shortest distance between two adjacent ones of the first pixels is greater than a shortest distance between one of the second pixels and one of the third pixels that is adjacent to the one of the second pixels, and

SDC-1351-00132923

JX-0005.15

US 11,594,578 B2

11

wherein the shortest distance between the two adjacent ones of the first pixels is different from a shortest distance between two adjacent ones of the second pixels.

23. The pixel arrangement structure of claim 1, wherein:
the plurality of second pixels comprises a first second pixel, a second second pixel, and a third second pixel;
each of the second pixels is configured to produce light having a second color;
the plurality of third pixels comprises a first third pixel, a second third pixel, and a third third pixel;
each of the third pixels is configured to produce light having a third color that is different from the second color;
the first second pixel, the first third pixel, the second second pixel, and the second third pixel form a first virtual quadrangle,
the second second pixel, the second third pixel, the third second pixel, and the third third pixel form a second virtual quadrangle;
the plurality of first pixels comprises a first first pixel in the first virtual quadrangle and a second first pixel in the second virtual quadrangle;
the first and second virtual quadrangles share a common side having endpoints at a common first vertex and a common second vertex of the first and second virtual quadrangles,
the second second pixel is arranged at the common first vertex, and the second third pixel is arranged at the common second vertex;
the plurality of first pixels further comprises a third first pixel;
the first first pixel and the third first pixel are located at opposite sides of the second second pixel;
each of the first pixels is configured to produce light having a first color that is different from the second color and the third color; and
the second pixels are larger in area than the first pixels and the third pixels.

24. The pixel arrangement structure of claim 23, wherein a first virtual line extending in the second direction, crossing a center of a second virtual line extending from the first third pixel to the second second pixel, and being perpendicular to the second virtual line, passes through the first first pixel.

25. The pixel arrangement structure of claim 23, wherein a first virtual line extending in the second direction, crossing a center of a second virtual line extending from the second second pixel to the third third pixel, and being perpendicular to the second virtual line, passes through the second first pixel.

26. The pixel arrangement structure of claim 23, wherein centers of two or more of the first pixels are aligned with each other along the first direction.

27. The pixel arrangement structure of claim 23, wherein centers of at least one of the second pixels and at least one of the third pixels are aligned with each other along the second direction.

28. The pixel arrangement structure of claim 1, wherein:
some of the second pixels are spaced from and alternately arranged with respective ones of the first pixels in a fifth set of pixels aligned along a fourth direction crossing the third direction from among the plurality of pixels;
the plurality of third pixels is spaced from the first pixels and the second pixels;

12

some of the third pixels are alternately arranged with other respective ones of the first pixels in a sixth set of pixels aligned along the third direction;
the fifth set of pixels and the sixth set of pixels intersect at one of the first pixels that corresponds to both the fifth set and the sixth set;
some of the first pixels and some of the third pixels are alternately arranged in a seventh set of pixels aligned along the fourth direction and an eighth set of pixels aligned along the third direction; and
the seventh set of pixels and the eighth set of pixels are located at sides of the fifth set of pixels.

29. The pixel arrangement structure of claim 28, wherein centers of one of the first pixels in the fifth set of pixels and one of the first pixels in the seventh set of pixels are aligned along the second direction.

30. The pixel arrangement structure of claim 28, wherein some of the first pixels and some of the second pixels are alternately arranged in each of a ninth set of pixels aligned along the fourth direction and a tenth set of pixels aligned along the fourth direction.

31. The pixel arrangement structure of claim 30, wherein the first pixels in the ninth set of pixels are arranged along the fourth direction, and wherein the second pixels in the ninth set of pixels are arranged along the fourth direction.

32. The pixel arrangement structure of claim 30, wherein the ninth set of pixels and the tenth set of pixels are arranged symmetrically with each other with respect to a column of ones of the first pixels and the third pixels arranged in the fourth direction.

33. The pixel arrangement structure of claim 28, wherein:
a shortest distance between two adjacent ones of the first pixels is greater than a shortest distance between one of the second pixels and one of the third pixels that is adjacent to the one of the second pixels; and
the shortest distance between the two adjacent ones of the first pixels is different from a shortest distance between two adjacent ones of the second pixels.

34. The pixel arrangement structure of claim 1, wherein:
the plurality of second pixels comprises a first second pixel, a second second pixel, and a third second pixel;
each of the second pixels is configured to produce light having a second color;
the plurality of third pixels comprises a first third pixel, a second third pixel, and a third third pixel;
each of the third pixels is configured to produce light having a third color that is different from the second color;
the first second pixel, the first third pixel, the second second pixel, and the second third pixel form a first virtual quadrangle;
the second second pixel, the second third pixel, the third second pixel, and the third third pixel form a second virtual quadrangle;
the plurality of first pixels comprises a first first pixel in the first virtual quadrangle, and a second first pixel in the second virtual quadrangle;
the first and second virtual quadrangles share a common side having endpoints at a common first vertex and a common second vertex of the first and second virtual quadrangles; and
the second second pixel is arranged at the common first vertex, and the second third pixel is arranged at the common second vertex.

35. The pixel arrangement structure of claim 34, wherein centers of the first second pixel and the second third pixel are aligned with each other along the first direction.

SDC-1351-00132924

JX-0005.16

US 11,594,578 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

**36.** The pixel arrangement structure of claim **34**, wherein:

the plurality of first pixels further comprises a third first pixel;

the plurality of second pixels further comprises a fourth second pixel;

the plurality of third pixels further comprises a fourth third pixel;

the first third pixel, the second second pixel, the fourth second pixel, and the fourth third pixel form a third virtual quadrangle in the second direction from the first virtual quadrangle; and

the third first pixel is located in the third virtual quadrangle.

**37.** The pixel arrangement structure of claim **36**, wherein centers of the first first pixel and the third first pixel are aligned with each other along the second direction.

**38.** The pixel arrangement structure of claim **36**, wherein the first virtual quadrangle and the third virtual quadrangle have a common side, and

wherein the first first pixel and the third first pixel are symmetrical to each other along the second direction with respect to the common side.

**39.** The pixel arrangement structure of claim **1**, wherein each of the first pixels has a non-quadrilateral polygonal shape.

**40.** The pixel arrangement structure of claim **1**,

wherein each of the first pixels has two elongated sides that are elongated in the third direction or a fourth direction crossing the third direction and different from the first and second directions, and two connection portions that connect the two elongated sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two elongated sides.

**41.** The pixel arrangement structure of claim **1**, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in the third direction or a fourth direction crossing the third direction.

**42.** A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising:

a plurality of first pixels;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

wherein the first lines and the second lines are alternately arranged,

wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

wherein the third lines and the fourth lines are alternately arranged,

wherein respective ones of the first pixels and respective ones of either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

wherein each of the second pixels has a larger area than each of the third pixels,

wherein a distance between centers of neighboring pixels of the second pixels and the third pixels is a first length,

wherein a distance between centers of neighboring pixels of the first pixels and the second pixels, and a distance between centers of neighboring pixels of the first pixels and the third pixels are a second length,

wherein a distance between centers of neighboring pixels of the first pixels is a third length that is greater than the second length, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

**43.** The pixel arrangement structure of claim **42**,

wherein each of the first pixels has two parallel sides that are elongated in the third direction or a fourth direction crossing the third direction and two connection portions that connect the two parallel sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**44.** The pixel arrangement structure of claim **42**, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in the third direction or a fourth direction crossing the third direction.

**45.** A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising:

a plurality of first pixels, wherein the first pixels have a shape comprising edges;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein only one of the second pixels and the third pixels is included in a virtual quadrangle containing outer edges comprising some of the edges of a group of four neighboring ones of the plurality of first pixels, all portions of all others of the second pixels and the third pixels being outside of the virtual quadrangle, and

wherein a shortest distance between any two of the group of four neighboring ones of the plurality of first pixels is greater than a shortest distance between the only one of the second pixels and the third pixels included in the virtual quadrangle and a nearest one of the second pixels or the third pixels in a direction perpendicular to any side of the virtual quadrangle.

**46.** The pixel arrangement structure of claim **45**, wherein the first pixels are configured to emit green light.

**47.** The pixel arrangement structure of claim **45**, wherein the virtual quadrangle does not cross any other of the first pixels, the second pixels, or the third pixels.

SDC-1351-00132925

JX-0005.17

US 11,594,578 B2

15

**48**. The pixel arrangement structure of claim **45**, wherein each of the first pixels, the second pixels, and the third pixels comprises an anode, a cathode, and an organic emission layer, at least one of the anode, the cathode, or the organic emission layer partially overlapping the pixel defining layer in a plan view.

**49**. The pixel arrangement structure of claim **45**, wherein each of the first pixels, the second pixels, and the third pixels comprises an anode, a cathode, and an organic emission layer, and

wherein the organic emission layer is formed utilizing a fine metal mask.

**50**. The pixel arrangement structure of claim **45**, wherein the first pixels have a polygonal shape different from a quadrilateral shape.

**51**. The pixel arrangement structure of claim **45**, wherein two parallel edges from among the edges of each of the first pixels are elongated in a first direction or a second direction crossing the first direction,

wherein remaining edges from among the edges of each of the first pixels connect respective first ends of the two parallel edges to each other and connect respective second ends of the two parallel edges to each other, and

wherein a total length of the remaining edges between at least one of the first ends or the second ends is greater than a shortest distance between the two parallel edges.

**52**. The pixel arrangement structure of claim **45**, wherein a shortest distance between two parallel edges that are elongated in a first direction or a second direction crossing the first direction from among the edges of one of the group of four neighboring ones of the plurality of first pixels is less than a shortest distance between the one of the group of four neighboring ones of the plurality of first pixels and the only one of the second pixels and the third pixels included in the virtual quadrangle.

**53**. A display comprising:

a plurality of first pixel rows, each of the first pixel rows comprising a plurality of first pixels arranged along a first direction;

a plurality of second pixel rows alternately arranged with the plurality of first pixel rows along a second direction crossing the first direction, each of the second pixel rows comprising a plurality of second pixels and a plurality of third pixels that are alternately arranged along the first direction;

a plurality of first pixel groups, each of the first pixel groups comprising a first one of the first pixels and one of the second pixels neighboring the first one of the first pixels; and

a plurality of second pixel groups, each of the second pixel groups comprising a second one of the first pixels and one of the third pixels neighboring the second one of the first pixels,

wherein the first pixel groups and the second pixel groups are alternately arranged along the first direction,

wherein a shortest distance between two nearest ones of the first pixels in the second direction is greater than a width in the second direction of at least one of the second pixels or the third pixels, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first pixel rows is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second pixel rows.

**54**. The display of claim **53**, wherein the first pixel groups and the second pixel groups are alternately arranged along the second direction.

16

**55**. The display of claim **53**, wherein:

the first pixels are arranged on a plurality of first pixel columns extending in the second direction;

the second pixels and the third pixels are alternately arranged on a plurality of second pixel columns extending in the second direction; and

the first pixel columns and the second pixel columns are alternately arranged along the first direction.

**56**. The display of claim **53**, wherein:

the first pixel groups are arranged in a plurality of first pixel sets along a first diagonal direction crossing the first direction and the second direction;

the second pixel groups are arranged in a plurality of second pixel sets along the first diagonal direction; and

the first pixel sets and the second pixel sets are alternately arranged along a second diagonal direction crossing the first diagonal direction.

**57**. The display of claim **56**, wherein the first pixels and the second pixels in the first pixel sets are alternately arranged along the first diagonal direction.

**58**. The display of claim **56**, wherein the first pixels and the third pixels in the second pixel sets are alternately arranged along the first diagonal direction.

**59**. The display of claim **56**, wherein the first pixel groups are arranged in a plurality of third pixel sets along the second diagonal direction, wherein the second pixel groups are arranged in a plurality of fourth pixel sets along the second diagonal direction, and wherein the third pixel sets and the fourth pixel sets are alternately arranged along the first diagonal direction.

**60**. The display of claim **59**, wherein the first pixels in the first pixel groups are elongated in the second diagonal direction, and wherein the first pixels in the second pixel groups are elongated in the first diagonal direction.

**61**. The display of claim **53**, wherein a virtual quadrangle formed by centers of two adjacent ones of the first pixels and centers of one of the second pixels and one of the third pixels that are adjacent to the two adjacent ones of the first pixels has a rhombus shape.

**62**. The display of claim **53**, wherein each of the first pixels has two parallel sides that are elongated in a first diagonal direction crossing the first direction and the second direction or a second diagonal direction crossing the first diagonal direction, and

wherein the two parallel sides are parallel to at least one side of the second pixels or the third pixels.

**63**. The display of claim **53**, wherein each of the first pixels has two parallel sides that are elongated in a first diagonal direction crossing the first direction and the second direction or a second diagonal direction crossing the first diagonal direction, and two connection portions that connect the two parallel sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**64**. The display of claim **53**, wherein the first pixels and the second pixels are alternately arranged along a first diagonal direction crossing the first direction and the second direction, and

wherein an imaginary line extending in the first direction through upper edges or lower edges of ones of the second pixels overlaps only the ones of the second pixels, the upper edges and the lower edges being defined with respect to the second direction.

SDC-1351-00132926

JX-0005.18

US 11,594,578 B2

17                                                              18

**65**. The display of claim **53**, wherein each of the third pixels is larger than any of the first pixels, and wherein each of the second pixels is larger than any of the first pixels and the third pixels.

**66**. The display of claim **53**, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in a first diagonal direction crossing the first direction and the second direction, or a second diagonal direction crossing the first diagonal direction.

**67**. A display comprising a plurality of pixels for displaying an image, the plurality of pixels comprising:

a plurality of first pixels to produce light of a first color;

a plurality of second pixels to produce light of a second color different from the first color;

a plurality of third pixels to produce light of a third color different from the first color and the second color,

wherein the plurality of pixels is organized into a plurality of first pixel rows and a plurality of second pixel rows that are alternately arranged along a column direction,

wherein each of the first pixel rows comprises some of the first pixels and some of the second pixels that are alternately arranged along a row direction substantially perpendicular to the column direction,

wherein each of the second pixel rows comprises some of the first pixels and some of the third pixels that are alternately arranged along the row direction,

wherein the first pixels in the second pixel rows are entirely outside a region extending in the row direction and completely overlapping the first pixels in one of the first pixel rows that is adjacent to the second pixel rows, and

wherein a shortest distance between two nearest ones of the first pixels in a third direction crossing the row direction and the column direction is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in the third direction.

**68**. The display of claim **67**, wherein:

the first pixels and the second pixels are alternately arranged along the column direction in a plurality of first pixel columns;

the first pixels and the third pixels are alternately arranged along the column direction in a plurality of second pixel columns; and

the first pixel columns and the second pixel columns are alternately arranged along the row direction.

**69**. The display of claim **68**, wherein centers of the first pixels on the first pixel columns are aligned in the column direction.

**70**. The display of claim **68**, wherein centers of the first pixels on the second pixel columns are aligned in the column direction.

**71**. The display of claim **68**, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the first pixel columns.

**72**. The display of claim **68**, wherein each of the first pixels is at an intersection of one of the first pixel rows and one of the second pixel columns only, or at an intersection of one of the second pixel rows and one of the first pixel columns only.

**73**. The display of claim **68**, wherein:

centers of corresponding ones of the second pixels are aligned in the first pixel rows and in the first pixel columns; and

centers of corresponding ones of the third pixels are aligned in the second pixel rows and in the second pixel columns.

**74**. The display of claim **73**, wherein:

two neighboring ones of the pixels on one of the first pixel rows and two neighboring ones of the pixels on one of the second pixel rows adjacent to the one of the first pixel rows form a virtual square; and

only the two neighboring ones of the pixels on the one of the first pixel rows and the two neighboring ones of the pixels on the one of the second pixel rows are in an area of the virtual square.

**75**. The display of claim **67**, wherein:

each of the first pixel rows comprises a plurality of first pixel groups, each of the first pixel groups consisting of one of the first pixels and one of the second pixels adjacent to the one of the first pixels on a corresponding first pixel row; and

each of the second pixel rows comprises a plurality of second pixel groups, each of the second pixel groups consisting of one of the first pixels and one of the third pixels adjacent to the one of the first pixels on a corresponding second pixel row.

**76**. The display of claim **67**, wherein centers of corresponding ones of the first pixels on the first pixel rows are aligned in the row direction.

**77**. The display of claim **67**, wherein centers of corresponding ones of the first pixels on the second pixel rows are aligned in the row direction.

**78**. The display of claim **67**, wherein all of the pixels on the second pixel rows are offset entirely in the column direction from the first pixels on the first pixel rows.

**79**. The display of claim **67**, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the second pixel rows.

**80**. The display of claim **67**, wherein the first color is green, the second color is blue, and the third color is red.

**81**. The display of claim **67**,

wherein each of the first pixels has two parallel sides that are elongated in the row direction or the column direction, and two connection portions that connect the two parallel sides to each other at respective ends of the two parallel sides, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**82**. The display of claim **67**, wherein an imaginary line extending in the row direction through upper edges or lower edges of ones of the second pixels overlaps only the ones of the second pixels, the upper edges and the lower edges being defined with respect to the column direction.

**83**. The display of claim **67**, wherein each of the third pixels is larger than any of the first pixels, and wherein each of the second pixels is larger than any of the first pixels and the third pixels.

**84**. The display of claim **67**, wherein a shortest distance between two parallel sides that are elongated in the row direction of one of the first pixels is less than a shortest distance between one of the two parallel sides and a nearest one of the second pixels in the column direction.

**85**. A display comprising:

a plurality of first pixel rows, each of the first pixel rows comprising a plurality of first pixels arranged along a first direction;

a plurality of second pixel rows alternately arranged with the plurality of first pixel rows along a second direction

SDC-1351-00132927

JX-0005.19

US 11,594,578 B2

19

crossing the first direction, each of the second pixel rows comprising a plurality of second pixels and a plurality of third pixels that are alternately arranged along the first direction;

a plurality of first pixel groups, each of the first pixel groups comprising a first one of the first pixels and one of the second pixels neighboring the first one of the first pixels; and

a plurality of second pixel groups, each of the second pixel groups comprising a second one of the first pixels and one of the third pixels neighboring the second one of the first pixels,

wherein the first pixel groups and the second pixel groups are alternately arranged along the first direction,

wherein each of the first pixels is elongated in a first diagonal direction crossing the first direction and the second direction or a second diagonal direction crossing the first diagonal direction and has two parallel sides, and two connection portions that connect the two parallel sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**86**. The display of claim **85**, wherein the first pixel groups and the second pixel groups are alternately arranged along the second direction.

**87**. The display of claim **85**, wherein:

the first pixels are arranged on a plurality of first pixel columns extending in the second direction;

the second pixels and the third pixels are alternately arranged on a plurality of second pixel columns extending in the second direction; and

the first pixel columns and the second pixel columns are alternately arranged along the first direction.

**88**. The display of claim **85**, wherein:

the first pixel groups are arranged in a plurality of first pixel sets along the first diagonal direction;

the second pixel groups are arranged in a plurality of second pixel sets along the first diagonal direction; and

the first pixel sets and the second pixel sets are alternately arranged along the second diagonal direction.

20

**89**. A display comprising a plurality of pixels for displaying an image, the plurality of pixels comprising:

a plurality of first pixels to produce light of a first color;

a plurality of second pixels to produce light of a second color different from the first color; and

a plurality of third pixels to produce light of a third color different from the first color and the second color,

wherein the plurality of pixels is organized into a plurality of first pixel rows and a plurality of second pixel rows that are alternately arranged along a column direction,

wherein each of the first pixel rows comprises some of the first pixels and some of the second pixels that are alternately arranged along a row direction substantially perpendicular to the column direction,

wherein each of the second pixel rows comprises some of the first pixels and some of the third pixels that are alternately arranged along the row direction,

wherein each of the first pixels is elongated in the row direction or the column direction and has two parallel sides, and two connection portions that connect the two parallel sides to each other at respective ends of the two parallel sides, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**90**. The display of claim **89**, wherein:

the first pixels and the second pixels are alternately arranged along the column direction in a plurality of first pixel columns;

the first pixels and the third pixels are alternately arranged along the column direction in a plurality of second pixel columns; and

the first pixel columns and the second pixel columns are alternately arranged along the row direction.

**91**. The display of claim **90**, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the first pixel columns.

**92**. The display of claim **89**, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the second pixel rows.

* * * * *

SDC-1351-00132928

JX-0005.20

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 25-1791

**Short Case Caption:** Samsung Display Co., Ltd. v. ITC

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>13</u> number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 08/15/2025

Signature: /s/ Tarek J. Austin

Name: Tarek J. Austin

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 25-1791

**Short Case Caption:** Samsung Display Co., Ltd. v. ITC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,997 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/15/2025

Signature: /s/ Tarek J. Austin

Name: Tarek J. Austin